UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENNIS PAREN,<br>　　　　　Plaintiff<br><br>v.<br><br>JAMES CRAIGIE, INDIVIDUALLY<br>and DANIEL FREY, INDIVIDUALLY<br>　　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO.: 04-30127 --MAP

RECEIPT # 30565
AMOUNT $ 150.00
SUMMONS ISS. A
LOCAL RULE 4.1
WAIVER OF SERV.
MCF ISSUED
AO 120 OR 121
BY DPTY CLK
DATE 7/02/04

## COMPLAINT AND DEMAND FOR JURY TRIAL

### THE PARTIES

1.   The Plaintiff, Dennis Paren, is an individual residing in Longmeadow, Hampden County,

Massachusetts.

2.   The Defendant, James R. Craigie, is an individual residing in (35 Far Hills Drive, 06001)

Avon, Hartford County, Connecticut.

3.   Upon information and belief, the Defendant, Daniel Frey, is an individual residing in

(588 New Britain Avenue, 06067) Rocky Hill, Hartford County, Connecticut.

### JURISDICTION

4.   This Court has jurisdiction under 28 U.S.C. 1332, where the parties are citizens of

different states.

### FACTS

5.   The Defendants are former officers of the Top-Flite Golf Company f/k/a Spalding Sports

Worldwide, a wholly owned subsidiary of SHC, Inc. renamed TFGC Estate Inc., a

Delaware corporation headquartered in Chicopee, Massachusetts.

6.    From 1979 to 2003 Dennis Paren was an employee of said corporation holding the position of Director Insurance & Risk Management since 1989.

7.    On or about September 1998, the predecessor corporation to Spalding Sports Worldwide, Spalding & Evenflo Companies, Inc., split into two separate legal and operating entities, Evenflo Company, Inc. (Evenflo) and Spalding Sports Worldwide (SSW), with Spalding becoming the successor corporation. Spalding invited Dennis Paren to relocate from Tampa, Florida to Longmeadow, Massachusetts to work in the capacity of Director Insurance & Risk Management for both SSW and Evenflo.

8.    In reliance upon an offer for a period of employment, Dennis Paren relocated with his family to Longmeadow, Massachusetts in October 1998.

9.    Dennis Paren's position of Director Insurance & Risk Management required him to oversee and identify issues of insurance and risk for the corporation, identify potential liabilities on behalf of actors within the corporation, obtain and monitor all group insurance coverages for employees, and supervise the audit function related to business travel expense reimbursements for officers and other high level employees of SSW.

10.   From 1981 to 1999, Dennis Paren was treated as a key employee and was included in retention bonus plans designed to reward key employees involved in significant restructuring efforts of the corporation.

11.   From 1989 to 2003, Dennis Paren was treated as a key employee and was included in the Management Incentive bonus plan designed to reward key employees involved in contributing to the success of the corporation.

12.   From 1997 to 2003, Dennis Paren was treated as a key employee and was included in management stock and stock option plans designed to reward key employees involved in contributing to the success of the corporation.

13.   Beginning in 1999, Dennis Paren began reporting instances of corporate waste and potentially fraudulent and otherwise improper activities of individuals within the corporation to the President and CEO, James Craigie, as well as to the CFO, Daniel Frey.

14.   From 1999 to 2004, Dennis Paren repeatedly complained about activity engaged in by the corporation and its officers and employees; some of the activities complained of were in violation of the law.

15.   In late 1999, James Craigie instituted Spalding Principles, which were displayed on the back of every employee's corporate telephone directory and were to be strictly adhered to.  There were fourteen principles, some of which included:

    a.    We must build organizational excellence and a superior work climate.

    b.    We must be highly cost efficient.

    These were principles that every employee was supposed to strive to uphold.

16.   Instead, when Dennis Paren attempted to meet those principles, he was reprimanded, retaliated against and chilled out of everyday activities within the corporation.

