# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____      :
                                         :
Dennis Paren,                            :
                                         :
                    Plaintiff,           :        Civil Action No. 04-30127-MAP
                                         :
          v.                             :
                                         :
James Craigie, Individually and          :
Daniel Frey, Individually,               :
                                         :
                    Defendants.          :
_____      :


# MEMORANDUM OF LAW OF
## DEFENDANTS JAMES CRAIGIE AND DANIEL FREY
### IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT


Jeffrey E. Poindexter, BBO #631922
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts 01115
Tel. 413-781-2820; Fax. 413-785-5060

Of Counsel:
Steven R. Wall (admitted *pro hac vice*)
Tamsin J. Newman (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103
215.963.4928/5201


Dated:  September 30, 2005

# TABLE OF CONTENTS

I.       **INTRODUCTION** ........................................................................................... 1

II.     **STATEMENT OF MATERIAL UNDISPUTED FACTS** ............................................ 2

     A.     Overview Of The Parties And The Distinct Corporate Entities Involved ............ 2

     B.     Plaintiff's Job History At Spalding ........................................................................ 3

     C.     Defendants James Craigie And Daniel Frey Join Spalding ................................... 3

     D.     The Operating Committee At Spalding ................................................................. 5

     E.     As Part Of His Job, Plaintiff Identifies Potential Areas Of Risk For The Company ............................................................................................................. 5

     F.     Spalding Suffers Financial Hardship In A Bleak Economic Climate ................... 6

     G.     The OCM Takes Steps To Ensure Continuity Of Management As The Company Prepares For A Change In Ownership .................................................... 6

     H.     The Retention Bonus Program Is Formally Adopted On April 23, 2002 ............. 9

     I.     Plaintiff Argues That He Should Have Been Selected To Participate In The Retention Bonus Program To Compensate For His Stock Losses ............... 10

     J.     Callaway Agrees To Purchase Certain Assets And Liabilities Of Spalding, And Mr. Frey Leaves Spalding On Or About June 20, 2003 ............................. 12

     K.     Mr. Craigie Leaves Spalding On Or About September 15, 2003, And Plaintiff Is Retained By New Top-Flite ............................................................. 14

     L.     After Learning That He Had Not Been Selected As A Supplemental Bonus Recipient, Plaintiff Argues, For The First Time, That He Was Not Selected Because He Reported Alleged Unlawful Or Improper Conduct .......... 14

     M.    Plaintiff Takes Action Against Mr. Craigie For Not Selecting Him For A Supplemental Retention Bonus ........................................................................... 15

     N.     Callaway's CFO Makes The Independent Decision To Eliminate The Position Held By Plaintiff ................................................................................. 17

     O.     Plaintiff Receives One Year Of Severance And Is Immediately Employed As A Consultant By Spalding's Bankrupt Estate ................................................ 18

P.     On July 2, 2004, Plaintiff Files A Charge Of Discrimination Against New Top-Flite And Initiates This Action Solely Against Mr. Craigie And Mr. Frey ............................................................................................ 18

III.     ARGUMENT .......................................................................................... 19

A.     The Summary Judgment Standard ...................................................... 19

B.     The Court Should Grant Defendants Summary Judgment With Respect To Plaintiff's Defamation Claims (Count I And II) ................................. 20

1.     The Standard For Defamation Under Massachusetts Law ..................... 21

2.     The Court Should Grant Mr. Craigie Summary Judgment With Respect To Count I ................................................................... 24

3.     The Court Should Grant Mr. Frey Summary Judgment With Respect To Count II ................................................................. 26

C.     The Court Should Grant Defendants Summary Judgment With Respect To Plaintiff's Claims For Intentional Interference With Contractual Relations And Advantageous Business Relations (Counts III Through VI) ...................... 28

1.     The Standard For Intentional Interference With Contractual Relations Or Advantageous Business Relations Under Massachusetts Law ............................................................... 29

2.     The Court Should Grant Mr. Craigie Summary Judgment With Respect To Counts III And V ............................................... 30

3.     The Court Should Grant Mr. Frey Summary Judgment With Respect To Counts IV And VI .............................................. 32

IV.     CONCLUSION ....................................................................................... 35

## TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)................................20

Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86 (1st Cir. 1996)....................20

Boudreault v. Chesapeake Biological Labs., Inc., No. 010443, 2005 WL
1812312 (Mass. Super. May 25, 2005)........................................22

Bourque v. Cape Southport Assocs., LLC, 800 N.E.2d 1077 (Mass. App. Ct.
2004) ................................................................29, 30

Bratt v. Int'l. Bus. Machs. Corp., 467 N.E.2d 126 (Mass. 1984) ........................21, 22

Carozza v. Blue Cross and Blue Shield of Mass., Inc., 14 Mass.L.Rptr. 88,
2001 WL 1517584 (Mass. Super. 2001)......................................21

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ....................................19, 20

Coholan v. Eastern Lumber Co., Inc., No. 02-P-1622, 2004 WL 1497609
(Mass. App. Ct. July 6, 2004) ........................................23

Elicier v. Toys "R" Us, Inc., 130 F. Supp. 2d 307 (D. Mass. 2001)..........................22

Fleming v. Benzaquin, 454 N.E.2d 95 (Mass. 1983).................................21

Foley v. Polaroid Corp., 508 N.E.2d 72 (Mass. 1987) ..........................................21, 22

Galdauckas v. Interstate Hotels Corp., 901 F. Supp. 454 (D.
Mass. 1995).........................................................21, 22, 25, 28

Goldhor v. Hampshire Coll., 521 N.E.2d 1381 (Mass. App. Ct. 1988)......................23

Harrison v. Netcentric Corp., 744 N.E.2d 622 (Mass. 2001) ...............................31, 33

LeBlanc v. Digital Equip. Corp., 1996 WL 1186817 (Mass. Super. 1996)................24

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)..................20

McCone v. New England Tele. and Telegraph Co., 471 N.E.2d 47 (1984)...............23

Mill-bern Assoc. Inc. v. Dallas Semiconductor Corp., 2002 WL 1340853
(Mass Supp. Ct. 2002) ................................................29

Millar Elevator Serv. Co. v. Liatsis, 12 Mass.L.Rptr. 559, 2000 WL 33171009
(Mass. Super. 2000).......................................................23

Netherwood v. Am. Fed'n of State, Cty. and Mun. Employees, 757 N.E.2d
257 (Mass. App. Ct. 2001)..................................................................................31, 33

Shea v. Emmanuel Coll., 682 N.E.2d 1348 (Mass. 1997) .........................29, 31, 32, 34

Sklar v. Beth Israel Deaconess Med. Ctr., 797 N.E.2d 381 (Mass. App. Ct.
2003) ..................................................................................................................22, 23

Thomas v. Sears, Roebuck & Co., 144 F.3d 31 (1st Cir. 1998) .....................22, 25, 28

White v. Blue Cross & Blue Shield of Mass., 809 N.E.2d 1034
    (Mass. 2004) ..................................................................................21, 26, 28, 29

Wright v. Shriners Hosp. For Crippled Children, 589 N.E.2d 1241 (Mass.
1992) ..............................................................................................................29, 32, 34

I.    __INTRODUCTION__

Plaintiff Dennis Paren alleges that as Director of Risk Management at Spalding Sports Worldwide ("Spalding"), he blew the whistle regarding alleged corporate improprieties, and that Defendants James Craigie and Daniel Frey, Spalding's CEO and CFO, retaliated against him by declining to select him for a retention bonus and terminating his employment.  However, the undisputed facts paint a very different picture.

As demonstrated below, this case is really about two things: (1) Plaintiff's resentment that he was not selected to receive a $24,000 retention bonus to compensate him for a lost investment in Spalding stock; and (2) Plaintiff's resentment that his employment with "New Top-Flite," the successor to Spalding (an entity with which Mr. Craigie and Mr. Frey had no connection) was terminated on December 5, 2003.  There is nothing more.[1]

Plaintiff asserts claims against Mr. Craigie and Mr. Frey in their individual capacities for defamation and intentional interference with his contractual and advantageous business relations. As demonstrated below, there is no factual or legal basis for Plaintiff's claims.  At a time when Spalding faced an uncertain future, Plaintiff was not selected for a retention bonus because Spalding's Operating Committee determined that Plaintiff's risk management duties were not critical to the ongoing function of the Company, and that he was not a risk to leave (indeed, Plaintiff did not leave).   Moreover, to the extent that Plaintiff raised concerns about alleged corporate improprieties, it is undisputed that Mr. Craigie and Mr. Frey believed that Plaintiff

---

[1]    As will be demonstrated below, Plaintiff suffered no damages as a result of the termination of his employment from New Top-Flite.  He immediately found substitute employment following his termination, and his income almost doubled in the following year because he collected a full year's severance from New Top-Flite.

properly did so within the scope of his job duties as Director of Risk Management.[2]  Spalding's
General Counsel and Director of Human Resources – neither of whom are parties to or have a
stake in this action – have provided sworn deposition testimony explaining the legitimate
business reasons for which Plaintiff was not selected for a retention bonus.

