# EXHIBIT A

**Dennis A. Paren**
**April 29, 2005**

1

Volume 1, Pages 1-231, Exhibits 1-16

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-30127-MAP


DENNIS A. PAREN

    Plaintiff

    v.

JAMES CRAIGIE, Individually

DANIEL FREY, Individually

    Defendants



DEPOSITION of DENNIS A. PAREN

Friday, April 29, 2005, 10:20 a.m. to 6:46 p.m.

Offices of Bulkley, Richardson & Gelinas, LLP

1500 Main Street, Suite 2700

Springfield, Massachusetts




---------- JONATHAN H. YOUNG, RDR, CRR -----------

COURT REPORTER

**Dennis A. Paren**
**April 29, 2005**

2

```
PRESENT:

Lisa Brodeur-McGan, Esq.

Cooley Shrair, PC

    1380 Main Street, Suite 201

    Springfield, Massachusetts 01103

    413.735.1775

    lbrodeurmcgan@cooleyshrair.com

    for the Plaintiff


Tamsin J. Newman, Esq.

Morgan, Lewis & Bockius LLP

    1701 Market Street

    Philadelphia, Pennsylvania 19103

    215.963.5201           Fax 215.963.5299

    tnewman@morganlewis.com

    for the Defendants
```

**Dennis A. Paren**
**April 29, 2005**

---

5

1    Q. Are you taking any drugs or medication of
2  any kind that would preclude you from answering
3  truthfully and accurately today?
4    A. No.
5    Q. Have you had any alcohol to drink in the
6  last eight hours?
7    A. No.
8    Q. And are you feeling sick at all today?
9    A. No.
10    Q. Is there any reason you can think of that
11  you would not be able to testify fully and
12  truthfully as you sit here today?
13    A. No.
14    Q. When were you deposed before?
15    A. I don't recall the exact dates; but I've
16  been deposed at other times in, normally, product-
17  liability claims against the company.
18    Q. Which company?
19    A. Spalding and Evenflo Companies,
20  Incorporated.
21    Q. How many times have you been deposed
22  before?
23    A. Maybe three.
24    Q. And those were in the 1990's, do you

---

6

1  remember?
2    A. Well, there were one or two after that.
3    Q. Have you ever been deposed in any lawsuit
4  to which you've been a party?
5    A. No.
6    Q. Have you ever filed any lawsuits before?
7    A. No.
8      MS. NEWMAN: I've taken the liberty
9  of premarking some exhibits, which I'm just going to
10  put in front of Mr. Paren.
11      Actually, I guess I should have brought
12  this up at the beginning. Are we doing the usual
13  stipulations?
14      MS. BRODEUR-MC GAN: Usual stipulations.
15      MS. NEWMAN: Okay.
16      [Paren Exhibits 1 through 4 marked for
17  identification]
18    Q. Mr. Paren, please take a look at the
19  document that's previously been marked as Exhibit
20  Paren 1. Do you recognize this document?
21    A. Yes.
22    Q. What is it?
23    A. It is the complaint against Jim Craigie and
24  Daniel Frey.

---

7

1    Q. And prior to the complaint being filed, did
2  you review it?
3    A. Yes, I did.
4    Q. And did you authorize your attorney to file
5  it on your behalf?
6    A. Yes, I did.
7    Q. On what date was it filed?
8    A. I don't remember the exact date. June or
9  July last year.
10      There's a date listed here of July 2,
11  2004.
12    Q. Does that sound about right to you?
13    A. It does.
14    Q. Do you have any reason to dispute July 2,
15  2004 as the filing date of the complaint?
16    A. No, I don't.
17    Q. And prior to filing the complaint, were the
18  allegations in the complaint true and accurate, to
19  the best of your knowledge and belief?
20    A. Yes, they were.
21    Q. If you could turn your attention to the
22  document that has previously been marked as Exhibit
23  Paren 2, do you recognize this document?
24    A. Yes, I do.

---

8

1    Q. What is it?
2    A. It's the complaint of age discrimination.
3    Q. Filed against which entities?
4    A. Filed against the Top-Flite Golf Company, a
5  wholly-owned subsidiary of Callaway Golf.
6    Q. If you could turn to Page 3, or the last
7  page of Exhibit Paren 2, is that your signature
8  halfway down the page?
9    A. Yes, it is.
10    Q. Prior to signing on Page 3, did you review
11  this complaint?
12    A. Yes, I did.
13    Q. Was it true to the best of your knowledge,
14  information and belief at the time that you signed
15  it?
16      MS. BRODEUR-MC GAN: Objection. You can
17  answer.
18    A. To the best of my knowledge, yes.
19    Q. And on what date did you sign this
20  complaint?
21    A. It is dated July 1, 2004. Therefore, I
22  must have signed it somewhere on or before that
23  date.
24    Q. Well, did you sign it in the presence of a

---

**Accurate Court Reporting**
**413.747.1806**

**Dennis A. Paren**
**April 29, 2005**

---

9

1  notary public?
2     A. I don't recall where I was at the time that
3  I signed it. Is it notarized? It's notarized.
4  Must have signed it in front of Lisa.
5     Q. Do you remember signing it in front of Lisa
6  Brodeur-McGan?
7     A. I don't remember where I was when I signed
8  that.
9     Q. Did you authorize Ms. Brodeur-McGan to file
10 this complaint with the Massachusetts Commission
11 Against Discrimination?
12    A. Yes, I did.
13    Q. On what complaint was this complaint filed,
14 if you know?
15    A. I don't know. The date on this piece of
16 paper states July 1, 2004.
17    Q. And if you could turn to the second page,
18 which is the first page of the complaint, you see
19 where it says Filing Date?
20    A. Yes.
21    Q. And it says 7/2/04?
22    A. Yes, I see that.
23    Q. Do you have any reason to dispute that
24 the complaint was filed with the Massachusetts

---

10

1  Commission Against Discrimination on July 2, 2004?
2     A. No, I don't.
3     Q. So it's possible that your complaint
4  against Mr. Craigie and Mr. Frey and your complaint
5  against Top-Flite, a wholly-owned subsidiary of
6  Callaway, were filed on the same day?
7     A. Someone should know that answer; I don't.
8  It's possible.
9     Q. It's possible?
10    A. I believe so.
11    Q. If you could turn your attention to the
12 exhibit that's been marked as Exhibit Paren 3, do
13 you recognize this document?
14    A. Yes, I do.
15    Q. What is it?
16    A. This is my answers to the defendants James
17 Craigie and Daniel Frey's first set of
18 interrogatories.
19    Q. Did you assist in the preparation of these
20 responses?
21    A. Yes, I did.
22    Q. If you could turn to Page 9 of Exhibit
23 Paren 3, is that your signature at the top of the
24 page?

---

11

1     A. Yes, it is.
2     Q. Prior to affixing your signature on Page 9,
3  did you review your answers to the interrogatories
4  to make sure that they were accurate and complete?
5     A. Yes.
6     Q. And you reviewed them under the penalties
7  of perjury?
8     A. Yes.
9     Q. Affixed to the back of Exhibit Paren 3 are
10 two charts. Do you see those?
11    A. Yes, I do.
12    Q. Did you authorize those to be attached to
13 the back of Exhibit Paren 3?
14        Let me ask it a different way. Are
15 these intended to be part of your response to the
16 interrogatories?
17        MS. BRODEUR-MC GAN: Objection. You can
18 answer.
19    A. Yes.
20    Q. If you could turn your attention to Exhibit
21 Paren 4, do you recognize this document?
22    A. Yes.
23    Q. What is it?
24    A. My supplemental answers to defendants James

