**97**

1    MS. NEWMAN: Number 2; right there.
2    A. Yes.
3    Q. Other than what you've already testified
4    to, is there any other knowledge or information that
5    Peter Arturi would have about either of these two
6    allegedly defamatory statements?
7    A. I don't know what else Peter would have,
8    but I know that Peter had a relationship, and he
9    served on the operating committee; so he surely
10   overheard things that I would not have heard.
11   Q. What about Vaughn Rist?
12   A. Vaughn Rist was in the same position.
13   Q. But do you have any specific knowledge that
14   Vaughn Rist knew about Jim Craigie's statement in
15   front of Roseanne Stirlacci?
16   A. When statements out of the ordinary
17   were made, more often than not I shared those
18   with Vaughn Rist; and he did likewise, a lot of
19   the time.
20   Q. So to the extent that Mr. Rist knew about
21   that statement, it was because you shared it with
22   him?
23        MS. BRODEUR-MC GAN: Objection.
24   A. I don't know whether somebody else shared

**98**

1    it with him.
2    Q. What knowledge or information does Dan
3    Frey have about Mr. Craigie's September 18, 2003
4    e-mail and/or his statement in front of Roseanne
5    Stirlacci?
6    A. I don't know what Dan actually knows about
7    that, other than I'm sure that he has seen this
8    e-mail.
9    Q. You're sure of that because it's been
10   produced in this litigation, or you're sure that he
11   saw it prior to this litigation?
12   A. I know that he saw it because of
13   this litigation. I don't know whether he saw it
14   beforehand; but because of the communication ties
15   between people, there is a very high possibility he
16   could have seen it, yes.
17   Q. But you're really speculating about that?
18   A. Right. I don't know, yes.
19        MS. BRODEUR-MC GAN: Objection.
20   Q. Other than what you've already testified
21   to, what knowledge or information does Andy Howley
22   have about either Mr. Craigie's September 18, 2003
23   e-mail or his statement in front of Roseanne
24   Stirlacci?

**99**

1    A. As I informed you, he knows about the
2    e-mail because I told him. I did not tell him about
3    the comment that he made in front of Roseanne
4    Stirlacci.
5    Q. Who is Ferris Grooms?
6    A. Ferris Grooms is the president of Grooms
7    Financial Group in Tampa, Florida, and served as a
8    broker-slash-consultant on employee-benefits issues.
9    Q. And what knowledge or information does he
10   have about Mr. Craigie's September 18, 2003 e-mail
11   and/or Mr. Craigie's statement in front of Roseanne
12   Stirlacci?
13   A. I shared information with Ferris on a
14   regular basis.
15        So, as something happened, I normally
16   shared it with him shortly thereafter.
17   Q. And what knowledge or information does your
18   family have regarding the September 18, 2003 e-mail
19   or Mr. Craigie's statement in front of his
20   secretary?
21   A. They knew when things happened as soon as
22   they happened. We lived through this for years.
23   Q. I'd like to turn your attention now
24   to your claim of defamation against Daniel Frey,

**100**

1    which starts on Page 14 of your complaint, and to
2    which you refer beginning on Page 2 of your
3    interrogatory responses.
4         The first statement that you allege to
5    be defamatory is a July 15, 2002 e-mail that Dan
6    Frey sent to Peter Arturi; is that right?
7    A. Yes.
8    Q. I'm handing you a document that I've marked
9    as Exhibit Paren 11.
10        [Paren Exhibit 11 marked for
11   identification]
12   Q. This document bears the Bates label 0047,
13   and appears to be an e-mail from Dan Frey to Peter
14   Arturi, copying Vaughn Rist and Jim Craigie, on July
15   15, 2002.
16        Is this the e-mail that you allege was
17   defamatory?
18   A. Can I take a minute to read it?
19   Q. Of course.
20        [Pause]
21   A. All right; what was the question again?
22        MS. NEWMAN: Can you read the question
23   back?
24        MS. BRODEUR-MC GAN: The question was,

**101**

1  Is this what you were referring to in the
2  interrogatory?
3      THE WITNESS: Yes.
4  Q. What statements in Dan Frey's July 15, 2002
5  e-mail do you believe are untrue or defamatory?
6  A. In the second paragraph, where he states
7  We walked through a few points in his letter to
8  Peter which I felt were factually inaccurate or
9  distorted.
10     Well, I don't believe that I wrote
11  anything that was factually inaccurate or
12  distorted.
13  Q. Anything else?
14  A. And then also the following sentence, Our
15  discussion was civil, but knowing Dennis we still
16  probably haven't heard the last from him on this
17  topic.
18  Q. Why do you character that as untrue or
19  defamatory?
20  A. Because it characterizes me as someone who,
21  one he has heard the truth, doesn't accept it; and
22  that's not what happened.
23  Q. Is there anything else in Mr. Frey's July
24  15, 2002 e-mail that you believe is untrue or

**102**

1  defamatory?
2  A. No
3  Q. This e-mail was not sent to you, was it?
4  A. No, it was not.
5  Q. How did you become aware of Mr. Frey's July
6  15, 2002 e-mail?
7  A. It was in my personnel file.
8  Q. Did there come a time when you inspected
9  your personnel file?
10  A. I believe there was.
11  Q. When was that?
12  A. Well, definitely after my termination, and
13  possibly prior to that.
14  Q. How did you get access to your personnel
15  file?
16  A. The process was the same for everyone. You
17  went to the human-resource department and requested
18  to see your personnel file.
19     They did not permit you to remove the
20  file from their presence, and you could inspect it;
21  and if you wanted to make a copy of something you
22  could.
23  Q. And did you make a copy of this e-mail?
24  A. Yes.

**103**

1  Q. Do you believe that Mr. Frey's July 15,
2  2002 mail was shared with anyone other than Peter
3  Arturi, Vaughn Rist and Jim Craigie?
4  A. Well, it was shared with those individuals,
5  plus anyone who reviewed my personnel file. That
6  was at a minimum.
7  Q. Are there others that you believe acquired
8  access to Mr. Frey's July 15, 2002 e-mail?
9  A. No.
10  Q. Do you believe that it was inappropriate
11  for Mr. Frey's July 15, 2002 e-mail to be placed in
12  your personnel file, if in fact it was?
13  A. If in fact it was? I don't understand.
14  Q. If the July 15, 2002 e-mail was in your
15  personnel file, do you believe it was
16  inappropriate for it to be there?
17  A. Well, first, it was in my personnel file;
18  all right?
19  Q. Okay.
20  A. And then, again, the decision as to whether
21  it should have been in my personnel file was not
22  mine to make. And so, I won't judge that.
23  Q. In Paragraph 57 of your complaint,
24  you allege that your ability to secure continued

**104**

1  employment with the purchased company Callaway was
2  affected by the false statements of Dan Frey; do you
3  see that there?
4      MS. BRODEUR-MC GAN: Objection. You can
5  answer.
6  A. Yes, I see it.
7  Q. How did Mr. Frey's July 15, 2002 e-mail
8  affect your ability to secure continued employment
9  with Callaway or the New Top-Flite?
10  A. By not supporting everything else in my
11  personnel file, which was all positive. This was
12  in effect a negative type of memo.
13  Q. And is it the same as you testified earlier
14  with respect to the fact that it was in your
15  personnel file?
16     Explain to me the causal link between
17  the e-mail being in your personnel file and it
18  affecting your ability to secure continued
19  employment with the new company.
20     MS. BRODEUR-MC GAN: Objection. You can
21  answer.
22  A. Two ways.
23     One, with regards to this memo, it was
24  the fact that this memo was in my personnel file and

**105**

1 was available for anyone from the new company to
2 see; all right?
3     It is customary, for people to
4 take a look at the personnel file, even if it's
5 just briefly, to get an idea of who they're going to
6 interview or discuss or even consider, without that
7 person maybe even having knowledge of it.
8     The second item that this refers to is
9 the fact that Dan Frey, just like Jim Craigie, had
10 interactions with the people at Callaway and with
11 other companies that might have been interested in
12 purchasing the assets of the bankrupt estate.
13     And I'm not privy to what conversations
14 they actually had. However, knowing that they had
15 been retaliating against me to begin with, I knew
16 that nothing positive was going to be said.
17   Q. But sitting here today, you don't know
18 whether Dan Frey said anything about you to the
19 people at New Top-Flite or Callaway, do you?
20     MS. BRODEUR-MC GAN: Objection. You can
21 answer.
22   A. No, I don't know.
23   Q. Looking back at your interrogatory
24 response, this is your Response Number 3, you

