# EXHIBIT C

DANIEL FREY

```
 1    A P P E A R A N C E S :

 2


 3        BRODEUR-MCGAN
          BY:  LISA BRODEUR-MCGAN, ESQUIRE
 4        1380 Main Street
          Springfield, Massachusetts 01103
 5        Representing the Plaintiff

 6


 7        MORGAN, LEWIS, & BOCKIUS, LLP
          BY:  TAMSIN NEWMAN, ESQUIRE
 8        1701 Market Street
          Philadelphia, Pennsylvania  19103
 9        Representing the Defendants

10


11    Also Present:
          James Craigie

12

13                       -   -   -

14

15

16

17

18

19

20

21

22

23

24
```

5a005064-e997-439e-b888-c505537e3c24

ORIGINAL

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

## DENNIS PAREN

-vs-

## JAMES CRAIGIE and DANIEL FREY

## No. 04-30127-MAP

----------

Tuesday, August 30, 2005
Princeton, New Jersey

----------

## DEPOSITION OF DANIEL FREY

### CHARLES P. CARMODY & ASSOCIATES

## COURT REPORTING & LEGAL VIDEO SERVICES

SERVING PHILADELPHIA, SOUTHEASTERN PA, NJ & SURROUNDING REGION
PO BOX 525 * AMBLER, PA   19002
(215) 646-2599 (O)*(215) 542-8650 (F)* DEPOSITION 1 @ COMCAST.NET

ORIGINAL

DANIEL FREY

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3                         -   -   -

4

5    DENNIS PAREN,                      :
                Plaintiff,              :
6                                       :
          VS.                           :
7                                       :
     JAMES CRAIGIE, Individually,       :
8    and DANIEL FREY, Individually:
                Defendant.              :   NO.  04-30127-MAP
9

10

11                     -   -   -
                 Tuesday, August 30, 2005
                  Princeton, New Jersey
12                     -   -   -

13

14

15

                        Oral deposition of DANIEL
16   FREY, taken pursuant to notice, was held in the Law
     Offices of MORGAN, LEWIS & BOCKIUS, 502 Carnegie
17   Ctr. #3, on the above date, commencing at
     approximately 9:15 a.m., before Susan Endt, Court
18   Reporter and Notary Public.

19

20

21   ---------------------------------------------------
              CHARLES P. CARMODY & ASSOCIATES
22              Court Reporting Services
     768 Bethlehem Pike, Suite 107 * P.O. Box 525
23            Ambler, Pennsylvania  19002
       (215) 646-2599 * deposition1@comcast.net
24

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 6

1              - - -
2              PROCEEDINGS
3              - - -
4       (It is hereby stipulated and agreed
5    by and between Counsel that all
6    objections, except as to the form of the
7    question, are reserved until the time of
8    trial.)
9              - - -
10          DANIEL FREY, having been
11   first duly sworn, was examined and
12   testified as follows:
13             - - -
14          EXAMINATION
15             - - -
16   BY MS. BRODEUR-MCGAN:
17      Q.    Do I pronounce it Frey or Frey?
18      A.    Frey.
19      Q.    Mr. Frey, my name is Lisa Brodeur-McGan
20   and I represent Dennis Paren, who is a plaintiff
21   in this case.
22          Today, I'm going to ask you a series of
23   questions. If you don't understand my question,
24   just let me know and I'll rephrase it, okay?

Page 7

1       A.    Okay.
2       Q.    You need to answer audibly so the
3    stenographer can get down your responses, all
4    right?
5       A.    Yes.
6       Q.    Which means you can't nod your head.
7       A.    Okay.
8       Q.    If you need a break for any reason, let
9    me know.
10      A.    Okay.
11      Q.    You do wish to read and sign?
12      A.    I don't know what that means.
13             MS. NEWMAN: Yes, he does.
14   Yes, he wishes to read.
15             It means that you get to
16   read your transcript and make any
17   corrections.
18             THE WITNESS: Yes.
19   BY MS. BRODEUR-MCGAN:
20      Q.    Could you give me your full name and
21   address for the record?
22      A.    Daniel S. Frey, F-R-E-Y, 194 Sunset
23   Ridge, Rocky Hill, Connecticut, 06067.
24      Q.    And how long have you lived at Rocky

Page 8

1    Hill?
2       A.    I've lived at Rocky Hill since 1990.
3    Not at that address.
4       Q.    Are you currently employed?
5       A.    Yes.
6       Q.    By whom?
7       A.    St. Paul Travelers.
8       Q.    That's in Hartford, Connecticut?
9       A.    Yes.
10      Q.    You work out of the Hartford,
11   Connecticut office?
12      A.    Yes.
13      Q.    How long have you been employed there?
14      A.    A little over two years.
15      Q.    Do you know the exact date of your
16   employment?
17      A.    June 30, 2003.
18      Q.    What's your title there?
19      A.    Chief Financial Officer, Special
20   Services.
21      Q.    As CFO of Special Services, what do you
22   do for -- I guess it's a runoff operation of St.
23   Paul Travelers?
24      A.    I manage the financial responsibilities

Page 9

1    across businesses in Hartford, New York, New
2    Jersey and London that have been placed into
3    runoff and are now handling claims but not issuing
4    new policies.
5       Q.    Has your job title remained the same
6    since June 30th of '03?
7       A.    No.
8             I was originally hired as Chief
9    Financial Officer of Gulf Insurance Group.
10      Q.    That changed at some point to --
11      A.    Approximately one year later.
12      Q.    But still has the title of CFO?
13      A.    Yes.
14      Q.    Wow do you live with in Rocky Hill with?
15             MS. NEWMAN: Objection to
16         the form.
17   BY MS. BRODEUR-MCGAN:
18      Q.    You can answer.
19      A.    My wife and child.
20      Q.    Your wife's name?
21      A.    Carrie, C-A-R-R-I-E.
22      Q.    And your child?
23      A.    Alexandra.
24      Q.    Who old is she?

CHARLES P. CARMODY & ASSOCIATES
215.646.2599

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 10

1   A.   Twelve.
2   Q.   **That is a she, right, I'm assuming?**
3   A.   Yes.
4   Q.   **Now, do you recall the date that you**
5   **separated from Spalding?**
6   A.   Sometime in June 2003.
7   Q.   **Do you recall the exact date?**
8   A.   No.
9   Q.   **Prior to coming here for your**
10  **deposition, did you have an occasion to review**
11  **documents to prepare for today's deposition?**
12  A.   Yes.
13  Q.   **Can you tell me what documents you**
14  **reviewed?**
15           MS. NEWMAN:  Let me just
16  insert an objection here.
17           You can answer except to
18  the extent that I selected documents for
19  you to review.
20           So did you review any
21  documents other than those that I
22  selected for you?
23           THE WITNESS:  No.
24           MS. BRODEUR-MCGAN:

Page 11

1   Objection.
2           That is not a proper
3   objection under the federal rules of
4   civil procedure.
5           MS. NEWMAN:  Under Sporck
6   versus Peil, it's attorney work product.
7           Any documents that I would
8   have selected for him, reflect the
9   mental impressions of an attorney.
10  BY MS. BRODEUR-MCGAN:
11  Q.   **Can you tell me the number of documents**
12  **that your attorney would have selected for you to**
13  **review?**
14  A.   Two or three.
15  Q.   **So there was approximately two or three**
16  **documents that your attorney selected for you to**
17  **review?**
18  A.   Yes.
19  Q.   **And was there any other documents that**
20  **you reviewed other than what your attorney**
21  **selected for you to review?**
22  A.   No.
23  Q.   **This is the hard part.  You have to wait**
24  **for my question to finish before you answer, okay?**

