# EXHIBIT D

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

**DENNIS PAREN**

-vs-

**JAMES CRAIGIE and DANIEL FREY**

No. 04-30127-MAP

----------

Tuesday, August 30, 2005
Princeton, New Jersey

----------

**DEPOSITION OF JAMES CRAIGIE**

### CHARLES P. CARMODY & ASSOCIATES
**COURT REPORTING & LEGAL VIDEO SERVICES**
*SERVING PHILADELPHIA, SOUTHEASTERN PA, NJ & SURROUNDING REGION*
*PO BOX 525 * AMBLER, PA  19002*
*(215) 646-2599 (O)*(215) 542-8650 (F)* DEPOSITION 1 @ COMCAST.NET*

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF MASSACHUSETTS
 3                           - - -
 4
 5   DENNIS PAREN,                    :
              Plaintiff,              :
 6                                    :
          VS.                         :
 7                                    :
     JAMES CRAIGIE, Individually,     :
 8   and DANIEL FREY, Individually:
              Defendant.              :   NO. 04-30127-MAP
 9
10
                           - - -
11              Tuesday, August 30, 2005
                  Princeton, New Jersey
12                         - - -
13
14
15
                     Oral deposition of JAMES
16   CRAIGIE, taken pursuant to notice, was held in the
     Law Offices of MORGAN, LEWIS & BOCKIUS, Carnegie
17   Ctr. #3, on the above date, commencing at
     approximately 2:45 p.m., before Susan Endt, Court
18   Reporter and Notary Public.
19
20
21   ----------------------------------------------
            CHARLES P. CARMODY & ASSOCIATES
22               Court Reporting Services
     768 Bethlehem Pike, Suite 107 * P.O. Box 525
23           Ambler, Pennsylvania  19002
        (215) 646-2599 * deposition1@comcast.net
24
```

JAMES CRAIGIE

Page 22

1  you're aware of?
2  A.  Not to my recollection.
3  Q.  Factory employees could be part of the
4  management team?
5  A.  No.
6  Q.  They could not?
7  A.  No.
8  Q.  Not even director of -- what is the word
9  I'm looking for -- there's a director of
10  manufacturing and operations?
11  A.  You're mixing terms.
12      There would have been union and, then,
13  everybody else.
14      The person you just described would not
15  be part of the union.  He would have been part of
16  the salaried employees.
17      Pretty much, salaried versus union was
18  the key differential in the company.
19  Q.  Before we go any further, can you
20  briefly discuss your educational background?
21  A.  Sure.
22      Starting with college?
23  Q.  Sure.
24  A.  I went to the University of Rochester,

Page 23

1  undergraduate.  I was commissioned as a naval
2  officer coming out of there.  The navy put me
3  through on a four-year scholarship.
4      While I was in the navy, I started a MBA
5  program at George Washington University.  I had to
6  end that program when I was transferred up to New
7  London, Connecticut.  I finished my time in the
8  Navy.
9      I, then, went to Harvard Business School
10  and that would be the extent of my education.  And
11  I graduated from Harvard Business School.
12  Q.  And a brief synopsis of your employment
13  experience.
14  A.  Well --
15  Q.  Why don't I do this?
16      Why don't you start before Kraft and
17  before the Department of Energy?
18  A.  After leaving undergraduate, I was a
19  naval officer for six years.  That was a joint
20  role as Department of Navy and Department of
21  Energy.  That was same, for 6 years.
22      I, then, went back to business school
23  for two years.  I left business school and joined
24  what, at the time, was called General Foods in

Page 24

1  1983.  It transformed into Kraft Foods, same
2  company, but, through acquisitions and mergers,
3  became Kraft Foods.  I spent 15 years with that
4  company.
5      At that point in time, I left that
6  company to join Spalding.  I was at Spalding for a
7  little less than five years.
8      After I left Spalding, I came to my
9  current job, with Church and Dwight.
10  Q.  And you're currently CEO and president
11  of Church and Dwight?
12  A.  Yes.
13  Q.  And that's located here in Princeton,
14  New Jersey?
15  A.  Yes.
16  Q.  And that's primarily a consumer
17  marketing corporation?
18  A.  Consumer package goods.
19  Q.  And the two years of business school
20  that you referred to after leaving the Department
21  of Energy was where and with whom?
22  A.  Harvard Business School in Boston,
23  Massachusetts.
24  Q.  Did you obtain a degree?

Page 25

1  A.  Yes, I have a Master's in Business
2  Administration.
3  Q.  That was what year?
4  A.  1983.
5  Q.  What did you do in the Navy or the
6  Department of Energy?
7  A.  I worked for a gentleman named Admiral
8  Rickover, who was the head of the nuclear navy.  I
9  was involved with his -- we called it our
10  financial, which was involved with contract
11  administration, negotiations for nuclear-powered
12  ships.
13  Q.  What was your title?
14  A.  My official titles were naval officer
15  titles, started with an ensign, as an officer.
16  And when I left, I was a lieutenant.
17  Q.  Prior to moving here to Princeton, New
18  Jersey, where did you live?
19  A.  A town called Avon, Connecticut.
20  Q.  When did you move from Avon to
21  Princeton?
22  A.  Just a month ago, July 15th.
23      I moved my residence.  I've been living
24  down in Princeton for the last year in an

7 (Pages 22 to 25)

JAMES CRAIGIE

Page 26

1  apartment.
2  Q.  You, a little bit earlier today, were
3  talking about your discussion with KKR about the
4  RBP concept.
5      Who at KKR were involved in those
6  original discussions?
7  A.  To the best of my recollection, two
8  people, Michael Tokarz and Mike Lipschultz.
9  Q.  Did either person at KKR discuss their
10 familiarity with other RBP programs?
11 A.  Not to my recollection.
12 Q.  Were you aware, around this time, that
13 Spalding had retained persons to look at ways of
14 perserving salary in the event of bankruptcy?
15     MS. NEWMAN:  Objection to
16     form.
17     THE WITNESS:  I don't
18     understand, to be honest with you.
19     What is "preserving
20     salary"?
21     What do you mean?
22 BY MS. BRODEUR-MCGAN:
23 Q.  Was there any concern in the year 2000,
24 late 2000, early 2001, that key-level employees or

Page 27

1  management employees ran the risk of losing their
2  job and contractual benefits?
3      MS. NEWMAN:  Objection to
4      form.
5      THE WITNESS:  In the time
6      frame of 2000 and 2001 -- let me put it
7      in context.
8      In about -- I don't recall
9      the timing.  Around the middle of 2001,
10     I recommended to KKR that we sell the
11     company, based on my perception of the
12     outlook of the company, I thought that
13     was best.  We proceeded to try to do
14     that.
15     It took a total of over --
16     almost over two years to see it through.
17     During that time frame, it went through
18     many twists and turns as to whatever,
19     including a change of ownership, to a
20     new owner.
21     So within the time frame of
22     2000, 2001 -- it wasn't until 2002 that
23     there was a -- to the best of my
24     recollection, a discussion of one of the

Page 28

1  options we looked at was a severe cut
2  back in head count.
3      That was the option that if
4  we couldn't sell the company or -- we
5  basically couldn't sell company, we'd
6  have to go forward as a stand-alone
7  company.  And if we did that, we'd have
8  to severely cut costs in order to be
9  able to pay our bank debt and things
10 like that.
