# EXHIBIT E



# JOB DESCRIPTION

TITLE: RISK & INSURANCE MANAGER          GRADE:

DEPARTMENT: INSURANCE                    DIVISION: CORPORATE

DATE: JULY 1994

---

I. **ORGANIZATIONAL RELATIONSHIP**

   Reports To: Treasurer/President

   Supervises: Directly - Risk & Insurance Administrator
   Indirectly - Divisional Insurance Administrators

   Controls Functionally: Risk management, group/health/life insurance, insurance and property loss control activities of domestic, foreign divisions, subsidiaries and affiliates. Coordination, development, and updating of company employee relations policies.

II. **GENERAL RESPONSIBILITIES**

   Responsible for directing the risk management and insurance operations of the company with the objective of preserving corporate assets and earnings with respect to pure loss exposures; to establish current and long-range risk management objectives, plans, and policies subject to approval up to the level of the Board of Directors; developing and staffing the department with responsible individuals capable of meeting department goals; representing the corporation to insurance and insurance brokerage communities. In addition, responsible for coordinating the development and implementation of corporate employee relations policies and procedures, keeping existing policies current.

III. **SPECIFIC DUTIES**

   Risk & Insurance

   1. Develops, in conjunction with strategic guidelines, the basic objectives, policies, and operating plans of the risk management function to assure both long and short term cost effectiveness, efficiency, and continuity of insurability.

   2. Identifies and evaluates the corporation's exposure to loss; develops and implements appropriate programs to minimize adverse financial impact at minimum cost.

   3. Develops and directs the company's insurance and risk management programs consistent with corporate guidelines, including the selection of

insurance companies, brokers, and consultants to assure completeness of coverage, services, and counsel; negotiate all insurance and insurance-related contracts, negotiate all insurance settlements and direct self-insured settlements with third parties.

4. Analyzes program results relative to established objectives and ensures that corrective action is taken for any unsatisfactory conditions.

5. Ensures the adequacy and financial stability of the company's risk financing programs with emphasis on accuracy of reserves and cash conservation.

6. Provides consultation to all levels of corporate and divisional management relative to business and company sponsored employee insurance, risk management, casualty and property loss control functions.

7. Defines the department's organizational structure for effective operation; appraises staff performance for professional development and advancement; identifies and implements programs for department efficiency.

8. Responsible for maintaining financial analysis for allocation of premiums and losses, and the preparation of budgets for same.

9. Directs the corporation's fire protection program, including application of state and federal laws and the Occupational Safety and Health Act relative to fire protection; conducts periodic surveys of corporate facilities.

10. Responsible for administrating employee health and insurance programs and ensuring compliance with all applicable state and federal laws.

11. Responsible for overseeing that divisional management economically and efficiently closes and settles workers' compensation claims.

12. Develops and directs the company's loss prevention services as provided by property and casualty insurers as well as outside consultants and state agencies.

13. Responsible for the development, coordination and implementation of computer software at both the corporate and divisional levels to ensure operating efficiencies with regards to insurance and employee group benefits data.

### Employee Relations/Benefits

1. Coordinate the development and implementation of employee relations and employee benefit policies and procedures, in conjunction with the legal department, company human resource directors, and consultants.

2. Responsible for communicating to company human resource directors changes in group health and life benefits, corresponding premium rates and the development and communication of employee health contribution levels for self-insured and insured plans.

   insurance companies, brokers, and consultants to assure completeness coverage, services, and counsel; negotiate all insurance insurance-related contracts, negotiate all insurance settlements and self-insured settlements with third parties.

4. Analyzes program results relative to established objectives and ensures that corrective action is taken for any unsatisfactory conditions.

5. Ensures the adequacy and financial stability of the company's risk financing programs with emphasis on accuracy of reserves and cash conservation.

6. Provides consultation to all levels of corporate and divisional management relative to business and company sponsored employee insurance, risk management, casualty and property loss control functions.

7. Defines the department's organizational structure for effective operation; appraises staff performance for professional development and advancement; identifies and implements programs for department efficiency.

8. Responsible for maintaining financial analysis for allocation of premiums and losses, and the preparation of budgets for same.

9. Directs the corporation's fire protection program, including application of state and federal laws and the Occupational Safety and Health Act relative to fire protection; conducts periodic surveys of corporate facilities.

10. Responsible for administrating employee health and insurance programs and ensuring compliance with all applicable state and federal laws.

11. Responsible for overseeing that divisional management economically and efficiently closes and settles workers' compensation claims.

12. Develops and directs the company's loss prevention services as provided by property and casualty insurers as well as outside consultants and state agencies.

13. Responsible for the development, coordination and implementation of computer software at both the corporate and divisional levels to ensure operating efficiencies with regards to insurance and employee group benefits data.

### Employee Relations/Benefits

1. Coordinate the development and implementation of employee relations and employee benefit policies and procedures, in conjunction with the legal department, company human resource directors, and consultants.