17.   During James Craigie's tenure, despite the written "policies" listed in paragraph 15 above, the actual policies of the president were to support acts of cronyism, waste and allow illegal and improper activities.

18.   Additionally, James Craigie fostered the inappropriate "fraternal" corporate culture by engaging in discriminatory conduct and encouraging discriminatory statements.

19. One such example is James Craigie's statement to Dennis Paren, in front of his secretary, Roseanne Stirlacci, wherein James Craigie yelled from his office to Dennis, "Dennis, how do you expect Roseanne to remember somebody from high school, if she can't even remember who she slept with last night".

20. On or about July 2001 the corporation was fiscally unsound and the writing was on the wall for potential bankruptcy.

21. Corporate waste should have become more important to control.

22. From early 1999 through June 2003, Dennis Paren reported to Daniel Frey, the CFO, as well as to various members of the Operating Committee Members, the fiscal irresponsibility of key employees. Such reports included, but were not limited to the following:

    a. A report on the review of an advertising promotion designed by Ed Several, whereby Post Cereals was being portrayed as a huge buyer of Spalding products but in reality the majority of the products were being furnished free of charge. While this discrepancy was being discussed with Daniel Frey, Ed Several appeared in his office and Daniel Frey remarked, "speak of the devil", giving up Dennis Paren's identity as the whistleblower. Subsequently Ed Several humiliated Dennis Paren by screaming "Lead me away in hand cuffs", and even called Dennis Paren into one of his staff meetings and announced to his staff members: "From now on Dennis Paren is going to attend all of our staff meetings and he will review every promotion prior to implementation."

    b. James Craigie routinely offered extraordinary company benefits to individuals previously associated with him at his prior employer, Kraft Foods, such as signing

4

h.  Complaints on this issue were reported to the CFO, Daniel Frey, to Scott Graves, Kevin Golmont, Chief Restructuring Officer for the company employed by Kroll Zolfo Cooper, and Andy Howely, Interim CFO Officer for the company employed by Kroll Zolfo Cooper, representing the interest of the then bankrupt estate.

i.  Charles Kimmet, Director of Accounting, stated to Dennis Paren with regards to his complaints about the promissory notes forgiveness that "Dan had sent him running for the exit with his dick in his hand".

j.  In early 1999, the president of the corporation ordered Dennis Paren to arrange an automobile lease for Ed Several, Vice President Marketing Services & Custom Ball, in violation of the car allowance by adding extra costs to the president's lease and thereby reducing the cost of Ed Several's lease.

k.  Dennis Paren complained of corporate waste when James Craigie wanted to report to employees that the OCM members were not receiving merit increases in 2001 but he neglected to reveal that in late December 2000 he authorized $1,000 monthly car allowances to all of his direct reports. In November 2000, when discussing this issue with Vaughn Rist, Vaughn indicated that, "There is no way the company is going to begin a car allowance policy for OCM members because it is simply cost prohibitive given the Company's financial performance. We never gave OCM members car allowances when the Company was financially sound."

l.  Tim O'Neill, Northeastern Sales Zone Manager, and a former Kraft associate of James Craigie, in April 2001 was found creating intricate methods for receiving

company reimbursement for thousands of dollars in excess of actual expenses, and when Dennis Paren reported this to his supervisor, Lou Tursi, Executive Vice President Sales and Customer Service, Lou Tursi laughed in Paren's face.

m.     Tim O'Neill was also found giving away in excess of $50,000.00 worth of golf ball and golf club products to current and former players of the New York Yankees. When Dennis Paren reported this to Daniel Frey, he responded "Well, Tim gets us free tickets to the Yankee games and that's what KKR wants". When other acts of corporate waste related to Tim O'Neill were found, the response by Mike Waniewski, Director of Asset Protection, was "Tim works for Lou and as long as Lou protects him he is untouchable".