It is further undisputed that Callaway Golf Company ("Callaway"), New Top-Flite's
owner, made the decision to terminate Plaintiff's employment from New Top-Flite in December
of 2003, and that Mr. Craigie and Mr. Frey (both of whom had left Spalding by September of
2003, and were never employed by New Top-Flite) had no input in or influence upon that
decision.  Callaway's Chief Financial Officer – who is not a party to and has no stake in this
action – has provided his sworn affidavit averring that he alone made the decision to eliminate
Plaintiff's job.

Even viewing the evidence in a light most favorable to Plaintiff, his claims are solely
based upon unsupported speculation and conjecture.  This is simply not enough to survive
summary judgment.   Accordingly, Mr. Craigie and Mr. Frey respectfully request that the Court
grant them summary judgment with respect to all of the claims in Plaintiff's Complaint.

## II.    <u>STATEMENT OF MATERIAL UNDISPUTED FACTS</u>

### A.    <u>Overview Of The Parties And The Distinct Corporate Entities Involved</u>

As referenced above, the parties are former employees of Spalding Sports Worldwide
("Spalding"), a wholly-owned subsidiary of SHC, Inc. ("SHC").  <u>See</u> Transcript of the
Deposition of Dennis Paren taken April 25, 2005 ("Pl. Dep.") at 13-15 attached hereto as Exhibit

---

[2]    For this reason, Plaintiff's allegations of corporate improprieties (which Defendants predict will
be discussed at length in Plaintiff's opposition memorandum) are a red herring.  As discussed
<u>infra</u>, the pertinent issue is not whether or not Plaintiff's concerns were legitimate, but whether
Mr. Craigie and Mr. Frey were motivated by Plaintiff's reporting of such concerns in taking any
adverse action against him.  The undisputed facts demonstrate that the answer to this question is
unequivocally "no."

A.  Spalding, headquartered in Chicopee, Massachusetts, was involved in the production, distribution and sale of primarily golf-related products.  See Exhibit M at 2.   In the timeframe of 2001 through 2003, Spalding employed approximately 1000 employees at its Chicopee headquarters.  See Affidavit of James Craigie, at ¶2, attached hereto as Exhibit B.  Of these, approximately 400 were salaried, non-union employees.  Id.

On June 30, 2003, SHC filed for Chapter 11 bankruptcy.   See Pl. Dep. at 13.  Shortly before the filing, Callaway Golf Company ("Callaway"), a company based in California, agreed to purchase certain of Spalding's assets and liabilities, which were placed into Callaway's wholly-owned subsidiary, Top-Flite Golf Company ("New Top-Flite").  Id. at 13-15. Callaway's acquisition of these assets and liabilities was consummated on or about September 15, 2003.  Id. at 14-15.

**B.        Plaintiff's Job History At Spalding**

Plaintiff was employed by Spalding or a predecessor as Director of Risk Management from April of 1979 until the Callaway acquisition on September 15, 2003.  See Pl. Dep. at 27-29. Plaintiff was initially located in Tampa, Florida, and relocated to Massachusetts in October of 1998.  Id. at 29.  In 1997, Plaintiff was given the opportunity to purchase company stock, which he considered an "honor."  Id. at 80.  Although not required to do so, Plaintiff purchased 18,000 shares at a cost of $5/share.  Id. at 79-80.  It is undisputed that Plaintiff performed his job in a satisfactory manner and received satisfactory evaluations.  See Transcript of the Deposition of Daniel Frey Taken August 30, 2005 ("Frey Dep.") at 138 attached hereto as Exhibit C.

**C.        Defendants James Craigie And Daniel Frey Join Spalding**

Defendant James Craigie served six years as an officer in the United States Navy and earned his MBA from Harvard Business School.  See Transcript of the Deposition of Jim Craigie Taken August 30, 2005 ("Craigie Dep.") at 23-25 attached hereto as Exhibit D.   Mr. Craigie

joined General Foods in 1983, which later became Kraft Foods.  See Craigie Dep. at 23-24.  In

December of 1998, Spalding's majority owner, a firm called KKR, recruited Mr. Craigie to be

Spalding's new President and CEO.  Id. at 143.  KKR had purchased Spalding in 1996, and it

had continued to lose money.  Id. at 142-43.  KKR relied upon Mr. Craigie to lead a new team to

turn the Company around.  Id. at 142-145.

Defendant Daniel Frey earned an accounting degree from the University of Connecticut.

See Frey Dep. at 18.  He began his career with Deloitte & Touche in 1986 as an accountant and

ultimately served as an Audit Manager.  Id. at 17.   In 1994, Mr. Frey joined Duracell

International, Inc. as Manager of External Reporting, and moved through a series of positions to

become the Director of Financial Shared Services.  Id. at 15.   Mr. Frey left Duracell in 1999

when he was recruited to become the CFO of Spalding.  Id. at 16.

As the head of the Finance Department at Spalding, Mr. Frey had seven direct reports,

including Plaintiff:

|  |  |
|---|---|
| Charlie Kimmett | Director of Accounting |
| Larry Kustra | Director of Credit and Accounts Receivable |
| Richard Levandowski | Manager, Cost Accounting |
| Mike Lyon | Director of Taxation |
| Stephen Nigro | Director of Treasury Operations |
| Dennis Paren | Director of Risk Management |
| Victor Varga | Director of Financial Planning and Analysis |

See Pl. Dep. at 29-31; see also Frey Dep. at 20-22.[3]

---

[3]    When Mr. Craigie and Mr. Frey joined Spalding, as officers, they were required to purchase stock
in the Company.  See Frey Dep. at 48-49; Craigie Dep. at 76.  They were given the choice to
purchase the stock up-front or to execute a promissory note and pay for the stock over time.  See
Frey Dep. at 49.  Mr. Craigie purchased 250,000 shares of common stock at $2/share, for a total
cash output of $500,000.  See Craigie Dep. at 76.  Mr. Craigie also purchased 500,000 shares of
restricted stock, at a cost of $0.01 per share.  Id.  Mr. Frey made an initial investment of $10,000
and executed a promissory note for the remainder.  See Frey Dep. at 49.  Although he does not
recall the total number of shares that he purchased, Mr. Frey recalls that he ultimately paid
$40,000 out of pocket, after payroll deductions.  Id. at 49-50.

### D.     The Operating Committee At Spalding

As President and CEO, Mr. Craigie presided over Spalding's Operating Committee, or "OCM."  See Craigie Dep. at 30.  In addition to Mr. Craigie, there were approximately eight members of the OCM, all of whom were officers of the Company, including Mr. Frey, Vaughn Rist, the Director of Human Resources, and Peter Arturi, the General Counsel.  See Craigie Dep. at 30.  The OCM, under Mr. Craigie's leadership, made the critical management decisions that directed the future of the company.  Id. at 30.   Mr. Craigie was accountable to the Board of Directors, which was controlled by Spalding's majority owner, KKR.  Id. at 29.  Plaintiff was not a member of the OCM and never attended any of its meetings.  See Pl. Dep. at 67, 69.

### E.     As Part Of His Job, Plaintiff Identifies Potential Areas Of Risk For The Company

As Director of Risk Management, Plaintiff was responsible for directing the risk management and insurance operations of the company with the objective of preserving corporate assets and earnings.  See Pl. Dep. at 27-28; see also Job Description, attached hereto as Exhibit E.  Plaintiff's job duties included the identification of potential areas of risk as well as the auditing of expense reports.  See Exh. E.

In Paragraph 22.a – 22.ee of his Complaint, Plaintiff alleges that he reported the "fiscal irresponsibility of key employees" to Mr. Frey and "various members" of the OCM.  With respect to the majority of issues described in the Complaint, Mr. Craigie and Mr. Frey do not recall that Plaintiff expressed concerns regarding them.  See Craigie Aff. at ¶5; Affidavit of Daniel Frey, attached hereto as Exhibit F, at ¶13; Craigie Dep. at 116-17, 135-36; See Frey Dep. at 142-43.

However, assuming (as we must, on summary judgment) that Plaintiff reported such concerns as he described in his sworn deposition testimony, Plaintiff can point to no specific

facts to support his belief that Mr. Craigie and/or Mr. Frey disapproved of his reporting such concerns, much less took action against him for doing so.  See generally Pl. Dep. at 161-213. Indeed, to the extent that Plaintiff reported such concerns to Mr. Frey, Mr. Craigie, or other OCM members, Mr. Craigie and Mr. Frey believe that Plaintiff would have properly done so within the scope of his job duties as Director of Risk Management.  See Craigie Aff., at ¶5; Frey Aff., at ¶13; see also Frey Dep. at 197-98 ("Other than the retention bonus plan, I don't recall any instances of learning that Dennis was probing or investigating items not related to his job.").