---

12

1  Craigie and Daniel Frey's first set of
2  interrogatories.
3     Q. Did you assist in the preparation of your
4  answers to defendants' interrogatories?
5     A. Yes.
6     Q. And is that your signature on Page 2 of
7  Exhibit Paren 4?
8     A. Yes, it is.
9     Q. Prior to signing Exhibit Paren 4, did you
10 review it to insure that it was accurate and
11 complete?
12    A. Yes.
13    Q. And you signed it under penalties of
14 perjury; is that correct?
15    A. That's correct.
16    Q. And the last page of Exhibit Paren 4 is a
17 chart entitled Damage Calculation Chart for Dennis
18 Paren; do you see that?
19    A. Yes, I do.
20    Q. Did you prepare this chart?
21    A. No, I did not.
22    Q. Did you assist in the preparation of the
23 chart?
24    A. I was asked some questions, which I

---

**Dennis A. Paren**
**April 29, 2005**

---

13

1  responded to.
2      Q.  Did you review this chart prior to affixing
3  your signature to Page 2 of Exhibit Paren 4?
4      A.  Yes.
5      Q.  If you could turn your attention to
6  the exhibit that's been marked as Paren 2, the
7  complaint filed with the Massachusetts Commission
8  Against Discrimination, I just want to get the time
9  line straight, as well as some nomenclature
10  straight.
11          You were formerly an employee of Top-
12  Flite company; correct?
13      A.  Correct.
14      Q.  And at some point in time Top-Flite went
15  bankrupt and sold its assets to another company; is
16  that correct?
17      A.  That's correct.
18      Q.  And as you allege in Paragraph 3, Top-Flite
19  filed the bankruptcy on June 30, 2003; is that
20  right?
21      A.  Yes.
22      Q.  And Callaway Golf Company acquired the
23  assets of Top-Flite as part of that bankruptcy; is
24  that right?

---

14

1      A.  That's correct.
2      Q.  And the bankruptcy closed on September 15,
3  2003; is that right?
4      A.  Could you repeat that question?
5      Q.  The bankruptcy and the Callaway acquisition
6  closed on or about September 15, 2003?
7          MS. BRODEUR-MC GAN:  Objection to form.
8  You can answer.
9      Q.  Is that right?
10      A.  No, that's not right.
11      Q.  Tell me your understanding of what
12  happened.
13          MS. BRODEUR-MC GAN:  Objection to form.
14  You can answer.
15      A.  On September 15, 2003, Callaway Golf
16  Company purchased the assets of the bankrupt Top-
17  Flite Company, and then changed its name of TFGC
18  Acquisition Company to Top-Flite Golf Company,
19  a wholly-owned subsidiary of Callaway Golf.
20      Q.  So, prior to September 15, 2003, you were
21  an employee of Top-Flite Golf Company; correct?
22      A.  Correct.
23      Q.  And then, after September 15, 2003, you
24  were an employee of a new company, also called

---

15

1  Top-Flite Golf Company; is that correct?
2      A.  That's correct.
3      Q.  And that new Top-Flite was a wholly-owned
4  subsidiary of Callaway; is that right?
5      A.  That's correct.
6      Q.  Just for purposes of clarity in this
7  deposition today, I'm going to refer to Old Top-
8  Flite or New Top-Flite, or alternatively Callaway.
9  Do you understand that?
10      A.  Yes.
11          MS. BRODEUR-MC GAN:  Objection.
12          MS. NEWMAN:  What's the nature of your
13  objection?
14          MS. BRODEUR-MC GAN:  Could we go off the
15  record for a second?
16          MS. NEWMAN:  Sure.
17          [Off the record]
18      Q.  Mr. Paren, for purposes of clarity in this
19  deposition, when I refer to your employer prior to
20  September 15, 2003, I'm going to refer to Old Top-
21  Flite.  Do you understand that?
22      A.  Yes.
23      Q.  And when I refer to your employer on or
24  after September 15, 2003, I will be referring to

---

16

1  New Top-Flite; do you understand that?
2      A.  Yes.
3      Q.  Where are you working now?
4      A.  DIMON, Incorporated.
5      Q.  What's your position there?
6      A.  Director, international risk and benefits
7  management.
8      Q.  When did you assume that position?
9      A.  Late October 2004.
10      Q.  Is that a full-time position?
11      A.  Yes.
12      Q.  What's your annual salary?
13      A.  At this moment?
14      Q.  Yes.
15      A.  Or at the time I was hired?
16      Q.  When don't you give it to me at the time
17  you were hired, and then tell me when it changed.
18      A.  When I was hired, it was $110,000.
19      Q.  Was there a point when that changed?
20      A.  It changed effective April 1 to $113,200,
21  I believe.
22      Q.  And when you say April 1, do you mean April
23  1, 2005?
24      A.  Yes, I do.

---

**Dennis A. Paren**
**April 29, 2005**

17

1    Q. What benefits are you receiving as an
2 employee of DIMON, Incorporated?
3    A. I receive a pension plan, a 401(k)
4 plan, medical benefits which I pay through my
5 spouse; dental plan, group life insurance, group
6 long-term disability, accidental death and
7 dismemberment.
8    Q. Prior to DIMON, where were you employed?
9    A. David L. Babson.
10    Q. What were your dates of employment with
11 Babson?
12    A. I believe it was three weeks during the
13 month of July 2004.
14    Q. Were you employed by Babson at any other
15 time?
16    A. No, I wasn't.
17    Q. What was your position with Babson?
18    A. I don't remember what the title was.
19    Q. What were your job duties?
20    A. The job was to review loan covenants with
21 regard to insurance.
22    Q. And what was your pay at Babson?
23    A. $70,000.
24    Q. Annually?

18

1    A. Annually.
2    Q. But you only worked there for three weeks?
3    A. Correct.
4    Q. Why is that?
5    A. Because I found another position.
6    Q. With DIMON?
7    A. With DIMON.
8    Q. Why did you decide to go to DIMON from
9 Babson?
10    A. Because it paid more money, and the job was
11 more challenging.
12    Q. How did you get the job with DIMON? Did
13 you send them a resume through the mail, or was
14 there some other way?
15    A. I actually made contact with the recruiter
16 in April 2004 in San Diego, California.
17    Q. What was the recruiter's name?
18    A. I don't remember. It's International
19 Insurance Recruiters in Fort Lauderdale, Florida.
20    Q. Where are your offices at DIMON?
21    A. 512 Bridge Street, Danville, Virginia
22 24541.
23    Q. And where were your offices at Babson?
24    A. In this building.

19

1    Q. Here in Springfield, Massachusetts?
2    A. Yes.
3    Q. You said you worked for Babson for about
4 three weeks in July 2004, but you didn't start for
5 DIMON until October of 2004?
6    A. Correct.
7    Q. Did you earn any income in August or
8 September 2004?
9    A. I was on unemployment.
10    Q. How much did you collect in unemployment in
11 August and September 2004?
12    A. I don't recall. I know the total for 2004.
13    Q. How much was that?
14    A. About $9,000.
15    Q. We have some of the unemployment comp
16 documents, but I don't think we necessarily have
17 all of them; so if you wouldn't mind checking to see
18 if you have any other documentation of that.
19    A. It's listed on my tax return, the total
20 amount.
21    Q. I'll take a look at that as well.
22    A. Yes.
23    Q. Prior to Babson, where did you work?
24    A. I was sort of a consultant for TFGC Estate,

20

1 Inc.
2    Q. A consultant doing what?
3    A. Insurance- and pension-related work for the
4 bankrupt estate.
5    Q. Who hired you as a consultant?
6    A. Susan Watson.
7    Q. Who is she?
8    A. She is with Walker, Truesdell and
9 Associates.
10    Q. And what do they do?
11    A. They serve as administrators for bankrupt
12 companies.
13    Q. When you were working as a consultant for
14 TFGC estate, Inc, who did you report to?
15    A. Susan Watson.
16    Q. Was there anyone at New Top-Flite to whom
17 you reported?
18    A. No.
19    Q. Was there anyone at Callaway to whom you
20 reported?
21    A. No. It's a completely different company.
22    Q. And what is Susan Watson's title?
23    A. I don't recall.
24    Q. What was your rate of pay as consultant for

**Dennis A. Paren**
**April 29, 2005**

21

1 TFGC Estate, Inc?
2    A. $150 an hour.
3    Q. And when did you first start rendering
4 services as a consultant for TFGC Estate, Inc?
5    A. In December 2003.
6    Q. Was that directly after your termination of
7 employment from New Top-Flite?
8    A. Shortly thereafter.
9    Q. Do you remember the exact date?
10    A. No, I don't remember the exact date.
11        [Paren Exhibit 5 marked for
12 identification]
13    Q. Mr. Paren, I've just handed you some
14 documents that I've marked as Exhibit Paren 5.
15    A. Yes. Go ahead.
16    Q. I'll just represent to you that these
17 are documents that your attorney produced to us in
18 response to our document request seeking documents
19 relating to sources of income that you had received
20 after the termination of your employment from New
21 Top-Flite.
22        Do these look accurate to you?
23        MS. BRODEUR-MC GAN: Objection. You can
24 answer.