**106**

1 state, Furthermore, on September 16, 2003 Peter
2 Arturi informed me that Dan Frey had decided to
3 exclude me (from the retention bonus plan) because
4 I was a pain in his butt. Did I read that
5 correctly?
6   A. Which number were you reading, again?
7     MS. BRODEUR-MC GAN: Right here.
8   A. Yes, you read that correctly.
9   Q. Tell me in your own words what Peter Arturi
10 told you on September 16, 2003.
11   A. Well, that's exactly what Peter Arturi told
12 me.
13   Q. What was the context in which he...
14   A. The context was that I knew, again, at this
15 point in time that everybody was receiving large
16 bonuses at the time of the closing of the sale
17 of the company, which was September 15;
18     and so there were many, many people
19 that were very, let's say, joyous about the event,
20 because they were happy to receive a large amount of
21 money. I was excluded from that.
22     Peter through the history had known
23 I had been asking for information; and he had
24 supported me in that effort, even though Dan

**107**

1 prevailed and excluded me.
2     So Peter, continuing with the
3 new company, sort of wanted to tell me that We're
4 starting with the new company, there's nothing that
5 the new company can do about what Dan Frey did; so
6 this is why you were excluded according to Dan, and
7 you just have to live with it and go on. That was
8 the context.
9   Q. What did Mr. Arturi tell you about Dan
10 Frey's reasons for excluding you from the
11 retention-bonus plan?
12   A. Well, the reasons, we knew. The reasons
13 were unstated. We knew what the reasons were.
14   Q. Did Peter Arturi tell you his understanding
15 of Dan Frey's reasons for excluding you from the
16 retention-bonus plan?
17   A. Peter and I talked on a daily basis for
18 years. He knew all of the various flaws within the
19 company that I had uncovered and tried to correct.
20     So those were the issues that were being
21 a pain in the ass to Dan Frey; because it was Dan
22 Frey's failings on these issues, financial in
23 nature, that were his responsibility.
24     And nobody likes to be told they're not

**108**

1 performing up to what I felt their duties and
2 responsibilities were.
3   Q. The question I'm posing to you is, did
4 Peter Arturi tell you his understanding of Dan
5 Frey's reasons for excluding you from the
6 retention-bonus plan?
7   A. Peter said something; but again it was all
8 well known between Peter, myself, Mike Lyon, Stephen
9 Nigro, Charlie Kimmett, Lynn LaFond, that I was the
10 person tooting the horn saying something is wrong,
11 and they didn't want to hear it.
12     So, we didn't have to talk about, Oh,
13 they didn't like it because you went and reported
14 Stephanie Lawrence, or you did something else.
15   Q. So the answer is that Mr. Arturi did not
16 tell you Mr. Frey's reasons for excluding you from
17 the retention-bonus plan?
18     MS. BRODEUR-MC GAN: Objection.
19   A. Mr. Arturi did not specifically outline
20 item by item those reasons.
21   Q. Did any of the people you just mentioned
22 ever tell you their understanding of the reasons
23 why you were excluded from the retention-bonus
24 plan?

Dennis A. Paren
April 29, 2005

**133**

1  Q. Mr. Paren, the document that I've just
2  provided to you and marked as Exhibit 12, is this
3  the e-mail to which you were referring?
4  A. No.
5  Q. There's another e-mail that you sent to
6  Scott Graves?
7  A. In the first sentence, it talks about
8  an e-mail that I sent him last Friday; so you'd have
9  to go back on a calendar to figure out when that
10 date was.
11 Q. Have you produced us a copy of that e-mail?
12 A. I assume so.
13     MS. BRODEUR-MC GAN: I'm sure, if we had
14 it, we produced it.
15     MS. NEWMAN: I'm sure, if we had it, I'd
16 have it as an exhibit.
17 Q. Well, the e-mail that you sent to
18 Mr. Graves, what did it say?
19 A. I'd have to reread it to be accurate as
20 to what it said, but it had something to do with the
21 fact that in the last days of Jim Craigie operating
22 as CEO he was doubling up on his expense reports.
23 Q. But the retention-bonus plan was adopted in
24 or about April of 2002; correct?

**134**

1  A. Yes.
2  Q. So, how did your reports of Mr. Craigie's
3  alleged unlawful activity result in your exclusion
4  from the retention-bonus plan that was adopted in
5  April of 2002?
6  A. Because the retention-bonus program was
7  under revision during the time when Dan had made
8  it known that he was leaving the company; that's
9  one.
10    Number two, other people that had been
11 included in the retention-bonus program had left the
12 company; which created fewer people, with more
13 money.
14    Number three, Jim Craigie had written
15 on a memo that I had written saying, We can't add
16 Dennis to the plan unless there are more dollars.
17 Q. Which memo did he write that on?
18 A. The memo that I wrote to Peter Arturi, and
19 then went to Jim's office and gave him that.
20 Q. Mr. Paren, I've just handed you a document
21 that we've marked as Exhibit Paren 13. It bears
22 Bates labels 0001 through 0003; a memo from
23 you to Peter Arturi.
24     [Paren Exhibit 13 marked for

**135**

1  identification]
2  Q. Is this the memo to which you were just
3  referring?
4  A. Yes, it is.
5     MS. BRODEUR-MC GAN: Just object for
6  the record. I'm not sure my client was finished
7  answering the question when we pulled the
8  document out.
9     MS. NEWMAN: I'm sorry.
10 Q. Go ahead and finish your answer.
11 A. Ask the question again.
12     MS. BRODEUR-MC GAN: Off the record a
13 second.
14     [Off the record]
15 Q. Mr. Paren, just so the record is clear,
16 I had asked you how your reports of Mr. Craigie's
17 alleged unlawful conduct had resulted in your
18 exclusion from a retention bonus, and you
19 were giving me a list of reasons.
20 A. Yes.
21 Q. Can you just finish that list, and then
22 we'll come back and ask you about Exhibit 13.
23 A. I'm not sure I have anything else to add to
24 that list at this time.

**136**

1  Q. So the first thing you mentioned, which we
2  already went over, was the fact that you went to the
3  board of directors in September of 2003, around the
4  time of the Callaway acquisition; right?
5  A. Correct.
6  Q. And then the second thing you mentioned was
7  the memorandum that you had prepared which had Jim
8  Craigie's handwriting on it; is that right?
9  A. Yes.
10 Q. Now, walk me through how Exhibit 13 relates
11 to your belief that Mr. Craigie excluded you from a
12 retention bonus because you reported his alleged
13 unlawful conduct.
14 A. Which one is Exhibit 13? Oh, okay. Ask me
15 that question again.
16     MS. BRODEUR-MC GAN: I'm objecting as to
17 form.
18 Q. I just want to understand the basis for
19 your belief that Mr. Craigie excluded you from a
20 retention bonus because you reported his alleged
21 unlawful or improper conduct; and you mentioned
22 this memorandum.
23     I just need to understand why you
24 mentioned the memorandum, and your reasons.

**137**

1  A. This memorandum provided me hope, because
2  he wrote, We cannot do this unless we have dollars
3  left under that plan or one of the participants
4  leaves Spalding.
5      Now, it was right around this time that
6  participants were leaving Spalding. There was more
7  money, Dan Frey was leaving. And so there were more
8  dollars on the table.
9      And Jim Craigie had a lot of influence
10 with who was accepted or who was put in this plan,
11 and for how much. Those are the reasons.
12 Q. This memorandum that you wrote to Peter
13 Arturi, you sent it to him in June of 2002; is that
14 right?
15 A. Yes.
16 Q. And do you know when Mr. Craigie hand-wrote
17 this language on the upper right-hand corner of
18 Exhibit 13?
19 A. I believe it was a few weeks afterwards.
20 Q. When did you first acquire a copy of your
21 memorandum with Mr. Craigie's handwriting on it?
22 A. I can't recall.
23 Q. So, what is the factual basis for your
24 belief that Mr. Craigie ultimately decided not to

**138**

1  include you in September 2003 for a retention
2  bonus?
3  A. Because I had this memo. Sometime in
4  September 2003 I had this memo, even in August.
5      I went to Vaughn Rist and said, I know
6  things are being changed; it says here that you'll
7  consider me based upon these events happening, and
8  they're happening.
9      And he went to Jim, and talked to Jim;
10 and actually even told me, I think Jim, now that
11 Dan is gone, will approve it.
12     And then subsequently, he came back and
13 he said, I'm sorry, Dennis, but I can only do what
14 I'm told to do.
15 Q. Did Mr. Rist tell you what Jim Craigie said
16 to him when he went to talk to him about your
17 inclusion in the retention bonus in 2003?
18 A. I believe he had more than one conversation
19 with him, and at one point he was hopeful.
20 Q. Did Mr. Rist tell you what Jim Craigie said
21 on any of those occasions?
22 A. No, he did not tell me specifically what he
23 said.
24 Q. But Mr. Rist conveyed to you his optimism