Page 12

1   A.   Sorry.
2   Q.   **Have you ever been deposed before?**
3   A.   No.
4   Q.   **Have you ever been involved an a**
5   **litigation case or a court case?**
6   A.   No.
7   Q.   **Not even as a witness?**
8   A.   No.
9           MS. BRODEUR-MCGAN:  All
10  right.  I'm going to reserve my right to
11  proceed on the question to which you
12  objected and claimed to privilege.
13           MS. NEWMAN:  It was
14  attorney work product that I claim.
15           MS. BRODEUR-MCGAN:  I'm
16  reserving my right to suspend the
17  deposition on that one issue.
18           MS. NEWMAN:  I can go pull
19  the case right now, if you'd like.
20           Sporck versus Peil.  It's a
21  well-known case.
22           MS. BRODEUR-MCGAN:  You
23  know what, listen, it's not a proper
24  objection.  I'm going to move on.  I

Page 13

1   reserved my right.
2           We can deal with this later
3   so that we can get this deposition done,
4   okay?
5           MS. NEWMAN:  Go ahead.
6           MS. BRODEUR-MCGAN:  Thank
7   you.
8   BY MS. BRODEUR-MCGAN:
9   Q.   **Now, did you bring any documents with**
10  **you today to refresh your memory about the events**
11  **that took place that Mr. Dennis Paren is**
12  **complaining about?**
13  A.   No.
14  Q.   **Now, let's talk about your time at**
15  **Spalding Sports Worldwide.**
16       **Do you remember when you were first**
17  **employed by Spalding or its parents?**
18  A.   Beginning in September of 1999.
19  Q.   **Do you know the exact date?**
20  A.   The day after Labor Day.
21  Q.   **And do you recall the exact date that**
22  **you separated from employment?**
23  A.   No.
24  Q.   **Was it approximately June 20 of '03?**

4 (Pages 10 to 13)

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 14

1    A.    It was during June of 2003, yes.  I
2  don't recall exact date.
3    Q.    **And obviously sometime before June 30th**
4  **of '03?**
5    A.    Correct.
6    Q.    **What was your title when you first went**
7  **to Spalding?**
8    A.    I'm not sure I understand the question.
9    Q.    **First of all, let me clarify something.**
10    **When I refer to the term "Spalding,"**
11  **will you understand that I mean Spalding and its**
12  **various names throughout the time that you were**
13  **employed by it?**
14              MS. NEWMAN:  Objection to
15        form.
16              THE WITNESS:  Okay.  I do
17        understand that.
18  BY MS. BRODEUR-MCGAN:
19    Q.    **When you were first employed by**
20  **Spalding, what was your title?**
21    A.    Chief financial officer.
22    Q.    **That was of Spalding?**
23    A.    Spalding Sports Worldwide.
24    Q.    **Did you direct report to anybody other**

Page 15

1  **than James Craigie or the president of Spalding**
2  **Sports Worldwide?**
3    A.    No.
4    Q.    **During your tenure, who was the**
5  **president of Spalding Sports Worldwide?**
6    A.    James Craigie.
7    Q.    **Prior to coming to Spalding, where were**
8  **you employed?**
9    A.    Duracell International, Inc.
10    Q.    **Where was that located?**
11    A.    In Bethel, Connecticut, B-E-T-H-E-L.
12    Q.    **Is that where you were physically**
13  **working, in Bethel, Connecticut?**
14    A.    Yes.
15    Q.    **What was your title there?**
16    A.    I had various roles there during my five
17  years.  My last title was director of financial
18  shared services.
19    Q.    **What was your first title at Duracell?**
20    A.    Manager of external reporting.
21    Q.    **How long were you there for?**
22    A.    A little more than five years, July 1994
23  through sometime in August of 1999.
24    Q.    **How was it that you left Duracell and**

Page 16

1  **went to Spalding?**
2    A.    I had the opportunity to become a chief
3  financial officer of Spalding.
4    Q.    **Did you solicit employment there or did**
5  **somebody reached out to you?**
6    A.    Somebody reached out to me.
7    Q.    **Who was that?**
8    A.    It was G. Wade Lewis, who was the acting
9  chief financial officer of Spalding before I
10  arrived.
11    Q.    **And did Mr. Lewis leave when you**
12  **arrived?**
13    A.    No.
14        He overlapped me by a couple of months.
15    Q.    **Do you know where he went to?**
16    A.    As far as I know, he retired.
17    Q.    **How did you know Mr. Lewis?**
18    A.    He had previously been the chief
19  financial officer of Duracell International, Inc.
20  and I had worked for him previously.
21    Q.    **Prior to the Duracell employment, where**
22  **were you employed?**
23    A.    Deloitte & Touche.
24    Q.    **In which location?**

Page 17

1    A.    Hartford, Connecticut.
2    Q.    **What was your title?**
3    A.    Various titles during eight years.  The
4  last of which was audit manager.
5    Q.    **Were you last there in 1994?**
6    A.    Yes.
7    Q.    **When were you first there?**
8    A.    June of 1986.
9    Q.    **What was your first title when you went**
10  **to Deloitte & Touche?**
11    A.    Staff accountant.
12    Q.    **When you left, you were audit manager?**
13    A.    Correct.
14    Q.    **Can you tell me what the position of**
15  **audit manager entitled?**
16    A.    Supervising on-site audit teams who
17  would go in and audit the books of various client
18  corporations.
19    Q.    **Who was your supervisor when you left**
20  **Deloitte & Touche?**
21    A.    I had a number of supervisors.  Any
22  audit partner in the firm would have been my
23  supervisor.
24    Q.    **Prior to Deloitte & Touche, where were**

5 (Pages 14 to 17)

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 18

1   you employed?
2       A.    I was not employed.
3             Prior to that, I was in college.
4       Q.    What's your date of birth?
5       A.    July 11th, 1964.
6       Q.    If you can, tell me a little bit about
7   your educational background?
8       A.    I have a Bachelor's degree from the
9   University of Connecticut, with a major in
10  accounting.
11      Q.    Any education after your B.A.?
12      A.    No.
13            B.S.  Sorry.
14      Q.    B.S.?
15      A.    Yes.
16      Q.    Any other significant educational
17  background?
18      A.    No.
19      Q.    Can you tell me a little bit about what
20  your job responsibilities were at Duracell when
21  you last left as director of financial shared
22  services?
23      A.    Duracell had five or six domestic
24  locations.  Each of those locations, at one point

Page 19

1   in time, had had stand-alone finance functions,
2   stand-alone payroll, accounts payable and
3   accounting functions.
4             A team was assembled to determine
5   whether those functions could be consolidated into
6   one location.  And, then, when it was determined
7   that that should be the proper course of action,
8   when a director of that single location was
9   needed, I was named as the director.
10            So my job in that capacity was to
11  consolidate accounting, payroll, accounts payable,
12  credit and receivable functions for all of
13  Duracell domestic operations into a single
14  location.
15      Q.    Now, going to your employment with
16  Spalding, can you tell me what your job as CFO
17  entailed?
18      A.    When I began, Spalding was a public
19  corporation, meaning subject to SEC filing
20  requirements.  So part of the job at that time was
21  insuring that SEC files were completed on time,
22  releasing financial statements each quarter,
23  performing analyst calls on those results each
24  quarter, overseeing the general finances of the