11     So we went through the
12 exercise to look at if we had to do
13 that, what we would have to do in terms
14 of head count cuts to survive, if we had
15 the -- if the only option was to go
16 forward as a stand-alone company.
17 BY MS. BRODEUR-MCGAN:
18 Q.  At that time, during the time you were
19 looking at severely cutting costs to operate as a
20 stand alone, about 2002, was there a figure that
21 was bantered about that you would needed to cut to
22 remain viable as a stand alone?
23 A.  Not that I recall.
24     MS. NEWMAN:  Objection to

Page 29

1      form.
2      THE WITNESS:  I do recall,
3      roughly, I would say, that we were
4      looking at about cutting a third of the
5      employees.
6      I can't recall any of the
7      specific figures that was talked about.
8  BY MS. BRODEUR-MCGAN:
9  Q.  Would there be any document that would
10 refresh your recollection as to the amount of
11 money you were talking about?
12 A.  There could be.
13     I'm not aware of where they could be.
14 Q.  Now, after the original discussion with
15 KKR -- incidentally, you said "change of
16 ownership."
17     Was KKR the primary owners at the time
18 of this discussion, and, then, after that, it
19 became Oaktree?
20 A.  Yes.
21 Q.  Any other owners after Oaktree prior to
22 sale to Callaway?
23 A.  No.
24 Q.  After the discussion with KKR about the

8 (Pages 26 to 29)

Page 30

1  RBP, the initial discussion, did you bring
2  discussions about an RBP to your OCM?
3    A.  Yes.
4    Q.  Just to clarify, do you recall who was
5  members of the OCM at the time that this was
6  originally discussed?
7    A.  Yes.
8    Q.  Can you tell me who they were?
9    A.  Dan Frey was my CFO, Keith Keindel was
10 my head of international, Vaughn Rist was the head
11 of human resources, Pete Arturi was the general
12 counsel, Chris Rousseau was the head of IT, Lou
13 Tursi was the head of sales, Mike Esch was the
14 head of operations, Tom Kennedy was the head of
15 research and development. Who am I forgetting?
16 I'm not sure if there was a gentleman named Ed
17 Bender, who was the head of marketing, or not. He
18 was let go sometime around that time frame. I
19 think that is it.
20   Q.  Who did Ed directly report to?
21   A.  Ed Bender?
22   Q.  Yes.
23   A.  He reported to me.
24       There was a gentleman named Ed Several,

Page 31

1  who was the head of marketing services.
2    Q.  Mike Esch in operations, who did he
3  report to?
4    A.  Me.
5    Q.  Do you recall when Mike was retained --
6  hired, I should say?
7    A.  Mike could have been hired sometime, I
8  believe, in 1999. That is best I can give you.
9    Q.  Did he work with you at Kraft before?
10   A.  Yes.
11   Q.  Chris Rousseau, who did she directly
12 report to?
13   A.  Me.
14   Q.  And Peter?
15   A.  Me.
16   Q.  And Vaughn?
17   A.  Me.
18       All of the people I just told you all
19 report to me.
20   Q.  With respect to Mr. Keindel, was he a
21 long-time employee of Spalding?
22       MS. NEWMAN:  Objection to
23       form.
24       THE WITNESS:  Define how

Page 32

1  long "long term" is?
2  BY MS. BRODEUR-MCGAN:
3    Q.  Let me rephrase it.
4       Do you know when he was hired?
5    A.  No.
6       He was there before me. I can tell
7  that.
8    Q.  How about Mr. Bender, do you know when
9  he was hired by Spalding?
10   A.  I believe it was sometime in 1999.
11   Q.  Was he from Kraft?
12   A.  No.
13   Q.  How about Mr. Several?
14   A.  He was hired sometime in 1999 and he was
15 from Kraft.
16   Q.  Lou Tursi was a long-term employee of
17 Spalding?
18       MS. NEWMAN:  Objection to
19       form.
20       THE WITNESS:  No.
21 BY MS. BRODEUR-MCGAN:
22   Q.  No?
23       Do you know when he was hired?
24   A.  He was hired some time in 1999.

Page 33

1    Q.  By you?
2    A.  Yes.
3    Q.  Where was he from?
4    A.  The company he was with before Kraft was
5  Vlasic.
6    Q.  The company he was before?
7    A.  I'm sorry.
8       Before Spalding was Vlasic.
9    Q.  He was not with Kraft?
10   A.  He was before Vlasic.
11   Q.  Thank you.
12       Now, when you brought the discussion of
13 retention bonus to your OCM, how did you present
14 it?
15   A.  I presented it as an issue as a subject
16 that had come up in discussions with KKR as a
17 means to insure continuity of management during
18 what was viewed as a turbulent time ahead for the
19 company. And that it was viewed as very important
20 to maintain continuity of management. And that
21 was the purpose of the plan.
22   Q.  When you originally came to OCM with the
23 suggestion of the plan, was there a pool of money
24 that the plan would be funded by already?

Page 34

1  MS. NEWMAN: Objection to
2  form.
3  THE WITNESS: Well,
4  "already," there was a --
5  BY MS. BRODEUR-MCGAN:
6  Q. Let me rephrase it.
7  Did you know how much there was going to
8  be involved with the retention bonus?
9  A. At some point, yes.
10 Q. Was that discussed early in the stage or
11 much later in the formulation of the plan?
12 A. It would have been relatively early.
13 Q. And, approximately, how much money was
14 that?
15 A. $4 million.
16 Q. Now, ultimately, you received, in the
17 plan, a million dollars -- well, let me rephrase
18 that.
19 You were slated to receive $1 million
20 over the course of four years, in the retention
21 bonus plan?
22 A. Over the course of four payments, yes.
23 Q. How was it decided that you would be a
24 recipient of the plan?

Page 35

1  A. I was one of the managers that was
2  considered important to retain by the company.
3  Q. Is that something that you made the
4  decision on or is that something that KKR or
5  Oaktree made the decision on?
6  A. That was something that was part of
7  discussions with KKR.
8  Q. Did you bring that up during the early
9  discussions, the first time you were discussing
10 the RBP with KKR, your participation within that
11 plan?
12 MS. NEWMAN: Objection to
13 form.
14 THE WITNESS: I was always
15 assumed, as part of the plan, myself and
16 my operating committee would be part of
17 the plan.
18 Then, there was an issue
19 of, below us, who would be included in
20 the plan.
21 BY MS. BRODEUR-MCGAN:
22 Q. Okay. Now, you said "it was always
23 assumed."
24 Can you tell me, prior to becoming

Page 36

1  involved with the creation of this plan, in your
2  experience, had you been involved with the
3  creation or had you participated in similar plans?
4  A. No.
5  Q. Since you left Spalding, have you been
6  involved in any retention bonus plan?
7  A. Not directly.
8  Q. What do you mean by that?
9  A. I'm a member of another board of a
10 company that is in the process of going through a
11 restructuring.
12 As part of that, as a board member, we
13 discussed retention plans for that company.
14 Q. What board is that?
15 A. It's a company called World Kitchens.
16 Q. You're a paid member of the board?
17 A. Yes.
18 Q. About 90 some odd thousand a year?
19 A. No.
20 Total compensation?
21 Q. Yes.
22 A. More like 50,000, 60,000 a year.
23 Q. You had said earlier it had been assumed
24 that the operating committee would be members of

Page 37

1  the plan.