2. Responsible for communicating to company human resource directors changes in group health and life benefits, corresponding premium rates and the development and communication of employee health contribution levels for self-insured and insured plans.

3. Review, analyze, and develop recommendations on divisional requests for modifications to existing employee benefit programs and the establishment of new programs.

## IV. STANDARDS OF PERFORMANCE

1. Performance of the department relative to stated plans and objectives in terms of: A) Accuracy B) Timeliness C) Thoroughness D) Staffing
2. The overall cost and coverage effectiveness of the corporation's risk management/insurance programs, group health and life programs, including minimizing impact of insurance market fluctuations.
3. The attitude, morale, and development of department personnel.
4. Ability to implement and execute insurance and risk mangement programs, including the ability to effect cooperation from operating groups and staff departments.
5. Value and benefit of guidance and counsel given to operating and corporate management.

## V. CONTACTS

1. Internal - management and executive management of the company and its affiliates on a regular basis.
2. External - Brokers, underwriters, adjustors, outside attorneys, professional organizations and consultants on a regular basis.

## VI. JOB QUALIFICATIONS

1. College business degree majoring in Insurance or Finance. Post graduate degree preferred.
2. Chartered Property Casualty Underwriter (CPCU) or Associate Risk Manager (ARM) designation.
3. Minimum five years insurance experience or ten years of financial experience at a large manufacturing company.

_____        _____
Employee                                Supervisor

DKE:INSURANCE:NAMED:RISK&INS.SAM:07/13/94

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Dennis Paren, | : |
| Plaintiff, | : Civil Action No. 04-30127-MAP |
| v. | : |
| James Craigie, Individually and Daniel Frey, Individually, | : |
| Defendants. | : |

### AFFIDAVIT OF DANIEL FREY

I, Daniel Frey, depose and state as follows:

1. From September 7, 1999 to June 20, 2003, I was employed by Spalding Sports Worldwide ("Spalding") as its Chief Financial Officer. I submit this Affidavit in support of the Motion for Summary Judgment filed on behalf of myself and James Craigie with respect to the above-captioned matter.

2. In 2001, I recommended that four of my seven direct reports be included in the Retention Bonus Program to be adopted by Spalding.

3. I recommended Charlie Kimmett, Director of Accounting, because he had primary responsibility for performing the monthly accounting closing process, had frequent interaction with the external auditors, and because of his familiarity with accounting details was likely to play a key role in any due diligence or merger and acquisition activity.

4. I recommended Mike Lyon, Director of Taxation, because he was handling several complex tax issues, including international transfer pricing, an ongoing IRS audit,

and valuation assessments of the company's net operating loss carryforwards, which were likely to be a factor in any debt restructuring or merger and acquisition activity.

5. I recommended Stephen Nigro, Director of Treasury Operations, because he had primary responsibility for management of the company's tight cash position, coordinating the timing of disbursements while monitoring cash collections. Mr. Nigro was also responsible for monitoring and planning for compliance with debt covenants, and was actively involved in any amendments to the company's debt agreements. Mr. Nigro was also a key contact for external auditors and bank group.

6. I recommended Victor Varga, Director of Financial Planning and Analysis, because he was my primary support for the company's budget, forecast, long-term planning, and evaluation of new business opportunities. Mr. Varga also had primary responsibility for analysis of business results vs. expectations, including preparation of materials for the Operating Committee, Board meetings, and third-party consultants. This experience was likely to require his heavy involvement in debt restructuring and M&A processes.

7. I did not recommend my remaining three direct reports – Larry Kustra, Director of Credit and Accounts Receivable, Richard Levandowski, Manager, Cost Accounting, and Dennis Paren, Director of Risk Management – for a retention bonus because I believed that these three individuals were not critical to the ongoing function of the Company, they were not at risk to leave, and if they did leave, their work could be absorbed elsewhere in the organization.

8. I recall discussions with Mr. Paren regarding the issue described in paragraph 22.a of the Complaint. Specifically, Mr. Paren did not agree with how the Company was spending its marketing budget as it related to Post Cereals. From the time of our discussion

2

through my separation from Spalding in June of 2003, I believed that Mr. Paren properly raised this concern within the scope of his job duties as Director of Risk Management.

9. I recall discussions with Mr. Paren regarding the issue described in paragraph 22.c of the Complaint. Specifically, Mr. Paren expressed a concern regarding the expense report of John Jaczek. I encouraged Mr. Paren to further investigate the matter, but do not remember what the result of his investigation was. From the time that Mr. Paren raised this concern through my separation from Spalding in June of 2003, I believed that Mr. Paren properly raised this concern within the scope of his job duties as Director of Risk Management.

10. I recall discussions with Mr. Paren regarding the issue described in paragraph 22.d of the Complaint. Specifically, Mr. Paren expressed a concern regarding the apparent loss of car stock inventory. I encouraged Mr. Paren to involve our security director and to contact the local police as needed. To my recollection, Mr. Paren's concern ultimately was not substantiated. Nonetheless, from the time that Mr. Paren raised this concern through my separation from Spalding in June of 2003, I believed that Mr. Paren properly raised this concern within the scope of his job duties as Director of Risk Management.