n.     In June 2001, Dennis Paren reported to General Counsel, Peter Arturi, of 45 double expense report submissions by Stephanie Lawrence, Vice President of Licensing, totaling to $6,750.00 and to others (CEO and President, James Craigie, VP of Human Resources, Vaughn Rist, and Daniel Frey, CFO).

o.     Lou Tursi, James Craigie, and Daniel Frey went through with the high risk sale of $4 million of product to K-Mart in order to meet on paper the EBITDA target goals they had promised to Oaktree Capital. Dennis Paren had informed management, in early December 2001, that credit insurance underwriters had reported the company had an unduly large account receivable balance with K-Mart compared to its competitors and bad debt insurance was not available on K-Mart as it was a major credit risk. Despite Paren's warning, management approved this large sales push to K-Mart in December 2001. And in fact, on or

about February 2002, K-Mart declared bankruptcy and indeed the corporation lost the majority of this money.

p.     On or about April 2002, after the restructuring of the company, the company held its previously postponed customer appreciation Hawaiian trip at a cost in excess of one million dollars; 150 people attended, including spouses.

q.     A "customer appreciation" party required the Company director responsible for the event, John Fuller, Director of Sales Planning, to advise customer invitees that 1099s would be issued to each couple in the amount of approximately $7,500.00.

r.     John Fuller did not submit the required attendee addresses and social security information and Daniel Frey did not enforce the collection of such material needed to issue the 1099s pursuant to the law.

s.     On or about August 2002, Mike Esch filed reports regarding inventory that were intentionally misleading and designed to reduce the appearance of "inventory levels".

t.     Additionally, on or about August 2002, Dennis Paren was instructed by Daniel Frey to aid in this improper activity of hiding of assets by Mike Esch, which was designed to fulfill a commitment made to Oaktree Capital to lower the investment in inventory, in preparation for the sale of Spalding.

u.     Daniel Frey acknowledged to Dennis Paren that changing insurance and accounting procedures to accomplish Mike Esch's objective was misleading and not in compliance with GAAP.

v.     Daniel Frey, nevertheless, stated in a meeting on this issue, prior to its implementation, that if the Chairman, Ed Artz, questioned the sudden decrease in

8

aa.  From November 2001 to September 2003, agents of the corporation readied the company for bankruptcy by positioning certain individuals in areas of protection to ensure job security and endorsed a "get what you can take" mentality.

bb.  The turnover in sales staff and other important employees was a result of less qualified men being placed in positions of authority for job security over others who were not connected."

cc.  Dennis Paren routinely spoke out about these practices.

dd.  Dennis Paren routinely complained about the company ignoring salary guidelines, service requirements and other guidelines when it was to their benefit.

ee.  Those that ignored the law and policies were rewarded; James Craigie, Lou Tursi, Mike Esch, Daniel Frey, and Ed Several provided themselves and their compatriots with greater salaries and unwarranted merit increases, promotions, and vacation and severance pay.

23.  On or about March 2002, the Defendants, James Craigie and Daniel Frey, excluded the Plaintiff, Dennis Paren from a retention bonus plan designed to reward key employees.

24.  Dennis Paren was excluded from this retention bonus plan, wherein all prior dates he had been included for bonuses and included as a key employee.

25.  Daniel Frey, James Craigie and others attempted to keep such a retention bonus plan secret so as to not alert Dennis Paren of his exclusion.

26.  The value of this retention bonus plan to Dennis Paren was in excess of approximately $160,000.

27.  When Dennis Paren found out about the retention bonus plan, he directly inquired as to why he was not included in the same.

28.    On or about September 15, 2003, Peter Arturi, a person with intimate knowledge, reported to Dennis Paren that Daniel Frey excluded him from the plan because "Dan stated he was a pain in the ass".

29.    Dennis Paren was publicly humiliated in the office as his financial department peers knew of his reports of wrongful acts, knew that James Craigie and Daniel Frey labeled him a "pain in the ass", knew that such management ultimately excluded Paren from his former key employee status on account of this, and knew that they had financially harmed him.