**F.     Spalding Suffers Financial Hardship In A Bleak Economic Climate**

In 1999 and 2000, Spalding faced significant competitive challenges when Nike, Taylor-Made Adidas and Callaway entered the golf ball market.  See Craigie Dep. at 143-44.  These challenges were compounded by the economic downturn of 2001 following the attacks on September 11th, increased competition from Titleist, and the unfortunate reality that golf, as a sport, was in a nationwide decline.  Id.  In fact, the rounds of golf played had steadily declined each year since 1996.  Id.; see also Pl. Dep. at 66-67 (acknowledging that the financial condition of Spalding was "deteriorating, due to poor performance" in 2000-01).  As a result, no employee received a merit increase or bonus for two years.  See Craigie Dep. at 63.   Despite this economic climate, on July 6, 2001, Plaintiff requested a salary increase.  See memorandum from Paren to Rist dated 7/6/01, attached hereto as Exhibit G.

**G.     The OCM Takes Steps To Ensure Continuity Of Management As The Company Prepares For A Change In Ownership**

In the Fall of 2001, Mr. Craigie recommended to the Board that the Company be sold, or, if a seller could not be located, that the Company undergo significant changes aimed at cutting costs so that it could survive as a stand-alone entity.  See Craigie Dep. at 27-28.  In order to increase the Company's desirability for potential buyers, Mr. Craigie and the other OCM

members discussed a variety of cost-cutting measures, including a possible one-third reduction in headcount.  Id. at 29.

In addition, Mr. Craigie recommended that the Company adopt and implement a Retention Bonus Program as a means of ensuring the continuity of management during the uncertain and potentially rocky years to come.  Id. at 33.  The OCM determined that the Retention Bonus Program would be specifically aimed at retaining those employees (1) who were absolutely critical to the ongoing value of the Company, and (2) who would be most at risk to leave, particularly those with skill sets in high demand by other employers.  Id. at 38; see also Frey Dep. at 70, 86; Deposition Transcript of Vaughn Rist ("Rist Dep.") at 13-15 attached hereto as Exhibit H; Pl. Dep. at 67-69 (stating "it's conjecture on my part" as to what decisions OCM members made regarding the Retention Bonus Program).

The OCM earmarked a $4 million pool to be used for the Retention Bonus Program.  See Craigie Dep. at 34.   Mr. Craigie directed each OCM member to submit recommendations of potential participants in the Retention Bonus Program for their respective departments.  See Frey Dep. at 89.  Applying the factors described above, Mr. Frey recommended that four of his direct reports in the Finance Department  -- Messrs. Kimmett, Lyon, Nigro and Varga --  participate in the Program.  See Frey Dep. at 91. Mr. Frey recommended Mr. Kimmett, the Director of Accounting, because he had primary responsibility for performing the monthly accounting closing process, had frequent interaction with the external auditors, and because of his familiarity with accounting details was likely to play a key role in any due diligence or merger and acquisition activity.   See Frey Aff. ¶3.  He recommended Mr. Lyon, the Director of Taxation, because he was handling several complex tax issues, including international transfer pricing, an ongoing IRS audit, and valuation assessments of the company's net operating loss carryforwards,

which were likely to be a factor in any debt restructuring or merger and acquisition activity.  <u>Id.</u> at ¶4.  He recommended Mr. Nigro, the Director of Treasury Operations, because he had primary responsibility for management of the Company's tight cash position, coordinating the timing of disbursements while monitoring cash collections.  <u>Id.</u> at ¶5.  Mr. Nigro was also responsible for monitoring and planning for compliance with debt covenants, and was actively involved in any amendments to the company's debt agreements.  <u>Id.</u>  Mr. Nigro was also a key contact for external auditors and bank group.  <u>Id.</u>  Mr. Frey recommended Mr. Varga, the Director of Financial Planning and Analysis, because he was Mr. Frey's primary support for the Company's budget, forecast, long-term planning, and evaluation of new business opportunities.  <u>Id.</u> at ¶6. Mr. Varga also had primary responsibility for analysis of business results vs. expectations, including preparation of materials for the OCM, Board meetings, and third-party consultants. This experience was likely to require his heavy involvement in debt restructuring and M&A processes.  <u>Id.</u>

Mr. Frey did not recommend Plaintiff to receive a retention bonus because he believed that Plaintiff was not critical to the ongoing function of the Company, he was not a risk to leave, and if he did leave, his work could be absorbed elsewhere in the organization.  <u>See</u> Frey Dep. at 182-83.  For the same reasons, Mr. Frey did not select two other direct reports – Mr. Kustra and Mr. Levandowski – for a retention bonus.  <u>See</u> Frey Aff. ¶7.

After a composite list of potential participants was prepared, Mr. Craigie sought the input of the OCM as to whether the potential participants were worthy of being selected.  <u>See</u> Rist Dep. at 16-17.  Ultimately, only 40 of Spalding's 400 salaried, non-union employees were selected to participate in the Retention Bonus Program.  <u>See</u> SHC, Inc. Retention Bonus Program

attached hereto as Exhibit I.  None of the OCM members objected to Mr. Frey's selections from the Finance Department.  <u>See</u> Rist Dep. at 17.

The amount of a participant's retention bonus was determined by Mr. Rist, based upon a percentage of base salary, the participant's prior bonus level, and making adjustments to ensure the $4 million pool was not exceeded.  <u>See</u> Rist Dep. at 27-29.  For instance, the participants selected by Mr. Frey were allotted the following retention bonuses:

| Name | Salary | Total Retention Bonus (to be paid in 4 equal installments) |
|---|---|---|
| Kimmett | $87K | $17,000 |
| Lyon | $120K | $23,528 |
| Nigro | $90K | $34,800 |
| Varga | $144K | $35,000 |

<u>See</u> Arturi Dep. at 29-30.[4]

**H.     The Retention Bonus Program Is Formally Adopted On April 23, 2002**

In April of 2002, Spalding entered into a restructuring agreement with Oaktree Capital Management.  <u>See</u> Pl. Dep. at 69.  At approximately the same time, the Board of Directors formally adopted the Retention Bonus Program, including the schedule of its participants, on April 23, 2002.  <u>See</u> Exh. I.  Pursuant to the Retention Bonus Program, bonus payments would be made in four equal installments: on the effective date, April 23, 2002, and then each subsequent December 31, except that payments would be accelerated in the event of a sale of the Company.  <u>Id.</u>; <u>see also</u> Frey Dep. at 88.  As a result, the first installment was paid to participants

---

[4]     It is undisputed that had Plaintiff been selected to participate in the Retention Bonus Program, applying Mr. Rist's criteria, Plaintiff's total bonus would have been no more than $24,000.  <u>See</u> Rist Dep. at 27-28.

shortly after April 23, 2002, and the second installment was paid on December 31, 2002. See
Deposition Transcript of Peter Arturi ("Arturi Dep.")  at 19-20 attached hereto as Exhibit J.

Although Plaintiff was not selected for a retention bonus, he received restricted stock
shares, representing a "sale bonus" which would be paid in the event of a sale of the Company of
more than $400 million.  See Pl. Dep. at 78-79; see also Exhibit I, at 4.

**I.      Plaintiff Argues That He Should Have Been Selected To Participate In The
Retention Bonus Program To Compensate For His Stock Losses**

Although the Retention Bonus Program was intended to be kept confidential, Plaintiff
learned about its existence shortly after the first installment was paid.  See Pl. Dep. at 66, 71.
Soon thereafter, Plaintiff spoke to a number of individuals, including Mr. Rist and Mr. Arturi,
expressing his belief of "how it was unfair that I was not included in that program."  Id. at 71-72;
Rist Dep. at 64-65.  In a memorandum to Peter Arturi, the Company's General Counsel, entitled
"Stock Loss," Plaintiff complained that "my $60,000 investment [in Spalding stock] has
evaporated," and that he should be compensated for the loss by receiving a retention bonus.  See
Paren memorandum to Arturi dated 6/7/02, attached hereto as Exhibit K.[5]

Plaintiff provided a copy of his memorandum to Mr. Craigie.  See Pl. Dep. at 137.  Mr.
Craigie forwarded the memorandum to Mr. Rist and Mr. Arturi with the following handwritten
note:

> Vaughn/Peter—
>
> Dennis stopped by this morning and gave me this letter.  He was very
> polite and asked me to read it at my convenience and respond.
>
> He is looking for inclusion in the retention bonus plan (how does he
> know?).  We cannot do this unless we have $'s left under that plan or one
> of the participants leaves Spalding.  We could give him more stock
> options.
>
> Vaughn – please review and recommend a response.

Id. at 1.  Mr. Rist advised Mr. Craigie that Plaintiff could not be included in the Retention Bonus

Program because all of the bonus pool money had already been allocated to employees who met

the criteria to receive a retention bonus.  See Rist Dep. at 72-74.

Plaintiff also complained about his exclusion from the Retention Bonus Program in a

discussion with Mr. Frey on July 15, 2002.  See Pl. Dep. at 100-102.  Mr. Frey memorialized the

substance of his discussion with Plaintiff in an e-mail to Messrs. Arturi, Rist and Craigie that

same afternoon, which was placed in his personnel file.  See Frey e-mail to Arturi, Rist, and

Craigie dated 7/15/02, attached hereto as Exhibit L.   In the second paragraph of the e-mail, Mr.