22

1    A. Well, I know that these are forms that I
2 received.
3        MS. BRODEUR-MC GAN: Can I just ask you
4 to rephrase the question? Do all the forms look
5 accurate as to what, specifically?
6        MS. NEWMAN: Okay; I will adopt that.
7        MS. BRODEUR-MC GAN: Thank you.
8    A. The forms from the Division of
9 Unemployment Assistance for Massachusetts only
10 show the very first payment of 558; and then it
11 shows payment of 474, when they began to withhold
12 taxes.
13        Those are not all of the receipts I
14 received from the DUA.
15    Q. And that's what I was referring to before.
16        It's your testimony that you received
17 approximately $9,000 as unemployment in the year
18 2004?
19    A. I believe that that was the amount on my
20 2004 tax return.
21    Q. If you could turn to the third page of
22 Exhibit Paren 5, which is Bates-numbered 0716, do
23 you recognize this document?
24    A. Yes.

23

1    Q. What is it?
2    A. This is one of my severance statements for
3 income received as of 9/30/2004 from the New Top-
4 Flite Golf Company.
5    Q. So there should be more than just one
6 paycheck, correct; or pay statement?
7        MS. BRODEUR-MC GAN: Objection. You can
8 answer.
9    A. There was a pay statement. There were 24
10 pay statements; each was for the exact amount.
11    Q. And that was in the year 2004?
12    A. That's correct.
13    Q. So if I look where it says on the upper
14 left-hand side Severance, and it says five
15 thousand...
16    A. Sixty-eight.
17    Q. ...sixty-eight fifty, that was paid on a
18 semimonthly basis; is that right?
19    A. Yes.
20    Q. So if I multiply that by 24, that was the
21 amount of the severance that you received from the
22 New Top-Flite?
23    A. Correct.
24    Q. And if I do that it comes to approximately

24

1 128; is that about right?
2    A. Correct.
3    Q. If you could turn to the next page, does
4 this reflect all of the income you received from
5 Babson Capital Management?
6    A. Yes.
7        As look at this statement, I see that
8 the three weeks that I worked were during September,
9 and not July as I indicated earlier.
10    Q. So you're correcting your testimony that
11 you gave before?
12    A. Yes.
13    Q. Are there any other pay statements from
14 Babson that were issued?
15    A. I don't recall. There might have been one
16 prior to this, but this is the year-to-date and last
17 statement.
18    Q. So Babson paid you in 2004 approximately
19 $2,962.16?
20    A. Yes.
21    Q. The rest of the documents appear to be pay
22 stubs. Are they pay stubs from Walker, Truesdell?
23    A. Yes.
24    Q. I'll represent to you that I added these up

**Dennis A. Paren**
**April 29, 2005**

25

1  and it came to $59,480. Does that sound about
2  right?
3     A. I think it was just a little bit more than
4  that. Again, the correct amount is listed on my
5  2004 statement.
6     Q. Let's take a look at your 2004 tax return,
7  which you have provided me today. I only have one
8  copy. We'll mark this as Exhibit Paren 6.
9         [Paren Exhibit 6 marked for
10  identification]
11    Q. Mr. Paren, looking at your 2004 federal tax
12  return, on Line 7 you've listed your wages; do you
13  see that there?
14    A. Yes, I do.
15    Q. Can you tell me the sources of income or
16  wages that comprise the total wage amount listed on
17  Line 7 of $141,455?
18    A. Well, I don't have with me an accurate
19  breakdown; but the majority of that, $120,000-some,
20  is a severance from the New Top-Flite Golf Company.
21  There's $2900 or so from David L. Babson Company.
22  There is a portion from DIMON. And then there is
23  also my wife's income from Baystate Hospital.
24    Q. What about your income from Walker,

26

1  Truesdell?
2     A. That is listed on Line 12; or a part of it,
3  actually.
4     Q. It's listed as business income because you
5  were rendering services as a consultant?
6     A. You actually have to turn to Schedule C,
7  Line 1.
8     Q. If you could provide me a copy of any
9  supporting documentation for your tax return for
10  2004, including your W-2s.
11    A. Yes.
12       MS. BRODEUR-MC GAN: Supporting
13  documentation I'll object to, but we could talk
14  specifically about what you want.
15       MS. NEWMAN: W-2s, specifically.
16    Q. So as reported to the Department of the
17  Treasury, Internal Revenue Service, your gross
18  income for 2004 was $211,870; is that right?
19    A. That's correct.
20    Q. And how much of that was your wife's
21  income, approximately?
22    A. Well, my wife began work in November; so it
23  was only about $5,000.
24       MS. NEWMAN: Off the record.

27

1         [Off the record]
2     Q. What were your exact dates of employment
3  for Old Top-Flite?
4     A. I can give you approximate dates.
5     Q. That's fine.
6     A. April 1979 to September 15, 2003.
7     Q. And then from September 15, 2003 through
8  December 5, 2003, you were an employee of New Top-
9  Flite?
10    A. Correct.
11    Q. What position did you hold with Old Top-
12  Flite just prior to September 15, 2003?
13    A. Director of risk management.
14    Q. How long did you hold that position?
15    A. Since 1989.
16       Well, the title had changed. Well, the
17  responsibilities had changed a little bit, also,
18  during those years.
19       [Paren Exhibits 7 and 8 marked for
20  identification]
21    Q. Mr. Paren, I'm handing you a document that
22  I've just marked as Exhibit Paren 7. Do you
23  recognize this document?
24    A. Yes. This is one of my earlier job

28

1  descriptions.
2     Q. I'll represent to you that I found this in
3  the personnel file that New Top-Flite provided to
4  us. Are you aware of a later job description?
5     A. Yes. There was a later job description.
6     Q. If you could take a moment to review this
7  job description and tell me if you believe that it
8  accurately describes your job duties as director of
9  risk management in 2003 for Old Top-Flite.
10    A. There are a number of responsibilities that
11  I had in 2003 that are not reflected in this job
12  description.
13    Q. What are those?
14       MS. BRODEUR-MC GAN: Objection.
15    Q. What are the additional job duties that you
16  believe you held in 2003 that are not reflected on
17  Exhibit Paren 7?
18    A. I was in charge of business travel.
19    Q. Anything else?
20    A. I was in charge of, well, to a degree the
21  auditing of expense reports. I was on the pension
22  committee, the 401(k) committee.
23       Those were the primary additions that
24  I can think of at this moment.

**Dennis A. Paren**
**April 29, 2005**

---

29

1    Q. And when did you move up to Massachusetts?
2    A. In October 1998.
3    Q. And who did you report to at that time?
4    A. Wade Lewis.
5    Q. What was his position?
6    A. Acting chief financial officer.
7    Q. Did there come a point in time when you
8  reported to someone else?
9    A. Yes. Wade Lewis hired Daniel Frey.
10    Q. When was that?
11    A. I don't recall the exact date.
12    Q. Do you have any reason to dispute that Dan
13  Frey started with Old Top-Flite in approximately
14  September of 1999?
15    A. No.
16    Q. That sounds about right?
17    A. Yes.
18    Q. So beginning September of 1999, you
19  reported to Dan Frey?
20    A. Correct.
21    Q. And what was his position?
22    A. Chief financial officer.
23    Q. And who did he report to, if you know?
24    A. Jim Craigie.