**139**

1  that Mr. Craigie might include you in the retention
2  bonus?
3  A. That's correct.
4  Q. And did Mr. Rist tell you if Mr. Craigie
5  explained to him why you ultimately were not
6  included for a retention bonus in September
7  of 2003?
8  A. Did he explain to me? No. Nothing more
9  than, I'm only told what to do.
10 Q. Did Mr. Rist convey to you what Mr. Craigie
11 had told him, other than that you wouldn't be
12 included?
13 A. No.
14 Q. Did Mr. Rist tell you that Jim Craigie had
15 told him that you would not be included because you
16 had reported improper or unlawful conduct by him?
17 A. No, he did not say it.
18 Q. Did anyone ever tell you that the
19 reason you were not included in the retention
20 bonus in September of 2003 was because you reported
21 unlawful or improper conduct by Jim Craigie?
22 A. Again, not specifically. It was a given
23 that the reason why I wasn't included was because I
24 did report; not just about Jim Craigie, but about

**140**

1  other individuals.
2      And so the precedent was already set to
3  exclude me. Jim Craigie just continued on that
4  path.
5  Q. When you say precedent, you mean the
6  original plan from April 2002?
7  A. Correct; and then when my name came up
8  subsequent to that also.
9  Q. So are you alleging that Mr. Craigie
10 excluded you from the retention-bonus plan in April
11 of 2002 because you reported unlawful or improper
12 conduct by Mr. Craigie, or by anyone else?
13 A. Well, not by Mr. Craigie, but by other
14 people.
15 Q. What is the factual basis for your belief
16 that your reporting of unlawful or improper conduct
17 was the reason why you were excluded from a
18 retention bonus?
19     MS. BRODEUR-MC GAN: Objection. You can
20 answer.
21 A. Well, I would refer you to the third
22 paragraph of the letter to Scott Graves.
23 Q. Paren 13?
24 A. Paren 12.

**161**

1  Q. What about with respect to KKR? Are
2  there any other facts that support your belief that
3  Mr. Frey retaliated against you and interfered with
4  your ability to secure employment with KKR?
5  A. I don't know anything more at this point.
6  Hopefully I'll learn more during the discovery
7  stage.
8  Q. Mr. Paren, I'd like to direct your
9  attention to your claims of intentional interference
10 with advantageous business relations against Jim
11 Craigie.
12       Other than what you've already
13 testified to, are there any other facts that you
14 rely on in support of your claim against Mr. Craigie
15 for intentional interference with advantageous
16 business relations?
17 A. No.
18 Q. And what about with respect to your claim
19 of intentional inference with advantageous business
20 relations against Dan Frey? Do you have any other
21 facts that you rely on that you hadn't already
22 testified to in support of that claim?
23 A. Not that I can think of at the moment.
24 Q. Now, I'd like to turn your attention to

**162**

1  Paragraph 22 of your complaint. I want to give you
2  the opportunity, sitting here today, to fully
3  explain your allegations in Paragraph 22.
4       So, beginning with Paragraph 22 A, you
5  allege -- I'm just going to read this -- a report on
6  the review of an advertising promotion designed by
7  Ed Several whereby Post Cereals was being portrayed
8  as a huge buyer of Spalding products when in reality
9  the majority of the products were being furnished
10 free of charge.
11      While this discrepancy was being
12 discussed with Daniel Frey, Ed Several appeared
13 in his office and Daniel Frey remarked, Speak of the
14 devil; giving up Dennis Paren's identity as the
15 whistleblower.
16      Subsequently, Ed Several humiliated
17 Dennis Paren by screaming Lead me away in handcuffs;
18 and even called Dennis Paren into one of his staff
19 meetings and announced to his staff members From now
20 on Dennis Paren is going to attend all of our staff
21 meetings, and he will review every promotion prior
22 to implementation.
23      Did I read that correctly?
24 A. Yes.

**163**

1  Q. When you state that the discrepancy was
2  being discussed with Daniel Frey, were you the
3  person who was discussing the discrepancy?
4  A. Yes.
5  Q. When did this occur?
6  A. I don't recall. I don't recall the date.
7  It was probably in 2001.
8  Q. The incident in which Ed Several screamed
9  Lead me away in handcuffs, when did that occur?
10 A. Shortly thereafter, after this incident.
11 Q. The same day?
12 A. No.
13 Q. So, it was how much longer after?
14 A. Well, it was within a period of a week or
15 two.
16      They called him Crazy Ed, and Dan
17 referred to him as psychotic.
18 Q. Do you contend that Mr. Frey directed
19 Mr. Several to scream Lead me away in handcuffs?
20 A. Did he direct him? No.
21 Q. Okay.
22 A. But he knew what Ed's reaction was going to
23 be; because he was called Crazy Ed, so he knew the
24 reaction was going to be very negative in nature.

**164**

1  Q. Aside from what you've already alleged,
2  is there anything else you want to tell me about
3  your claim that Post Cereals was not appropriately
4  portrayed as a huge buyer of Spalding products?
5       MS. BRODEUR-MC GAN: Objection.
6  A. I'm sorry; what is it that you want to know
7  exactly?
8  Q. What's the factual basis for your belief
9  that Post Cereals was inappropriately portrayed as a
10 huge buyer of Spalding products?
11 A. There was a contract for this particular
12 promotion. I reviewed the contract for purposes of
13 seeing whether a performance bond was secured
14 properly.
15      In reading the contract, I obviously
16 became familiar with what the terms of the contract
17 were, and they seemed to be very disfavorable to
18 Spalding.
19      Dan Frey told me that Ed Several had
20 presented this promotion within the operating
21 committee group; and those individuals don't
22 normally read the contracts, they simply
23 listen to the presentation.
24      And Ed Several presented this promotion

**165**

1 in a manner as that it was going to produce a lot of
2 future sales for the company; and I was telling Dan
3 I didn't see how that was going to happen based upon
4 the contract.
5     I asked Dan who analyzed the contract to
6 see whether it made financial sense for the company.
7 It turned out that nobody actually had analyzed the
8 contract.
9     And so therefore, I took a look at it.
10 I was reporting back to Dan what I saw, and that's
11 when Ed came in the door; and he didn't like
12 the fact that somebody was scrutinizing or
13 second-guessing one of his promotions.
14 Q. How did Mr. Frey respond to your raising a
15 concern about this?
16 A. Very nonchalantly.
17 Q. What did he say?
18 A. He said, Ed has a very strong relationship
19 with Jim Craigie, and whatever Ed wants to do, Jim
20 Craigie is going to approve; Ed is psychotic, so you
21 need to be careful with him.
22     And then, as soon as that was said, Ed
23 walks in the door, and he lets Ed know what I'm
24 talking about.

**166**

1 Q. In Paragraph 22 B, you allege, James
2 Craigie routinely offered extraordinary company
3 benefits to individuals previously associated with
4 him at his prior employer, Kraft Foods, such as
5 signing bonuses, higher salaries, and quick
6 promotions;
7     and also unique benefits for a select
8 few, for instance providing Dan Zanetich, director
9 of procurement, contractual lifetime health-care
10 benefits at the time of his hiring.
11     Did I read that correctly?
12 A. Yes, you did.
13 Q. Which individuals do you believe were
14 receiving extraordinary company benefits?
15 A. In terms of compensation?
16 Q. Well, in terms of the individuals that you
17 were referring to in Paragraph 22 B of your
18 complaint.
19 A. Mike Esch, Lou Tursi, Ed Several, Dan Frey,
20 Dan Bracken. I'd have to take a look at a whole
21 long list. Dan Zanetich, in this instance.
22     They were referred to as cheeseheads in
23 the company, because most of them were formerly from
24 Kraft.

**167**

1 Q. Why do you believe that the benefits
2 offered to these individuals were extraordinary?
3 A. Here's a case where I pointed out
4 that a person was given lifetime medical. That's
5 completely contrary to the policies that the company
6 has. They're not able to give lifetime medical to
7 somebody, especially if they're no longer an
8 employee.
9     Dan Bracken was given an expense-
10 reimbursed vacation.
11     Other individuals from Kraft were
12 given quick promotions, and one year's severance
13 agreements when they had just worked a few months
14 for the company. They were given more vacation than
15 what they were entitled to under company policies.
16 Q. Did you raise to anyone your concern that
17 certain individuals were receiving extraordinary
18 benefits?
19 A. That was talked about all the time.
20 Q. So the answer is yes?
21 A. The answer is yes.
22 Q. Who did you raise your concern to?
23 A. Oh, we talked with Vaughn Rist, Dan Frey,
24 Peter Arturi. It was all talked about within just

**168**

1 the finance group.
2 Q. What was Vaughn Rist's response when you
3 expressed your concern?
4 A. That Jim Craigie and his direct reports
5 were destroying the internal policies of the
6 company.
7 Q. When did he say this?
8 A. I don't recall the date that he said that.
9 Q. And when you raised your concern about the
10 extraordinary benefits provided to certain
11 individuals...
12 A. I don't remember the exact date, but I
13 remember what we were talking about; and what we
14 were talking about was the jump in the level of
15 income of the executive officers as a group from
16 what it used to be to what it was under Jim
17 Craigie.
18 Q. Does that give you a better sense of when
19 it was that you talked with Vaughn Rist about this?
20 A. No. Maybe two years ago. I'm not sure
21 exactly.
22 Q. When did you raise your concern to Dan
23 Frey?
24 A. Well, we were always telling Dan Frey that

**169**

1 the company's financial performance was terrible,
2 and that they should cut out some of these
3 benefits and things that were going on.
4     Q. When you say we, who are you talking about?
5     A. Well, I voiced it. I believe Lynn LaFond
6 voiced it too; because people were upset, the normal
7 working people were upset, at what was going on.
8     Q. And again, Dan Frey's response to your
9 concern was what?
10    A. It was a nonissue.
11    Q. That's what he said?
12    A. I don't remember what his response was. It
13 was like talking to the wall.
14    Q. When you raised your concerns about the
15 extraordinary benefits to Peter Arturi, do you
16 remember when that was?
17    A. No.
18        On various occasions when a
19 person was being terminated, normally when they were
20 being terminated and they had a prior connection to
21 Jim Craigie they were receiving like a one-year
22 severance agreement and they had only been working
23 for one year, when the normal severance would have
24 been two or three weeks.