Page 20

1   corporation, including cash receipts, cash
2   disbursements, merger and acquisition
3   opportunities.  Basically all financial
4   responsibility for the corporation.
5       Q.    And when you first went to Spalding, how
6   much direct reports did you have?
7       A.    I don't recall.
8       Q.    Did it change, over time, significantly?
9             MS. NEWMAN:  Objection to
10            the form.
11            THE WITNESS:  Not by more
12            than one or two.
13  BY MS. BRODEUR-MCGAN:
14      Q.    Can you list some of the direct reports
15  that you do recall while at Spalding?
16      A.    I can list my direct reports as of my
17  departure, which I do recall.
18      Q.    Okay.
19      A.    There were seven.  Larry Kustra,
20  K-U-S-T-R-A, was the director of credit and
21  accounts receivable, Dennis Paren, was the
22  director of risk management, Victor Varga, was the
23  director of financial planning and analysis.
24      Q.    Director of financial planning and

Page 21

1   analysis?
2       A.    Yes.
3             Michael Lyon was the director of
4   taxation.
5       Q.    What does that entail?
6       A.    Mike handled all of our state and
7   federal tax filing requirements.  He also had
8   oversight responsibility for international
9   operations, tax issues, transfer pricing.
10      Q.    With respect to tax filing requirements,
11  would that entail issuing 1099s and/or W-2s to
12  employees?
13      A.    No.
14            That would have been in the payroll
15  department.
16      Q.    Would he have oversaw the payroll
17  department?
18      A.    No.
19            The payroll department is part of human
20  resources.
21      Q.    And which of the direct reports, if any,
22  would have been involved with HR, with -- to you?
23      A.    None of my direct reports were members
24  of HR.

6 (Pages 18 to 21)

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 22

1    Q.    I stopped you at Mike Lyons.
2          Did you mention Mr. Kimmett?
3    A.    No.
4    Q.    Is it Kimmett?
5    A.    It's Kimmett, K-I-M-M-E-T (sic),
6    believe.
7          Do you want me to finish the list?
8    Q.    Yes.
9          Is Mr. Kimmett on the list or a Mrs.
10   Kimmett?
11   A.    Yes, Mr. Kimmett is on the list, Charles
12   Kimmett.
13   Q.    Okay.
14   A.    He was the director of accounting.
15         There was also a Stephen Nigro,
16   N-I-G-R-O.  He was the director of treasury.  And
17   Richard Levendowski, who was the manager of cost
18   accounting.
19   Q.    Do you believe that list is complete,
20   with respect to the time that you separated from
21   Spalding?
22   A.    To the best of my recollection, yes.
23   Q.    And the director of treasury, Mr.
24   Nigro --

Page 23

1    A.    Yes.
2    Q.    -- what does that job entail?
3    A.    Mr. Nigro had primary responsibility for
4    interacting with our bank group and managing our
5    lines of credit, overseeing the company's daily,
6    weekly, and monthly cash in-flows, cash out-flows,
7    forecasting of cash position and equity position.
8    Q.    Mr. Levendowski, what did his job
9    entail?
10   A.    Mr. Levendowski was responsible for
11   establishing the cost of the company's inventory
12   and tracking it through cost of sales.
13   Q.    Mr. Kustra in credit, what was his job?
14   A.    Mr. Kustra was in charge of establishing
15   credit limits for our retail customers, insuring
16   that billing occurred in the proper time frame
17   and, then, following up on collection as much as
18   necessary.
19   Q.    Now, Mr. Paren, his full title was
20   director of risk management and insurance?
21   A.    I recall his full title as director of
22   risk management.
23   Q.    Okay.  And can you tell me what his job
24   entailed when you last left, when you left

Page 24

1    Spalding?
2    A.    Dennis' responsibilities included
3    insuring that the company had adequate corporate
4    insurance and that that insurance was obtained at
5    a reasonable cost.  He was also involved, as time
6    permitted, in auditing travel and expense reports
7    for Spalding employees.  And those are the primary
8    functions I recall.
9    Q.    The risk management portion of his job
10   title, what did that entail, if anything?
11   A.    I believe risk management refers to the
12   placement of insurance.
13   Q.    Do you recall whether or not he had
14   anything to do with licensing issues before you
15   separated from employment?
16   A.    I don't recall that, no.
17   Q.    Do you recall asking him to get involved
18   with licensing issues sometime after 1999?
19   A.    No.
20   Q.    Did you review Mr. Paren's personnel
21   file before coming here today?
22   A.    No.
23   Q.    When is the last time you would have
24   seen Mr. Paren's personnel file?

Page 25

1    A.    Prior to my departure from Spalding.
2    Q.    How would you use your employees or your
3    direct reports' personnel files?
4          Would you routinely review them?
5                MS. NEWMAN:  Objection to
6          form.
7                THE WITNESS:  No.  I
8          wouldn't say that.  I don't believe I
9          ever reviewed their personnel files.
10               My interaction with their
11         personnel files would have only been to
12         make sure that their reviews were
13         included in their personnel files.
14   BY MS. BRODEUR-MCGAN:
15   Q.    Let's talk about reviews.
16         Can you tell me, of the direct reports
17   that you listed, did you personally do their
18   reviews or their performance evaluations?
19   A.    Yes.
20   Q.    Would that include Mr. Paren's?
21   A.    Yes.
22   Q.    Tell me the process that you personally
23   used to do Mr. Paren's personnel evaluation -- or
24   excuse me -- his performance evaluation?

7 (Pages 22 to 25)

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 46

1    Q.    Did you provide, to your attorney, any
2    documents -- let me rephrase this for you.
3         Do you have -- did you keep any personal
4    notes or diaries about any issues relevant to Mr.
5    Paren during your tenure at Spalding?
6    A.    Let me clarify the question.
7         Did I keep them while I was at Spalding
8    or did I keep them after my departure at Spalding.
9    Q.    Did you keep personal notes or diaries
10   while you were employed at Spalding?
11   A.    Yes.
12   Q.    Can you tell me what form you kept them
13   in?
14   A.    My daily diary and calendar was on the
15   company's computer system, using a palm pilot.  I
16   kept various notes on a variety of topics in
17   manila folders in file drawers in my office.
18   Q.    Did you keep any notes relative to Mr.
19   Paren in your office?
20   A.    I had weekly meetings with each of my
21   staff members and would make notes on topics as
22   necessary, including Mr. Paren, yes.
23   Q.    When you left Spalding, did you take
24   those documents, the weekly meeting minutes or

Page 47

1    other notes, with you?
2    A.    No.
3    Q.    Did you take your palm pilot with you?
4    A.    Yes.
5    Q.    Within your palm pilot, did you have any
6    notes relevant to Mr. Paren?
7    A.    I can't say.
8         My palm pilot became un-useful within a
9    week after my departure at Spalding.
10   Q.    Un-useful?
11   A.    The battery -- sorry, for the grammer.
12   The battery died.  If you don't replace your palm
13   pilot battery within about two minutes, its entire
14   memory is wiped.  I lost everything.
15   Q.    That's fabulous, huh?
16   A.    That is what happened.
17   Q.    Now, you have replaced your palm pilot
18   with you new palm pilot?
19   A.    I did not, actually.  Because I had lost
20   everything in my palm pilot, I decided not to go
21   that route ever again.
22   Q.    Now, other than information that would
23   have been contained in that palm pilot that you
24   took with you when you left Spalding, did you take

Page 48

1    any other notes or diaries with you relevant to
2    your tenure at Spalding?
3    A.    No, I did not.
4    Q.    Did you take any of your own personal
5    promissory notes or stock documents with you?
6         MS. NEWMAN:  Objection to
7    form.
8         THE WITNESS:  By that time,
9    by the time I left Spalding, I had no
10   promissory notes, nor any stock.
11   BY MS. BRODEUR-MCGAN:
12   Q.    While you were employed by Spalding, did
13   you have promissory notes with Spalding?
14   A.    Yes.
15   Q.    Why don't you tell me about them?
16        MS. NEWMAN:  Objection to
17   form.
18        If you understand her
19   question.
20        THE WITNESS:  I think I
21   understand the question.
22        When I came to Spalding, I
23   was required to invest in Spalding
24   stock.  The company offered several