2  Tell me why.
3  A. It wasn't necessarily assumed but it was
4  always part of the discussions when it was brought
5  up. And I can't remember who first brought it up
6  in the discussions with KKR, about putting into
7  effect the retention bonus plan. It was always
8  meant to retain individuals who were very
9  important to the ongoing company.
10 So from early times, it was always well
11 known that that would obviously be myself and the
12 key members of my staff. And, then, it was a case
13 of who else.
14 Q. Back in 2001 when the list for the
15 retention bonus was being formalized, how many
16 people, other than operating committee members,
17 did you have reporting directly to you?
18 MS. NEWMAN: Objection to
19 form.
20 THE WITNESS: Just the
21 people I told you before.
22 BY MS. BRODEUR-MCGAN:
23 Q. So there weren't any persons that were
24 not on the operating committee that reported

Page 38

1  directly to you?
2    A.   Not to my recollection.
3    Q.   When the retention bonus plan was
4  discussed among the OCM, did you advise or did KKR
5  direct as to what the criteria would be for
6  selection?
7    A.   I can recall the general discussions of
8  what the criteria would be.
9    Q.   Okay. Tell me what that is.
10   A.   It was primarily people who were
11 absolutely critical to preserving the ongoing
12 value of the company. And people who would be a
13 particular risk of losing because they would be
14 highly employable during that time frame, and,
15 therefore, at risk of leaving the company.
16   Q.   How would you determine who would be
17 highly employable?
18   A.   People whose skill sets would be in high
19 demand by other companies.
20   Q.   In the time that you --
21   A.   I should say this, too. There was also
22 a factor of -- it was tied with a second factor.
23 There were people who had to fit the first --
24 critical, absolutely critical to the ongoing

Page 39

1  running of the company. And, then, people who
2  we -- of that first list, in particular, people we
3  had a concern of losing during the turbulent time
4  because they would be easily employable on the
5  outside.
6    Q.   Anything else?
7    A.   No.
8    Q.   From the time that you first brought the
9  discussion to the OCM about the retention bonus
10 plan, to the time that it was finalized, how much
11 time had elapsed?
12   A.   All I can tell you, the best of my
13 recollection, discussions about the whole process
14 of restructuring started around September of 2001.
15 And the actual restructuring wasn't finalized
16 until April of 2002.
17        During that time frame, I can't be
18 anymore specific, honestly, there was retention of
19 bonus but I can't honestly remember when it
20 started or when it ended but it was between those
21 two time frames.
22   Q.   What were your dates of employment with
23 Spalding?
24   A.   I started on December 7th, 1998. And I

Page 40

1  left around the middle of September of 2003.
2    Q.   And did you leave to go directly to your
3  next employer?
4    A.   No.
5         I had no job when I left.
6    Q.   Was it a voluntarily separation when you
7  left in September of 2003?
8    A.   It was in my request.
9         Part of the whole process was I would
10 see the company through the restructuring process.
11 I did not want to be part of the company going
12 forward, whoever was buying the company.
13        And so, therefore, it was agreed to when
14 that process ended, which ended in September of
15 2003, that I would leave the company.
16   Q.   Who was that agreed with?
17   A.   The board of directors.
18   Q.   Of Callaway?
19   A.   No.
20        The Board of directors of, at that time,
21 Top Flight, Inc. Whatever the name of the company
22 was at that point in time.
23   Q.   I understand these were loose dates that
24 you describe the discussions about the RBP taking

Page 41

1  place in September of 2001 until about April of
2  2002.
3         My question for you is: How many times
4  during that time period did the OCM meet to
5  discuss the slate of people to be selected for the
6  RBP?
7    A.   Very few. I would say no more than two
8  or three times.
9    Q.   Can you recall any discussion
10 surrounding Mr. Frey's failure to put Mr. Paren on
11 the list?
12             MS. NEWMAN: Objection to
13        the form.
14             THE WITNESS: None.
15 BY MS. BRODEUR-MCGAN:
16   Q.   Were you involved with any discussions
17 with Mr. Arturi about Mr. Frey's not putting Mr.
18 Paren on the list?
19   A.   When?
20   Q.   After April of 2002 and before the
21 litigation.
22   A.   No.
23   Q.   Were you involved with any discussions
24 with Vaughn Rist about Dan Frey's failure to put

Page 58

1  with Vaughn about Mr. Paren's placement or lack of
2  placement in the RBP?
3     A.   Not to my recollection.
4     Q.   After that memo that you sent to Vaughn,
5  which was Frey Number 12, did you talk to Mr.
6  Craigie about placing Mr. Paren on the list?
7     A.   Not to my recollection.
8     Q.   This is a little bit of a different
9  question.
10        Did you ever ask Mr. Frey why he didn't
11  put Mr. Paren on the list to receive a RBP?
12    A.   Not to my recollection.
13    Q.   To your knowledge, did he ever tell you
14  the reason why, other than what you heard today,
15  why he did not give Mr. Paren or place him on the
16  list for the RBP?
17    A.   Not to my recollection.
18        Can I state, for the record, this
19  document is dated June 7, 2002. The RBP was put
20  into effect on April 23rd, 2002. So at the point
21  in time that Mr. Paren came forward to present
22  this, the plan was already complete and there was
23  no means which to modify the plan at this point in
24  time. Nor, were there any discussions going on at

Page 59

1  this point in time.
2        So that is why my own note said that we
3  can't do this, unless at some point in time there
4  are dollars left under the plan or somebody
5  leaves.
6        So there were no discussions going on
7  about adding people to the plan or subtracting
8  people to the plan, at this point in time.
9        That's why, the best of my recollection,
10  I passed this note onto Mr. Rist. And to the best
11  of my recollection, I can't remember how word came
12  back to me, basically, that there were reasons why
13  Dennis wasn't included in the initial plan.
14  Nothing had changed to make us think otherwise.
15  And there were no considerations going on, as to
16  this point in time, as to add or -- to the plan.
17  So it was just end of discussion.
18    Q.   As of June of 2002, there were people
19  who had left that were slated to have received a
20  retention bonus, were there not?
21             MS. NEWMAN: Objection to
22        the form.
23             THE WITNESS: Not to my
24        recollection.

Page 60

1  BY MS. BRODEUR-MCGAN:
2     Q.   Okay.
3     A.   The plan had only been in affect for
4  about 45 days.
5     Q.   In June of 2003, Mr. Frey knew he was
6  leaving Spalding, correct?
7     A.   You'd have to ask Mr. Frey.
8     Q.   I'll ask it different way.
9        Did Mr. Frey tell you he was leaving
10  Spalding sometime on or about June of 2003?
11    A.   First time I knew Mr. Frey was leaving
12  the company was the day he walked into my office
13  and told me he was resigning from the company.
14    Q.   Do you remember when that was?
15    A.   Mid to late June, 2003.
16    Q.   At that time, during that same
17  discussion, when he came and told you he was
18  resigning, was there a discussion about people
19  that were important after he left?
20    A.   At some point within a matter of days,
21  when he announced he was leaving, there was a
22  discussion as to how we would fulfill his duties,
23  involved with the ongoing day-to-day management of
24  the company, in the terms of who would perform the

Page 61

1  chief financial officer duties.
2     Q.   Tell me about what was said regarding
3  how his duties would be performed after he left.
4     A.   There were discussions, to the best of
5  my recollection, between myself and
6  representatives of Oaktree, who were now the
7  primary owners of the company, as to what we
8  should do as a result of the unexpected news that
9  Dan was leaving the company.
10        And options were considered from trying
11  to hire somebody to replace Dan, to just dividing
12  up his duties between the various employees and
13  that was it.