11. I recall discussions with Mr. Paren regarding the issue described in paragraph 22.l of the Complaint. Specifically, Mr. Paren expressed a concern that Tim O'Neill had double-submitted certain expense account items. As a result, the Company launched a full investigation involving myself, Mr. Paren, Peter Arturi, the General Counsel, Vaughn Rist, the Director of Human Resources, Dave Tobin, Mr. O'Neill's supervisor, and Lou Tursi, Mr. Tobin's supervisor. As a group, we decided to take corrective action against Mr. O'Neill and, as a result, Mr. O'Neill repaid all of the monies. From the time that Mr. Paren raised

3

this concern through my separation from Spalding in June of 2003, I believed that Mr. Paren properly raised this concern within the scope of his job duties as Director of Risk Management.

12. I recall discussions with Mr. Paren regarding the issue described in paragraph 22.n of the Complaint. Specifically, Mr. Paren expressed a concern that Stephanie Lawrence had submitted double expense reports. I encouraged Mr. Paren to fully investigate his concern. As a result of Mr. Paren's investigation, all monies were repaid, and Ms. Lawrence ultimately was terminated. From the time that Mr. Paren raised this concern through my separation from Spalding in June of 2003, I believed that Mr. Paren properly raised this concern within the scope of his job duties as Director of Risk Management.

13. I do not recall that Mr. Paren expressed concerns regarding the issues described in paragraph 22.b, e-k, m, or o-ee of the Complaint during my tenure at Spalding. However, to the extent that Mr. Paren may have raised concerns about such issues and I do not remember, I believe that Mr. Paren would have properly raised such concerns within the scope of his job duties as Director of Risk Management.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing information is true and correct, based upon my knowledge, information and belief.

_____
DANIEL FREY

DATED: September 28, 2005

4

# EXHIBIT G

## MEMO

To: Vaughn Rist                                                July 6, 2001

From: Dennis Paren

Ref: Revised Job Description

Position:    Director Insurance & Risk Management

The responsibilities of my position have expanded over the last few years to now include ERISA compliance issues, corporate credit card administration, business travel contract negotiations and travel policy compliance responsibilities, specifically expense report audits, all of which are outside of the normal risk management role. I have eagerly assumed and have successfully demonstrated my ability to manage these areas and per our recent discussion on this issue, I have revised my job description accordingly.

Since the last time my job description was revised, 1994, I have also assumed responsibilities associated with the Pension Committee and I have joined the board of directors of Arrow Mutual, Spalding's workers compensation insurance carrier in the states of New York and Massachusetts. A breakdown of the major cost areas I either control or monitor now is as follows:

| | |
|---|---|
| Casualty Insurance | $ 1,625,000 |
| Golf Consultants - Insurance | $   573,000 |
| Group Insurance | $ 5,700,000 |
| Airline Charges | $ 1,923,000 |
| Business Travel | $ 3,251,000 |
| Total | $13,072,000 |

My major cost saving accomplishments in these areas during the last two years include the following:

| | | |
|---|---|---|
| A) Massachusetts Workforce Grant | $ 170,000 | (One time benefit - November 1999) |
| B) Correction of Employee Benefit Administration Errors | $ 198,000 | (Annual Savings - $55,577) |
| C) Airline Discount Agreements | $ 200,000 | (Annual savings) |
| D) AMEX Corporate Card Program | $  26,000 | (Annual savings) |
| E) Chubb Settlement on LGB Claim | $ 170,000 | (One time benefit - July 2000) |
| F) Hartford Retroactive Adjustment Revisions (1994-2000) | $  84,000 | (One time benefit - January 2001) |
| G) Reimbursement of Acushnet Advertising Legal fees | $  68,000 | (One time benefit - April 2001) |
| H) Life & Disability Insurance Premiums | $  37,000 | (Annual savings) |
| I) Expense Report Audits | $  31,000 | (To-date) |
| Total | $897,000 | |

Attached is the most recent Compensation and Benefits Survey conducted by RIMS, Risk and Insurance Management Society, in 1999. The survey is much more credible

0004

than the data gathered in a general compensation survey as it focuses only on risk management positions. Also the survey points out several interesting facts:

- For companies in New England, total cash compensation averaged $137,000 at the 75th percentile (25% of the respondents earned more than this amount).
- Employee benefits were included in the responsibilities of only 25% of the respondents.

Vaughn, I believe it is necessary to review industry compensation data but more importantly it is necessary to review what an individual brings to a position. Based upon my assumption of new responsibilities, my successes in achieving material cost savings, and my most recent "exceeds expectations" MAP review rating, I request you consider a salary adjustment which corresponds to my responsibilities and rewards my performance and integrity. In addition, I feel the title of Director of Corporate Risk may better reflect the broad range of my responsibilities.


Att.

0005