30.    Dennis Paren was harmed by his exclusion from the retention bonus plan, suffered, and was otherwise damaged.

31.    On or about June 2002 Dennis Paren became aware of the fact that he was excluded from the retention bonus program and drafted a memorandum to the president, James Craigie, outlining his accomplishments as well as why he felt it was unfair for him to be excluded from the retention bonus program, whereas before he had always been included.

32.    Peter Arturi, in-house counsel for the corporation at the time, requested that he receive the memorandum and that it would not be given to the president directly so as to protect it from disclosure to others.

33.    Peter Arturi had told Dennis Paren after reviewing his memo to the president, James Craigie, that "you have convinced me that you are a key employee".

34.    Dennis Paren contacted by email Jerry Sullivan, Risk Manager for Kohlberg, Kravis, and Roberts (KKR), and Mr. Sullivan felt so strongly that Dennis Paren was being retaliated against that he contacted Mike Lipschultz, a former director of the company.

35.    Mark Lipschultz contacted Daniel Frey to no avail.

36.   Daniel Frey called Dennis Paren to his office the next day and stated, "Do you know how long after you contacted Jerry Sullivan that I received a call from Mark Lipschultz? Not more than 20 minutes. You are not doing yourself any favors by contacting the board of directors", further humiliating Denis Paren's actions and giving the impression that the board of directors fully agreed with Daniel Frey and Jim Craigie's actions.

37.   Despite the written memorandum regarding his exclusion from the bonus retention program, he was never included; instead, James Craigie wrote on Paren's memo to Vaughn Rist, Vice President in Human Resources, and asked him how Dennis Paren "found out about the plan."

38.   Within the corporate office, it was generally known that Dennis Paren was being punished for doing his job.

39.   Lynn LaFond, Payroll Director, stated to Dennis Paren with regards to his complaints about corporate waste and the reporting of such acts to James Craigie, Daniel Frey, Peter Arturi, and Vaughn Rist and that he had been financially harmed for such reports by James Craigie and Daniel Frey, "And we all know where that got you".

40.   Andy Howley, Interim CFO, stated to Dennis Paren with regards to his upcoming memo to Scott Graves on many of the above-mentioned issues, "Then do you mind getting for me before you leave tonight the information I requested?" The implication being that this particular day would be his last as an employee after Scott Graves received the memo. And in fact Dennis Paren was dismissed just three days after he had emailed Kevin Golmont requesting an update on the promissory note tax issue.

41.    Dennis Paren suffered emotional distress damages due to the Defendants' conduct, undergoing medical treatment and incurring medical expense associated with mental and physical injuries.

## COUNT I
*(Defamation v. James Craigie)*

42.    The Plaintiff repeats and realleges the averments contained in paragraphs 1 through 40 above as if they were fully set forth herein.

43.    Based upon information and belief, the defendant James Craigie made verbal and written statements that were untrue and otherwise defamatory to third parties about Dennis Paren.

44.    These statements were not protected by privilege or otherwise protected speech.

45.    Based upon information and belief, these statements were re-published to many people.

46.    These statements caused Dennis Paren harm.

47.    Dennis Paren's reputation was harmed by these false and malicious statements.

48.    Upon information and belief, Dennis Paren's ability to secure continued employment with the purchase company (Callaway) was affected by the false statements.

49.    The damage includes loss of reputation, loss of potential future employment by Callaway and other third party corporations such as Russell, and possibly others.

50.    Damage further includes emotional distress and other injuries received due to working in the defamatory environment.

**Wherefore**, the Plaintiff, Dennis A. Paren, requests that this Court issue judgment against Defendant James Craigie and award Plaintiff damages, costs, interest, and any other relief this Court deems appropriate.