Frey wrote:

> I spent about a half hour with him, and I was very frank.  We walked
> through a few points in his letter to Peter [Arturi] which I felt were
> factually inaccurate or distorted, and agreed to disagree on a few things.

---

[5]     In his 6/7/02 memorandum, Plaintiff further argued that some employees "had the impact of their
loss substantially mitigated" through "the forgiveness of a company loan."  See Exhibit K.  This
refers to Mr. Craigie's decision, in another step designed to retain employees, to cancel the
promissory notes and corresponding stock of those employees who had not purchased their stock
in cash up-front.  See Craigie Dep. at 134-135.  Since the stock had become worthless, Mr.
Craigie felt that it would make little sense, and would result in the loss of employees who were
critical to the ongoing function of the Company, if the Company continued to require payments
on promissory notes for worthless stock.  Id.  However, for those employees who had paid for
their stock up-front, including Mr. Craigie and Plaintiff, nothing could be done; even if there were
sufficient funds to refund employees for their stock investments (which there was not), any
excess monies would have to be paid to creditors.  Id. at 134-135.   An employee's stock losses
were not a factor in the selection of retention bonus recipients.  See Frey Dep. at 86.

> Our discussion was civil, but knowing Dennis we still probably haven't
> heard the last from him on this topic.

Id.  Plaintiff disagrees that any of the points in his letter to Mr. Arturi were "factually inaccurate

or distorted," and believes that the last sentence of this paragraph "characterizes me as someone

who, once he has heard the truth, doesn't accept it; and that's not what happened."  See Pl. Dep.

at 101-102.  Plaintiff does not challenge the placement of the e-mail in his personnel file.  Id. at

103.

Mr. Frey told Mr. Arturi that he did not select Plaintiff to participate in the Retention

Bonus Program because "Dennis' job is easy and . . . Dennis is not going anyplace," which Mr.

Arturi understood to mean that "Dennis' job was not one of the jobs that he needed people

around to be able to do over the next twelve to twenty-four months and he didn't consider

Dennis to be one of the people who would leave the company regardless of whether he got a

retention bonus."  See Arturi Dep. at 37.

In May or June of 2002, Plaintiff also called Jerry Sullivan, the risk manager at KKR,

Spalding's owner at the time, to complain that he had not been selected for a retention bonus,

and Mr. Sullivan then contacted Marc Lipschultz, a Spalding Board member, who contacted Mr.

Frey for an explanation.  Id. at 120-21.  In his conversation with Mr. Lipschultz, Mr. Frey simply

explained the reasons why he did not select Plaintiff to participate in the Retention Bonus

Program.  See Frey Dep. at 180-183.

**J.     Callaway Agrees To Purchase Certain Assets And Liabilities Of Spalding,
        And Mr. Frey Leaves Spalding On Or About June 20, 2003**

In 2003, two companies competed in a bankruptcy court-ordered auction to acquire

Spalding's golf business assets.  See Craigie Dep. at 103-104.  Callaway was the winning bidder.

Although Callaway would not agree to assume all of Spalding's liabilities, Callaway did agree to

assume the liability for the Retention Bonus Program.  Id.   Spalding filed for bankruptcy on June 30, 2003.  See Pl. Dep. at 13.

Prior to the bankruptcy sale, a few employees in the original Retention Bonus Program left the Company, including Mr. Frey.[6]  See Craigie Dep. at 121.  At the urging of the debt holders, the OCM distributed the limited funds that had been freed from the departure of Retention Bonus Program participants to additional Spalding employees whose functions were essential to ensure a smooth transition through the acquisition.  See Rist Dep. at 65-67.   For instance, certain critical employees in Spalding's Research and Development Department who had not been selected to participate in the Retention Bonus Program were selected to receive retention bonuses under this supplemental program.  Id.; see also Arturi Dep. at 22-24; Rist Dep. at 19-26.

In addition, Mr. Craigie asked Mr. Frey which of his direct reports were needed to assume his CFO duties in order to see the Company through the bankruptcy filing and the acquisition by Callaway.  See Arturi Dep. at 16-17; see also Frey Dep. at 91-93; Craigie Dep. at 60-62, 87-89.  Mr. Frey identified Mr. Kimmett, Mr. Nigro, and Mr. Varga, and told Mr. Craigie that he believed that payments of $20,000 each should be sufficient incentive for these three employees to stay and perform his CFO duties.  See Arturi Dep. at 25-26; Frey Dep. at 91. Plaintiff did not assume any of Mr. Frey's duties after his departure.  See Pl. Dep. at 35.

The supplemental payments to the three employees who assumed Mr. Frey's CFO duties were reflected on the revised schedule of retention bonus recipients, which was included in the Spalding's June 30, 2003 bankruptcy filing.  See relevant excerpts from bankruptcy filing,

---

[6]     Mr. Frey resigned in order to accept a position with St. Paul Traveler's, near his hometown of Rocky Hill, Connecticut.  See Frey Dep. at 8; Craigie Dep. at 121-122.  Mr. Frey left Spalding on or about June 20, 2003.  See Frey Dep. at 13-14; Pl. Dep. at 32.

attached hereto as Exhibit M. Those employees who had been guaranteed a severance payment in the event of a change of control, including Plaintiff,[7] also were identified in the bankruptcy filing. Id. As reflected in the bankruptcy filing, there were many employees who were not entitled to any severance payment. Id.

### K.    Mr. Craigie Leaves Spalding On Or About September 15, 2003, And Plaintiff Is Retained By New Top-Flite

Mr. Craigie opted not to continue as Chief Executive Officer after the Callaway acquisition, which took effect on Monday, September 15, 2003. See Craigie Dep. at 39-40. As such, Mr. Craigie's last day was September 12, 2003, and he was never employed by the new entity, New Top-Flite.[8] Id. at 39-40; see also Pl. Dep. at 32. By contrast, New Top-Flite retained Plaintiff in his same position as Director of Risk Management. See Pl. Dep. at 27.

### L.    After Learning That He Had Not Been Selected As A Supplemental Bonus Recipient, Plaintiff Argues, For The First Time, That He Was Not Selected Because He Reported Alleged Unlawful Or Improper Conduct

When Plaintiff learned that additional funds had been freed up by the departure of some of the participants in the Retention Bonus Program, he had "hope" that Mr. Craigie would select him for a supplemental bonus. See Pl. Dep. at 134. However, Plaintiff learned from Mr. Rist that he had not been selected. Id. at 138. Plaintiff thereafter concluded that it was a "given" that he was not selected because he had reported alleged unlawful or improper conduct. Id. at 139-40. Plaintiff concedes that he jumped to this conclusion on his own, and that no one ever told him this. Id. On September 15, 2003, the remaining two installments of the Retention Bonus Program, along with the supplemental bonus payments, were paid. See Arturi Dep. at 20-21.

---

[7]      Plaintiff's severance was increased from 39 weeks to 52 weeks. See Rist Dep. at 73-74.

[8]      Since July of 2004, Mr. Craigie has served as the President and Chief Executive Officer of Church & Dwight, Inc.

On September 16, 2003, after the Callaway acquisition had been consummated, Plaintiff spoke to Mr. Arturi about his displeasure at being excluded from the Retention Bonus Program a second time.  See Pl. Dep. at 105-09.  Mr. Arturi told Plaintiff that at some point in the past, Mr. Frey had called him a "pain in the butt."   See Pl. Dep. at 106; Arturi Dep. at 37, 64-65. Although Mr. Frey did not explain to Mr. Arturi what he meant by this remark, he was referring to the fact that Plaintiff continued to complain about not receiving a retention bonus – a $20,000 issue – while Mr. Frey and the rest of the Company were navigating through a debt restructuring that involved hundreds of millions of dollars.  See Arturi Dep. at 65; Frey Dep. at 180-81, 196-97.

**M.     Plaintiff Takes Action Against Mr. Craigie For Not Selecting Him For A Supplemental Retention Bonus**

After his conversation with Mr. Arturi, Plaintiff embarked upon an audit of Mr. Craigie's expense reports and discovered that two items had been double-billed.  He reported this to Mr. Arturi and Mr. Rist, and then to Scott Graves of Oaktree Capital Management, claiming that he had been "excluded from the retention bonus plan for criticizing certain management decisions." See Paren letter to Graves dated 9/18/03, attached hereto as Exhibit N.   While Plaintiff in the past had argued he was entitled to a retention bonus to compensate him for his lost stock investment, Plaintiff now argued, for the first time, that he had been the victim of retaliation.  Id.

When Mr. Craigie learned of Plaintiff's accusations (which was after Mr. Craigie had left Spalding and after the supplemental retention bonus decisions had been made), he sent an e-mail to Plaintiff stating that "I have always enjoyed working with you and felt that you were a very competent employee.  That is why I was totally astounded by your attempt to accuse me of expense account fraud."  See Craigie e-mail to Paren dated 9/18/03, attached hereto as Exhibit O. Mr. Craigie went on to explain that his administrative assistant, Rosanne Stirlacci, may have

made a mistake in filling out the expense report, and that he welcomed the audit of his expense reports.  Id.  Mr. Craigie closed the e-mail as follows:

> While I am no longer an employee of the company, I would ask that you please try to bury your bitterness about not being part of the retention bonus plan.  The company now has a bright future as a result of the elimination of the debt load and becoming part of the world's largest golf equipment company.  It needs your help to deliver this bright future by focusing your energy on issues that can motivate fellow employees rather than continuing to spew your venom on the integrity of fellow employees.