---

30

1    Q. And what was his position?
2    A. Chief executive officer.
3    Q. In the time frame from September of 1999
4  into 2003, who else reported to Dan Frey, if you
5  know?
6    A. Mike Lyon.
7    Q. What was his position?
8    A. Director of taxes. Charlie Kimmett.
9    Q. What was his position?
10    A. General accountant.
11    Q. Who else?
12    A. Lynn LaFond.
13    Q. What was her position?
14    A. I don't know whether she reported directly
15  to Dan. Payroll administrator.
16    Q. Who else?
17    A. Stephen Nigro.
18    Q. What was his position?
19    A. Directory of treasury operations.
20    Q. Who else?
21    A. Vic; last name escapes me right now.
22    Q. Varga?
23    A. Varga.
24    Q. What was his position?

---

31

1    A. Director of financial planning.
2    Q. Did anyone else report to Dan Frey?
3    A. Yes. The director of collections.
4    Q. What was his name, or her name?
5    A. It escapes me right now.
6    Q. Could it have been an employee by the last
7  name of Kustra?
8    A. Kustra, K-u-s-t-r-a.
9    Q. What was that employee's first name?
10    A. Larry.
11    Q. Did anyone else report to Dan Frey?
12    A. No.
13    Q. You mentioned Rich Levandowski. What was
14  his position?
15    A. Standard cost accountant.
16    Q. So to summarize, in addition to
17  yourself, Mike Lyon, Charlie Kimmett, Stephen
18  Nigro, Vic Varga, Larry Kustra and Rich Levandowski
19  reported directly to Dan Frey; is that right?
20        MS. BRODEUR-MC GAN: Objection. You can
21  answer.
22    A. To the best of my knowledge.
23    Q. And in addition, Lynn LaFond may have
24  reported to Dan Frey indirectly; is that right?

---

32

1    A. Correct.
2    Q. Did there come a point in time when Dan
3  Frey was no longer employed by Old Top-Flite?
4    A. Yes.
5    Q. When was that, if you know?
6    A. I believe it was in June 2003.
7    Q. Is it possible it could have been about...
8    A. Could have been the end of May.
9    Q. June 20, 2003? Does that sound about
10  right?
11    A. Yes.
12    Q. Did there come a point in time when Jim
13  Craigie was no longer employed by the New Top-Flite?
14    A. Yes.
15    Q. When was that?
16    A. September 15, 2003.
17    Q. So Dan Frey was never employed by New Top-
18  Flite; correct?
19    A. Correct.
20    Q. Actually, I need to rephrase something I
21  said before.
22        Jim Craigie was never employed by New
23  Top-Flite either, was he?
24    A. Correct.

---

Dennis A. Paren
April 29, 2005

33

1    Q. After Dan Frey left, who did you report to?
2    A. The name escapes me.
3    Q. Would it refresh your recollection to look
4  at the list of employees on...
5    A. No. He wouldn't have been on that list.
6    Q. If the name comes to you later, if you
7  wouldn't mind telling me, that would be great.
8    A. Okay.
9    Q. After Dan Frey left...
10   A. Andrew Kelleher.
11   Q. Kelleher?
12   A. I believe so.
13   Q. What was his position?
14   A. Chief financial officer.
15   Q. Of what company?
16   A. The New Top-Flite.
17   Q. On what date did you begin to report to
18  Andrew Kelleher?
19   A. I don't remember the date that he started.
20   Q. But it was sometime after September 15,
21  2003?
22   A. Correct.
23   Q. Who did you report to in the time period
24  from when Dan Frey left in June of 2003 until

34

1  September of 2003?
2    A. I don't recall the name. He was in
3  California.
4    Q. So the person you reported to was at
5  Callaway?
6    A. Correct.
7    Q. Did they have an insurance department at
8  Callaway?
9    A. The insurance functions were divided.
10   Q. In what way?
11   A. In that they did not have one person or
12  department.
13        They had workmen's compensation in one
14  area, and the person that I reported to did the
15  majority of the acquisition of the insurance.
16   Q. And that's the person whose name you can't
17  remember right now?
18   A. Correct.
19   Q. Who took over Dan Frey's job duties as CFO
20  from June of 2003 through September of 2003?
21   A. Andrew Howley, H-o-w-l-e-y.
22   Q. What was his job title?
23   A. Acting chief financial officer.
24   Q. Was he hired from the outside?

35

1    A. He was with, I can't remember the exact
2  name of the company. Kolfo, Zoop; help me out.
3        He was with a consulting company that
4  they hired. Kevin Goldmont and Andrew Howley.
5  Kevin Goldmont is the acting CEO.
6    Q. Was this after New Top-Flite came into
7  being?
8    A. He continued after New Top-Flite, but he
9  didn't work for New Top-Flite. He was working for
10  the estate at that point.
11   Q. But wasn't Jim Craigie the chief executive
12  officer of Old Top-Flite?
13   A. Yes, he was; but he was sharing those
14  responsibilities once the bankruptcy happened.
15   Q. With Kevin Goldmont?
16   A. Yes.
17   Q. That was just for the time period of June
18  2003 to September 2003?
19   A. Yes.
20   Q. Were there any employees that assumed some
21  of Dan Frey's job responsibilities after he left, to
22  your knowledge?
23   A. Not know.
24        MS. BRODEUR-MC GAN: What was the

36

1  answer? Not know?
2        THE WITNESS: Not that I know of.
3    Q. Do you remember giving your resume to
4  Vaughn Rist in about April 2003?
5    A. I remember giving my resume to Vaughn Rist.
6  I do not recall the date.
7    Q. Were you aware that Vaughn Rist passed your
8  resume on for possible consideration by Russell?
9    A. Yes. I do recall that.
10   Q. Did you authorize Mr. Rist to pass your
11  resume on to Russell?
12   A. Yes, I did.
13   Q. Why did you do that?
14   A. He thought it would be a good idea to do.
15        He suggested it because the president of
16  Russell also used to live in western Massachusetts,
17  Longmeadow, Massachusetts; and because Russell was
18  obtaining the assets of Spalding that had the
19  largest exposure to product-liability claims.
20   Q. And was that something desirable for you?
21        MS. BRODEUR-MC GAN: Objection. You can
22  answer.
23   Q. Why did that matter to you?
24   A. Why did what matter to me?

**Dennis A. Paren**
**April 29, 2005**

---

37

1    Q. What you just described about the Russell
2 business.
3        MS. BRODEUR-MC GAN: Objection. You can
4 answer.
5    A. Well, it's when companies have an exposure
6 that they normally need somebody more specialized in
7 insurance.
8    Q. Is it possible that this could have been in
9 or around April of 2003?
10   A. Yes.
11   Q. Were you looking to leave Old Top-Flite in
12 April of 2003?
13   A. No, I wasn't looking to leave. Matters
14 were very uncertain at the time.
15   Q. What response, if any, was there to your
16 resume on behalf of Russell?
17   A. I never heard back. I never heard
18 anything.
19   Q. Did you pass your resume on to any other
20 companies in April 2003?
21   A. I may have. I don't recall. I was not in
22 an active job search in April 2003.
23   Q. It just basically looked like a good
24 opportunity, so you wanted to just consider that

---

38

1 opportunity?
2        MS. BRODEUR-MC GAN: Objection. You may
3 answer.
4    Q. Just explain to me why you were interested
5 in applying there.
6        MS. BRODEUR-MC GAN: Objection.
7    A. I did not apply.
8        If somebody says there could be
9 an opportunity, most people would say I don't
10 have any problem with you having them look at my
11 resume.
12   Q. Did you tell anyone other than Vaughn Rist
13 that your resume was being passed on to Russell?
14       MS. BRODEUR-MC GAN: Objection. You can
15 answer.
16   A. I believe Peter Arturi and Vaughn both
17 spoke to their counterparts at Russell.
18   Q. Are you aware of anyone else who may have
19 known that your resume had been passed on to
20 Russell?
21   A. No.
22       [Recess taken]
23 BY MS. NEWMAN:
24   Q. Mr. Paren, when did you learn that New Top-

---

39

1 Flite was terminating your employment?
2    A. On the date that it happened.
3    Q. December 5, 2003?
4    A. Yes.
5    Q. How did you learn that your employment was
6 being terminated? Did somebody tell you?
7    A. I was called into Vaughn's office.
8    Q. What was Vaughn Rist's job title?
9    A. Senior vice-president of human resources.
10   Q. Was anyone else in Mr. Rist's office when
11 he called you in?
12   A. Oh. Andrew.
13   Q. Andrew Kelleher?
14   A. Andrew Kelleher.
15   Q. Anyone else?
16   A. No.
17   Q. And what happened next when you went into
18 Mr. Rist's office?
19   A. He informed me that the job function was
20 being terminated.
21   Q. This is Mr. Rist; he said that? Who was it
22 that said that?
23   A. I don't recall whether it was Vaughn or
24 Andrew.