**170**

1        When those issues arose, Peter Arturi
2 and I discussed extraordinary benefits.
3     Q. And what did Mr. Arturi tell you was his
4 view on this issue?
5     A. That it was Jim's decision.
6     Q. In Paragraph 22 C of your complaint,
7 you allege, Dennis Paren reported John Jaszek,
8 director of southeastern operations, for fraud
9 for double submission of the same business travel
10 expenditure to Daniel Frey and to his supervisor,
11 Keith Kendall, vice-president of international.
12       Did I read that correctly?
13    A. Yes.
14    Q. To whom did you report John Jaszek for
15 fraud?
16    A. Dan Frey and Keith Kendall.
17    Q. And when was that?
18    A. I don't know whether we have submitted that
19 in the information or not. I don't recall the exact
20 time that happened. It was probably 2001, 2002.
21 I'm not sure.
22    Q. Did you report Mr. Jaszek for fraud in
23 person, or in a document?
24    A. Yes. There was a document. We have

**171**

1 written documents for every one of these
2 individuals.
3     Q. Was it a document that was prepared?
4     A. No. It was a document that was prepared by
5 Cheryl Kubic.
6     Q. And what did the document say?
7     A. The document said something to the
8 effect that during an audit of the cash account
9 a credit in the cash account was noted from John
10 Jaszek, and there should not be any credits in the
11 cash account.
12       And so the why, as to what happened to
13 generate that cash account, was looked into; and we
14 found that he had taken out a cash advance to take a
15 trip overseas, had collected on the expense report,
16 and the program automatically subtracted from his
17 expense reimbursement the amount he owed back to
18 the company for the cash advance.
19       Then, when he resubmitted the same
20 expense report to a different supervisor and again
21 it was paid, again, money for that same cash advance
22 was taken out; and that generated the credit, and
23 that's how we found the fraud.
24    Q. Keith Kendall was Mr. Jaszek's supervisor?

**172**

1     A. Yes.
2     Q. What was the response of Mr. Frey and
3 Mr. Kendall to your report?
4     A. No response.
5     Q. Do you know whether Mr. Frey or Mr. Kendall
6 took any action in response to receiving your
7 report?
8     A. They did not take any action. I took
9 action.
10    Q. What did you do?
11    A. I collected the money back from Mr. Jaszek,
12 and Mr. Jaszek came into my office and told me that
13 I acted as if I was doing something wrong.
14    Q. Did you tell Mr. Frey or Mr. Kendall that
15 you had taken action to get the money back from
16 Mr. Jaszek?
17    A. Yes.
18    Q. Did Mr. Frey or Mr. Kendall ever tell you
19 that they disagreed with your actions?
20    A. They weren't supportive.
21    Q. How were they not supportive?
22    A. Well, Mr. Kendall by never returning my
23 call with regard to the incident; and Mr. Frey by
24 not terminating the employment of these individuals

**173**

1  as they were caught, to set an example.
2  Q. In Paragraph 22 D in your complaint,
3  you allege, Dennis Paren reported suspicious claims
4  for the loss of car-stock inventory by the salesmen,
5  Matt Valentine and Pat Sellers, for $49,000 and
6  $21,000 respectively.
7       Dennis Paren also reported to Daniel
8  Frey that at various times there appeared to be
9  hundreds of thousands of dollars of car-stock
10 inventory not returned by former employees.
11      Did I read that accurately?
12 A. Yes; except it's Pat Sellers, not Peter.
13 Q. To whom did you report the suspicious
14 claims for the loss of car-stock inventory?
15 A. Well, that was talked to with Vaughn,
16 Peter, Dan, Cheryl Kubic, Mike Waniewski.
17 Q. Why did you believe that the claims were
18 suspicious?
19 A. Because the pictures of Matt Valentine's
20 storage unit I believe were three floors up, and to
21 take $49,000 worth of equipment would have required
22 a number of trips up and down the elevator into an
23 area that had some type of security, where they had
24 cameras, but they didn't catch this particular

**174**

1  thing; the tape had already been destroyed or
2  rewritten by the time we got involved.
3       And the fact that he reported that
4  he went to his locker and it was locked, and so he
5  surmised that he had left the storage unit unlocked,
6  someone came in, stole everything, and then locked
7  the storage unit, that was an unbelievable story.
8  Q. So you believed that Mr. Valentine had
9  stolen the car stock that he claimed was missing?
10 A. That's correct. I believed that; and so
11 did Mike Waniewski, who was the director of asset
12 protection.
13 Q. How did you report this to Mr. Frey?
14 A. As the events unfolded.
15 Q. Verbally?
16 A. I believe it was mostly verbally, and I
17 believe there could have been something within
18 my weekly notes that I presented to him.
19 Q. How did Mr. Frey respond to your report of
20 these suspicious claims for loss of car-stock
21 inventory?
22 A. Too small of an issue for him to bother
23 with.
24 Q. He told you that?

**175**

1  A. He didn't say anything about it. He didn't
2  take any action.
3  Q. To your knowledge, he didn't take any
4  action?
5  A. To my knowledge. And if he did take any
6  action, I should have known about it.
7  Q. And when was this?
8  A. The date is not listed here, so I can't
9  remember. Matt Valentine was a relatively new
10 employee at the time.
11 Q. Your allegations in Paragraphs 22 E through
12 I relate to what you characterize as the forgiveness
13 of promissory notes?
14 A. Yes.
15 Q. Tell me your understanding of what happened
16 with respect to the promissory notes.
17 A. Well, first of all, when the
18 individuals purchased stock from the company,
19 they were apparently in this situation given the
20 option of paying cash for it or taking out a company
21 loan in the form of a promissory note.
22      These promissory notes were taken out in
23 1999 and the year 2000; or early 2000, probably.
24      These notes in November of 2001

**176**

1  were forgiven or, to use the word that Dan uses,
2  cancelled; and it's my contention that when you
3  cancel these notes, or forgive them, however you do
4  that, that's reportable income on the individual's
5  state and federal tax return.
6       Those numbers were not reported.
7  Q. The numbers were not reported on the
8  individual recipients' tax returns?
9  A. That's correct.
10 Q. How do you know that?
11 A. I was told that by the tax department; I
12 mean, by the payroll department.
13 Q. But isn't the decision to include something
14 as income made by the individual who is filing their
15 personal tax return?
16      MS. BRODEUR-MC GAN: Objection. You can
17 answer.
18 A. No. This is income that the company is
19 required to record on the individual's W-2.
20 Q. Oh, okay; okay.
21      What happened to the stock of the
22 persons who had promissory notes?
23 A. The amount that they had not yet paid for
24 was in effect sold back to the company at what they

**Page 177**

1 had paid for it.
2   Q. So the stock that had not yet been paid for
3 was essentially cancelled?
4   A. Yes; but the thing is that the stock
5 serves as collateral for the note. The stock became
6 worthless, but the company was still owed money.
7 These individuals did not pay the company back
8 the money that was owed.
9   Q. I'm not a tax lawyer, but wouldn't you take
10 a corresponding loss for the deduction for the
11 worthless stock?
12       MS. BRODEUR-MC GAN: Objection. You can
13 answer.
14   A. Yes. The individual has to take the tax
15 loss to offset capital gains, because it's a capital
16 loss; so it can only be offset by capital gains.
17   Q. Who did you complain to about the
18 accounting for the cancellation of the promissory
19 notes?
20   A. Dan Frey, Carl Sun, and Mike Lyon and I
21 talked about it quite often.
22       And then, Cindy Marr is the one that
23 told me that it was not included on their W-2s.
24   Q. How did Mr. Frey respond when you expressed