Page 49

1    options as to how you could make that
2    investment.  Pay all cash up front, pay
3    a small amount of cash up front and sign
4    a note for the remainder.
5         I paid a small amount of
6    cash up front.  I signed a note for the
7    remainder.  I re-paid portions of the
8    note through a series of payroll
9    deductions over a portion of my
10   employment at Spalding.
11        And, then, at some point, I
12   believe in 2001, any shares which had
13   not be paid for at that time were
14   canceled and the corresponding note to
15   pay for those shares was canceled.
16   BY MS. BRODEUR-MCGAN:
17   Q.    Do you recall how much you invested,
18   initially, with your own money for the Spalding
19   stock?
20   A.    I believe, to the best of my
21   recollection, initially, I put in about $10,000.
22   And by the time I was done with payroll
23   deductions, I believe I had put in about $40,000.
24   Q.    Do you recall what the initial note was

13 (Pages 46 to 49)

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 50

1  that you took to purchase the Spalding shares?
2      A.    I don't understand the question.
3      Q.    At some point, did you execute a note to
4  purchase the shares while at Spalding?
5      A.    I executed a note to re-pay the company,
6  yes.
7      Q.    Do you recall when that was?
8      A.    I do not.
9      Q.    From 1999 to 2004, did you use an
10  accountant to help you with your tax returns?
11      A.    For the 1999 tax year, yes, but I
12  believe that wouldn't have been until 2000.
13      Q.    How about for the year 2001 and --
14      A.    Yes.
15      Q.    I'm sorry.
16          I didn't mean to interrupt you but how
17  about for the year 2001?
18      A.    Yes.
19      Q.    Do you recall --
20      A.    For all years subsequent to 1999, I've
21  used the same tax preparer.
22      Q.    That was my question.
23          And who is that?
24      A.    Burns & Clarke.

Page 51

1      Q.    Where are they located?
2      A.    I believe they are located in
3  Farmington, Connecticut but it might be Bristol,
4  Connecticut.
5      Q.    Do you have a person there that you
6  dealt with the same person over time?
7      A.    Yes, John Burns.
8      Q.    John Burns?
9      A.    Yes.
10      Q.    And what office is he out of?
11      A.    They only have one office.
12      Q.    Do you recall if he's still employed
13  there?
14      A.    To the best of my knowledge, he is.
15      Q.    I'm going to hand you, first, all of
16  your tax returns and ask you if these are, in
17  deed, your tax returns for the year of 2004, 2003,
18  2002, 2000 and 1999?
19      A.    Do you want me to look at every page?
20      Q.    Yes.
21      A.    (Witness complies.)
22      Q.    If it would be helpful, the documents
23  that I handed to you are Bates stamped Frey 006
24  through 0125 and are attached to a confidentiality

Page 52

1  log of Defendant Frey.
2          MS. NEWMAN:  While he's
3      reviewing, do you want to take a
4      two-minute break to go to the bathroom?
5          MS. BRODEUR-MCGAN:  Sure.
6          Do you want to stipulate on
7      the record that these are confidential
8      records, not to be disseminated to any
9      third party for any reason?
10          MS. NEWMAN:  Yes, that
11      would be great.
12          MS. BRODEUR-MCGAN:  Okay.
13      Can we put that on the record, right
14      now?
15          MS. NEWMAN:  Pursuant to
16      the confidentiality agreement that we
17      agreed to.
18          MS. BRODEUR-MCGAN:  Why
19      don't we also state that all of the
20      other documents that are being used in
21      today's deposition that bear a stamp
22      "Confidential," are similarly not to be
23      made public for any reason and are part
24      of a confidentiality agreement.

Page 53

1          MS. NEWMAN:  And are not to
2      be disseminated to any third-party.
3          - - -
4          (Whereupon, a brief recess was
5      taken.)
6          - - -
7  BY MS. BRODEUR-MCGAN:
8      Q.    Mr. Frey, did you have an opportunity to
9  look at the documents Bates stamped 0006 through
10  0142?
11      A.    Just to clarify, I don't see a Bates
12  stamp on the first page.  I see the second page
13  does say 0007.
14          MS. NEWMAN:  Sometimes they
15      are hard to find.  Here we are
16      (indicating).
17          THE WITNESS:  Yes.
18  BY MS. BRODEUR-MCGAN:
19      Q.    Are those, in deed, your tax returns for
20  the years 1999 through 2004?
21      A.    As far as I can tell, these are complete
22  copies of my return, yes.
23      Q.    I'm going to direct your attention to
24  Bates stamp 0132.  It's in the 1999 report.  So it

14 (Pages 50 to 53)

DANIEL FREY

Page 70

1    Q.    Thank you.
2    A.    We discussed implementing a retention
3    bonus plan to retain those people who would be
4    most affected by those potential changes, be most
5    involved in helping us successfully navigate
6    through those potential changes and who,
7    potentially, were a risk to leave the company and
8    not be available to help us navigate through those
9    potential changes.
10   Q.    Was the initial concept for the
11   retention bonus plan of 2001 the brain child of
12   any one individual?
13   A.    I don't recall the genesis of it, no.
14   Q.    Can you tell me, were there, ultimately,
15   parameters created for creating the retention
16   bonus plan of 2001?
17   A.    I'm sorry. I don't understand the
18   question.
19   Q.    That was a bad question. There will be
20   some more today.
21         The operating -- you discussed how the
22   operating committee discussed how there should be
23   an RBP of 2001; is that fair?
24              MS. NEWMAN: Objection to

Page 71

1         form.
2              THE WITNESS: I discussed
3         my understanding, again, as -- and the
4         precursor to my answer, my understanding
5         of how I viewed my direct reports which
6         is all I had influence over.
7    BY MS. BRODEUR-MCGAN:
8    Q.    Other than your understanding of how you
9    were going to view your direct reports, were there
10   any discussions that you were present in about how
11   other people were going to view their direct
12   reports and how they would select people for
13   inclusion?
14              MS. NEWMAN: Objection to
15         form.
16              THE WITNESS: Not that I
17         recall, no.
18   BY MS. BRODEUR-MCGAN:
19   Q.    Were there any written criteria that the
20   operating committee members had to go by when
21   selecting people for the RBP?
22   A.    Not that I recall, no.
23   Q.    Did you ever have any conversations, for
24   instance, with Mr. Craigie, as to how he was going

Page 72

1    to select people for the retention bonus plan of
2    2001?
3    A.    No, I did not.
4    Q.    Did he ever mention it to you how or to
5    any other person in your presence as to how he was
6    going to select people?
7              MS. NEWMAN: Objection to
8         form.
9              THE WITNESS: No.
10             Only to me tell me that I
11        would be selected.
12   BY MS. BRODEUR-MCGAN:
13   Q.    How about Peter Arturi, did he, in your
14   presence, discuss how he was going to select
15   people to be obtaining the RBP in 2001?
16             MS. NEWMAN: Objection to
17        form.
18             THE WITNESS: Not that I
19        can recall.
20             I'm not sure whether Peter
21        had any people in the retention bonus
22        plan.
23   BY MS. BRODEUR-MCGAN:
24   Q.    How about Vaughn Rist?