14        And we chose to go down option two.
15    Q.   Did Mr. Frey recommend who would or
16  should assume his responsibilities?
17    A.   Yes.
18        When the decision was made between
19  myself and Oaktree that we would not replace Mr.
20  Frey but would go by dividing up his duties, Mr.
21  Frey was asked how to recommend how we do that.
22  That's what happened.
23    Q.   How did he recommend it?
24    A.   He recommended his duties be split up

JAMES CRAIGIE

Page 62

1  among three individuals, Mr. Lyons, I think Mr.
2  Kimmett and Mr. Nigro.
3  Q.  Was there any discussion as to who Mr.
4  Lyon, Kimmett and Nigro would report to after Dan
5  Frey left?
6  A.  Me.
7  Q.  Who would have been responsible, if
8  anybody, for doing the performance evaluations
9  after Dan Frey left?
10  A.  Me.
11  Q.  Do you know, in fact, if you did do
12  performance evaluations for Lyon, Kimmett or Nigro
13  after Frey left?
14  A.  I didn't.
15  Q.  How about merit increases for the year
16  of 2003, after Mr. Frey left?
17      Do you know whether or not Mr. Lyon,
18  Kimmett and Nirgo received merit increases after
19  Mr. Frey left?
20  A.  I do not know.
21  Q.  If they did receive merit increases, how
22  would that have occurred?
23      Would you have been involved with that?
24  A.  Merit increases were normally decided

Page 63

1  upon and granted, usually, at the end of the first
2  quarter, in the March/April time period.
3      I cannot recall whether or not we
4  granted them that year.  We did not grant them in
5  some of the prior years.  So I can't honestly
6  recall whether or not there were merit increases
7  in the year 2003.
8  Q.  To your knowledge, other than the year
9  2000, were there any years, during your tenure at
10  Spalding, that merit increases were not allowed?
11  A.  To my recollection, there were at least
12  two years that we did not give merit increases.
13  Q.  What two years were they?
14  A.  I'm not positive.  I believe they were
15  2001 and possibly 2002.
16  Q.  Do you think merit increases were given
17  in the year 2000?
18  A.  To the best of my recollection, I
19  believe they were but I'm not positive.
20  Q.  I'm going to show you a document labeled
21  Frey-2.  It's multiple pages.
22      I'm going to ask you to focus your
23  attention on the last two of those multiple pages.
24  And I'm really focusing on whether or not that

Page 64

1  refreshes your recollection as to who, if anyone,
2  would have given Mr. -- is that Nigro --
3  A.  Nigro.
4  Q.  -- a merit increase and when.
5  A.  This document starts out, it says, "We
6  are pleased to announce that merit increases have
7  been re-instated for 2003," which would have
8  implied that they were not given in the year 2002.
9      It, then, shows in the document that
10  this is a letter to -- or a document for Mr.
11  Nigro, from his supervisor, Mr. Frey, that states
12  that he was to be given a 3.0 percent merit
13  increase for the year 2003, which would have been
14  effective, as this document states, on April 16th,
15  2003.
16  Q.  The next page, do you think you've ever
17  seen that document before, the last page of that
18  exhibit?
19  A.  Let me make sure I'm clear which is the
20  last page here.  These are pages going back to
21  different years.
22  Q.  Just for the record, what I'll refer
23  to --
24  A.  I didn't see this.  I don't know

Page 65

1  whether --
2  Q.  That is all right.
3  A.  I didn't realize this was flipped
4  around.
5  Q.  No.  I'm glad you're cautious.
6      Exhibit 2, and I'm specifically
7  referring to Frey Number 2, and the last stapled
8  page, which is called a personal action form, with
9  the current date, October 2, 2003.
10      My question for you is:  Does that
11  refresh your memory?
12      Well, first, my last question was:  Had
13  you ever seen that before?
14  A.  This document, no.
15  Q.  Does that refresh your recollection as
16  to whether or not Mr. Nigro received another merit
17  increase, by you, after Mr. Frey left?
18  A.  I never saw this document before.
19      My recollection of reading documents
20  like this, this has nothing to do with merit
21  increases.  This simply says, "Salary continuance
22  through June 4, 2004."
23      Areas in this document that would have
24  talked about merit increases are blank.

17 (Pages 62 to 65)

Page 74

1  increases or performance evaluations. So it was
2  irrelevant, at that point in time, as to who would
3  have done Mr. Paren's next determination of a
4  merit increase or a performance evaluation.
5  Q. To your knowledge, was there any merit
6  increases for any member or any employee of
7  Spalding after June of 2003 but before Callaway
8  took over?
9  A. To my knowledge, there was none.
10 Q. Were there any other pay increases, by
11 way of promotion, that you were aware of, after
12 June of 2003, and before you left in September of
13 2003?
14         MS. NEWMAN: Objection to
15     form.
16         THE WITNESS: Not that I'm
17     aware of.
18 BY MS. BRODEUR-MCGAN:
19 Q. Merit increases normally would have been
20 given, if at all, when, for an employee?
21 A. In the March/April time period.
22 Q. That is true of all employees?
23 A. Yes.
24     We did them all at once.

Page 75

1       Before I came to Spalding, when I first
2  came to Spalding, they were done on the
3  anniversary date of whenever the employee had
4  joined the company. So they spread throughout the
5  whole year. Shortly after I came, we standardized
6  that to happen just once a year.
7  Q. I just handed back to you Bates stamped
8  Craigie Confidential 043, 0203, which you had
9  earlier identified what you believe to be your tax
10 returns. I'm going to ask you a couple questions
11 about them.
12     First of all, are you familiar with the
13 term "an 83B report" for purposes of tax returns?
14 A. I'm familiar with it.
15 Q. Did you, in fact, file one of them in
16 1999?
17 A. I believe so.
18     I saw that when I was leafing through
19 those earlier here.
20 Q. And Bates stamp number 0195, I believe,
21 is the 83B report. There should be a tab on it to
22 find it. It's on the 1999.
23 A. Yes.
24 Q. And do you believe that that 83B report

Page 76

1  is a fair and accurate report of the shares that
2  you owned for Spalding stock?
3         MS. NEWMAN: Objection to
4     form.
5         THE WITNESS: Can I refer
6     to Dan Frey's deposition, for a second,
7     because you misclassified my shares?
8  BY MS. BRODEUR-MCGAN:
9  Q. Sure.
10 A. You misunderstood my shares.
11 Q. Okay.
12 A. I had two types of shares. When I had
13 joined the company, I was required to buy 250,000
14 shares of common stock at $2 a share, for which I
15 paid $500,000.
16 Q. Okay.
17 A. I was, then, also given a second class
18 of stock, to my best recollection, it was called
19 called restricted stock, which was 500,000 shares,
20 which were deemed by an outside auditor to have a
21 value of 51 cents a share, which would have given
22 them a value of $255,000, of which I was required
23 to pay a penny a share or $5,000, for those
24 shares. They would have vested over 5, at 20

Page 77

1  percent a year.
2      The Section 83B filing here refers only
3  to that second class of stock.
4  Q. It was not necessary, in your opinion,
5  to file an 83B for the 500,000 shares that you
6  purchased at $2 a share?
7         MS. NEWMAN: Objection to
8     form.
9         THE WITNESS: To the best
10    of my recollection, Section 83B had
11    nothing to do with the first class of
12    stock because I owned those outright.