## COUNT II
*(Defamation v. Daniel Frey)*

51.    The Plaintiff repeats and realleges the averments contained in paragraphs 1 through 49 above as if they were fully set forth herein.

52.    Based upon information and belief, the defendant Daniel Frey made verbal and written statements that were untrue and otherwise defamatory to third parties about Dennis Paren.

53.    These statements were not protected by privilege or otherwise protected speech.

54.    Based upon information and belief, these statements were re-published to many people.

55.    These statements caused Dennis Paren harm.

56.    Dennis Paren's reputation was harmed by these false and malicious statements.

57.    Upon information and belief, Dennis Paren's ability to secure continued employment with the purchase company (Callaway) was affected by the false statements.

58.    The damage includes loss of reputation, loss of potential future employment by Callaway and other third party corporations such as Russell, and possibly others.

59.    Damage further includes emotional distress and other injuries received due to working in the defamatory environment.

        **Wherefore**, the Plaintiff, Dennis A. Paren, requests that this Court issue judgment against Defendant Daniel Frey and award Plaintiff damages, costs, interest, and any other relief this Court deems appropriate.

## COUNT III
*(Intentional Interference with Contractual Relations v. James Craigie)*

60.    The Plaintiff repeats and realleges the averments contained in paragraphs 1 through 58 above as if they were fully set forth herein.

61.    Defendant James Craigie retaliated against Dennis Paren by badmouthing him behind his back for doing his job regarding corporate waste, failing to recommend him for retention to the new corporation, Callaway, excluded him from the bonus retention plan in 2002, and otherwise excluded him from other opportunities and key employee benefits in retaliation for his reporting of illegal activity.

62.    Dennis Paren had a right to complain of improper activity to these persons, which was consistent with the company's policies at the time and part of his job description.

63.    The motivation of James Craigie in retaliating against Dennis Paren was based on his own personal motive and gain.

64.    Defendant James Craigie's conduct and statements were improper and intentional and interfered with Dennis Paren's existing contracts and prospective contractual relations both inside and outside the corporation.

65.    James Craigie's conduct had the effect of damaging Dennis Paren.

66.    Specifically, Dennis Paren was excluded from a bonus retention plan worth in excess of $160,000.00.

67.    Upon information and belief, Dennis Paren was excluded because he repeatedly spoke out about improper or illegal management activities.

68.    Additionally, Dennis Paren was not slated for retention by the new company because of the conduct of James Craigie in defaming his person and damaging his reputation within the corporation for being "Mr. Sunshine" and other untrue and derogatory statements.

69.    Defendant James Craigie's conduct interfered with Dennis Paren's prospective contractual relations with third parties both inside and outside the corporate structure.

70.    By reason of Defendant James Craigie's retaliation against Dennis Paren, Mr. Paren suffers from emotional distress, has been prevented from transacting his business as a risk manager and an insurance specialist for the new entity, Callaway, and has otherwise suffered damages and injuries.

**Wherefore**, the Plaintiff, Dennis A. Paren, requests that this Court issue judgment against Defendant James Craigie and award Plaintiff damages, costs, interest, and any other relief this Court deems appropriate.

**COUNT IV**
*(Intentional Interference with Contractual Relations v. Daniel Frey)*

71.    The Plaintiff repeats and realleges the averments contained in paragraphs 1 through 69 above as if they were fully set forth herein.

72.    Defendant Daniel Frey retaliated against Dennis Paren by badmouthing him behind his back for doing his job regarding corporate waste, failing to recommend him for retention to the new corporation, Callaway, excluded him from the bonus retention plan in 2002, and otherwise excluded him from other opportunities and key employee benefits in retaliation for his reporting of illegal activity.

73.    Dennis Paren had a right to complain of illegal activity to these persons, which was consistent with the company's policies at the time and part of his job description.