Id.  Mr. Craigie forwarded the e-mail to Mr. Arturi, who forwarded it to Mr. Rist, who placed the e-mail in the personnel files of Plaintiff and Mr. Craigie.  Id.  Plaintiff does not challenge Mr. Rist's placement of the e-mail in his personnel file.  See Pl. Dep. at 91.  Nor does he recall whether he forwarded the e-mail to anyone, although he did discuss it with Mr. Arturi and communicate its contents to at least one third party.  See Pl. Dep. at 85-90.

In response to Plaintiff's accusations, the Board completed an independent audit of Mr. Craigie's expense reports for his entire tenure at Spalding, and determined that the only two instances of double-billing were the instances identified by Plaintiff.  See Craigie Dep. at 124-127; Pl. Dep. at 208-09.  The independent audit concluded that the double-billing had been the result of inadvertent mistakes by Mr. Craigie's administrative assistant – in one instance, a car payment check that had been cut and deposited prior to the bankruptcy filing was accidentally resubmitted and paid again, and in the second instance, Mr. Craigie's administrative assistant double-billed an airline ticket after Mr. Craigie had changed flights during a business trip.  See Craigie Dep. at 127.   Plaintiff concedes that the independent audit cost Spalding's bankrupt estate "an exorbitant amount of money."  See Pl. Dep. at 209.

### N.    Callaway's CFO Makes The Independent Decision To Eliminate The Position Held By Plaintiff

Following the Callaway acquisition, Brad Holiday, Callaway's Chief Financial Officer, began the process of assessing the synergies of New Top-Flite and Callaway from an organizational perspective, with the goal of eliminating any redundancies within his supervision. See Affidavit of Brad Holiday ("Holiday Aff."), attached hereto as Exhibit P, ¶3.  As part of this process, Mr. Holiday met with Victor Varga (who was the Director of Financial Planning and Analysis at Spalding and who continued to hold this position at New Top-Flite) to identify potential redundancies within the two organizations.  Id.  At Mr. Holiday's request, Mr. Varga provided an overview of the organizational structure of the finance function of New Top-Flite, and informed him that certain functions – including tax, risk management, treasury, and credit and collection – appeared to be redundant with functions at the corporate level at Callaway.  See Affidavit of Victor Varga, attached hereto as Exhibit Q, ¶3. The information Mr. Varga provided to Mr. Holiday was based upon his own independent assessment of the apparent redundancies within the organization.  Id. ¶4.

Based upon this information, Mr. Holiday decided that the risk management function at New Top-Flite was redundant and could be consolidated with the risk management function at Callaway.  See Holiday Aff. ¶4.  As a result, Mr. Holiday made the decision to eliminate the position of Director of Risk Management at New Top-Flite, which position was held by Plaintiff.  Id.  It is undisputed that Mr. Craigie and Mr. Frey had no involvement in, or influence upon, Mr. Holiday's decision to eliminate Plaintiff's position.  Id. ¶¶ 5,6; see also Pl. Dep. at 96, 105.[9]

---

[9]     Plaintiff speculates that Callaway wanted to "rid the company of anyone associated in any way with Jim Craigie and his direct reports."  See Pl. Dep. at 45-48.  Even if Plaintiff could substantiate this conjecture (which he cannot), the fact remains that the decision to eliminate his position was made by Callaway, and Mr. Craigie and Mr. Frey did not have any input into that decision.

### O.    Plaintiff Receives One Year Of Severance And Is Immediately Employed As A Consultant By Spalding's Bankrupt Estate

On December 5, 2003, Plaintiff was informed that effective immediately, his job function was being eliminated and his responsibilities were shifting to Callaway, in California.  See Pl. Dep. at 38-42.  For a full year thereafter, through December of 2004, Plaintiff received severance equal to his annual salary of $122,000, and medical coverage at the employee contribution rate. Id. at 43.  He accepted his severance even though he refused to sign a release.  Id. at 44-45.

Immediately after his termination from New Top-Flite through May of 2004, Plaintiff was retained as a consultant for TFGC Estate, Inc., performing insurance- and pension-related work for Spalding's bankrupt estate.  Id. at 20.  In this position, Plaintiff continued to have an office at New Top-Flite and was paid $150/hour.  Id. at 20-21, 46.  After receiving unemployment compensation for a short period of time, in July of 2004, Plaintiff worked briefly for Babson Capital as an Insurance Specialist.  Id. at 17.  In September of 2004, Plaintiff accepted a position with DIMON Inc. as Director of International Risk and Benefits Management, earning an annual salary of $110,000 plus benefits, which is the position he holds today.  Id. at  18.

As a result of receiving a full year's severance and being immediately employed following his termination from New Top-Flite, Plaintiff's gross income in 2004 was more than $200,000.  Id. at 26.  By contrast, Plaintiff earned an annual salary of $122,000 in 2003.  Id. at 43.

### P.    On July 2, 2004, Plaintiff Files A Charge Of Discrimination Against New Top-Flite And Initiates This Action Solely Against Mr. Craigie And Mr. Frey

On July 2, 2004, Plaintiff filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") against Top-Flite and Callaway, alleging that Top-Flite and Callaway unlawfully terminated him because of his age.  See Pl. Dep. at 7-10.  That same day, Plaintiff

commenced this action solely against Messrs. Craigie and Frey. See Compl. In his Complaint, Plaintiff purports to assert three claims against each Defendant relating to his non-selection for participation in the Retention Bonus Program and the termination of his employment from New Top-Flite: defamation (Counts I and II); intentional interference with contractual relations (Counts III and IV); and intentional interference with advantageous business relations (Counts V and VI). Plaintiff seeks retention bonus payments amounting to $150,000, back pay, front pay and benefits to age 65, emotional distress damages, and attorneys' fees.

Plaintiff subsequently withdrew his MCAD complaint, and in May of 2005, Plaintiff executed a release in favor of New Top-Flite and Callaway in exchange for meeting with Mr. Arturi and Mr. Rist (who were still employed by New Top-Flite) in an effort to obtain "information and documents that might be relevant to his case against Mr. Craigie and Mr. Frey." See Arturi Dep. at 40-41. Notwithstanding Plaintiff's counsel's meeting with Mr. Arturi and Mr. Rist, both provided sworn deposition testimony that exonerated Mr. Craigie and Mr. Frey. E.g., Arturi Dep. at 22, 27-28, 38-39; Rist Dep. at 19-21, 29-31. Discovery closed on May 31, 2005.[10]

## III.   ARGUMENT

### A.   The Summary Judgment Standard

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment against a party who fails to offer admissible evidence sufficient to establish the existence of every element essential to that party's case and on which that party bears the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 327 (1986). Thus, summary judgment is appropriate "if the

---

[10]   Notwithstanding the close of discovery, Defendants produced copies of their tax returns to Plaintiff based upon the understanding that such documents would be kept confidential. Mr. Craigie and Mr. Frey also gave their depositions on August 30, 2005.

pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial,' and the moving party is entitled to judgment as a matter of law." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In responding to a motion for summary judgment, a plaintiff must "make a showing sufficient to establish the existence of [every] element essential to his case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. To avoid summary judgment, a plaintiff must offer "concrete evidence from which a reasonable [trier of fact] could return a verdict in his favor" and may not rely on unsupported assertions, conclusory allegations, or mere suspicions. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "[S]peculation and surmise" and unsupported factual allegations are insufficient. Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94-95 (1st Cir. 1996).

Judged against these standards, Plaintiff simply cannot carry his burden of coming forward with specific facts upon which the Court could find in his favor, and, therefore, the Court should grant summary judgment to Mr. Craigie and Mr. Frey.

**B.    The Court Should Grant Defendants Summary Judgment With Respect To Plaintiff's Defamation Claims (Count I And II)**

In Counts I and II, Plaintiff alleges that Messrs. Craigie and Frey "made verbal and written statements that were untrue and otherwise defamatory to third parties about Dennis Paren," and that as a result, his "reputation was harmed" and his "ability to secure continued employment with the purchase company (Callaway) was affected by the false statements." See Compl. ¶¶43, 47-48, 52, 56- 57. Plaintiff's defamation claims fail as a matter of law.