---

40

1    Q. What else did they tell you?
2    A. They told me I had the rest of the
3 afternoon to clean my office up.
4    Q. Anything else?
5    A. They asked me if there was anything that I
6 could think of that I wanted from the company.
7 I said, Laptop computer.
8    Q. How did you respond?
9    A. I said, I'd like to keep the laptop.
10       And they provided me the severance
11 agreement.
12   Q. Was that in the form of a letter?
13   A. The letter I had already had, yes. They
14 handed me a termination package.
15   Q. What was contained in the termination
16 package?
17   A. A COBRA notification, and I think it was
18 about a three-page termination letter.
19   Q. Anything else?
20   A. There might have been something else, but I
21 don't recall what that was. Maybe something to do
22 with the 401(k).
23   Q. Did Mr. Rist or Mr. Kelleher explain to you
24 what they meant by your job function being

---

**Dennis A. Paren**
**April 29, 2005**

41

1  terminated?
2      A.  I think they basically said that the
3  responsibilities were shifting to California.
4      Q.  To Callaway?
5      A.  Correct.
6      Q.  What else did they tell you?  Did they tell
7  you anything else?
8      A.  I don't recall.
9      Q.  Did they tell you which person or persons
10  in Callaway were assuming your job responsibilities?
11      A.  No.
12      Q.  Did you have an understanding as to who
13  that person or persons might be?
14      A.  I didn't ask.  I had an idea of what the
15  structure was at the time.
16      Q.  Did you express any opinion regarding the
17  fact that your job function was being terminated?
18          MS. BRODEUR-MC GAN:  Objection.  You can
19  answer.
20      A.  No, I didn't express any opinion other than
21  at that time.
22      Q.  Did you express anything to them in this
23  meeting in December of 2003?
24      A.  No.  I was in shock.

42

1      Q.  You had no reason to know that your
2  employment was being terminated prior to December of
3  2003?
4      A.  Well, everyone's employment was uncertain.
5      Q.  Why were you in shock?
6      A.  Because I was still performing a required
7  function for the company, and I felt that I was
8  contributing and getting along with all
9  individuals.
10          I mean, it wasn't a complete shock; but
11  nevertheless, 25 years, when someone says your job
12  is ending.
13      Q.  And by this time, in December of 2003,
14  Mr. Craigie was not employed by New Top-Flite;
15  correct?
16      A.  That's correct.
17      Q.  And by this time, in December of 2003, Dan
18  Frey was not employed by New Top-Flite; correct?
19      A.  Correct.
20      Q.  I'm handing you a document, Mr. Paren, that
21  I've just marked as Exhibit Paren 8.  Is this the
22  termination letter to which you just referred?
23      A.  It appears to be.
24      Q.  Did Mr. Rist or Mr. Kelleher discuss the

43

1  contents of this December 5, 2003 letter with you?
2      A.  Briefly.
3      Q.  What did they say?
4      A.  I believe they said that my pay
5  would continue until the end of December 2004, and
6  that I would have medical coverage at the employee-
7  contribution rate during that period of severance.
8      Q.  And your annual salary at this time was
9  what?
10      A.  I think it was $122,000.
11      Q.  Do you see Paragraph 6 on Page 2?
12      A.  Yes, I see it.
13      Q.  Did Mr. Rist or Mr. Kelleher discuss with
14  you Paragraph 6?
15      A.  No, they did not discuss this.
16      Q.  Did you have an opportunity to review the
17  December 5, 2003 letter at some point after your
18  meeting with Mr. Rist and Mr. Kelleher?
19      A.  Yes, I did.
20      Q.  Did you review Paragraph 6?
21      A.  I'm familiar with what Paragraph 6 attempts
22  to do, and so I did not read it.
23      Q.  What do you mean, you're familiar with what
24  it attempts to do?

44

1      A.  The purpose of Paragraph 6 is to release
2  one's rights against a company, and I didn't feel I
3  was going to do that.  I didn't bother to review in
4  detail this document.
5      Q.  Was it your understanding that signing the
6  release was a condition to receiving your severance
7  benefits?
8      A.  I did not believe so, and therefore I never
9  signed that release.
10      Q.  Why didn't you believe so?
11      A.  Because in the change-of-control letter
12  that I had from the company, which provided for one
13  year of severance, there is no language with regard
14  to signing a release.  Therefore, I did not believe
15  any additional consideration was being provided me,
16  and I wasn't going to sign it.
17      Q.  Did you raise to anyone at New Top-Flite
18  your belief that you didn't have to sign the
19  release?
20      A.  It was inherent in my actions.
21      Q.  But basically, you accepted the severance
22  but didn't sign the release?
23          MS. BRODEUR-MC GAN:  Objection.  You can
24  answer.

**Dennis A. Paren**
**April 29, 2005**

---

45

1    A. Correct.
2    Q. What do you believe is the reason why your
3    employment was terminated by New Top-Flite on
4    December 5, 2003?
5    A. The company wanted to reduce costs to the
6    extent possible, and they wanted to eliminate any
7    employees who they felt had any type of working
8    relationships with previous management.
9    Q. What is the factual basis for your belief
10   in the fact that the company wanted to reduce costs
11   and to eliminate any employees who they felt had
12   working relationships with previous management?
13   A. I had heard that they believed that Jim
14   Craigie, Dan Frey, Lou Tursi, Ed Several and Mike
15   Esch had lied during the due-diligence period, and
16   they did not want them or anyone related to them.
17   They began to find out how bad the company really
18   was.
19   Q. When you say they, who are you referring
20   to?
21   A. Well, I heard that from Peter Arturi.
22   Q. When was that?
23   A. Sometime in early 2004.
24   Q. In early 2004, when you spoke to

---

46

1    Mr. Arturi, was this in person?
2    A. Yes.
3    Q. Where?
4    A. At the New Top-Flite headquarters.
5    Q. At his offices?
6    A. Either in his office or my office. I also
7    had an office there.
8    Q. And Mr. Arturi was general counsel of New
9    Top-Flite at the time?
10   A. Correct.
11   Q. When you say you had an office there,
12   didn't your employment terminate in December of
13   2003?
14   A. Yes, it did.
15   Q. Why did you have an office at the New
16   Top-Flite in 2004?
17   A. Because the TFGC Estate, Inc had contracted
18   for an office with the New Top-Flite.
19   Q. In your conversation with Mr. Arturi in
20   early 2004, that you were referring to earlier, what
21   exactly did he tell you?
22   A. Something to the effect that the new
23   president -- I forget his first name; last name was
24   Pennicka -- Pennicka and top management at Callaway