**Page 178**

1 your concern about the accounting of the
2 cancellation of the promissory notes?
3   A. He said that it was authorized by Simpson,
4 Thatcher.
5   Q. Carl Sun is the SSW audit manager for
6 Deloitte & Touche?
7   A. Yes.
8   Q. How did he respond?
9   A. When I was talking with Carl, I was talking
10 to Carl with regards to the reporting of that on the
11 financial documents, the financial reporting of the
12 company; and he told me that it was immaterial for
13 reporting purposes.
14       We did not talk about the taxability.
15   Q. How did Mike Lyon respond to your concern
16 about the accounting for the cancellation of
17 promissory notes?
18   A. He believed it was totally wrong.
19   Q. He told you that?
20   A. Yes.
21   Q. What action did he take, if you know, based
22 on his belief that it was wrong?
23   A. He didn't take any action. He just knew
24 about it, and knew that Dan Frey did not come to him

**Page 179**

1 with a question as to how the company should record
2 this event; because he knew that Dan did not want to
3 hear the right answer.
4       And that's what we all believed, and
5 that's what we talked about.
6   Q. What about Cindy Marr? How did she
7 respond?
8   A. The only response was, They're at it again.
9   Q. What was her position?
10   A. She is the head payroll clerk. I'm not
11 sure of her exact title.
12   Q. Did she explain to you what she meant by
13 They're at it again?
14   A. I don't know exactly what she said. It was
15 small quip of some type.
16   Q. Are you a tax lawyer?
17   A. No, I'm not.
18   Q. Do you have any tax degrees of any sort?
19   A. Well, I have an MBA in finance, and I've
20 been in corporate finance for 25 years; so I know
21 quite a bit about taxes, even though I don't have a
22 tax degree. But I do have an announcement from the
23 IRS that speaks directly to this point.
24   Q. So you would defer to...

**Page 180**

1   A. The Internal Revenue Service.
2   Q. In Paragraph 22 I, you have an allegation
3 about a statement that Mr. Kimmett made that we
4 discussed earlier.
5   A. Yes.
6   Q. Is there anything you want to add to your
7 earlier testimony with regard to that incident?
8   A. No.
9   Q. In Paragraph 22 J, you allege that the
10 president of the corporation ordered you to arrange
11 an automobile lease for Ed Several; do you see that
12 there?
13   A. Yes.
14   Q. The president was who at this time?
15   A. Jim Craigie.
16   Q. Why do you believe that arranging an
17 automobile lease for Mr. Several was in violation
18 of the car allowance?
19   A. Mr. Several had a $1,000 monthly car
20 allowance.
21       The car that he selected to purchase
22 would have created a total cost in excess of the
23 thousand dollars with regards to the cost of the
24 lease, the cost of gasoline, the cost of whatever;

**Page 181**

1  maintenance, taxes and everything else.
2      He complained to Jim Craigie that the
3  cost of his car was going to exceed his monthly
4  allowance.
5      Simultaneously, I was obtaining
6  almost the identical car for Jim Craigie at the
7  same dealership, but it was a more expensive model.
8  Jim Craigie asked me to have the dealership add more
9  cost to his car to offset the decrease in Ed
10 Several's car.
11  Q. Did you express to anyone your opinion that
12 this was inappropriate?
13  A. Sure. I told Vaughn. I indicated that to
14 Peter at some time. Everybody knows that it's
15 inappropriate.
16  Q. How did Mr. Rist respond?
17  A. Negatively. I don't remember anything more
18 than that.
19  Q. Did he agree with you that it was a
20 violation of the policy?
21  A. Yes. I think everybody agrees that it's a
22 violation of the policy.
23  Q. But did Mr. Rist say that he was going to
24 take action to address the violation of the policy?

**Page 182**

1  A. No, because it was the president doing the
2  violation.
3  Q. And how did Mr. Arturi respond when you
4  expressed your concern about the car allowance?
5  A. Again, it was the president doing the
6  violation. There's not a lot that subordinates can
7  do.
8  Q. In Paragraph 22 K of your complaint, you
9  refer to complaints of corporate waste relating to
10 OCM members not receiving merit increases; do you
11 see that there?
12  A. Yes, I see it.
13  Q. Tell me what you believe was inappropriate
14 about Mr. Craigie's conduct.
15  A. What was inappropriate was that the raises
16 for everybody were on a fiscal-year basis, and the
17 fiscal year began April 1; and that was the year in
18 which people received their raises. That was the
19 time of the year people received their raises.
20      Mr. Craigie wanted to report to the
21 people that the OCM members were not receiving any
22 raises in fiscal 2001; but he didn't mention that in
23 late December 2000 he authorized giving everybody a
24 $1,000 car allowance, which on a percentage basis

**Page 183**

1  for some of those people was greater, I think for
2  most of them it was greater, than what their merit
3  rate increase would have been.
4  Q. To whom did you complain about this issue?
5  A. Oh, these are probably Vaughn Rist. Again,
6  it might have been mentioned to Peter Arturi; talked
7  to with Mike Lyon, Stephen Nigro.
8      Again, these are samples of things that
9  went on.
10  Q. Later in Paragraph 22 K you allege that
11 Mr. Rist told you that there is no way the company
12 is going to begin a car-allowance policy for OCM
13 members, because it is simply cost-prohibitive
14 given the company's financial performance; and
15 we never gave OCM members car allowances when
16 the company was financially sound.
17      Do you recall him making that specific
18 statement?
19  A. I sure do.
20  Q. Where were you when he made that statement
21 to you?
22  A. In his office.
23  Q. And this is in November of 2000?
24  A. Yes.

**Page 184**

1  Q. Do you know if Mr. Rist expressed this
2  opinion to Mr. Craigie?
3  A. He gave me every indication he did.
4  Q. Did he tell you what Mr. Craigie's response
5  was?
6  A. Something to the effect that Jim wants to
7  do it.
8  Q. In Paragraph 22 L of your complaint, you
9  refer to Tim O'Neill; do you see that there?
10  A. Yes, I do.
11  Q. What do you mean when you say that Mr.
12 O'Neill was found creating intricate methods of
13 receiving company reimbursement for thousands of
14 dollars in excess of actual expenses?
15  A. One example is making a lot of calls on a
16 cell phone, over say a thousand dollars, submitting
17 that expense report to the company, getting
18 reimbursed the thousand dollars;
19      and then calling the phone company
20 complaining to them that he was overcharged, and
21 then having it taken off of his credit-card bill.
22 That's somewhat intricate.
23  Q. And you made this discovery, that he was
24 doing this?

**185**

1  A. Myself, and Cheryl Kubic.
2  Q. When did you report this to Lou Tursi?
3  A. You would have to take a look at the date
4  of the memo.
5  Q. So you reported it by way of the memo?
6  A. Yes. It was my memo.
7  Q. Did you report Mr. O'Neill to anyone other
8  than Mr. Tursi?
9  A. Dan Frey, Peter Arturi, Vaughn Rist, Cheryl
10 Kubic knew about it; Mike Waniewski.
11 Q. This memorandum that you prepared, who was
12 it directed to?
13 A. It was probably directed to Tim O'Neill
14 with a copy to Dan Frey and Lou Tursi. That was
15 the normal manner in which things were done.
16 Q. And what did your memorandum to Mr. O'Neill
17 say?
18 A. It itemized every instance in which he was
19 caught defrauding the company.
20 Q. And how did Mr. Tursi respond to your
21 memorandum?
22 A. He laughed when I showed it to him. He
23 said something to the effect, I don't know how some
24 people can be so good at sales and so terrible at

**186**

1  bookkeeping.
2  Q. So he believed that Mr. O'Neill had made an
3  inadvertent mistake?
4  A. Yes.
5  Q. And you disagreed with Mr. Tursi?
6  A. Yes, I did.
7     Well, maybe one mistake I can
8  understand; but not five or ten or 15 or 20.
9  Q. Did you discuss Mr. O'Neill's situation
10 with Dan Frey?
11 A. Yes, on a number of occasions.
12 Q. What was his response?
13 A. His response was, We need to talk to Lou;
14 and then Tim O'Neill's wife called Dan Frey up and
15 cried on the phone, and that sort of scuttled any
16 actions of terminating him. Of course, he was
17 well protected by Lou Tursi.
18 Q. Do you know if any actions were taken to
19 address Mr. O'Neill's situation?
20 A. We had a meeting in the conference room;
21 and they said that they wanted to make things tough
22 on Mr. O'Neill and get the money back, and they were
23 going to deduct, I don't know, some amount like $700
24 a month out of his check.