Page 73

1    A.    I don't recall any operating committee
2    member having any discussion with me as to how
3    they were going to select people for inclusion in
4    the RBP.
5    Q.    My next question is: So do you have any
6    sense, from any source, as to how others selected
7    people for the RBP in 2001?
8    A.    No, I do not.
9    Q.    Do you know whether or not people in the
10   operating committee used similar analyses, as you
11   described for me earlier, for your basis for
12   selection for the RBP for 2001?
13             MS. NEWMAN: Objection to
14        form.
15             THE WITNESS: I have no
16        knowledge of that, no.
17   BY MS. BRODEUR-MCGAN:
18   Q.    Now, prior to 2000, in September of '99,
19   when you first came to Spalding --
20   A.    Yes.
21   Q.    -- was there any designation of
22   employees as being key employees, for any reason?
23   A.    Not that I'm aware of.
24   Q.    Were you familiar with any history of

19 (Pages 70 to 73)

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 86

1    all, in your analysis?
2        A.    No.
3        Q.    Was the amount of money spent on stock
4    options over time relevant in your analysis?
5        A.    No.
6        Q.    Now, when you said it's important -- you
7    had a common-sense approach to who was retained.
8            Was it important that they be retained
9    through the transition or was it important that
10   they be retained for the new entity after sale?
11               MS. NEWMAN:  Objection to
12           form.
13               THE WITNESS:  At the time
14           we originally developed the retention
15           bonus plan, there was no imminent sale.
16           So it was not an either or.
17               It was important that these
18           people be retained for all the
19           possibilities I articulated before,
20           which would have been amendment of prior
21           agreements, restructuring of the
22           subordinated debt, potential change in
23           ownership and the likely triggering of
24           possible M&A activity, or completion of

Page 87

1            re-evaluation of the direction of the
2            company.
3    BY MS. BRODEUR-MCGAN:
4        Q.    Now, were you aware that the retention
5    bonus plan of 2001 needed to be submitted to the
6    bankruptcy court for any reason?
7               MS. NEWMAN:  Objection to
8           form.
9               THE WITNESS:  At the time
10           we talked about the retention bonus plan
11           of 2001, there was no discussion of
12           bankruptcy.
13   BY MS. BRODEUR-MCGAN:
14       Q.    Let me rephrase that.
15           After the formulation of the RBP and the
16   selection of those who would participate, were
17   you, at some point, made aware that in order to
18   execute the RBP of 2001, there would need to be a
19   reporting or a motion to bankruptcy court?
20               MS. NEWMAN:  Objection to
21           form.
22               THE WITNESS:  I don't
23           understand the question.
24               We executed the RBP in 2001

Page 88

1            without any bankruptcy court approval
2            because there was no bankruptcy
3            discussion at that time.
4    BY MS. BRODEUR-MCGAN:
5        Q.    Let me rephrase that.
6            The RBP that was created in 2001, tell
7    me how many years it took to execute?
8               MS. NEWMAN:  Objection to
9           the form.
10               THE WITNESS:  My
11           recollection is that is was originally
12           intended to pay out in four equal
13           installments, being December 31st, of
14           2001, December 31st, 2002, December
15           31st, 2003, December 31st, 2004, with
16           the caveat that the earliest payment
17           could not occur before the bond
18           restructuring was complete.  And that,
19           upon the change in control, any later
20           payments and any remaining unpaid
21           payments would accelerate.
22   BY MS. BRODEUR-MCGAN:
23       Q.    Sitting here today, do you recall how
24   much money was put into the 2001 RBP?

Page 89

1            And let me rephrase this and tell you
2    what I'm getting at.
3            The RBP of 2001's plan was that there be
4    four equal payments over a period of four years,
5    correct?
6        A.    Yes.
7        Q.    Do you recall the amount of money
8    involved in payout to recipients over all that
9    time?
10               MS. NEWMAN:  Objection to
11           form.
12               THE WITNESS:  I recall
13           discussion of a $4 million pool.
14   BY MS. BRODEUR-MCGAN:
15       Q.    Now, getting back to the formation of
16   the RBP in 2001 and the selection of names for
17   recipients, can you tell me if you were also
18   involved with selection of amounts for recipients?
19       A.    The only thing I recall is coming up
20   with the list of participants.  And that, at some
21   point in the process, reviewing a draft of who
22   those participants were and what the
23   draft-targeted amounts were for them but I don't
24   recall having input into the amount.

23 (Pages 86 to 89)

CHARLES P. CARMODY & ASSOCIATES
215.646.2599

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 90

1    Q.    How about for the operating committee
2    members, do you recall whether or not there was
3    any input as to the targeted amount that they
4    would receive during the draft stage?
5                MS. NEWMAN:  Objection to
6          form.
7                THE WITNESS:  I don't
8          recall that, no.
9                I did not have any input
10         into my amount, as an example.
11   BY MS. BRODEUR-MCGAN:
12   Q.    As an example, who had input into what
13   you would receive?
14   A.    I have no idea.
15   Q.    You didn't participate in that?
16   A.    No.
17   Q.    Can you describe for me the level of
18   Pete Arturi's participation in the selection of
19   the amounts and the recipients?
20   A.    No.  I'm not aware of what his
21   participation was in either the level of amounts
22   or participants.
23   Q.    Do you recall, sitting here today, who
24   you selected to participate in the RBP of your

Page 91

1    direct reports?
2    A.    Yes, I do.
3    Q.    Who were they?
4    A.    To the best of my recollection, I
5    selected Mr. Varga, Mr. Nigro, Mr. Kimmett and Mr.
6    Lyon.
7    Q.    Did you select them during the -- let me
8    rephrase this.
9          Were there any of your direct reports
10   that you suggested to be in the RBP that were not
11   ultimately put in the RBP?
12   A.    Not that I recall, no.
13   Q.    That last question, I was referring to
14   the RBP of 2001, okay, did you understand that?
15   A.    That is the only RBP which I
16   participated in so I'm assuming that is what all
17   your RBP questions refer to.
18   Q.    Did you have other direct reports in
19   late 2000 or 2001 that were not selected for the
20   RBP?
21   A.    Yes, I did.
22   Q.    Who were they?
23   A.    Dennis Paren, Larry Kustra, and Rich
24   Levendowski.

Page 92

1    Q.    Why was Larry Kustra not selected?
2    A.    His job responsibilities were not likely
3    to be influenced significantly by the potential
4    changes that we were going to through and I didn't
5    feel that he was a high risk to leave the company.
6    And even if he had left the company, I felt we
7    could have scrambled together to cover his duties
8    elsewhere.
9    Q.    Do you know how long Mr. Kustra had been
10   involved by Spalding or its predecessors?
11   A.    I don't know specifically.  I believe it
12   was more than a decade.
13   Q.    And Mr. Levendowski, can you tell me why
14   you did not select him?
15   A.    Same reasons.  Basically, Rich's duties
16   were not likely to be affected by changes in bank
17   debt or seeking debt agreements or M&A activity or
18   change in ownership.
19         I did not feel that he was a risk to
20   leave the company.  And if he had left the
21   company, I felt we could have, if necessary,
22   covered his duties with other individuals.
23   Q.    And Mr. Paren, why was he not selected?
24   A.    Same reasons.