13 BY MS. BRODEUR-MCGAN:
14 Q. You purchased them with your own money,
15 without taking any notes from the corporation?
16 A. That is correct.
17 Q. And when did you purchase them?
18 A. To the best of my recollection, I joined
19 the company December 7th, 1998. And between then
20 and the end of March 1999, I negotiated that issue
21 with KKR. It was sometime in that time frame. I
22 honestly can't recall.
23     We came to final agreement as to how
24 many shares I would many purchase from the

Page 86

1  A.  Nothing more than what is here.
2  Q.  And "here," meaning these tax returns?
3  A.  Yes, to the best of my recollection.
4  Q.  Did you tell your accountant, who you
5  told me about previously, whose name I have
6  forgotten already, Greg Butler, did you tell Mr.
7  Butler that you had received a bonus to pay off a
8  term loan, prior to the time that your taxes were
9  created by him or drafted by him?
10 A.  I honestly can't recall.
11     You are talking five years ago.
12 Q.  Do you recall about whether or not you
13 talked to him about the 500,000 shares of stock
14 that you paid $2 for --
15         MS. NEWMAN:  Objection to
16     the form.
17 BY MS. BRODEUR-MCGAN:
18 Q.  -- $2 per share for?
19 A.  I vaguely recall I told him about that,
20 yes.  As was reflected, I think, in the 2002 tax
21 returns here.
22 Q.  Do you recall whether or not you
23 provided him copy of the worthless stock?
24 A.  I honestly can't recall.

Page 87

1         MS. BRODEUR-MCGAN:  Why
2     don't we take a five minute break?
3         - - -
4     (Whereupon, a brief recess was
5     taken.)
6         - - -
7  BY MS. BRODEUR-MCGAN:
8  Q.  Mr. Craigie, we had talked about this a
9  little bit ago but I want to go back to it.
10     When Mr. Frey was leaving the employment
11 of Spalding Sports Worldwide and made
12 recommendations to you as to who, if anybody,
13 would need to pitch in for his job
14 responsibilities, did Mr. Paren's name come up for
15 any reason?
16 A.  Never.
17 Q.  Were you involved -- let me rephrase
18 this.
19     Do you know that Mr. Varga and Mr.
20 Nigro -- is that right -- received an additional
21 bonus, in addition to the RBP, original plan?
22 A.  Yes.
23 Q.  Could you tell me about how that was
24 created?

Page 88

1  A.  To the best of my recollection, when Dan
2  was asked to divide up his duties, he came back
3  and recommended that it be divided among those
4  three individuals.
5      He was also, to my recollection, asked
6  for what do you think would be fair in
7  compensation for them taking on significant
8  additional duties.  To do that, to the best of my
9  recollection, he came up with the figure, I think
10 it was about $20,000 a piece, for them, basically,
11 splitting up and taking on his job, which,
12 considering he was making -- I don't know what.  I
13 would say it was probably over $200,000 a year,
14 the fact that we had split his duties among three
15 people for a total of $60,000, I think, was more
16 than a great deal.
17 Q.  That was Varga, Nigro and Kimmett?
18 A.  Kimmett.
19 Q.  And did Kimmett receive a bonus as well,
20 and additional bonus, in addition to the RBP of
21 2001?
22         MS. NEWMAN:  Objection to
23     the form.
24         THE WITNESS:  He was one of

Page 89

1  the three people who were identified for
2  that.
3      I'm aware, at some point
4  subsequent to that, he left the company
5  to go with the people who bought
6  Spalding, which was the Russell
7  corporation.
8      So whether or not he ever
9  received that money, I can't tell you.
10 BY MS. BRODEUR-MCGAN:
11 Q.  Did you participate in obtaining the
12 authority to give Mr. Varga or Mr. Nigro a bonus,
13 that additional bonus, that you were just
14 referring to?
15 A.  I was aware of it.  It was mostly
16 discussed between Mr. Frey and the people at
17 Oaktree.  So, in essence, I consented to it.
18 Q.  At that time, on or about June of 2003,
19 when Mr. Frey was leaving the employment of
20 Spalding, could you have given Mr. Paren a bonus
21 for any reason?
22         MS. NEWMAN:  Objection to
23     form.
24         THE WITNESS:  Could I?

JAMES CRAIGIE

Page 102

1  within the OCM?
2  A.  No.
3  He wouldn't have known anybody below the
4  OCM.
5  Q.  That was my next question.
6  Did you have any occasion to discuss
7  other members of management team that were not OCM
8  members?
9  A.  No.
10 Q.  Did he ask any questions or did Mr.
11 Drapeau or Mr. Penicka ask any questions about any
12 members of the management team?
13 A.  Not that I recall.
14 Q.  To your knowledge, did they look at any
15 personnel files of your OCM?
16 A.  I'm not aware. I don't recall.
17 Q.  Who would they have asked to do that
18 from?
19 A.  If they had asked --
20       MS. NEWMAN: Objection to
21 form.
22       THE WITNESS: If they had
23 asked anybody, it would have been Vaughn
24 Rist.

Page 103

1
2  BY MS. BRODEUR-MCGAN:
3  Q.  All right.
4  A.  It was a rather quick turnover process.
5  It was not -- it was roughly a matter of a week or
6  less.
7  Q.  Did they ask any questions about the
8  retention bonus plan, Mr. Drapeau and Mr. Penicka?
9  A.  Not to my recollection.
10 Q.  To your knowledge, were they aware of
11 the plan?
12 A.  Yes.
13 Q.  How do you know that?
14 A.  Because, to the best of my recollection,
15 in the auction that took place for the company,
16 where there were 35 rounds of bids between
17 Callaway and Taylor Made; in one of the rounds,
18 Callaway upped their bid by picking up the cost of
19 the retention bonus plan which, otherwise, would
20 have been borne by the owners of the company,
21 being Oaktree.
22 Q.  And that was the remainder of what was
23 owed in the plan because some monies had already
24 been paid out?

Page 104

1  A.  Yes.
2  The last two payments.
3  Q.  And --
4  A.  That is the best of my recollection.
5  Q.  Okay.
6        MS. BRODEUR-MCGAN: Let's
7  take a five-minute break.
8        - - -
9        (Whereupon, a brief recess was
10 taken.)
11       - - -
12       (Whereupon, Exhibits Craigie-10 and
13 Craigie-11 were marked for
14 identification.)
15       - - -
16 BY MS. BRODEUR-MCGAN:
17 Q.  I marked a couple more documents.
18 Exhibit Number 11 is Ms. Rousseau's.
19 I'm going to ask you if you've seen that
20 before today.
21 A.  No.
22 Q.  Okay.
23 A.  Not to my recollection.
24 Q.  And --

Page 105

1  A.  These are all internal records that
2  human resource keeps. They are just their logs.
3  So it isn't something which would have been passed
4  around, quite honestly.
5  Q.  Do you know the PAF form, the one that
6  says "Personnel Action Form"?
7  A.  Yes.
8  Q.  That was something that was used by
9  managers and signed off on, correct?
10 A.  That, again, was a piece of paper about
11 that big (indicating), which, then, there were --
12 it was the approval for any kind of pay change or
13 title change or salary grade change.
14 Q.  That's different than the top two pages
15 of this document, Exhibit 11, correct?
16 A.  Yes, to my knowledge.
17 It doesn't look like what you showed me
18 earlier, which was that -- it was on a full page
19 but it was only a half-page document.