74.    The motivation of Daniel Frey in retaliating against Dennis Paren was based on his own personal motive and gain.

75.    Defendant Daniel Frey's conduct and statements were improper and intentional and interfered with Dennis Paren's existing contracts and prospective contractual relations both inside and outside the corporation.

76.    Daniel Frey's conduct had the effect of damaging Dennis Paren.

16

77.   Specifically, Dennis Paren was excluded from a bonus retention plan worth in excess of $160,000.00.

78.   Upon information and belief, Dennis Paren was excluded because he repeatedly spoke out about improper or illegal management activities, and he was "labeled" a pain in the ass for properly performing his duties to enforce company policies and comply with laws and regulations.

79.   Additionally, Dennis Paren was not slated for retention by the new company because of the conduct of Daniel Frey in defaming his person and damaging his reputation within the corporation for being a "Mr. Sunshine" and other untrue and derogatory statements.

80.   Defendant Daniel Frey's conduct interfered with Dennis Paren's prospective contractual relations with third parties both inside and outside the corporate structure.

81.   By reason of Defendant Daniel Frey's retaliation against Dennis Paren, Mr. Paren suffers from emotional distress, has been prevented from transacting his business as a risk manager and an insurance person for the new entity, Callaway, and has otherwise suffered damages and injuries.

**Wherefore**, the Plaintiff, Dennis A. Paren, requests that this Court issue judgment against Defendant Daniel Frey and award Plaintiff damages, costs, interest, and any other relief this Court deems appropriate.

## COUNT V
*(Intentional Interference With Advantageous Business Relations v. James Craigie)*

82.   The Plaintiff repeats and realleges the averments contained in paragraphs 1 through 80 above as if they were fully set forth herein.

17

83. Defendant James Craigie intentionally and/or recklessly interfered with Dennis Paren's advantageous business relations in that he was excluded from the bonus retention plan, his reputation was damaged within the corporate structure, and he was not slated for retention or recommended for retention by the new Callaway corporation, with the motivation of Defendant James Craigie being personal in that he wanted to insulate Dennis Paren from doing his job, which in part complained about Craigie's poor performance, immoral and unethical activity.

84. By reason of Defendant James Craigie's retaliation against Dennis Paren, he suffers from emotional distress, has been prevented from transacting his business as a risk manager and an insurance person for the new entity, Callaway and has otherwise suffered damages and injuries.

**Wherefore**, the Plaintiff, Dennis A. Paren, requests that this Court issue judgment against Defendant James Craigieand award Plaintiff damages, costs, interest, and any other relief this Court deems appropriate.

## COUNT VI
*(Intentional Interference With Advantageous Business Relations v. Daniel Frey)*

85. The Plaintiff repeats and realleges the averments contained in paragraphs 1 through 83 above as if they were fully set forth herein.

86. Defendants Daniel Frey intentionally and/or recklessly interfered with Dennis Paren's advantageous business relations in that he was excluded from the bonus retention plan, his reputation was damaged within the corporate structure, and he was not slated for retention or recommended for retention by the new Callaway corporation, with the motivation of Defendant Daniel Frey being personal in that he wanted to insulate Dennis

18

Paren from doing his job, which in part complained about Frey's poor performance and immoral and unethical activity.

87.    By reason of Defendant Daniel Frey's retaliation against Dennis Paren, he suffers from emotional distress, has been prevented from transacting his business as a risk manager and an insurance person for the new entity, Callaway and has otherwise suffered damages and injuries.

**Wherefore**, the Plaintiff, Dennis A. Paren, requests that this Court issue judgment against Defendant Daniel Frey and award Plaintiff damages, costs, interest, and any other relief this Court deems appropriate.

THE PLAINTIFF,
DENNIS A. PAREN

Date: July 2 , 2004

Lisa Brodeur-McGan, his attorney
Cooley, Shrair, P.C.
1380 Main Street
Springfield, MA 01103
BBO# 556755
Tel (413) 735-8025; Fax (413)733-3042

64356

19