1.        **The Standard For Defamation Under Massachusetts Law**

To prevail on a claim of defamation, a plaintiff must prove that the defendant was at fault for the publication of a false statement regarding the plaintiff, which was capable of damaging the plaintiff's reputation in the community, and which caused economic loss.  White v. Blue Cross & Blue Shield of Mass., 809 N.E.2d 1034, 1036 (Mass. 2004).   An assertion that cannot be proven false – i.e., a statement of opinion rather than a statement of fact – cannot constitute defamation.  Galdauckas v. Interstate Hotels Corp., 901 F. Supp. 454, 471 (D. Mass. 1995).  As a result, the courts routinely reject claims of defamation based upon expressions of opinion.  E.g., Galdauckas, 901 F. Supp. at 471 (holding that negative statements in plaintiff's personnel file and "abusive taunts," including a comment that plaintiff belonged to the "Geritol Generation," constituted expressions of opinion and not defamation and granting summary judgment to employer on defamation claim); Fleming v. Benzaquin, 454 N.E.2d 95, 103 (Mass. 1983) (holding that calling a police officer "lunkhead, "meathead, "absolute barbarian," and the like were statements of "harsh judgment" or "mere vituperation and abuse," not defamation); Carozza v. Blue Cross and Blue Shield of Mass., Inc., 14 Mass.L.Rptr. 88, 2001 WL 1517584, at *13-14 (Mass. Super. 2001) (holding that interoffice memorandum authored by human resources representative expressing her opinion regarding the personality of plaintiff, including her opinion that he was "dangerous," was not defamation).

An employer may assert a conditional privilege to publish defamatory material, even if the statements turn out to be false, if the publication is reasonably necessary to protect or further a legitimate business interest and the privilege is not abused.  Bratt v. Int'l Bus. Machs. Corp., 467 N.E.2d 126, 128 (Mass. 1984); Foley v. Polaroid Corp., 508 N.E.2d 72, 79-80 (Mass. 1987).

This privilege applies to statements by a supervisor, executive or corporate officer. <u>Sklar v. Beth Israel Deaconess Med. Ctr.</u>, 797 N.E.2d 381, 388 (Mass. App. Ct. 2003).[11]

As a result, the courts applying Massachusetts law routinely reject claims of defamation based upon internal business communications and statements made in the workplace, including statements contained in an employee's personnel file. <u>E.g.</u>, <u>Thomas v. Sears, Roebuck & Co.</u>, 144 F.3d 31, 34 (1st Cir. 1998) (finding that internal company feedback and deficiency memoranda and a comment that plaintiff was disloyal, a troublemaker and negative on automotive issues were protected by the conditional privilege and affirming summary judgment for employer and supervisor); <u>Elicier v. Toys "R" Us, Inc.</u>, 130 F. Supp.2d 307, 311 (D. Mass. 2001) (finding that manager's statement accusing plaintiff of selling drugs at meeting attended by supervisors and a human resources manager was protected by the conditional privilege and granting summary judgment for employer on defamation claim); <u>Galdauckas</u>, 901 F. Supp. at 471 (holding that negative statements in plaintiff's personnel file and "abusive taunts," including a comment that plaintiff belonged to the "Geritol Generation," even if defamatory, were protected by the conditional privilege and granting employer summary judgment on defamation claim); <u>Foley</u>, 508 N.E.2d at 79-80 (finding that oral and written statements made by Polaroid executives, including statement that "being found not guilty doesn't mean you are innocent" and statement regarding "continuing allegations" that the plaintiff was "approaching other women," were protected by the conditional privilege and reversing jury verdict for plaintiff); <u>Bratt</u>, 467

---

[11]     Abuse of the conditional privilege can only be shown if the plaintiff proves that the employer knew the information was false, had no reason to believe it to be true, or recklessly published the information unnecessarily, unreasonably, or excessively. <u>Sklar</u>, 59 Mass. App. Ct. at 559 (citations omitted). Mere negligence in the determination of the truth or in publication does not destroy the privilege. <u>Bratt</u>, 467 N.E.2d 126. Nor can a plaintiff survive summary judgment by merely speculating as to the recklessness or ulterior motives of the employer. <u>Boudreault v. Chesapeake Biological Labs., Inc.</u>, No. 010443, 2005 WL 1812312, at *4 (Mass. Super. May 25, 2005).

N.E.2d at 129 (acknowledging lower court's determination that interoffice memorandum

expressing view that plaintiff had a mental problem was protected by the conditional privilege)

McCone v. New England Tele. and Telegraph Co., 471 N.E.2d 47 (1984) (finding that negative

employee evaluations are protected by the conditional privilege and affirming trial court's

dismissal of defamation claim for failure to state a claim); Sklar, 797 N.E.2d at 388 (finding that

employer's transmission of its finding that plaintiff's job performance violated professional

standards to American Occupational Therapy Association was protected by the conditional

privilege and affirming summary judgment for employer); Coholan v. E. Lumber Co., Inc., No.

02-P-1622, 2004 WL 1497609, at *2-3 (Mass. App. Ct. July 6, 2004) (finding that statements

made about plaintiff in which he was interrogated regarding theft of company property and then

terminated were protected by conditional privilege and affirming summary judgment for

employer); Goldhor v. Hampshire Coll., 521 N.E.2d 1381, 1382 (Mass. App. Ct. 1988) (finding

that university's announcement of plaintiff's suspension to persons associated with the university

was protected by the conditional privilege and granting summary judgment to university on

defamation claim); Boudreault, 2005 WL 1812312, at *3-4 (finding that contractor's

communications to its customer regarding its decision to ban customer's employee from its

premises due to allegations of sexual harassment were protected by the conditional privilege and

affirming summary judgment for contractor on defamation claim); Carozza, 2001 WL 1517584,

at *13-14 (holding that interoffice memorandum authored by human resources representative

expressing her views regarding the personality of the plaintiff, including her opinion that he was

"dangerous," was protected by the conditional privilege and granting summary judgment to

employer on defamation claim); Millar Elevator Serv. Co. v. Liatsis, 12 Mass.L.Rptr. 559, 2000

WL 33171009, at *5 (Mass. Super. 2000) (finding that employer's communication regarding the

reasons for plaintiff's termination to prospective employer was protected by the conditional privilege and granting summary judgment to employer on defamation claim); LeBlanc v. Digital Equip. Corp., 1996 WL 1186817, at *4-5 (Mass. Super. 1996) (finding that intracompany communications stating that plaintiff was being fired for theft of company property were protected by the conditional privilege and granting summary judgment for employer on defamation claim).

Judged against these standards, Plaintiff's defamation claims against Mr. Craigie and Mr. Frey plainly cannot survive summary judgment.

### 2.    The Court Should Grant Mr. Craigie Summary Judgment With Respect To Count I

Plaintiff's defamation claim against Mr. Craigie is based upon two statements by Mr. Craigie. See Pl. Dep. at 81. First, Plaintiff points to the September 18, 2003 e-mail from Mr. Craigie to him addressing Plaintiff's accusations of double-billing, in which Mr. Craigie asked Plaintiff to "bury your bitterness about not being part of the retention bonus plan" and asked Plaintiff to focus his energy "on issues that can motivate fellow employees rather than continuing to spew venom on the integrity of fellow employees." Id. at 81-91; see also Exhibit O. This e-mail was forwarded to Mr. Arturi, Spalding's General Counsel, and Mr. Rist, the Human Resources Director, who placed it into the personnel files of Mr. Craigie and Plaintiff. See Pl. Dep. at 90-91. Plaintiff believes (but cannot prove) that Callaway management may have viewed the e-mail as part of the due diligence process. Id.

Second, Plaintiff points to Mr. Craigie's alleged remark[12] in front of his secretary, Roseanne Stirlacci, that, "A oh, he has one of those Dennis Paren faces on," as Plaintiff

---

[12]    Although Mr. Craigie does not recall this remark, for purposes of summary judgment, viewing the facts in a light most favorable to Plaintiff, we assume that the remark was made.

approached him to break the news that he had discovered that an employee had cheated on her expense reports. Id. at 91-100. Plaintiff speculates that Ms. Stirlacci may have shared Mr. Craigie's remark with management at New Top-Flite, and that it may have "tarnished my reputation" and "closed off opportunities with the new company; because people talk, and people share opinions, and sometimes presidents like to take the advice of their assistants." Id. at 94-95.

Neither of these statements constitutes actionable defamation under Massachusetts law. As a preliminary matter, the statements are protected by a conditional privilege because they were made by Spalding's CEO in furtherance of a legitimate business interest. Mr. Craigie was entitled to express his viewpoint regarding accusations of double-billing that had been raised with Spalding's Board of Directors, and his remark to his secretary was a reaction to his perception that Plaintiff was about to deliver news of employee misconduct discovered while performing his job duties as Director of Risk Management. Nor can Plaintiff overcome the conditional privilege by establishing that the statements were published recklessly, given that the September 18, 2003 e-mail was simply placed into his personnel file, and given his admission that Ms. Stirlacci was the only witness to Mr. Craigie's remark regarding Plaintiff's facial expression. Galdauckas, 901 F. Supp. at 471.[13] Based upon the application of the conditional privilege alone, Plaintiff's defamation claim against Mr. Craigie fails. Thomas, 144 F.3d at 34.