---

47

1    had decided that it was best to rid the company of
2    anyone associated in any way with Jim Craigie or
3    his direct reports.
4    Q. What else did Mr. Arturi tell you?
5    A. Well, I want to change that. That was the
6    implication of what Mr. Arturi told me.
7        He stated that Pennicka had instructed
8    him to terminate the employment of Roseanne
9    Stirlacci.
10   Q. Who is she?
11   A. She was Jim Craigie's secretary;
12   administrative assistant.
13       And when Roseanne asked why am I being
14   terminated, the response was that the company has
15   made a decision to terminate anyone associated with
16   Jim Craigie.
17   Q. And who did Ms. Stirlacci hear that from?
18   A. Peter Arturi.
19   Q. Just so I understand, Ms. Stirlacci was
20   terminated and she asked why...
21   A. She asked Peter Arturi.
22   Q. She asked Mr. Arturi why.
23       And Mr. Arturi said, Because I have
24   been told to terminate the employment of employees

---

48

1    who are associated with prior management, and
2    specifically Jim Craigie? Did I characterize
3    that right?
4        MS. BRODEUR-MC GAN: Objection. You can
5    answer.
6    Q. Just feel free to correct me.
7    A. That's close.
8    Q. Is there anything else you want to add to
9    that?
10   A. Well, I don't recall every detail. This is
11   over a year ago, now, that that took place.
12       People talked about this type of stuff
13   all day long; and, even though I was no longer an
14   employee, I still saw all of the announcements of
15   the New Top-Flite.
16       And we saw that there were consecutively
17   layoffs, and the people being laid off were those
18   people that had had executive-type relationships
19   under Jim Craigie's leadership.
20   Q. I just want to completely understand. What
21   did Mr. Arturi tell you?
22   A. Mr. Arturi told me that he was given the
23   task to terminate Roseanne Stirlacci, even though
24   Roseanne did not report to him.

---

**Dennis A. Paren**
**April 29, 2005**

65

1  rather than to a smaller management group; and by
2  doing that management was going to provide
3  employees a smaller merit rate increase.
4      Q.  Did Mr. Rist tell you how he reached that
5  understanding?
6      A.  It was all spelled out in company
7  documents.  It was provided to the employees
8  through a communication meeting.
9      Q.  Do you have a copy of any of those
10  documents?
11      A.  I don't know, but everybody is familiar
12  with that.
13      Q.  And what did Jim Craigie announce to the
14  employees?
15      A.  Simply that the company was going
16  to provide a smaller merit rate increase to all
17  employees, but was going to include the employees in
18  the management incentive bonus program;
19          so thereby, if the company met
20  its performance goals, which he was in charge of
21  achieving with his direct reports, then everybody
22  would enjoy in effect a higher rate of compensation
23  than what they would have received just with a pure
24  merit increase.

66

1          Not only was this communicated one time;
2  there were subsequent meetings where Jim Craigie
3  would explain how the company's performance was
4  doing versus its goal.
5      Q.  Did Cindy Marr, Mary Rosenthal or Lynn
6  LaFond identify any of the persons they believed
7  were receiving bonuses?
8      A.  They did, but I don't recall their names.
9          They did, sort of reluctantly.  This
10  payroll information should be confidential.
11      Q.  If you remember, who were the people that
12  they identified as receiving bonuses?
13      A.  I can't recall their names.  They were
14  sales people.
15      Q.  How would you characterize the financial
16  conditions of Old Top-Flite or Spalding in the
17  2000-2001 time frame?
18      A.  It was deteriorating, due to poor
19  performance.
20      Q.  Well, isn't it also true that at the time
21  there were new entrants into the market, including
22  Nike, Adidas, and Callaway?
23      A.  Throughout the industry, there will always
24  be cycles of new entrants coming in and others

67

1  leaving.
2      Q.  Were you familiar with that in the
3  2000-2001 time frame?
4      A.  Yes.
5      Q.  Now, Old Top-Flite had different managing
6  committees?
7      A.  Can you be more specific?
8      Q.  Sure.  Are you familiar with the operating
9  committee of Old Top-Flite?
10      A.  Yes.
11      Q.  Were you on that committee?
12      A.  No.
13      Q.  What committees did you sit on?
14      A.  The pension committee.  The 401(k).
15      Q.  Were the pension committee or the 401(k)
16  committee involved in making decisions with regard
17  to the award of retention bonuses?
18      A.  No.
19      Q.  Do you know what committee, if any, was
20  involved in making those decisions?
21      A.  There was a compensation committee, I
22  believe.
23      Q.  Were you on that committee?
24      A.  No.

68

1      Q.  Do you believe the compensation committee
2  was involved in making decisions with regard to
3  retention bonuses?
4          It's okay if you don't know; you just
5  need to tell me what you know.
6      A.  I believe that it was primarily Jim
7  Craigie, Dan Frey, and the direct reports of Jim
8  Craigie.
9      Q.  And what's your factual basis for believing
10  that Jim Craigie, Dan Frey, and Mr. Craigie's direct
11  reports made decisions with regard to retention
12  bonuses for employees?
13      A.  Those individuals served as the members of
14  the operating committee; OCM.
15      Q.  And it's your understanding that the OCM
16  and its members made decisions with regard to the
17  retention bonuses?
18          MS. BRODEUR-MC GAN:  Objection.  You can
19  answer.
20      Q.  Is that right?
21      A.  It's conjecture on my part.  That's what I
22  would assume.  They directed the operations of
23  everything in the company.
24      Q.  But you had no involvement in making

**Dennis A. Paren**
**April 29, 2005**

---

69

1  decisions with regard to retention bonuses?
2      A. No, I did not.
3      Q. And you didn't attend any OCM meetings, did
4  you?
5      A. No, I did not.
6      Q. You attend any meetings at which retention
7  bonuses were discussed, did you not?
8          MS. BRODEUR-MC GAN: Objection. You can
9  answer.
10     A. Correct.
11     Q. Did you have the opportunity to review any
12  documents that related to the retention-bonus
13  program that was adopted in 2002?
14     A. When?
15     Q. At any time.
16     A. At any time? I saw certain documents
17  during the course of a year or two with regard to
18  the retention-bonus programs.
19     Q. What documents did you see?
20     A. There is a document in the April 2002
21  restructuring agreement with Oaktree Capital
22  Management.
23     Q. What document is that? Can you describe
24  the document for me?

---

70

1      A. It's a document that lays out a guaranteed
2  retention-bonus program.
3      Q. When did you have the opportunity to review
4  that document?
5      A. Peter Arturi and Mike Lyon had copies of
6  that agreement, and they each provided me at
7  different times access to look at it.
8      Q. When did Peter Arturi provide you access to
9  the retention-bonus-program document that you refer
10  to?
11     A. Well, first of all, the retention-
12  bonus-program document was included in a very
13  large binder, so he did not specifically provide
14  me the document just to look at retention bonuses.
15     Q. Why did he provide you the document, if you
16  know?
17     A. I was probably looking at, it could have
18  been warranties and representations that were being
19  made by the company, insurance requirements that
20  were being asked, directors' and officers'
21  exposures; things of that nature.
22     Q. And what did Mr. Lyon show you; the same
23  document?
24     A. He had the exact same copy.

---

71

1      Q. Have you had the opportunity to review any
2  other documents relating to the retention-bonus
3  program?
4      A. There were additional documents that were
5  filed with the bankruptcy court.
6      Q. Anything else?
7      A. No.
8          With regard to just pure documents, it
9  all depends what your definition is of a document
10  with the retention-bonus program on it.
11     Q. I guess I want to hear about documents
12  that related to eligibility for retention bonuses,
13  or determining the amounts of retention bonuses.
14  Did you see any documents like that?
15     A. No. Those are the ones I saw.
16     Q. When did you become aware that Old Top-
17  Flite had adopted a retention-bonus program in
18  2002?
19     A. I believe it was subsequent to the first
20  payment being made, which would have been after mid-
21  April 2002.
22     Q. And how did you learn that the first
23  payment of the retention bonuses had been made?
24     A. Either Mike Lyon or Peter Arturi provided

---

72

1  me access to the 2002 restructuring agreement, and
2  it was enclosed in that.
3      Q. But the first you learned about the
4  retention-bonus payments being made was when you
5  reviewed the Oaktree Capital restructuring agreement
6  in April of 2002?
7      A. Correct.
8      Q. Did that document reflect that payments
9  were being made in April 2002?
10     A. Yes.
11     Q. What did you do after you learned about the
12  payments being made?
13     A. I believe I talked with Mike Lyon, and I
14  might have talked with some other individuals, and
15  indicated how it was unfair that I was not included
16  in that program; and then I began to prepare a
17  memorandum to that effect.
18     Q. Did Mr. Lyon receive a retention bonus?
19     A. Yes, he did; small one.
20     Q. Do you know how much his bonus was?
21     A. No, not offhand.
22     Q. Do you know which the other direct reports
23  to Dan Frey received a retention bonus as part of
24  the 2002 retention-bonus plan?