**187**

1     And when we went to Mr. O'Neill and
2  told him that the company intended on collecting on
3  the amount that they had been defrauded, if I recall
4  correctly, he overnighted a check to the company for
5  the entire amount.
6  Q. In Paragraph 22 M of your complaint, you
7  also refer to Tim O'Neill, and you state that he was
8  found giving away in excess of $50,000 worth of golf
9  ball and golf-club products to current and former
10 players of the New York Yankees; do you see that
11 there?
12 A. Yes.
13 Q. What was wrong with giving products away to
14 members of the Yankees, in your view?
15 A. Because the Yankees weren't purchasing
16 products from the company.
17    The idea of providing somebody a product
18 was to create additional sales.
19 Q. And Dan Frey responded that Mr. O'Neill
20 gets free tickets to Yankees games, and that is what
21 KKR wants; is that right?
22 A. Yes.
23    A very nonchalant type of response.
24 In this example, I'm only showing $50,000; but there

**188**

1  were thousands and thousands of more dollars that we
2  saw going out of the company due to Tim O'Neill.
3  Q. Did you report Mr. O'Neill's conduct to
4  anyone other than Mr. Frey?
5  A. Mike Waniewski was reporting on
6  Mr. O'Neill's conduct to Jim Craigie directly
7  for a long period of time, and nothing was being
8  done about that.
9  Q. How do you know that he was reporting to
10 Jim Craigie on Mr. O'Neill?
11 A. He told me, and he kept tabs as to how much
12 various salespeople were giving away.
13 Q. Did Mr. Wanieski tell you that he believed
14 that Mr. O'Neill had acted inappropriately in giving
15 away product to the Yankees?
16 A. His reaction was, yes, he believed that it
17 was inappropriate.
18 Q. He told you that?
19 A. When I informed him, his reaction was such
20 that he appeared to be in total agreement with me.
21 Q. That was your perception?
22 A. That was definitely my perception, as well
23 as the perception of other people.
24    I did not know the names of these people

**189**

1  that were receiving this product; and actually I was
2  looking at a document and Mike Lyon, who was an avid
3  baseball fan, said, hey, a lot of these people are
4  former Yankees, some of them weren't even current
5  players at all.
6     Q. And you allege in your complaint that
7  Mr. Wanieski said that Tim O'Neill works for Lou,
8  and as long as Lou protects him he is untouchable.
9     A. Yes.
10    Q. He said that to you?
11    A. Yes.
12    Q. And Lou refers to Lou Tursi?
13    A. Correct.
14    Q. In Paragraph 22 N of your complaint, you
15  refer to a double expense-report submission by
16  Stephanie Lawrence.
17    A. Yes.
18    Q. When were Ms. Lawrence's double expense-
19  report submissions discovered?
20    A. In June 2001.
21    Q. And were you the person who discovered
22  them?
23    A. No. It was Cheryl Kubic.
24    Q. And you reported the double expense

**190**

1  submissions to Peter Arturi as well as
2  Mr. Craigie, Mr. Rist, and Mr. Frey?
3     A. That's correct.
4     Q. How did Mr. Arturi respond after you
5  reported Stephanie Lawrence's conduct?
6     A. He responded that it wasn't fraud unless we
7  called it fraud.
8     Q. What did he mean by that, if you know?
9  What was your understanding of what he meant by
10  that?
11    A. My understanding was that we could call
12  it theft and terminate the person for fraud, or we
13  could say we accept it and it's a form of additional
14  compensation in violation of all the practices of
15  the company.
16    Q. How did you report it to Mr. Craigie?
17    A. In a memo format.
18    Q. Who was your memo directed to?
19    A. The memos were normally always made
20  in a format where it went to the person's direct
21  supervisor; so in this case it was Jim Craigie, with
22  a copy always to the CFO, and in this case Vaughn
23  Rist and Peter Arturi could have been on the memo,
24  or they could have been blind-copied, because they

**191**

1  were blind-copied on just about everything.
2     Q. Did you have occasion to speak to
3  Mr. Craigie about your report on Stephanie
4  Lawrence?
5     A. Yes. I went into his office to talk to him
6  about it.
7     Q. And what did he say?
8     A. He said, Oh, there's Dennis Paren with that
9  Dennis Paren look again.
10    Q. What else did he say?
11    A. We're going to have to make Stephanie pay
12  this money back.
13    Q. Did he say anything else?
14    A. No.
15    Q. How did Mr. Rist respond to your report
16  about Stephanie Lawrence?
17    A. That it was out of his control, there
18  wasn't anything he could do about it; it was Jim's
19  decision.
20    Q. Jim's decision as to what actions to take?
21    A. Correct.
22    Q. And did you discuss with Dan Frey Stephanie
23  Lawrence's conduct?
24    A. Yes.

**192**

1     Q. And how did he respond?
2     A. The same way. It was Jim's decision.
3     Q. Do you know what actions, if any, were
4  taken in response to your report about Stephanie
5  Lawrence?
6     A. We gave the report to Stephanie. She
7  blamed the actions on her administrative assistant,
8  and repaid the money.
9        And she made a comment that Maybe the
10  only reason that this whole incident came up was
11  because she didn't spend time being nice to the
12  people in the bullpen area.
13    Q. She made that comment to you?
14    A. No. She made it to Cheryl Kubic.
15    Q. Who related it to you?
16    A. Yes.
17    Q. And do you have an understanding as to what
18  Ms. Lawrence meant by the people in the bullpen?
19    A. The people that were outside of what they
20  called the executive hallway.
21    Q. In Paragraph 22 O of your complaint, you
22  refer to the sale of product to K-Mart; do you see
23  that there?
24    A. Yes, I do.

Dennis A. Paren
April 29, 2005

**193**

1  Q. Why did you have a concern about the sale
2  of product to K-Mart?
3  A. At the time I was doing a study trying to
4  obtain for the company credit insurance on those
5  purchasers of our product that were at highest
6  credit risk.
7      K-Mart was at the top of that list.
8  We already had an exposure to K-Mart in excess of
9  $4 million at the time the study was being
10 conducted.
11     Talking with experts in the area of
12 credit insurance, they informed me that it appears
13 K-Mart is going to go bankrupt, because there is no
14 insurance available for K-Mart.
15     And management went ahead and pushed
16 another $4 million of sales to K-Mart in an attempt
17 to get to a $40 million EBITDA number.
18  Q. That's EBITDA number?
19  A. Yes.
20  Q. What does that...
21  A. Earnings before interest, taxes,
22 depreciation and amortization.
23  Q. Who in management did you inform in
24 management that you believed that this was a high-

**194**

1  risk sale?
2  A. Well, I was talking with Dan Frey and
3  Larry Kustra about this on an ongoing basis. I was
4  reporting to them about my progress in trying to
5  obtain credit insurance for the company.
6  Q. How did Dan Frey respond to your concern?
7  A. He said that it was a good business
8  decision to go ahead and make that sale.
9  Q. Did he explain the basis for that belief?
10  A. Nothing other than they had made a
11 commitment to Oaktree Capital, and they needed
12 this sale at the end of December in order to get
13 to where they wanted to be.
14  Q. How did Larry Kustra respond to your
15 concern about the K-Mart sale?
16  A. He knew that it was a very risky sale, and
17 had he been in charge he would not have approved it;
18 but he knew that Lou Tursi, Jim Craigie and Dan Frey
19 wanted that approved.
20  Q. But he told you that he disagreed with the
21 decision?
22  A. Yes. He disagreed with giving K-Mart any
23 more credit, where we already had given them more
24 credit than any other company in the sporting-

**195**

1  goods industry.
2  Q. In 22 P of your complaint you refer to the
3  previously postponed customer-appreciation Hawaiian
4  trip; do you see that?
5  A. Yes, I do.
6  Q. And actually, you also refer to this trip
7  in Paragraphs 22 Q and R as well; correct?
8  A. Yes. They refer to the same trip.
9  Q. When was the trip to Hawaii originally
10 scheduled for?
11  A. I believe it was October 2001.
12  Q. Were you involved in preparations for the
13 Hawaiian trip?
14  A. I was involved in reviewing the
15 contract when it was originally set up, and
16 in trying to obtain insurance for the company due
17 to the activities that the participants were going
18 to engage in there.
19  Q. When did you review the contract for the
20 Hawaiian trip?
21  A. Sometime in 2001.
22  Q. And are you aware of when the trip was paid
23 for?
24  A. The trip was paid for in installments, and

**196**

1  most of the trip had been paid for at that
2  particular date.
3      So I do realize that the trip had been
4  paid for by the time they took the trip, or a lot of
5  the costs had been incurred.
6  Q. And who went on the trip? Were they mostly
7  customers of...
8  A. I did not see a list of the people that
9  went.
10  Q. But the general purpose of the Hawaiian
11 trip was to express appreciation to the company's
12 customers?
13  A. Correct.
14  Q. Is it your contention that Form 1099s were
15 not issued to persons who attended the Hawaiian
16 trip?
17  A. Yes.
18  Q. Why do you believe that no 1099s were
19 issued?
20  A. This is an incident which Mike Lyon
21 would complain to me about. He was endeavoring to
22 issue 1099s, and each time that he was requesting
23 the information he was being stonewalled and not
24 given the information.