Page 93

1          Dennis' role was not likely to be
2    significantly affected by going through a debt
3    restructuring or a change in ownership, or any
4    potential M&A activity.  I did not feel he was a
5    risk to leave the company.  And if he did leave
6    the company, I felt we could have covered his
7    duties elsewhere.
8    Q.    When you first submitted your list for
9    those to be select -- let me back up a second.
10         How did you communicate your desire to
11   put Mr. Varga, Nigro, Kimmett and Lyon on the RBP
12   list?
13         How did you communicate that to the OCM?
14   A.    I don't recall whether it was verbally
15   or through e-mail.  I don't recall.
16              - - -
17         (Whereupon, a discussion was held off
18         the record.)
19              - - -
20         (Whereupon, Exhibit Frey-4 was marked
21         for identification.)
22              - - -
23              MS. BRODEUR-MCGAN:  For the
24         record, this is Frey Number 4, a

24 (Pages 90 to 93)

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 138

1    THE WITNESS: Sorry. What
2    was the question again?
3  BY MS. BRODEUR-MCGAN:
4    **Q.    My question is: Have you ever seen this**
5  **document before, without the pink highlighting?**
6    A.    I'm not sure. Honestly, I'm not sure.
7    **Q.    Okay. Let's step back for a second.**
8    **I would like to ask you some questions**
9  **about Mr. Paren, generally, during his tenure at**
10 **Spalding.**
11    **Can you tell me whether or not Mr. Paren**
12 **was a good employee?**
13    MS. NEWMAN: Objection to
14    form.
15    THE WITNESS: During my
16    tenure, I think Dennis was generally a
17    good employee and that is reflected in
18    the evaluations I gave him.
19 BY MS. BRODEUR-MCGAN:
20    **Q.    Did you have an opportunity to review**
21 **those personnel evaluations in the last six**
22 **months, of Mr. Paren, that you did?**
23    MS. NEWMAN: Objection to
24    form.

Page 139

1    THE WITNESS: Sorry.
2    MS. NEWMAN: During the
3    last -- six months ago?
4  BY MS. BRODEUR-MCGAN:
5    **Q.    Let me rephrase it.**
6    **Since you left Spalding, did you have an**
7  **opportunity to review Dennis Paren's performance**
8  **evaluations that you had did for him?**
9    MS. NEWMAN: Prior to this
10    lawsuit, right?
11 BY MS. BRODEUR-MCGAN:
12    **Q.    For any reason.**
13    A.    I reviewed the reviews I did for Mr.
14 Paren that were provided by either you or Mr.
15 Paren in the initial document exchange.
16    **Q.    Now, during Mr. Paren's tenure with**
17 **Spalding, while you were employed there, did he**
18 **raise certain issues with you about corporate**
19 **improprieties?**
20    MS. NEWMAN: Objection to
21    form.
22    Do you want to define the
23    term "corporate improprieties"?
24    THE WITNESS: Yes, you'll

Page 140

1    have to be more specific in terms of
2    what you mean.
3  BY MS. BRODEUR-MCGAN:
4    **Q.    Did Mr. Paren raise issues about**
5  **reporting of income that should be reported by the**
6  **corporation, for any reason?**
7    MS. NEWMAN: Objection to
8    form.
9    THE WITNESS: Not that I
10    recall, no.
11    I don't recall know why
12    Dennis would suggest we weren't
13    reporting income that we should have
14    reported.
15 BY MS. BRODEUR-MCGAN:
16    **Q.    Did Mr. Paren have a discussion with you**
17 **about the need, in his opinion, to issue 1099s for**
18 **the Hawaiian trip?**
19    A.    Not that I recall.
20    I do recall having discussions about the
21 1099s for the Hawaii trip but not with Mr. Paren.
22    **Q.    Who do you recall having discussions**
23 **with?**
24    A.    Mr. Lyon.

Page 141

1    **Q.    What were the discussions about?**
2    A.    We had a number of customers attend the
3  Hawaii trip. The intent from the beginning was
4  that they would have reported income, issuing form
5  1099s.
6    Mr. Lyon coordinated with John Fuller
7  who was the head of sales planning and the
8  organizer of that trip, to obtain all the
9  necessary information from the participants to
10 issue 1099s.
11    That information process was never
12 properly completed and the discussion we ended up
13 having was, do we need to issue 1099s for, as an
14 example, six of the ten people who we do have or
15 do an all or nothing. And the conclusion was to
16 do an all or nothing.
17    It was the responsibility of the
18 individuals who were informed that it would be a
19 taxable event to report their own taxes and that
20 if we couldn't given a complete 1099, that we
21 couldn't give 1099s.
22    **Q.    Was it your understanding that the**
23 **members -- that the people who went on the Hawaii**
24 **trip were informed that it was a taxable event?**

36 (Pages 138 to 141)

CHARLES P. CARMODY & ASSOCIATES
215.646.2599

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 142

1    A.    They were supposed to be informed.
2         I don't have any actual knowledge as to
3    whether sales planning actually informed them of
4    that.
5    **Q.    You said whether or not sales**
6    **planning --**
7    A.    Sales planning.  Mr. Fuller in sales
8    planning.
9    **Q.    With respect to the promissory note that**
10   **was your own promissory note that you had with the**
11   **company, that ultimately was cancelled; is that**
12   **fair to say?**
13   A.    Yes.
14   **Q.    Is there another for word for that, like**
15   **being forgiven?**
16   A.    I would not use the word "forgiven."
17        Forgiven implies that I received
18   something of value for which I did not pay and
19   that is not what happened.
20   **Q.    Is that word "forgiven" a term of art in**
21   **the tax arena?**
22   A.    I don't know.
23   **Q.    You would use the word "cancelled"?**
24   A.    Yes.

Page 143

1         We cancelled a certain number of shares
2    in the corresponding loan amount.
3    **Q.    Did Mr. Paren ever bring to your**
4    **attention the fact that that was a taxable event?**
5    A.    Not to my recollection, no.
6    **Q.    Did he bring it to any OCM members'**
7    **attention, the fact that that cancellation of**
8    **promissory notes was a taxable event?**
9    A.    Not to my knowledge, no.
10   **Q.    Did Mr. Paren have any job**
11   **responsibilities having to do with risk management**
12   **over products such as soccer balls, Infusion**
13   **soccer balls.**
14   A.    Mr. Paren was in charge of insuring that
15   we had product liability coverage.
16   **Q.    Other than that?**
17   A.    That would be my understanding of the
18   extent of his role.
19   **Q.    Do you know whether or not he evaluated**
20   **risk of the company, other than the risk that was**
21   **insured within his position of risk management?**
22             MS. NEWMAN:  Objection to
23        form.
24             THE WITNESS:  I would

Page 144

1    expect that the answer is yes, because
2    part of his job would have been to
3    determine whether we had exposures for
4    which insurance was needed.
5    BY MS. BRODEUR-MCGAN:
6    **Q.    With respect to the cancellation of your**
7    **promissory note, did you hear from any source,**
8    **prior to this litigation, that Mr. Paren was**
9    **complaining that you should have paid taxes on**
10   **that promissory note cancellation?**
11             MS. NEWMAN:  Objection to
12        form.
13             THE WITNESS:  Not that I
14        recall, no.
15   BY MS. BRODEUR-MCGAN:
16   **Q.    Do you know whether or not Mr. Paren**
17   **called or wrote Mr. Graves or any other member of**
18   **Oaktree Capital about the cancellation of**
19   **promissory notes, and other events that should be**
20   **taxable that were not reported?**
21             MS. NEWMAN:  Objection to
22        form.
23             THE WITNESS:  Other than
24        this memo which we've marked Frey-13,

Page 145

1        no.
2    BY MS. BRODEUR-MCGAN:
3    **Q.    Do you know whether or not Mr. Paren**
4    **complained to Mr. Craigie that cancellation of**
5    **promissory notes were taxable events?**
6    A.    Not to my knowledge, no.
7    **Q.    Do you know whether or not Mr. Paren**
8    **complained about deviation from the GAAP standards**
9    **in the finance department?**
10             MS. NEWMAN:  Objection to
11        form.
12             THE WITNESS:  Not that I'm
13        aware of, no.
14             Mr. Paren wouldn't be in a
15        position to opine on GAAP.
16   BY MS. BRODEUR-MCGAN:
17   **Q.    Incidentally, do you know Mr. Paren's**
18   **educational background?**
19   A.    I don't recall it, no.
20   **Q.    Do you know whether or not he had a**
21   **Master's in anything?**
22   A.    I don't.
23   **Q.    Or a B.A. or a B.S.?**
24   A.    I'm not positive.