20 Q.  They were actually manila cards, the
21 personnel action forms?
22 A.  It was a multi-form thing which you
23 could pull off. So it would go through different
24 forms but it was only about a half-page sized

CHARLES P. CARMODY & ASSOCIATES
215.646.2599

Page 114

1  them. And myself and my management team
2  recommended to the board that we not pay a bonus.
3      So I don't believe -- I think, I
4  believe -- I honestly have to go back and get the
5  records. I don't believe, after we changed the
6  system, that we ever paid a bonus, a management
7  incentive bonus, a performance bonus.
8   Q.  In the old system, the MIBP that existed
9  when you came in, you called it select top
10 management.
11     Do you know if there was ever the term
12 "key employee," used in connection with the MIBP?
13  A.  No, I don't know.
14  Q.  Regarding your salary and your
15 increases, if any, during your tenure, during
16 Spalding, how were they selected and how were you
17 given raises?
18     Could you do it unilateral or was it
19 done by somebody other than you?
20  A.  No.
21     It was discussed, negotiated and
22 approved by the owners of the company, who for --
23 initially, negotiated as part of my initial
24 contract in December of '98. Then, it was KKR who

Page 115

1  were the owners for 1999, 2000, and 2001. And,
2  then, discussed with -- then, done with Oaktree in
3  2002 and 2003.
4   Q.  Who were the principles of Oaktree that
5  you primarily dealt with, with these types of
6  issues of what you would be paid?
7   A.  Scott Graves.
8   Q.  Would it be fair to say that he was your
9  primary Oaktree contact for most significant
10 issues?
11  A.  Yes.
12  Q.  Is it fair to say that each year, from
13 1999 up until your separation from employment,
14 that you received income increases from Spalding?
15  A.  No.
16  Q.  Let me ask you this.
17     Do you know what you were making in
18 1998, when you were first retained by Spalding?
19  A.  I want to say -- I believe -- I'm really
20 not positive -- somehow the figure either 275 or
21 350 comes into my head. I can't be positive that
22 was my initial salary.
23  Q.  And, in 1999, do you recall receiving an
24 increase to approximate by 600,000 some odd

Page 116

1  dollars?
2   A.  500,000.
3   Q.  In the year 1999, do you know whether or
4  not any income reported in the 1999 tax returns,
5  other than $500,000 salary, was regarding the
6  cancellation of the term loan?
7   A.  I honestly couldn't tell you.
8   Q.  Generally speaking, how much contact did
9  you have with Dennis Paren during his tenure and
10 your tenure at Spalding?
11  A.  Very little. Extremely little.
12  Q.  Okay.
13  A.  He didn't report to me.
14  Q.  Can you describe, for me, his
15 personality --
16     MS. NEWMAN: Objection
17 BY MS. BRODEUR-MCGAN:
18  Q.  -- in your personal opinion --
19     MS. NEWMAN: Objection to
20 the form.
21 BY MS. BRODEUR-MCGAN:
22  Q.  -- while employed?
23  A.  Dennis was very quiet. A quiet guy,
24 polite, not much of a personality. You know, just

Page 117

1  a normal guy.
2   Q.  To you knowledge, during his tenure at
3  Spalding, did he ever complain to you about
4  exorbitant salary increases of some employees?
5   A.  Never.
6   Q.  Did he ever complain to you that 1099s
7  should be issued for the Hawaii trip and were not?
8   A.  Never.
9   Q.  Did he ever complain to you that the
10 promissory notes for, at least, Mr. Frey, that
11 were cancelled, should have been reported by the
12 corporation?
13  A.  Not to my recollection.
14  Q.  Did you have any discussions -- strike
15 that.
16     Did you have any knowledge of what risk
17 management duties he did during his tenure at
18 Spalding?
19  A.  Very generally.
20  Q.  Do you know if he was involved with the
21 Infusion Ball issues?
22  A.  I was not aware of that.
23  Q.  Do you know whether or not he was
24 involved with any product liability issues that

JAMES CRAIGIE

Page 118

1  were of concern by Spalding, during the
2  re-organization or buy out?
3      A.   No, I'm not aware.
4      Q.   You were here when Mr. Frey testified
5  earlier today, correct?
6      A.   Yes.
7      Q.   And he told me how he told Mr. Arturi
8  that Dennis Paren was a pain in the ass.
9           MS. NEWMAN: Objection to
10          your characterization of Mr. Frey's
11          testimony, which speaks for itself.
12          THE WITNESS: Question?
13 BY MS. BRODEUR-MCGAN:
14     Q.   My question is: Did you ever have a
15 conversation with Mr. Frey, wherein, he told you
16 that Dennis Paren was a pain in the ass?
17     A.   No.
18     Q.   Did you ever have a conversation with
19 Mr. Frey about Mr. Paren and his concern over the
20 RBP?
21     A.   Retention bonus plan?
22     Q.   Yes.
23     A.   Say that again.
24     Q.   I'll rephrase that for you.

Page 119

1      A.   What you call "retention bonus," I
2  always think of as the KERP.
3      Q.   The retention bonus.
4      A.   I always called it KERP. I'm sorry.
5           Give me the question, again.
6      Q.   Did you ever have a conversation with
7  Mr. Frey concerning Mr. Paren's concern of being
8  excluded by the RBP or the KERP?
9      A.   I can't honestly recall a direct
10 conversation with Dan Frey.
11          I vaguely recall when Dennis raised the
12 whole issue. I was aware -- I can't remember
13 how -- that Dennis complained several times about
14 not being part of KERP, the RBP, as you call it.
15          My recollection was, the feedback I
16 always received, was that Dennis didn't fit the
17 criteria that we generally discussed for
18 participation in the KERP. And that is why he was
19 never included.
20     Q.   Was it your understanding that that was
21 Mr. Frey's decision to include him or exclude him
22 from the KERP or known as the RBP?
23     A.   Yes.
24          As it was every one of my functional

Page 120

1  heads, their decision for the people in their
2  group.
3      Q.   If you had desired it, would you have
4  been able to place a member of the OCM's direct
5  reports on the list for RBP?
6      A.   I could have.
7           I wouldn't have, though, unless a member
8  of my staff agreed with me after discussing it. I
9  would not have unilaterally ordered it.
10          I considered that they were the best,
11 most knowledgeable people of the members of their
12 staff. And I cannot recall any changes to the
13 recommendations they made for participation of the
14 RBP or KERP.
15     Q.   Have you ever heard the nickname "Mr.
16 Sunshine," prior to this litigation, as it
17 referred to Mr. Paren?
18     A.   No.
19     Q.   Were you aware that Mr. Paren had been
20 complaining of certain reporting activities of Mr.
21 Frey to Mr. Frey and to KKR?
22     A.   When you say "reporting activities," I'm
23 not sure what you mean.
24     Q.   Either GAAP accounting reporting

Page 121

1  principles or --
2      A.   No, I was not aware of that.
3      Q.   -- inventory reporting issues?
4      A.   No.
5           Dan was every highly respected by the
6  owners of the company for being a very good chief
7  financial officer.
8      Q.   Do you know why Dan left when he did?
9      A.   Dan left because Dan knew what we were
10 heading into, a very difficult time period. Dan
11 knew if the company was acquired, it was likely
12 that his job would be eliminated or Dan would be
13 potentially asked to move to the location of the
14 new owner. Dan had made it long known that he did
15 not want to relocate.