Moreover, even in the absence of a conditional privilege, whether Plaintiff exhibited "bitterness," should stop "spewing [his] venom," or had a particular facial expression cannot be factually verified because such statements constitute expressions of Mr. Craigie's opinion. As such, the statements do not constitute defamation. Galdauckas, 901 F. Supp. at 471. Finally, aside from pure speculation, Plaintiff cannot point to a shred of evidence that Mr. Craigie's

statements caused Plaintiff to not be selected for participation in the Retention Bonus Plan,

caused the termination of his employment by New Top-Flite, or caused him any type of

economic loss.  See Pl. Dep. at 96; White, 809 N.E.2d at 1038.  Given these circumstances, the

Court should grant Mr. Craigie summary judgment with respect to Count I.

### 3.  The Court Should Grant Mr. Frey Summary Judgment With Respect To Count II

Plaintiff's defamation claim against Mr. Frey is based upon four statements by Mr. Frey,

and is similarly bereft of merit.  First, Plaintiff points to the July 15, 2002 e-mail from Mr. Frey

to Mr. Craigie, Mr. Arturi, Spalding's general counsel, and Mr. Rist, Spalding's human resources

director, in which Mr. Frey described his meeting with Plaintiff to discuss the reasons why

Plaintiff was not selected for the Retention Bonus Program and stated that "our discussion was

civil, but knowing Dennis we still probably haven't heard the last from him on this topic."  See

Pl. Dep. at 100-105; see also Exhibit L.  Plaintiff disagrees with Mr. Frey's characterization of

him as "someone who, on[ce] he has heard the truth, doesn't accept it."  See Pl. Dep. at 101.  The

e-mail was placed in Plaintiff's personnel file, and Plaintiff speculates that Callaway

management may have viewed the e-mail as part of the due diligence process and that the e-mail

somehow impeded his continued employment with New Top-Flite.  Id. at 102-05.

Second, Plaintiff points to Mr. Frey's statement to Mr. Arturi, Spalding's general

counsel, that Plaintiff was "a pain in his butt."  Id. at 106-110.  Plaintiff believes that this

statement was defamatory because it was "Dan Frey's whole perspective on me as an employee."

Id. at 109.  Plaintiff "imagines," but does not know, that Mr. Arturi shared Mr. Frey's statement

with others.  Id. at 110.

---

[13]     Indeed, it appears that Plaintiff freely published these statements to various third parties.  See Pl. Dep. at 85-88, 97-99.

Third, Plaintiff points to Mr. Frey's alleged reference[14] to him "in a derogatory manner as Mr. Sunshine while speaking to other employees" on at least two occasions at meetings with Mr. Frey's direct reports in the Finance Department.  Id. at 113-120.  According to Plaintiff, Mr. Frey referred to him as "Mr. Sunshine" in the context of Plaintiff "normally having reported on something that was inappropriate, and having a scowl" on his face.  Id. at 114-15.  Plaintiff has no specific knowledge that Mr. Frey's alleged reference to him as "Mr. Sunshine" was conveyed to anyone outside of the meeting.  Id. at 117-18.

Fourth, Plaintiff points to Mr. Frey's conversation with Mr. Lipschultz, a Spalding Board member.  Id. at 120-26.  In this conversation, Mr. Frey simply explained the reasons why he did not select Plaintiff to participate in the Retention Bonus Program.  See Frey Dep. at 182-183.  Plaintiff does not know what Mr. Frey said to Mr. Lipschultz, and assumes that "whatever he said is poisoning that company [KKR] towards me."  See Pl. Dep. at 122-23.

None of these statements constitute actionable defamation under Massachusettes law.  All of the statements are protected by a conditional privilege because they were made by Spalding's CFO in furtherance of a legitimate business interest.  The statements were made to Spalding's General Counsel, Director of Human Resources, his direct reports at a Finance Department meeting, and to a member of Spalding's Board of Directors, in the context of either characterizing Plaintiff as an employee or explaining why Plaintiff was not selected for Spalding's Retention Bonus Program.  Nor can Plaintiff overcome the conditional privilege by establishing that the statements were published recklessly, given that the July 15, 2002 e-mail was simply placed into his personnel file, and there is no evidence of publication of the

---

[14]     Mr. Frey does not recall referring to Plaintiff as Mr. Sunshine.  See Frey Dep. at 185.  However, for purposes of summary judgment, viewing the facts in a light most favorable to Plaintiff, we assume that he did so.

remaining statements.  Galdauckas, 901 F. Supp. at 471.  Based upon the application of the conditional privilege alone, Plaintiff's defamation claim against Mr. Frey fails.  Thomas, 144 F.3d at 34.

Moreover, even in the absence of a conditional privilege, whether Mr. Frey was correct that "knowing Dennis we still probably haven't heard the last from him on this topic," whether Plaintiff was a "pain in the butt," or whether Plaintiff looked like "Mr. Sunshine" cannot be factually verified because such statements constitute expressions of Mr. Frey's opinion.  As such, the statements do not constitute defamation.  Galdauckas, 901 F. Supp. at 471.  Finally, aside from pure speculation, Plaintiff cannot point to a shred of evidence that Mr. Frey's statements caused Plaintiff to not be selected for participation in the Retention Bonus Program, caused the termination of his employment by New Top-Flite, or caused him any type of economic loss.  See Pl. Dep. at 105; White, 442 Mass. at 69.  Given these circumstances, the Court should grant Mr. Frey summary judgment with respect to Count II.

### C.     The Court Should Grant Defendants Summary Judgment With Respect To Plaintiff's Claims For Intentional Interference With Contractual Relations And Advantageous Business Relations (Counts III Through VI)

In Counts III through VI, Plaintiff alleges that Mr. Craigie and Mr. Frey intentionally interfered with his "existing contracts and prospective contractual relations both inside and outside the company," and his "advantageous business relations in that he was excluded from the bonus retention Program, his reputation was damaged within the corporate structure, and he was not slated for retention or recommended for retention by the new Callaway corporation." See Compl. ¶¶64, 68-70, 75, 79-80.  Plaintiff further alleges that Mr. Craigie and Mr. Frey were motivated by personal animosity toward him and "wanted to insulate Dennis Paren from doing his job," which, Plaintiff alleges, involved complaining about Mr. Craigie and Mr. Frey's "poor performance, immoral and unethical activity." Id. ¶¶83, 86.   These claims fail as a matter of law.

28

1.      **The Standard For Intentional Interference With Contractual Relations Or Advantageous Business Relations Under Massachusetts Law**

To survive summary judgment on a claim for intentional interference with contractual or advantageous business relations,[15] a plaintiff must proffer admissible evidence sufficient to warrant findings that establish (1) the existence of a contract or a business relationship which contemplated economic benefit; (2) the defendant's knowledge of the contract or business relationship; (3) the defendant's intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages.  Bourque v. Cape Southport Assocs., LLC, 800 N.E.2d 1077, 1082-83 (Mass. App. Ct. 2004) (citations omitted). The Supreme Judicial Court of Massachusetts has held that the improper motive or means required is "actual malice."  Shea v. Emmanuel Coll., 682 N.E.2d 1348, 1350-51 (Mass. 1997). Actual malice is any "spiteful, malignant purpose, unrelated to the legitimate corporate interest." Id. (quoting Wright v. Shriners Hosp. For Crippled Children, 589 N.E.2d 1241, 1246 (Mass. 1992)).  Something more than intentional interference is required.  Bourque, 800 N.E.2d at 1083 (citations omitted).

Judged against this standard, Plaintiff's claims for intentional interference with contractual relations and advantageous business relations fail as a matter of law.

---

[15]    The courts generally apply the same analysis to claims for intentional interference with contractual relations and for intentional interference with advantageous business relations.  E.g., Bourque v. Cape Southport Assocs., LLC, 800 N.E.2d 1077, 1082-83 (Mass. App. Ct. 2004); Am. Fed'n of State, Cty. and Mun. Employees, 757 N.E.2d 257, 266.  The elements of the two torts are essentially the same, with the exception of the first element (i.e. proving the existence of a contract with a third party or a business relationship for economic benefit with a third party). Mill-bern Assoc. Inc. v. Dallas Semiconductor Corp., 2002 WL 1340853 (Mass. Supp. Ct. 2002). Because, as demonstrated infra, the remaining three elements are fatal to each of Plaintiff's claims for intentional interference with contractual relations and advantageous business relations, the claims are analyzed together for purposes of this Motion.

2.    **The Court Should Grant Mr. Craigie Summary Judgment With Respect To Counts III And V**

Plaintiff claims that Mr. Craigie intentionally interfered with his contractual and advantageous business relations in two ways: (1) by impeding Plaintiff's continued employment with New Top-Flite; and (2) by excluding Plaintiff from the Retention Bonus Program.  See Compl. ¶¶64, 68-70, 83-84.  Plaintiff claims that Mr. Craigie took these alleged actions "based on his own personal motive and gain" and in retaliation for Plaintiff's complaints about alleged improper activity within the Company.  Id. ¶¶61-63, 84.  These claims simply cannot survive summary judgment.