---

**Dennis A. Paren**
**April 29, 2005**

---

77

1    Q. Do you know who was involved in making the
2  decision to award sale bonuses to certain employees?
3    A. Specifically, no, I do not.
4    Q. Do you have a belief as to who was involved
5  in making determinations with regard to sale
6  bonuses?
7    A. I would believe that Dan Frey and Jim
8  Craigie drove the program, and maybe there was
9  some type of contribution from Vaughn Rist.
10    Q. What did Mr. Arturi tell you in the summer
11  of 2002 with regard to sale bonuses?
12    A. That it was being somehow based upon the
13  amount of stock which a current employee owned in
14  the company.
15    Q. Did he tell you anything else?
16    A. He might have told me something else, but
17  that's all I can recall at this moment.
18    Q. Are you aware that you were one of the
19  employees that was selected for a sale bonus?
20    A. Yes, I was.
21    Q. When did you become aware of that?
22    A. When Peter Arturi informed me.
23    Q. So he informed you in the summer of 2002?
24    A. Yes. I believe Dan Frey might have

---

78

1  informed me of that also.
2    Q. Do you remember if it was Mr. Arturi or
3  Mr. Frey who told you first?
4    A. I believe it was Mr. Arturi.
5    Q. And what did you say in response to him, if
6  anything, after he informed you that you had been
7  selected for a sale bonus?
8    A. We both laughed.
9    Q. Did he say anything?
10    A. He might have said something to the effect
11  of, Don't count on it ever happening.
12    Q. And when did you discuss the sale bonus
13  with Mr. Frey?
14    A. Sometime towards the summer of 2002, I
15  believe, Dan called me in to give me, I believe,
16  some restricted stock shares, and told me at that
17  point in time in an effort to appease me.
18    Q. What did he tell you about the restricted
19  stock shares?
20    A. That I had more than anybody else in the
21  finance group.
22    Q. Did he tell you why you were being issued
23  restricted shock shares?
24    A. Because I had purchased more company stock

---

79

1  than anybody else in the finance group, and paid
2  for it.
3    Q. What did you say in response, if anything?
4    A. I don't recall what my response was. It
5  was not positive.
6    Q. Why wasn't it positive?
7    A. Because it was based upon an unattainable
8  level.
9    Q. The sale bonus?
10    A. The sale bonus, yes.
11    Q. What about the restricted stock shares?
12    A. The restricted stock shares were worthless.
13    Q. When did you purchase shares, originally,
14  in the company?
15    A. 1997.
16    Q. Any other years?
17    A. No.
18    Q. And how much stock did you purchase in
19  1997?
20    A. I purchased, I think it was 18,000 shares.
21    Q. How much did you pay for the 18,000 shares?
22    A. $5 apiece. And then there were some
23  adjustments afterwards.
24    Q. Was it mandatory to purchase stock in 1997?

---

80

1    A. It was expected.
2    Q. Was there something in writing that it was
3  expected?
4    A. The purpose of the program was to have
5  management, that was in charge of performance of the
6  company, share in the exposure as to its success or
7  failure.
8    Q. But did anyone convey to you that you were
9  expected to purchase shares?
10    A. It was an honor. It was presented to
11  people as an honor to be able to purchase shares,
12  and in fact everyone purchased shares but one
13  individual.
14    Q. And you were not required to purchase those
15  shares in 1997; correct?
16    A. No one told me I was required, right.
17      MS. NEWMAN: We can take a break for
18  lunch right now.
19        [Luncheon recess]
20  BY MS. NEWMAN:
21    Q. Mr. Paren, now I want to talk about your
22  defamation claim that you've asserted against
23  James Craigie.
24      If you could turn to your complaint,

---

**Dennis A. Paren**
**April 29, 2005**

---

85

1    A. The last part of Item 4.
2    Q. Which part?
3    A. When I was informed of this violation, I
4 immediately made Stephanie repay the double-billed
5 amounts, and I subsequently severed her as an
6 employee.
7        Her termination of employment was quite
8 a bit past the time at which I reported the double
9 billing; and the characterization is that he was
10 punishing her for falsifying her expense reports,
11 when that was really not the case.
12        Other than that, there are no other
13 statements.
14    Q. This e-mail was sent from Jim Craigie to
15 you on September 18, 2003; is that right?
16    A. Yes.
17    Q. Did you forward this e-mail to anyone?
18    A. I may have. I don't recall.
19    Q. Do you remember the names of any of the
20 people to whom you may have forwarded Mr. Craigie's
21 September 18, 2003 e-mail?
22        MS. BRODEUR-MC GAN: Objection.
23    A. I do not recall at this moment.
24    Q. To your knowledge, was this e-mail shared

---

86

1 with anyone within the company; the company being
2 New Top-Flite?
3    A. Within the New Top-Flite, or the Old
4 Top-Flite?
5    Q. Well, this was sent on September 18, 2003,
6 so there was no Old Top-Flite any more; right?
7    A. Well, there was still Kevin Goldmont, and
8 there was still Andy Howley, that worked for the Old
9 Top-Flite.
10    Q. But the entity itself didn't exist after
11 September 15, 2003; right?
12    A. The bankrupt entity continued to exist. It
13 had just simply changed its name from the Top-Flite
14 Golf Company to TFGC Estate, Inc.
15    Q. But we discussed earlier the definitions of
16 New Top-Flite and Old Top-Flite, so I need to
17 understand...
18        MS. BRODEUR-MC GAN: Objection.
19    A. There were no longer any employees in the
20 Old Top-Flite.
21        However, there was still the
22 acting CFO, there was still the acting CEO;
23 and those people, Andy Howley, I did talk to
24 about this e-mail. I don't know that I showed

---

87

1 it to him, but I did talk to him about it.
2    Q. And who was Andy Howley? What was his
3 position?
4    A. Oh. Kroll Zolfo Cooper; that's the name of
5 the company.
6        Andy Howley was the acting chief
7 financial officer; was.
8    Q. So, how did Andy Howley become aware of
9 Mr. Craigie's September 18, 2003 e-mail?
10    A. I informed him.
11    Q. What did you tell him?
12    A. I told him I received this e-mail.
13    Q. Did you show him a copy of the e-mail?
14    A. I don't recall.
15    Q. Did you describe the contents of the e-mail
16 to him?
17    A. I believe I did.
18    Q. And what if anything did he say in
19 response?
20    A. It sounds like Jim Craigie had too much
21 wine to drink before he sent that e-mail to you at
22 10:00 at night.
23    Q. Are there any other persons who became
24 aware of Mr. Craigie's September 18, 2003 e-mail?