**197**

1       And Dan Frey was not supporting him in
2  that.  Dan Frey was in charge of enforcing the
3  company's compliance with US tax laws.
4     Q.  So it's your understanding that Mike Lyon
5  raised his concern about the 1099s to Dan Frey?
6     A.  Yes, and to John Fuller.
7     Q.  And do you know when Mike Lyon raised these
8  concerns to Dan Frey?
9     A.  Way before the trip.
10    Q.  Did you ever discuss this issue with
11 Mr. Frey?
12    A.  Probably just in passing.
13    Q.  Did Mike Lyon tell you how Dan Frey
14 responded when he expressed his concern about
15 1099s not being issued for the Hawaiian trip?
16    A.  He basically said that Dan was not
17 supporting him in his efforts to comply with
18 the law, that this was a taxable event for the
19 participants, and that John Fuller felt that it
20 would be an impediment to taking customers; because
21 some customers had already stated that they would
22 not go on the trip if they were going to get a
23 1099 from the company.
24    Q.  And you said that you discussed this in

**198**

1  passing with Dan Frey.  Can you describe for me what
2  was said when you discussed the 1099 issue with Dan
3  Frey?
4     A.  Like I said, it was in passing.  It was
5  something that I can't recall specifically.
6        But that's a sales issue; it's not my
7  responsibility.
8     Q.  In Paragraph 22 S through V, you refer to
9  Mike Esch filing reports regarding inventory.
10    A.  Correct.
11    Q.  Tell me what you believe was wrong about
12 what Mike Esch did.
13    A.  This had to do with in-transit inventory;
14 that is, product that we're buying, primarily in
15 China, and having it shipped to the United
16 States.
17       It takes 30 days for it to go
18 over the ocean; and then it takes about a week
19 after it's unloaded in California to be transported
20 to Chicopee, Massachusetts, which is very near here.
21       When we don't have it in our factories,
22 it's considered in-transit inventory.
23       It is our inventory, because we have
24 contractually obligated ourselves to buy it, and we

**199**

1  are paying the insurance and the freight to buy it;
2  and we are taking title of that inventory at the
3  port of origin, whatever port that is,
4  someplace in China.
5        What Mike Esch devised doing was,
6  instead of taking title at the port of origin, to
7  take title at the port of Long Beach, California,
8  but still pay the freight and the insurance on
9  the shipment.
10       The general accounting principle is
11 that, first of all, you cannot insure a product
12 unless you have an insurable interest.  Once you
13 insure a product and you're paying the freight for
14 that product, that is considered your asset, and you
15 need to report that on your accounting statements.
16       Mike Esch wanted to devise this
17 method of taking title at the port of destination
18 and thereby, in his mind, have a rationale for
19 deducting the amount of inventory that the
20 company owned or was going to buy, that
21 was in transit on the ocean;
22       and that was anywhere from $10 million
23 to $18 million, depending upon the months.  So, with
24 a stroke of a pen, that inventory vanished!

**200**

1     Q.  And tell me how you allege that Mr. Frey
2  instructed you to aid in Mike Esch's conduct.
3     A.  In order for the manufacturers of this
4  product that we were buying to agree to these new
5  terms of sale, because these were new terms of sale,
6  they wanted to be assured that, should anything
7  happen to that product, they were going to
8  continue to be paid for it.
9        So, in order to do that, they needed me
10 to complete certificates of insurance, which I had
11 to show and file to these companies, to show them
12 that they would be paid in the event that product
13 was lost.
14    Q.  Did you do that?
15    A.  At Dan's request, yes.  I did do that.
16    Q.  Did you tell Mr. Frey that you believed
17 that this was inappropriate?
18    A.  Oh, Mr. Frey knew it was inappropriate.  He
19 told me it was inappropriate.
20    Q.  When was that?
21    A.  Before we went into the meeting to talk
22 about it.
23    Q.  What did he say to you specifically?
24    A.  Well, he said that this was against general

**201**

1 accounting principles.
2 Q. Did he say anything else?
3 A. That he wasn't going to let them get away
4 with this.
5    And then he helped them do it anyway.
6 Q. And tell me about the meeting on this issue
7 where Mr. Frey referred to the chairman, Ed Artz.
8 What did he say?
9 A. Apparently it was Ed Artz that was
10 concerned about the level of inventory, and was
11 putting pressure on Mike Esch to decrease the
12 inventory;
13    and then, during the meeting, they
14 were saying, well, because Mike Esch is going to say
15 something to the chairman, or the chairman is paying
16 attention to the inventory numbers, he's going to
17 see a decrease.
18    And so when he asks, well, that's great,
19 you guys got a decrease, how did you get it, Dan
20 Frey was going to confuse him with his answer.
21 Q. That's what Dan Frey said?
22 A. Yes.
23 Q. In Paragraph 22 W, you again refer to
24 Stephanie Lawrence, this time with respect to

**202**

1 gasoline expenses; do you see that?
2 A. Yes.
3 Q. Why did you believe that the gasoline
4 expenses were taxable and reportable as income?
5 A. Stephanie Lawrence lived in Exeter, New
6 Hampshire, and commuted to Chicopee, Massachusetts;
7 and because of the two-hour drive one way, her gas
8 expenses were very high.
9    Once she was caught cheating on her
10 expense reports, she was losing income, in effect;
11 and so she went to Jim Craigie and asked Jim Craigie
12 if she could have a gasoline allowance, and he
13 agreed.
14    Now, if you have a gasoline allowance
15 and you're using it just for normal commute back and
16 forth to your workplace, that's taxable under the
17 law.
18    And the people in the tax department
19 knew it, and the people in the payroll department
20 that put it on W-2s knew it; and Dan did it anyway.
21 Q. How did you express your concern about
22 this?
23 A. I told Lynn LaFond to put it on Stephanie's
24 W-2.

**203**

1    She later told me that Dan told her
2 not to do it; and then Dan told me that he wasn't
3 concerned about adding whatever the thousands of
4 dollars were to her W-2.
5 Q. Did he say anything more; Mr. Frey?
6    What did he mean by he wasn't concerned;
7 did he tell you?
8 A. He was too important to be concerned with
9 those type of issues.
10 Q. Did you express your concern about this to
11 anyone else?
12 A. The typical. Probably Cheryl Kubic knew it
13 at the time. Lynn LaFond knew about it at the time,
14 Mike Lyon. People that knew about taxes in the
15 company. There weren't that many.
16 Q. Did you prepare a memorandum describing
17 your concerns about this issue also?
18 A. No.
19 Q. In Paragraph 22 X of your complaint, you
20 refer to a report that you made in September 2003
21 about the existence of certain improper applications
22 by Mr. Craigie for expenses by doubling up expenses
23 on two expense-report submissions; do you see that?
24 A. Yes, I do.

**204**

1 Q. And in fact your allegations in Paragraphs
2 Y and Z also relate to this issue, don't they?
3 A. Yes, they do.
4 Q. How did you reach the conclusion that
5 Mr. Craigie was doubling up on expenses?
6 A. The audit function of expense reports had
7 been taken away from Dan Frey, and he gave that
8 back to Lynn Lafond's operation.
9 Q. When was that?
10 A. Beginning of 2002. I believe that was the
11 date.
12    Dan let go of the person that was doing
13 the audit of the expense reports. We had a person
14 that was doing auditing. So, there was a general
15 cutback, and they let this person go; and so they
16 were going back to the old way of doing things,
17 essentially, which I had proved didn't work.
18    In any event. The people that helped
19 audit the reports, I had a relationship with them,
20 a trusting relationship.
21    June Lemlin came to my office and told
22 me, Look at this expense report from Jim Craigie.
23 And I saw that he had an expense report approved by
24 Dan Frey; and then, immediately after Dan left the

**205**

1 company, he went to Andy Howley and had the same
2 expenditure approved again.
3     And I said to June, Let's wait and see
4 if Jim does this again. So, we didn't report that
5 when it first happened.
6   Q. And when did June Lemlin come to you?
7   A. Sometime right after Dan Frey left. That's
8 when it happened.
9   Q. So around June of 2003?
10  A. Right. Towards the end of June 2003, the
11 first part of July.
12  Q. And June Lemlin was in charge of the audit
13 function?
14  A. That was one of her functions.
15     So we waited for Jim to pass through
16 another fraudulent expense report, and he did.
17  Q. Tell me how you reached that conclusion.
18  A. Well, I don't have the information here to
19 look at; but we reached that conclusion because this
20 is something that we caught a lot of people doing,
21 and in this case it just happened to be the
22 president.
23  Q. So was it June Lemlin who came to you a
24 second time? Who came to you a second time?

**206**

1   A. Yes, it was June Lemlin that came to me
2 a second time; because we were waiting for him to
3 falsify another expense report. So we were waiting
4 for something to come across that was falsified.
5   Q. And the first expense report, in June of
6 2003, who filled that out?
7   A. I don't have it here to look at, so I can't
8 say.
9   Q. I mean, did Mr. Craigie typically fill out
10 his own expense reports?
11  A. I don't recall. I don't know.
12  Q. Is it possible that his administrative
13 assistant filled it out?
14  A. It's possible.
15  Q. Referring just to the first expense report,
16 what was it an expense for?
17  A. I think it was insurance on his car.
18  Q. Do you remember how much the submission was
19 for?
20  A. No, but we did provide that information.
21  Q. The second time that Mr. Craigie submitted
22 the expense report for the first item, was that
23 expense report filled out by Mr. Craigie?
24  A. As far as I know it was, yes.