37 (Pages 142 to 145)

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 182

1  called someone who was involved in risk management
2  for KKR, who he felt was a supporter of his.
3      That person was not involved on the
4  Spalding account. Mark Lipschultz had been on the
5  board for Spalding so Mark was more familiar with
6  the financial organization of the management team.
7      Mark called me basically to say, "Dennis
8  has complain that there was a retention bonus and
9  he was not included. Can you give me the
10 background as to what happened?"
11     Q.    How much time did you spend explaining
12 that to Mr. Lipschultz on the phone?
13     A.    I would say not more than five minutes.
14     Q.    Tell me, in summary, what you told him.
15     A.    The same thing I told you today, which
16 was that the criteria for retention bonus were
17 additional responsibilities that were going to be
18 brought about as we went through a potential debt
19 restructuring, change in ownership, bank
20 amendment, potential M&A, et cetera, that I didn't
21 think that was going to have a significant impact
22 on Mr. Paren's position, that I didn't think he
23 was a risk to leave the company, and that, even if
24 he did leave the company, I thought we would

Page 183

1  absorb his work elsewhere in the organization.
2      Q.    I know you have just used the term "the
3  criteria used," and I think earlier you clarified
4  for me that you knew what your criteria was for
5  inclusion in the retention bonus?
6      A.    Correct.
7              MS. NEWMAN: Objection to
8          form.
9  BY MS. BRODEUR-MCGAN:
10     Q.    Is it fair to say that you were not
11 aware of how others created or if others created
12 their own criteria on the OCM?
13     A.    That is fair to say, yes.
14     Q.    Did you tell Mr. Lipschultz that this
15 was your criteria?
16     A.    I don't recall.
17     Q.    Did you tell -- well, first of all, do
18 you know that Mr. Paren complained to KKR and risk
19 management about other issues surrounding you, not
20 just his exclusion form the retention bonus?
21             MS. NEWMAN: Objection to
22         form.
23             THE WITNESS: I'm not aware
24         of that, no.

Page 184

1  BY MS. BRODEUR-MCGAN:
2      Q.    Do you know whether or not anybody
3  reported to Deloitte & Touche, Simpson and
4  Thatcher or KKR, that promissory notes were being
5  forgiven and not reported as income?
6      A.    Not prior to these proceedings, no.
7      Q.    Did you tell Mr. Paren that Mr.
8  Lipschultz called you?
9      A.    Yes, I did.
10     Q.    What did you tell him?
11     A.    I told him that he should be aware that
12 his call to KKR generated a call to me, that I had
13 had a discussion with KKR as to I what I just
14 summarized for you. And at the end of that
15 conversation, Mr. Lipschultz said, "Okay, I
16 understand." And that was it.
17     Q.    And did you tell Mr. Paren, in essence,
18 during that same conversation after Mr. Lipschultz
19 called you that you knew what he had done and that
20 it was useless?
21             MS. NEWMAN: Objection to
22         form.
23             THE WITNESS: I don't
24         recall that, no.

Page 185

1  BY MS. BRODEUR-MCGAN:
2      Q.    Did you ever make a reference to sending
3  Mr. Paren out of the room, regarding that
4  Lipschultz conversation, as having, quote, "left
5  with his dick in his hand"?
6              MS. NEWMAN: Objection to
7          form.
8              THE WITNESS: I do not
9          recall that, no.
10 BY MS. BRODEUR-MCGAN:
11     Q.    Did you call Mr. Paren "Mr. Sunshine"?
12     A.    Not to my recollection, no.
13     Q.    Have you ever heard him referred to as
14 such?
15     A.    No, not until these proceedings.
16     Q.    Did you have any nicknames for Mr.
17 Paren?
18     A.    No.
19     Q.    No?
20     A.    Not that I recall, no.
21     Q.    Other than Mr. Lipschultz at KKR, were
22 you contacted by anybody else who had been
23 contacted by Mr. Paren regarding the retention
24 bonus issue?

47 (Pages 182 to 185)

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 178

1  long the discussion was with Mr. Paren the first
2  time?
3      A.    I don't actually recall the discussion
4  itself but I don't have any reason to believe that
5  a half of an hour is not the amount of time I
6  spent with him.
7      Q.    Did he tell you, in that first
8  conversation, that he felt he was being unfairly
9  excluded?
10              MS. NEWMAN:  Objection to
11          form.
12              THE WITNESS:  I don't
13          recall him asserting that he was
14          unfairly excluded.
15              I do recall him being
16          displeased that he was not included in
17          the retention bonus plan.
18              I don't recall him
19          characterizing it as an unfair
20          exclusion.
21  BY MS. BRODEUR-MCGAN:
22      Q.    Do you recall whether or not he asked
23  you why you excluded him during that first
24  conversation?

Page 179

1      A.    I do recall that, that was the main
2  topic of our discussion, was what the criteria
3  were for having been included in the retention
4  plan, which is the same criteria I have outlined a
5  couple times here today.
6      Q.    Other than telling him the criteria that
7  you had or inclusion, did you give him any
8  specifics as to why he didn't fit within that
9  criteria, during that first discussion?
10      A.    No.
11              I think they was self-explanatory.
12      Q.    Sitting here today, do you,
13  specifically, recall whether or not he asked you
14  why he didn't fit within that criteria?
15      A.    No, I do not.
16      Q.    That e-mail, Exhibit Number 19, has a
17  sentence in it which is highlighted in pink.
18              It says, "Our discussion was civil but
19  knowing Dennis, we still probably haven't heard
20  the last from him on this topic."
21              What did you mean by that?
22      A.    That Dennis was very diligent on
23  following through his ideas and that he was not
24  satisfied with the answer that I gave him in our

Page 180

1  discussion, and that he would continue to raise
2  it.
3      Q.    Did you ever refer to Mr. Paren as being
4  a pain in your ass?
5      A.    I referred to Mr. Paren as being a pain
6  in the ass.  I don't recall if it was a pain in my
7  ass.  Sometime after the date of this memo.
8      Q.    Who did you refer to him as such --
9  strike that.
10              I don't know even know what that means.
11              Who did you say that to?
12      A.    To the best of my recollection, that was
13  in my discussion with Mr. Arturi.
14      Q.    Why did you tell Mr. Arturi that Mr.
15  Paren was a pain in the ass?
16      A.    It was with regard to this topic, his
17  not being included in the retention bonus plan.
18  And his, basically, repeated unwillingness to
19  accept the answer that these were my criteria for
20  who was included in the retention bonus plan.
21              He didn't meet those criteria.  I didn't
22  include you in the retention bonus plan.  And
23  Dennis wanted to continue to have that discussion
24  with me again.  Had gone to Mr. Rist to raise

Page 181

1  objection.  Had gone to Mr. Arturi to raise his
2  objection.  Had gone to Mr. Craigie to raise his
3  objection.  And, ultimately, gone to KKR to raise
4  his objection on a matter which I had frankly and
5  honestly discussed with him in terms of what the
6  criteria was and why he didn't meet those
7  criteria.
8      Q.    How do you know he went to KKR to raise
9  the issue of his exclusion?
10      A.    Because KKR called me for my explanation
11  as to what the retention bonus criteria were and
12  why Dennis was not a recipient of the retention
13  bonus.
14      Q.    Who at KKR called you?
15      A.    Mark Lipschultz.
16      Q.    Approximately when was that in relation
17  to this e-mail of Exhibit 19?
18      A.    I don't recall.  I believe it was after
19  the date of this memo but I don't specifically
20  recall.
21      Q.    What did you say -- what did Mark
22  Lipschultz say when he called you?
23      A.    I don't recall his exact comments.
24              Something to the effect that Dennis had