16          And, then, apparently, unbeknownst to
17 me -- I heard details I didn't know today -- Dan
18 received a great job offer from an insurance
19 company in the Hartford area.
20          So it was a very big surprise to me,
21 when he walked into my office, in whenever it was
22 in late June, and announced that he was leaving.
23 It was a very critical loss that we lost him
24 because he was a very key figure in the whole

31 (Pages 118 to 121)

CHARLES P. CARMODY & ASSOCIATES
215.646.2599

Page 122

1 restructuring of the company.
2 Q. Do you know of any other OCM members,
3 during the time that you left the company, that
4 are still employed by Callaway?
5 A. There are only two. The only -- can I
6 go through the list just to be sure?
7 Q. Absolutely.
8 A. Now, after I left, every OCM member was
9 retained by Callaway. And, then, subsequently,
10 they severed Mr. Keindel, who was the head of
11 international, who they initially promoted to be
12 the head of an even bigger responsibility. And,
13 then, they let him go.
14     Mr. Esch was initially retained. And,
15 then, they let him go and replaced him with the
16 Callaway chairman's son-in-law.
17     They retained Mr. Tursi and replaced him
18 with a 28-year-old rep from Taylor Made, who they
19 subsequently fired. After promoting, they fired.
20     They retained Peter Arturi, the general
21 counsel. Although, to my knowledge right now, he
22 is only part time. And will soon leave the
23 employment of the Callaway.
24     They -- Ed Several, the head of

Page 123

1 marketing services, was retained. And, then,
2 terminated.
3     They did retain Chris Rousseau. And,
4 then, moved her to California to -- she was the
5 head of -- she was CIO. I'm not exactly sure what
6 job she has with new Callaway but they were very
7 impressed by her. And, I believe, she has greater
8 responsibilities right now within Callaway. I'm
9 not sure if she is the CIO of the whole company or
10 not. I'm not positive.
11     They retained Tom Kennedy, the head of
12 R&D, who is still, basically, doing his current
13 job. Although, I believe now, he also has
14 responsibility for Callaway Golf Balls.
15     Vaughn Rist was retained. And, then,
16 retired.
17     There were marketing people who were --
18 I think I told you I had eliminated marketing,
19 specific job on my staff. It ended up Mr. Tursi's
20 responsibility, but there was a gentleman named
21 Mike Ferris, who was considered to be our top
22 marketing guy. He was never on my staff. He was
23 retained. He was moved to California. And, then,
24 he was just recently fired and now works for

Page 124

1 Taylor Made. I think that is the list.
2 Q. Mr. Esch, who was replaced by somebody
3 else, what was the age of the person that he was
4 replaced by?
5 A. I'm not exactly positive.
6     It was the chairman of Callaway's
7 son-in-law.
8     If you want to talk about nepotism, that
9 is a whole other discussion.
10         MS. BRODEUR-MCGAN:  Off the
11     record.
12         - - -
13     (Whereupon, a discussion was held off
14     the record.)
15         - - -
16 BY MS. BRODEUR-MCGAN:
17 Q. With respect to the Mr. Paren's auditing
18 of traveling functions or traveling expenses,
19 prior to the issue surrounding you and the audit
20 or allegations by Mr. Paren, were you aware that
21 Mr. Paren was auditing travel?
22 A. Yes.
23 Q. Can you tell me how you became aware
24 that Mr. Paren was alleging that your travel

Page 125

1 expenses had problems?
2 A. How I became aware was right at the very
3 end of my final days as CEO of the company. As we
4 were transitioning the company over to Callaway, I
5 was made aware that he reported to, I believe it
6 was Scott Graves, who was principle person from
7 Oaktree, who was on the board of directors, that
8 he had audited my expense reports, had found, in
9 his opinion, two items that were double billed,
10 that, in his opinion, if there were two, there
11 were many more. And that he was alleging that I
12 had double billed expenses and, basically, was
13 defrauding the company.
14     I received a call from Mr. Graves
15 telling me about this. Mr. Graves said, quite
16 honestly, he couldn't believe it. I told him I
17 couldn't believe it either but he said it was his
18 fiduciary duty, as a board of directors member, to
19 independently audit this. They hired an
20 independent auditor to come back and audit all of
21 my expense reports. And all he came across was
22 the two items that Dennis had found. The two
23 items happened for strange reasons.
24     To the best of my recollection, I had

JAMES CRAIGIE

Page 126

1  received expense checks for some items that I
2  had -- that were legitimate expenses. My wife had
3  failed to cash them. When the company declared
4  bankruptcy, any outstanding liabilities became --
5  I don't know what the term is.
6  Q.  Discharged?
7  A.  No.
8      They went into -- anybody who the
9  company owed became -- I can't think of the term.
10  It's a technical legal term.
11  Q.  Preferenced?
12  A.  Yes. Preferenced things in the
13  bankruptcy court.
14      However, in the bankruptcy process,
15  reimbursable expenses for employees are legitimate
16  reimbursable expenses.
17      So my secretary had to go back and
18  re-submit expense items that she thought were the
19  ones that had been bounced. The checks bounced
20  because my wife hadn't cashed them before the
21  bankruptcy process.
22      In the process of doing that, my
23  secretary who did my expense reports, as well as
24  management at least ten other people besides me,

Page 127

1  re -- accidentally re-billed some expenses I had,
2  two items in particular.
3      One was a payment for my car lease in
4  the company and, one was an airline ticket that I
5  had changed flights coming back from meeting with
6  Callaway in California. And she re-billed it.
7      I never saw it as a clear re-bill
8  because the company aggregated expenses when they
9  paid them. It wasn't like it was item by item.
10  They sent you a check in total for items. So when
11  I received a check back in the process, it was
12  just one of many reimbursable checks I received,
13  over my tenure, there were for expenses. I just
14  cashed it.
15      Dennis, in this process, identified the
16  fact that my secretary had -- he identified that
17  these two particular items had been double billed.
18      The auditor came through there and
19  checked every expense I filed the entire time that
20  I was the CEO of the company and never found
21  another item that had been double billed.
22  Q.  But those two --
23  A.  But those two.
24  Q.  -- that Dennis had articulated?

Page 128

1  A.  Right.
2  Q.  You had started that answer by telling
3  me that it had been communicated by letter to
4  Scott Graves from Dennis Paren.
5      Was it this letter, which was previously
6  marked Frey-13, that you're referring to, or was
7  there another letter?
8  A.  As this letter states, Frey-13, the
9  opening sentence says -- I didn't send this as a
10  letter, I sent this communication.
11      This thing says, "Last Friday, I sent
12  you a copy of e-mail concerning Jim Craigie's
13  recent expense reports." The e-mail was also sent
14  to Vaughn Rist and Peter Arturi.
15      So he apparently sent an e-mail to Scott
16  Graves about my expense reports.
17  Q.  Okay. Had you ever seen that document,
18  which is Frey Number -- what is the number on
19  it --
20  A.  13.
21  Q.  -- 13?
22      MS. NEWMAN: Prior to this
23      litigation?
24      THE WITNESS: Prior on this

Page 129

1      litigation, I do not believe so because
2      I left the company right around this
3      time.
4          So I don't believe I
5      actually saw this until I saw it as part
6      of the discovery process.
7  BY MS. BRODEUR-MCGAN:
8  Q.  Now, other than an e-mail that Mr. Paren
9  would have sent to Scott Graves about the
10  expense -- your expense reports, do you know what
11  else he communicated to Mr. Graves about you, on
12  or about September of 2003?