Plaintiff's claim based upon his termination from New Top-Flite suffers from at least three fatal deficiencies: causation, improper motive and damages.  It is undisputed that Plaintiff continued to be employed by New Top-Flite after the Callaway acquisition on September 15, 2003, while Mr. Craigie was never employed by that entity.  See Paren Dep. at 32, 38-39, 42.  It is further undisputed that the decision to eliminate Plaintiff's position was made by Brad Holiday, Callaway's CFO, without any input from Mr. Craigie, who had no connection whatsoever to New Top-Flite or Callaway.  See Holiday Affidavit.  Plaintiff can point to no facts that indicate otherwise.  See Pl. Dep. at 45-51.

Given these circumstances, Mr. Craigie cannot possibly have interfered with Plaintiff's employment relationship with New Top-Flite or Callaway, no less done so with an improper purpose or by improper means.  Nor has Plaintiff suffered any damages, given that he immediately found employment following his termination from New-Top Flite, and in fact earned twice his income in 2004 than when he was employed by New Top-Flite in 2003.  See Pl. Dep. at 105 (gross income in 2004 $211,870).  See Harrison v. Netcentric Corp., 744 N.E.2d 622, 632 (Mass. 2001) (affirming summary judgment on claim for intentional interference with

contractual relations, where plaintiff admitted he had no personal knowledge concerning whether Board members participated in the decision to terminate him); Netherwood v. Am. Fed'n of State, Cty. and Mun. Employees, 757 N.E.2d 257, 266-67 (Mass. App. Ct. 2001) (affirming grant of judgment notwithstanding the verdict for defendant on claim for intentional interference with contractual relations, where plaintiff failed to demonstrate that nonrenewal of his contract "directly and proximately resulted" from plaintiff's actions).

Plaintiff's claim based upon not being selected for a retention bonus similarly fails. While Mr. Craigie's actions may have resulted in Plaintiff not receiving a $24,000 retention bonus, there is not a shred of evidence that Mr. Craigie did so "with an improper purpose or by improper means," or with "actual malice." Shea, 682 N.E.2d at 1350-51. It is undisputed that the Retention Bonus Program had a legitimate business purpose – i.e., to retain those employees (1) who were absolutely critical to the ongoing value of the Company, and (2) who would be most at risk to leave, particularly those with skill sets in high demand by other employers. See Craigie Dep. at 38; see also Frey Dep. at 70; Rist Dep. at 13-15. It is further undisputed that Mr. Craigie agreed with the decision not to select Plaintiff for a retention bonus in 2001 or a supplemental bonus in 2003 because he believed that Plaintiff simply did not meet these criteria. See Craigie Dep. at 119-120. Plaintiff can point to no facts that indicate otherwise. See Pl. Dep. at 142-46.

While Plaintiff may believe that he was some sort of whistleblower and speculate that Mr. Craigie was motivated to retaliate against him for his complaints about alleged improper activity within the company, this is pure conjecture. See Pl. Dep. at 67-69. Indeed, to the extent that Mr. Craigie was aware of Plaintiff's complaints about such issues, he considered Plaintiff to be performing his job functions as Director of Risk Management. See Craigie Aff. ¶3; cf.

Compl. ¶62 (alleging that Plaintiff's complaints were "consistent with the company's policies at the time and part of his job description").[16]  As such, Plaintiff cannot establish that Mr. Craigie acted "with an improper purpose or by improper means." Shea, 682 N.E.2d at 1350-51.  See also Shea, 682 N.E.2d at 1350-51 (affirming grant of summary judgment to defendant on intentional interference with contractual relations claim, where plaintiff failed to point to any facts to establish that the defendant was motivated to terminate her based upon her reporting the theft of funds); Wright, 589 N.E.2d at 1246 (reversing judgment for plaintiff on intentional interference with contractual relations claim, finding that "the record was devoid of evidence that the defendant's purpose in discharging plaintiff was unrelated to a legitimate corporate interest" where the plaintiff was terminated for reporting concerns about patient care to an outside survey team).

Given these circumstances, Mr. Craigie is entitled to summary judgment with respect to Plaintiff's claims for intentional interference with contractual relations and advantageous business relations (Counts III and V).

### 3. The Court Should Grant Mr. Frey Summary Judgment With Respect To Counts IV And VI

Like his claims against Mr. Craigie, Plaintiff's claims for intentional interference with contractual relations and advantageous business relations against Mr. Frey are based upon his termination from New Top-Flite and his exclusion from the Retention Bonus Program, as well as Plaintiff's belief that Mr. Frey was motivated by his "own personal motive and gain" to retaliate against him for making complaints about alleged improper activity within the company.  See Compl. ¶ 71-81, 85-87.  These claims similarly cannot survive summary judgment.

---

[16]     Nor could Mr. Craigie have retaliated against Plaintiff for his accusations regarding double-expense reports, given that Plaintiff did not lodge this accusation until after Mr. Craigie had left Spalding and the retention bonus decisions had already been made.

Plaintiff's claim based upon his termination from New Top-Flite suffers from the same three fatal deficiencies: causation, improper motive and damages. It is undisputed that Plaintiff continued to be employed by New Top-Flite after the Callaway acquisition on September 15, 2003, while Mr. Frey was never employed by that entity. See Paren Dep. at 32, 38-39, 42. In fact, Mr. Frey had resigned from Spalding in late June of 2003, approximately three months before the Callaway acquisition occurred. See Frey Dep. at 8. It is further undisputed that following the Callaway acquisition, the decision to eliminate Plaintiff's position was made by Brad Holiday, Callaway's CFO, not Mr. Frey. See Holiday Affidavit. Plaintiff can point to no facts that indicate otherwise. See Pl. Dep. at 45-51, 104-05. Given these circumstances, Mr. Frey cannot possibly have interfered with Plaintiff's employment relationship with New Top-Flite or Callaway, no less done so with an improper purpose or by improper means. Moreover, as discussed supra, Plaintiff has suffered no damages as a result of his termination of employment from New Top-Flite. See Harrison, 744 N.E.2d at 632; Netherwood, 757 N.E.2d at 266.

Similarly, Plaintiff's claim based upon his non-selection for retention bonus cannot survive summary judgment. Although Mr. Frey did not select Plaintiff to participate in the Retention Bonus Program, he did not act "with an improper purpose or by improper means," or with "actual malice." Shea, 682 N.E.2d at 1350-51. Again, it is undisputed that the Retention Bonus Program had a legitimate business purpose – i.e., to retain those employees (1) who were absolutely critical to the ongoing value of the Company, and (2) who would be most at risk to leave, particularly those with skill sets in high demand by other employers. See Frey Dep. at 70;; see also; Rist Dep. at 13-15; Craigie Dep. at 38. It is further undisputed that Mr. Frey selected only those of his direct reports which met these criteria. See Frey Dep. at 97. Mr. Frey did not

33

feel that Plaintiff's position was going to be significantly affected by going through a debt restructuring or a change in ownership, or any potential merger and acquisition.  See Frey Dep. at  93.  Furthermore, Mr. Frey did not feel that Plaintiff was a risk to leave the company (indeed, Plaintiff did not leave).  Id.  Plaintiff can point to no facts that indicate otherwise.  See Pl. Dep. at 142-46.   As such, Plaintiff cannot establish that Mr. Frey acted with an improper purpose or by improper means. Shea, 682 N.E.2d at 1350-51; Wright, 589 N.E.2d at 1246.[17]

Given these circumstances, Mr. Frey is entitled to summary judgment with respect to Plaintiff's claims for intentional interference with contractual relations and advantageous business relations (Counts IV and VI).

---

[17]     Indeed, taking Plaintiff's argument to his logical extreme, Mike Lyon, the Director of Taxation, would not have been selected for a retention bonus.  According to Plaintiff, Mr. Lyon allegedly expressed his concern that U.S. tax laws required Spalding to issue Form 1099s for a Hawaii trip that was provided to customers.  See Pl. Dep. at 195-98; see Arturi Dep. at 29-30.  The fact that Mr. Lyon was selected for a retention bonus is fatal to Plaintiff's assertion that Mr. Frey retaliated against those who reported concerns by excluding them from the Retention Bonus Program.

IV.     **<u>CONCLUSION</u>**

For the foregoing reasons, Defendants James Craigie and Daniel Frey respectfully request that the Court enter summary judgment in their favor with respect to all of the Counts in Plaintiff's Complaint.


Respectfully submitted,

The Defendants
JAMES CRAIGIE, INDIVIDUALLY AND
DANIEL FREY, INDIVIDUALLY
By Their Attorneys

/s/  Jeffrey E. Poindexter
Jeffrey E. Poindexter, BBO #631922
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts 01115
Tel. 413-781-2820; Fax. 413-785-5060

Of Counsel:
Steven R. Wall (admitted *pro hac vice*)
Tamsin J. Newman (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103
215.963.4928/5201

Dated:  September 30, 2005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above Memorandum of Law of Defendants James Craigie and Daniel Frey In Support Of Their Motion For Summary Judgment was filed electronically and served upon Lisa Brodeur-McGan by facsimile on Friday, September 30, 2005.

　　　　　　　　　　　　　　 /s/Jeffrey E. Poindexter
　　　　　　　　　　　　　　Jeffrey E. Poindexter, Esquire