---

88

1    A. I might have shown it to Peter Arturi.
2    Q. When was that?
3    A. I don't know whether I did or I did not,
4 but normally I shared information with Vaughn Rist
5 and Peter Arturi.
6    Q. So is it possible that you shared
7 Mr. Craigie's September 18, 2003 e-mail with
8 Vaughn Rist?
9    A. Possible.
10    Q. Are there any other persons you believe
11 were aware of Mr. Craigie's September 18, 2003
12 e-mail?
13    A. I can't recall.
14    Q. Do you have any reason to believe that
15 Mr. Arturi, Mr. Rist, or Diane Blaney, to whom this
16 e-mail was forwarded, shared the e-mail with anyone
17 else?
18    A. Peter Arturi could have provided it to his
19 legal assistants, paralegals, who knew me quite
20 well.
21    Q. Do you have any knowledge that he did that?
22    A. No, I don't.
23        MS. BRODEUR-MC GAN: Don't guess.
24    A. I don't know that he did that, or I don't

---

**Dennis A. Paren**
**April 29, 2005**

---

93

1    A. Yes.
2        I don't know, he might have known
3    previous to that, though; before I went to talk to
4    him.
5    Q. Was he expecting you?
6    A. No.
7    Q. And did you have an understanding as to
8    what he meant when he said He has one of those
9    Dennis Paren faces on?
10    A. Yes.
11    Q. What did you believe he meant?
12    A. Well, he meant that within the small
13    corporate-executive wing that we had, the majority
14    of the individuals all had happy, smiley faces on,
15    because they were all part of his cronyism bunch
16    and were being rewarded, and I was excluded from
17    that;
18        and I was trying to instill ethics
19    within the company, and because I was having no
20    success very often the stress would make me frown.
21    Q. Did he ever tell you that that's what he
22    meant when he referred to your Dennis Paren face?
23    A. It was, I thought, very well understood.
24    Q. But you're just assuming that you have the

---

94

1    same understanding that he had; right?
2    A. Yes; a strong belief that that's correct.
3    Q. How did Mr. Craigie's statement in front of
4    Roseanne Stirlacci affect your ability to secure
5    continued employment with Callaway or the New
6    Top-Flite?
7        MS. BRODEUR-MC GAN: Objection. You can
8    answer.
9    A. Well, again, Roseanne worked for the
10    president, and she was going to continue with the
11    new president; and Roseanne also knew that I felt a
12    lot of stress in trying to clean up the company
13    without having the support of the executive
14    management.
15        To give you one example, one time
16    when I was writing something to the CFO before Dan
17    Frey, Wade Lewis, she saw it and reported that to, I
18    think, Vaughn Rist; who came and spoke to me and
19    said, no, it would be better not to have that.
20        Another thing that Roseanne did, because
21    she knew of this stress, is she would buy me things
22    that said Don't sweat the small stuff; try not to
23    carry this all on your shoulders.
24    Q. So, how did Mr. Craigie's statement affect

---

95

1    your ability to secure continued employment with New
2    Top-Flite?
3    A. Well, I think it tarnished my reputation,
4    and it closed off opportunities for me with the new
5    company; because people talk, and people share
6    opinions, and sometimes presidents like to
7    take the advice of their assistants.
8    Q. Who is the president that Roseanne
9    Stirlacci worked for?
10    A. Rob Pennicka. I believe it's Rob, is his
11    first name.
12    Q. Do you believe that Ms. Stirlacci repeated
13    Mr. Craigie's statement -- Oh, he has one of those
14    Dennis Paren faces on -- to other people?
15    A. I can't say.
16    Q. You don't know?
17    A. I don't know.
18    Q. Are there any other reasons why you
19    believe that Mr. Craigie's statement in front of
20    Roseanne Stirlacci affected your ability to secure
21    continued employment with Callaway or the New Top-
22    Flite?
23    A. Only that because of Mr. Craigie's
24    position with the company, and because he was at

---

96

1    one time trusted by and interacted with the people
2    at Callaway, his having a diminished view of myself
3    didn't help me with seeking employment with the new
4    company.
5    Q. Is it your contention that Mr. Craigie
6    advised Top-Flite or Callaway not to continue with
7    you?
8    A. No. It's my contention that he had
9    interactions with them which I am not privy to;
10    and during those interactions something may have
11    been said, and it's through this course of
12    discovery that we hope to find out.
13    Q. But you don't know that he said anything at
14    all to anyone at New Top-Flite or Callaway about
15    you, do you?
16    A. No, I don't know for a fact; no.
17    Q. In your answers to interrogatories, which
18    are Exhibit Paren 3, you identified Peter Arturi,
19    Vaughn Rist, Dan Frey, Andy Howley, Ferris Grooms
20    and your family as having knowledge or information
21    regarding the two statements that you allege
22    Mr. Craigie made that were defamatory.
23        MS. BRODEUR-MC GAN: Can I ask what
24    number you're referring to?

---

**Accurate Court Reporting**
**413.747.1806**

**Dennis A. Paren**
**April 29, 2005**

89

1  know that he didn't do that.
2    Q. So the question is, do you have any reason
3  to believe that anyone other than the people to whom
4  this e-mail was forwarded saw this e-mail; the
5  September 18, 2003 e-mail?
6    A. Do I have any reason to believe?
7       My only reason to believe that
8  somebody else saw it is because this is gossip
9  fodder in a corporate office; and people like to
10 see things like this, especially about an ex-CEO
11 who was very disliked.
12   Q. Did anyone tell you that they saw the
13 e-mail?
14   A. No. No, they did not.
15   Q. So you're just assuming that people saw it
16 because it was gossip fodder?
17   A. Yes.
18   Q. In your complaint, you allege that your
19 ability to secure continued employment with the
20 purchased company Callaway was affected by the
21 false statements.
22      Do you see that in Paragraph 48 of your
23 complaint?
24   A. Yes.

90

1    Q. How did Mr. Craigie's September 18, 2003
2  e-mail affect your ability to secure continued
3  employment with Callaway?
4    MS. BRODEUR-MC GAN: Objection to form.
5  You can answer.
6    A. Paragraph 48 was not referring to that
7  e-mail specifically, although it could include
8  that e-mail.
9    Q. Sitting here today, do you believe that
10 Mr. Craigie's September 18, 2003 e-mail affected
11 your ability to secure continued employment with
12 Callaway or New Top-Flite?
13   A. May have influenced that, yes.
14   Q. How?
15   A. Well, it was placed in my personnel file;
16 and as part of new management coming in, reviewing
17 personnel files of individuals, that would have been
18 one of the most recent additions to the file.
19   Q. Do you believe it was inappropriate for
20 this e-mail to have been put in your personnel
21 file?
22   A. I don't believe that it was something that
23 positively reflected upon me by putting it in my
24 personnel file.

91

1    Q. But the question is, are you saying that it
2  was inappropriate for Vaughn Rist to have directed
3  Diane Blaney to put Mr. Craigie's September 18,
4  2003 e-mail in your file?
5    A. I believe that Vaughn might have done
6  better to put this in a separate file.
7       However, I am not a human-
8  resource executive; so I do not know exactly
9  what the policies and procedures are as to what
10 should be placed in a personnel file and what
11 shouldn't.
12   Q. Are there any other facts that support your
13 belief that Mr. Craigie's September 18, 2003 e-mail
14 affected your ability to secure continued employment
15 with Callaway or the New Top-Flite?
16   A. No.
17   Q. The next statement that you identify as
18 defamatory that was made by Mr. Craigie relates to a
19 statement he made in front of his secretary; is that
20 right?
21   A. Yes.
22   Q. Tell me what he said.
23   A. Reading from the answer, it says, A oh, he
24 has one of those Dennis Paren faces on.

92

1    Q. When was this?
2    A. Shortly after Stephanie Lawrence was found
3  cheating on her expense reports.
4    Q. And when was that?
5    A. I would have to review records to give you
6  that date.
7    Q. And Jim Craigie's secretary was Roseanne
8  Stirlacci?
9    A. Correct.
10   Q. Were there any other witnesses to this
11 statement that he made?
12   A. No.
13   Q. What was the context in which he made that
14 statement?
15   A. The context was that I was bringing him bad
16 news, and I had sort of a frown on my face at the
17 time, because nothing was getting done with these
18 types of incidents.
19      And so I was appealing to the most
20 authoritative person there in the office to do
21 something significant to stop these abuses.
22   Q. So he made the statement before you
23 informed him about Stephanie Lawrence's double
24 submissions of travel expenses?