**207**

1   Q. Is it possible that it was filled out by
2 his administrative assistant?
3   A. It's possible; but we all believed that he
4 did it, and he knew exactly what he was doing.
5   Q. Why did you have that opinion?
6   A. Because at the time we investigated it, and
7 he said some things that I think we found out to be
8 untrue.
9   Q. Like what?
10  A. I would have to look at the information,
11 really. I don't know. I believe the second time
12 it was with the purchase of an airline ticket.
13  Q. And the second time that June Lemlin came
14 to you, with respect to the airline ticket, was in
15 September of 2003?
16  A. I believe so.
17  Q. So this was just before the Callaway
18 acquisition?
19  A. Yes. His last chance.
20  Q. Do you remember how much the airline ticket
21 was for?
22  A. No, I don't. It was for first-class
23 travel, I believe, from Los Angeles to Hartford.
24  Q. And again, with respect to the expense

**208**

1 reports submitted for the airline ticket, do you
2 know whether Jim Craigie personally filled in those
3 submissions?
4     MS. BRODEUR-MC GAN: Objection. You can
5 answer.
6   A. We believe he did. We believe that he
7 provided information that was false, either to his
8 administrator, or he submitted it himself. One way
9 or the other, we believe that he knew what he was
10 doing; and we were waiting for him to do it again,
11 and we caught him.
12  Q. So, how did you make the board of directors
13 aware of your concerns about Mr. Craigie and the
14 expense submissions?
15  A. It was through an e-mail.
16  Q. Who was the e-mail addressed to?
17  A. Scott Graves.
18  Q. And this is the e-mail that we discussed
19 earlier today?
20  A. Yes.
21  Q. How did Scott Graves respond to your
22 raising the concern about the double expense
23 submission of Mr. Craigie?
24  A. He was concerned.

209

1 Q. Did the board of directors take any action?
2 A. I understand they did a three-year audit.
3 Q. Do you know what the result of the audit
4 was?
5 A. Yes; that the only double expenditures were
6 the ones that I provided them.
7 Q. Did Scott Graves tell you anything else in
8 response to your reporting Mr. Craigie's double
9 expense-report submissions?
10 A. He wrote me back a letter.
11 Q. And what did he say?
12 A. That, after an audit that had cost the
13 estate an exorbitant amount of money, they found
14 nothing other than what I had reported to them.
15 Q. Do you have a copy of the e-mail from Scott
16 Graves? Because I don't believe that it's been
17 produced to us.
18 A. It wasn't an e-mail. Scott sent an
19 overnight package. It was a letter.
20 Q. I don't think we have a letter.
21     MS. BRODEUR-MC GAN: I'm pretty sure
22 it's in there.
23     MS. NEWMAN: I'll go back and check.
24 We can both go back and check:

210

1 Q. In your complaint, you state that
2 Mr. Graves implied that you had somehow done
3 something wrong in reporting the misconduct.
4 A. Yes.
5 Q. Why do you believe that that was implied?
6 A. Because, if you read the letter, it sounds
7 like I caused the company to incur needless costs
8 in the examination of his expense reports.
9 Q. In Paragraph 22 AA, you allege that
10 in November of 2001 to September of 2003 agents of
11 the corporation readied the company for bankruptcy
12 by positioning certain individuals in areas of
13 protection to ensure job security and endorsed
14 a "get what you can take" mentality.
15     Did I read that correctly?
16 A. Yes.
17 Q. Which agents of the corporation are you
18 referring to?
19 A. Well, the agents in this context are
20 referring to the officers of the company.
21 Q. Specifically who?
22 A. Well, all members of the operating
23 committee, all operating-committee members;
24 that's what I'm referring to.

211

1 Q. And who are the certain individuals that
2 were being positioned in areas of protection?
3 A. Well, they were positioning themselves; and
4 then they were positioning favored people that
5 reported to them.
6 Q. And who were the favored people that were
7 being positioned by members of the OCM?
8 A. I would have to refer to a list of the
9 people, because I don't recall all of them.
10 Q. If you refer to Exhibit Paren 3, there are
11 charts in the back.
12 A. Okay; that might be helpful.
13     So, first we're talking about Jim
14 Craigie, Peter Arturi, Mike Esch, Keith Kendall, Tom
15 Kennedy, Vaughn Rist, Chris Russo, Ed Several, Lou
16 Tursi. They all received lucrative change-in-
17 control agreements.
18     And then the other people they helped
19 protect, I believe, were people like Dan Bracken,
20 Tim Seitter, Mike Ferris.
21     And then they also protected these other
22 people with bonuses.
23 Q. In Paragraph 22 BB, you allege that
24 less qualified men were being placed in positions

212

1 of authority for job security over others who were
2 not connected. Do you see that there?
3 A. Yes, I do.
4 Q. Who were the less qualified men that were
5 being qualified in positions of authority for job
6 security?
7 A. Well, people like Lou Tursi, to begin
8 with. People didn't believe that he was qualified
9 to do anything with regard to boost sales; but he
10 continued to receive promotions, bonuses, CIC
11 agreements.
12     It was assumed, or it was thought of,
13 that he was the one creating the turnover in the
14 sales staff.
15     I did not work with sales, so I only saw
16 these people with names and photographs and things
17 of that nature. I would have to see who was in a
18 position, and then who left.
19     There was a lot of talk from people that
20 we did not have competent people any longer on the
21 sales staff.
22 Q. And you spoke out against these practices?
23 A. Yes. I spoke out to everybody about
24 the fact that the company was losing sales, and

**213**

the turnover of the sales staff. The rule of thumb was every time a salesperson left, his replacement could only expect to achieve 80 percent of what the other person did.

So, as the turnover increased because of the unhappiness with the company's performance, and because they didn't respect Lou Tursi, this created a snowball effect with sales decreasing.

Q. Other than what you've already testified to, are there any other facts that you rely on in support of any of your claims in your complaint?

MS. BRODEUR-MC GAN: Objection. You can answer.

A. I can only say that I have not listed everything that happened in this complaint. There are other things. I can't recall them all. They were just too numerous.

But as we go through discovery, we're hopeful that we'll come up with more issues.

Q. I would just ask that, to the extent that you remember anything else as we move forward through discovery, that you supplement your interrogatory responses and your documentary responses.

**214**

MS. BRODEUR-MC GAN: Objection.
MS. NEWMAN: Do you object to supplementing discovery responses?
MS. BRODEUR-MC GAN: I object to the question being posed to the witness.
MS. NEWMAN: All right.

I will pose it to you; and ask that, to the extent that Mr. Paren remembers anything else, any other facts, on which he relies, that he supplement his interrogatory responses and document requests.

Are you agreeable to that?
MS. BRODEUR-MC GAN: Not necessarily, no.
MS. NEWMAN: You're not agreeable to supplementing?
MS. BRODEUR-MC GAN: I don't think we need to do this on the record at 6:20.
MS. NEWMAN: I'm actually not totally done.
MS. BRODEUR-MC GAN: Okay; let's take a five-minute break.
[Recess taken]
BY MS. NEWMAN:

**215**

Q. If you could refer to Exhibit Paren 4, which are your supplemental interrogatory responses, the chart on the last page entitled Damage Calculation Chart for Dennis A. Paren, do you see that?
A. Yes, I do.
Q. Does this reflect the damages that you're seeking in this case?
A. Yes.
Q. Why are you seeking damages for pay cuts?
A. My attorney advised me to.
Q. Why are you seeking damages for 401(k) contribution?
MS. BRODEUR-MC GAN: I'm going to instruct the client not to answer any attorney-client-privileged information, but otherwise to answer.
A. Well, there is a difference between my past 401(k) employer contribution and my current employer contribution; and it's significant.
Q. What is your current employer contribution?
A. Two percent.
Q. And what was the contribution of New Top-Flite?

**216**

A. It appears it was five percent.
Q. Do you remember it being five percent?
A. I believe that's what it was. I believe that's the correct number.
Q. And why are you seeking damages for a pension?
A. Again, following the same rationale, the contribution by the employer on their cash-balance plan is different.
Q. And you mentioned earlier that you have a pension plan with DIMON.
A. Correct.
Q. What kind of pension plan is that?
A. A cash-balance plan.
Q. And was it a cash-balance plan or a defined-benefit plan that you participated in with New Top-Flite?
A. With New Top-Flite, they just have a defined-contribution plan.
Q. How did you calculate the difference between your pension plan under New Top-Flite and your pension plan with DIMON, considering the difference between seven percent and five percent?