CHARLES P. CARMODY & ASSOCIATES
215.646.2599

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 194

1    aware that I was not the only one in
2    that situation.
3            I don't recall,
4    specifically, who else would have been.
5    BY MS. BRODEUR-MCGAN:
6    **Q.    Do you recall, specifically, what you**
7    **did with the stock and/or the promissory notes**
8    **after it was canceled?**
9            MS. NEWMAN:  Objection to
10   form.
11           THE WITNESS:  I do not.
12   BY MS. BRODEUR-MCGAN:
13   **Q.    Do you know how the company, Spalding,**
14   **during your tenure, decided who would be allowed**
15   **to purchase stock?**
16           MS. NEWMAN:  Objection to
17   form.
18           THE WITNESS:  During my
19   tenure, the only people who I'm aware of
20   who purchased stock during my tenure
21   were people who joined the company
22   subsequent KKR's hiring of Jim.
23           And it was, at least in my
24   case, a requirement that stock be

Page 195

1    purchased, as opposed to being allowed
2    to purchase stock.
3    BY MS. BRODEUR-MCGAN:
4    **Q.    Again, during your tenure at Spalding,**
5    **were you aware of any written criteria where**
6    **certain employees, non-factory level or non-union**
7    **employees, would be given certain stock options?**
8            MS. NEWMAN:  Objection to
9    form.
10           THE WITNESS:  Sorry.
11           What was the question
12   again?
13   BY MS. BRODEUR-MCGAN:
14   **Q.    Let me rephrase it for you.**
15           **Are you aware of any special stock**
16   **options, given during your tenure at Spalding, for**
17   **people who were in upper level management?**
18   A.    I don't recall.  I don't recall,
19   honestly, whether I had stock options or not.
20   **Q.    Going back to your comment to Mr. Arturi**
21   **that Dennis Paren was a pain in the ass, can you**
22   **tell me why you referred to him as a pain in the**
23   **ass?**
24           MS. NEWMAN:  Objection.

Page 196

1            Asked and answered.
2            THE WITNESS:  I believe I
3    already did.
4            Do you want me to tell you
5    again?
6    BY MS. BRODEUR-MCGAN:
7    **Q.    Sure.**
8            **We will see if it's the same answer.**
9            MS. NEWMAN:  Objection.
10           THE WITNESS:  Mr. Paren had
11   complained repeatedly about not being
12   included in the retention bonus plan.
13   And, although, I had a one-to-one
14   discussion with him to explain it to
15   him, he was not accepting of the
16   explanation.
17           He wanted to pursue that in
18   further discussion with Mr. Rist.  Then,
19   in a further discussion with Mr. Arturi.
20   Then, in a further discussion with Mr.
21   Craigie.  And, ultimately, he called
22   KKR.
23           This is at a time when we
24   are in the middle of restructuring the

Page 197

1    company's debt and ownership position in
2    such a way as to remove more than $100
3    million in debt from the company's
4    books, free up more than $20 million a
5    year in annual cash interest expense
6    and, I had Mr. Paren in my office -- and
7    I know in other people's offices
8    repeatedly -- over a $20,000 issue.
9    BY MS. BRODEUR-MCGAN:
10   **Q.    Can you recall, during your tenure at**
11   **Spalding, if Mr. Paren ever complained to you**
12   **about the significant salary increases of Mr.**
13   **Craigie's direct reports?**
14           MS. NEWMAN:  Objection to
15   form.
16           THE WITNESS:  No, I don't
17   recall that.
18   BY MS. BRODEUR-MCGAN:
19   **Q.    Do you ever recall Mr. Paren -- let me**
20   **rephrase this.**
21           **Did Mr. Paren stick his nose into areas**
22   **that you felt that they it didn't belong in, other**
23   **than with respect to the retention bonus plan?**
24           MS. NEWMAN:  Objection to

CHARLES P. CARMODY & ASSOCIATES
215.646.2599

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 198

1    form.
2            Can you define "stick his
3    nose"?
4    BY MS. BRODEUR-MCGAN:
5    **Q.    If you can answer it.**
6    A.    Other than the retention bonus plan, I
7    don't recall any instances of learning that Dennis
8    was probing or investigating items not related to
9    his job.
10   **Q.    I think you said this but I just want to**
11   **confirm.**
12           **To your knowledge, there were no 1099s**
13   **issued for the Hawaii trip?**
14           MS. NEWMAN:  Objection.
15           Asked and answered.
16           THE WITNESS:  That is
17   correct.
18   BY MS. BRODEUR-MCGAN:
19   **Q.    And who is Terry Voight?**
20   A.    I believe Terry Voight was one of
21   Dennis' -- was an employee that Dennis brought in.
22           Can you confirm that for me or should I
23   just keep going?
24   **Q.    Yes.  I believe that to be true.**

Page 199

1    A.    Okay.
2    **Q.    Let me rephrase this and I will use a**
3    **document that we have marked today.**
4            **The 2001 performance evaluation of Mr.**
5    **Paren indicates that there was only one negative**
6    **part of his performance and that was Terry who,**
7    **who did not work out and needed to be terminated.**
8            MS. NEWMAN:  Objection to
9            your testimony and objection to the form
10           of the question.
11   BY MS. BRODEUR-MCGAN:
12   **Q.    Do you recall that Terry Voight needed**
13   **to be terminated on or about 2001?**
14   A.    I remember that Terry Voight was hired
15   that she did not work out and that she needed to
16   be terminated.  I don't recall what year.
17   **Q.    Do you recall the circumstances**
18   **surrounding her termination?**
19   A.    She failed to perform the duties of her
20   job.
21           That was Mr. Paren's assessment as well
22   as mine.
23   **Q.    What was it a negative aspect of Mr.**
24   **Paren's performance review that she needed to be**

Page 200

1    **terminated?**
2    A.    Because her hiring was his
3    recommendation and she was under his supervisor
4    and she failed to perform.
5            MS. BRODEUR-MCGAN:  I think
6    I'm almost done.
7            If you can just give me two
8    minutes, I'm sure we can wrap up in less
9    than five.
10           - - -
11   (Whereupon, a discussion was held off
12   the record.)
13           - - -
14   (Whereupon, a brief recess was
15   taken.)
16           - - -
17   BY MS. BRODEUR-MCGAN:
18   **Q.    Prior to -- let me strike that.**
19           **After you left Spalding, did anybody**
20   **ever contact you regarding Dennis Paren and/or a**
21   **recommendation or a reference?**
22   A.    No.
23           Sorry.  Regarding a recommendation or a
24   reference, no.  About Dennis at all, yes.

Page 201

1    **Q.    Who?**
2    A.    Andy Howley called me at home one
3    weekend.
4    **Q.    When was that?**
5    A.    I believe it was in September of 2003
6    but I'm not positive of that date.
7    **Q.    What was his -- was he still actively**
8    **involved with the corporation at the time?**
9    A.    Yes.
10           He was in Chicopee at the time.
11   **Q.    What did he call you about?**
12   A.    He called me about Dennis' allegations
13   that Jim had cheated on his expense reports.
14   **Q.    What did you say?**
15   A.    I didn't have to say much.  Andy said --
16   Andy asked me whether I thought it was likely that
17   there was a real problem there or whether this was
18   simply a disgruntled employee making noise?
19           I responded to him that I felt it was
20   the latter.
21   **Q.    What did you base your opinion on, when**
22   **you gave Andy Howley that opinion?**
23   A.    The fact that the person who reviewed
24   Jim's expense reports during my tenure was me and

CHARLES P. CARMODY & ASSOCIATES
215.646.2599

5a005064-e997-439e-b888-c505537e3c24