13      MS. NEWMAN: Objection to
14      the form.
15      THE WITNESS: Other than
16      what's in this document, at that point
17      in time, no.
18  BY MS. BRODEUR-MCGAN:
19  Q.  Again, up until September of 2003, did
20  Scott Graves tell you that Mr. Paren had been
21  complaining about other issues, other than your
22  travel expenses?
23  A.  No. Not that I'm aware of. Not that I
24  recall.

33 (Pages 126 to 129)

Test

Page 134

EXAMINATION
- - -
BY MS. NEWMAN:
Q. Mr. Craigie, why was the decision made to cancel the promissory notes about which you testified earlier?
A. For the people who owed stock?
Q. For people such as Dan Frey.
A. At the time of the restructuring, which was completed in April of -- excuse me for a second -- 2002, there was a number of people -- I can't honestly remember how many, not a big list, a very small list of people, who were on payment plans to pay off the stock that they received when they joined the company.
 The stock, as a result of the restructuring, became worthless and would never become worth anything. So if those people were held liable for that, they would have left the company and left behind the responsibility for payment of that stock. And discussions were held with KKR, I believe also Oaktree, at that time. That it was absolutely critical to retain those people for the ongoing -- protect the ongoing

Page 135

value of the company.
 It would be ridiculous to make them keep paying against stock that was worthless. That, if we were to require that, they would, most likely, leave the company.
 So it was decided to -- the legal terms, I'm not sure of -- but the end result was to cancel the stock in return for returning the stock but I don't recall the exact legal terms for that.
 So, again, the bottom line is, done in the best interest of the company, to retain those people to protect the ongoing value of the company.
 All those people did lose money, from what they had already paid.
Q. During your tenure, were you aware of whether Dennis Paren expressed concerns to anyone about the salary increases of employees?
A. I'm never aware of Dennis ever talking to anybody about salary increases of employees.
Q. During your tenure, were you aware of whether Dennis Paren complained or expressed concerns to anyone regarding the issuance of 1099s for the Hawaii trip?

Page 136

A. I'm not aware of that at all.
 For the record, I did not go on that trip. My wife was in the hospital having a hysterectomy. And, therefore, neither she, nor I, attended that trip.
Q. During your tenure, were you aware of whether Dennis Paren complained or expressed concerns to anyone regarding the tax treatment of the cancellation of the promissory notes?
A. I'm not aware of that. I was never aware of that.
 MS. NEWMAN: No further questions.
 - - -
EXAMINATION
- - -
BY MS. BRODEUR-MCGAN:
Q. I have just a couple points of clarification.
 The Frey-13 Exhibit, did you see that prior to litigation and were you aware, in that letter, that he was complaining about the cancellation of promissory notes?
 MS. NEWMAN: Objection to

Page 137

form.
 Asked and answered.
 THE WITNESS: I do not recall seeing this prior to litigation.
BY MS. BRODEUR-MCGAN:
Q. Okay. And regarding persons who owned stock that was worthless, were you aware that Mr. Paren was one of the few people who had purchased a significant volume of stock, for which he did not have a promissory note?
 MS. NEWMAN: Objection to form.
 THE WITNESS: I was aware that Dennis had purchased stock. I was not aware how much he had purchased. I was not aware he had paid it all off at that point in time.
BY MS. BRODEUR-MCGAN:
Q. Were you aware that he was complaining that he had worthless stock that he had spent his own money on and that it was unfair that others, essentially, would have notes forgiven and would lose significantly less, if the company handled it as such?

Page 142

1  the form.
2  THE WITNESS: Yes, I did.
3  BY MS. BRODEUR-MCGAN:
4  Q. And you did receive a forgiveness of a
5  term loan?
6  A. I didn't receive anything on that. I
7  lost $5,000 on that.
8  Q. $5,000?
9  A. On top of the $500,000.
10      MS. BRODEUR-MCGAN: I don't
11  have any further questions.
12      MS. NEWMAN: I have one
13  more question.
14      - - -
15      EXAMINATION
16      - - -
17  BY MS. NEWMAN:
18  Q. Can you describe the economic
19  environment that Spalding experienced from the
20  years 2000 through 2003?
21  A. When I joined the company, KKR -- a
22  little history -- KKR bought the company in 1996.
23  They paid, roughly, $900 million for the company.
24      By 1998, the company had gone from

Page 143

1  making, at the time they bought it, roughly, $50
2  million EBITDA. By 1998, they had lost $10
3  million EBITDA.
4      They had brought in a new CEO shortly
5  after they bought the company. He was there while
6  the company went from plus 50 to minus 10. They
7  hired me to come in at the end of 1998, or the
8  year they had lost 10. They gave me direction to
9  turn it around.
10      I led a team, I bought in, basically, a
11  new team to do that. The first year, we took from
12  minus 10 to plus 60. Unfortunately, in our first
13  year, our key business and key profit maker was
14  golf balls. Unfortunately, in that first 12
15  months, the Nike Company and the Taylor Made
16  Company decided to enter the golf ball business.
17  That would be the year 1999. The year 2000, the
18  Callaway Company decided to enter the golf ball
19  business.
20      At the same time, rounds of golf played
21  had steadily declined every year from 1996 through
22  my tenure in 2003. So you had a situation where
23  there was declining market, significantly
24  increased competition. And other things had

Page 144

1  happened, such as Titleist, the leader in golf
2  balls, decided to enter the mass merchant club
3  store channels, which we had dominated and they
4  had never been in before.
5      So they, also, entered our key channels
6  and impacted our business. And the crowning blow
7  was September 11, 2001, when the famous 9/11
8  happened. And, as a result, many of the golf
9  resorts in America had a significant reduction in
10  business for almost a year. That also hurt the
11  golf ball business. That was the blow that caused
12  us to miss a covenant, our bank covenant. That
13  caused a change in ownership from KKR to Oaktree,
14  who quietly had amassed a majority position. That
15  is when we went through the whole restructuring
16  process and had quite, miraculously, a peaceful,
17  transition of ownership between KKR and Oaktree.
18  There could have been a bankruptcy at that
19  process. We avoided that, for the sake of the
20  company.
21      It was at that time, we were going
22  through the whole process of deciding if Spalding
23  would have a very hard time surviving as a
24  stand-alone company. We started to try to sell it

Page 145

1  while it was owned by KKR. Nobody, the Nikes, the
2  Wilsons, nobody wanted to buy the whole company.
3      So we, then, decided to break it up into
4  pieces as a way to do what's best for the owners
5  of the company. In that process, we sold off
6  three pieces. We sold off, first, Etonic Shoes.
7  We, then, sold off the Spalding piece to Russell.
8  Finally, we were left with $600 million of debt on
9  the golf business.
10     The golf business is very coveted
11  because it was our biggest strength but nobody
12  wanted to inherent the debt that KKR had taken on
13  when they bought the company in '96.
14     So as part of their process with
15  Callaway, they made us a decent bid for the
16  company but they would only do it as an asset sale
17  which meant that we had to go through bankruptcy
18  to get rid of the debt. And that is what we did.
19     In the process of doing that, the -- we
20  actually did an auction. We engaged Taylor Made,
21  who was owned by Adidas, to participate in the
22  auction which, subsequently, drove the price even
23  higher of the company.
24     So that was the Spalding Sports