# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 04-30127-MAP
Pages 1-87

DENNIS PAREN

vs.

JAMES CRAIGIE, INDIVIDUALLY AND
DANIEL FREY, INDIVIDUALLY



---
**DEPOSITION OF:   VAUGHN RIST**
---

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Bulkley, Richardson and
Gelinas, LLP, 1500 Main Street, Springfield,
Massachusetts on MAY 20, 2005, commencing at
2:10 p.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931      Fax (413) 731-7451

**PERLIK and COYLE REPORTING**

APPEARANCES:

FOR THE PLAINTIFF:

    LISA BRODEUR-MCGAN, ESQUIRE
    1380 Main Street
    Springfield, Massachusetts 01103
BY:  LISA BRODEUR-McGAN


FOR THE DEFENDANTS:

    MORGAN, LEWIS & BOCKIUS LLP
    1701 Market Street
    Philadelphia, Massachusetts 19103
BY:  TAMSIN J. NEWMAN, ESQUIRE


REPRESENTING THE DEPONENTS:

    SKOLER, ABBOTT & PRESSER
    One Monarch Place
    Springfield, Massachusetts 01144
BY:  JAY M. PRESSER, ESQUIRE


In Attendance:  Peter A. Arturi

Case 3:04-cv-30127-KPN   Document 27-8   Filed 09/30/2005   Page 4 of 12

DENNIS PAREN vs. JAMES CRAIGIE ET AL
VAUGHN RIST                MAY 20, 2005

**13**

1  bonus plan in 2002?
2   A.  Yes.
3   Q.  Did you attend the Operating Committee
4  meetings?
5   A.  Yes.
6   Q.  How often were those meetings held in
7  2002?
8   A.  Weekly.
9   Q.  When did the idea of adopting a
10  retention bonus plan first arise, if you recall?
11   A.  Sometime during the first quarter of
12  2002.
13   Q.  How did that idea come about?
14   A.  It became quite evident during that
15  period of time that we were going to have to do
16  something with the company -- the sale of
17  divisions or the sale of the company -- and we
18  felt it was critical that certain functions in the
19  company be retained.
20      Most of us had had experience in other
21  situations outside Top-Flite or Spalding where we
22  had been involved in retention programs and we've
23  seen them work positively so we recommended that
24  we establish a retention program.

**14**

1   Q.  Do you recall whose idea it was at first
2  to adopt a retention bonus program?
3   A.  I can't remember exactly.  It was
4  discussed generally amongst the Operating
5  Committee.
6   Q.  Was there a discussion of how persons
7  would be selected to participate in the April,
8  2002 retention bonus plan?
9   A.  Yes; there was.
10   Q.  When did that occur?
11   A.  During that period of time when we
12  established the program, which would have been
13  that first quarter, spring of 2002.
14   Q.  Tell me what was discussed with regard
15  to how persons would be selected for participation
16  in the April, 2002 retention bonus plan?
17   A.  We took a look at functional areas to
18  determine which area we needed to retain.
19      Once we did that, it was critical to the
20  ongoing business -- once we did that, we then went
21  in and looked at those people in each functional
22  area and asked the Operating Committee members to
23  go back to their functional areas and determine
24  just how many and/or who in their organization

**15**

1  they wanted to retain.
2   Q.  Did you make recommendations with regard
3  to the Human Resources function as to who should
4  participate in the retention bonus program in
5  April of 2002?
6   A.  Yes.
7   Q.  Did you make any determinations with
8  respect to people outside of the Human Resources
9  function?
10   A.  No.
11   Q.  Dan Frey as CFO was in charge of the
12  finance function, is that correct?
13   A.  Mmm-hmm.
14      MR. PRESSER:  Is that yes?
15   Q.  (BY MS. NEWMAN)  Is that a yes?
16   A.  Yes.
17   Q.  So he is the person who made the
18  decision regarding which of his direct reports
19  would participate in the April, 2002 retention
20  bonus plan, is that correct?
21   A.  Yes.
22   Q.  What was the process by which the final
23  list of participants in the April, 2002 retention
24  bonus plan was decided?

**16**

1   A.  Each manager went away and developed a
2  list.
3      We, as the Operating Committee, met a
4  period of time after that instruction was given to
5  review the entire list -- not only our own
6  department but other departments -- and to maybe
7  consult and/or give our opinion on those functions
8  that we felt maybe should not be included.
9   Q.  Do you recall when that meeting
10  occurred?
11   A.  Well, it would have had to have been
12  just before the April program so it would have
13  been late March, early April.
14   Q.  Do you recall whether there were any
15  discussions in that meeting regarding the persons
16  who had been selected within the finance function
17  to participate in the retention bonus program?
18   A.  Yes; there were, as there were with all
19  of the departments.
20   Q.  What was discussed?
21   A.  Just the question was raised, do you
22  feel that the people in -- well, it was part of a
23  general question.
24      The general question was to review the

Case 3:04-cv-30127-KPN    Document 27-8    Filed 09/30/2005    Page 5 of 12

DENNIS PAREN vs. JAMES CRAIGIE ET AL
VAUGHN RIST                MAY 20, 2005

**17**

1  list and do you feel that the people identified on
2  this list were -- are worthy of being included in
3  the retention program.
4        Q.   Who asked that question?
5        A.   Jim Craigie did.
6        Q.   Who did he ask that question of?
7        A.   Of everybody in the Operating Committee.
8        Q.   So he was seeking input of everyone in
9  the Operating Committee with respect to a final
10 selection of the people on the list?
11       A.   Yes.
12            MS. BRODEUR-McGAN:  Objection; you
13 can answer.
14       Q.   (BY MS. NEWMAN)  Do you recall whether
15 anyone raised an objection with regard to the
16 persons who were selected by Dan Frey to
17 participate in the April, 2002 retention bonus
18 plan?
19       A.   No; there were no objections that I can
20 remember.
21       Q.   Did Mr. Paren's name come up in that
22 meeting?
23       A.   No; I don't believe it did.
24       Q.   Did you have -- strike that.  What

**18**

1  involvement, if any, did you have in deciding the
2  amounts of retention bonuses that would be paid to
3  participants pursuant to the April, 2002 plan?
4        A.   It was basically the calculation of a
5  suggested bonus and once done, to add all of that
6  up and see how it compared against the pool of
7  four million dollars.
8             Once that was done, we then found that
9  we were in excess of four million dollars and we
10 had to go back and adjust recommendations
11 accordingly.
12       Q.   Was there any particular formula or
13 measure that was used in determining the amounts
14 of people's bonuses?
15       A.   There was a basic formula for those
16 people that were listed, although the Operating
17 Committee -- and that involved -- let's go back
18 for a second.
19            Everybody in the company participates in
20 MIBP from a clerical level all the way up to
21 president.
22       Q.   And that's the management incentive
23 bonus plan?
24       A.   It's the management incentive bonus

**19**

1  plan, and each person has a grade level with a
2  guideline bonus attached to it.
3             We took that guideline bonus for the
4  people that were identified, simply multiplied
5  that against base salary and that became the
6  guideline for the potential retention bonus.  That
7  was then added up to the four-million-dollar pool
8  and adjustments were made off of that -- off of
9  that list.
10       Q.   Are you aware that Mr. Paren, at various
11 times, complained about what he believed to be
12 unlawful or improper conduct at Old Top-Flite?
13            MS. BRODEUR-McGAN:  Objection; you
14 can answer.
15            THE WITNESS:  I'm aware of it; yes.
16       Q.   (BY MS. NEWMAN)  Did Jim Craigie ever
17 tell you that Mr. Paren was not selected for a
18 retention bonus in April of 2002 because he
19 complained about alleged unlawful or improper
20 conduct?
21            MS. BRODEUR-McGAN:  Objection; you
22 can answer.
23            THE WITNESS:  No; I'm not, but even
24 so, that objection -- I mean that complaint, I

**20**

1  believe, if and when it did happen, would have
2  been after the time we established the list of the
3  retention bonus personnel participants.
4        Q.   (BY MS. NEWMAN) When you refer to that
5  complaint, are you referring to Mr. Paren's audit
6  of Mr. Craigie's expense reports?
7        A.   Yes.
8        Q.   Did Mr. Craigie ever tell you that
9  Mr. Paren was not selected for a retention bonus
10 in April of 2002 because Mr. Paren complained
11 about any type of conduct?
12       A.   No.
13            MS. BRODEUR-McGAN:  Objection.
14       Q.   (BY MS. NEWMAN)  Did Mr. Frey ever tell
15 you that Mr. Paren was not selected for a
16 retention bonus in April of 2002 because Mr. Paren
17 complained about alleged improper or unlawful
18 conduct?
19            MS. BRODEUR-McGAN:  Objection.
20            THE WITNESS:  No.
21       Q.   (BY MS. NEWMAN)  Do you have any reason
22 to believe that Mr. Craigie or Mr. Frey did not
23 select Mr. Paren for a retention bonus in April,
24 2002 because he complained about alleged unlawful

Case 3:04-cv-30127-KPN   Document 27-8   Filed 09/30/2005   Page 6 of 12

DENNIS PAREN vs. JAMES CRAIGIE ET AL
VAUGHN RIST                    MAY 20, 2005

**21**

1 or improper conduct?
2    A.  No.
3    Q.  Did there come a time when additional
4 people were selected to receive a retention bonus?
5    A.  Yes.
6    Q.  That was in the September, 2003 time
7 frame?
8    A.  Yes.
9    Q.  How did it come about that there were
10 additional people selected for a retention bonus
11 in September of 2003, if you know?
12   A.  Over the period of time from April of
13 2002 to September of 2003, people left the company
14 for whatever reason.
15        Those that left that were -- many of
16 which waived their retention bonus.  That
17 eventually totaled a large sum of money.  We had
18 discussions as to how and what to do with that
19 money.
20        The first discussion was, well, let's
21 just split it up amongst all of the existing
22 personnel receiving retention bonuses and just
23 divide it out equally somehow on some sort of
24 formula.

**22**

1        It was determined after discussion --
2 that discussion -- that we had some serious
3 problems in the factory having to do with research
4 and development specifically.  One of the key
5 elements of any sale of golf balls -- of a golf
6 ball company -- is it's intellectual property and
7 we wanted to make sure that we retained as many of
8 the research and development people as we could.
9        We had just gone through a series of
10 problems with our IT staff in instituting an ERP
11 system.  We wanted to make sure that we maintained
12 a strong IT department.
13        We had a marketing -- there were no
14 marketing people -- personnel -- included in the
15 first list.  We wanted to make sure that we
16 retained some of those marketing personnel that
17 were key to moving forward.
18        It was decided then to go to the
19 Operating Committee, have them go back and add up
20 or make a list of those people that they would
21 recommend, submit the list in, and then we went
22 through almost the same process we did when we
23 established the first list.
24        MR. PRESSER:  Excuse me, you may

**23**

1 want to clarify -- maybe it's me -- but my
2 understanding -- you referred to it as the
3 September, 2003 bonus.
4        My understanding that's when it was paid
5 or adopted.  You may want to clarify on the record
6 if that's what he is talking about or something
7 else.
8        MS. NEWMAN:  I apologize.
9    Q.  (BY MS. NEWMAN)  When I was referring
10 earlier to September, 2003, just to clarify, that
11 is when the bonuses you just referred to were paid
12 out, is that right?
13       MS. BRODEUR-McGAN:  Objection; you
14 can answer.
15       THE WITNESS:  That's when they were
16 paid out; that's correct.
17   Q.  (BY MS. NEWMAN)  When was it that the
18 decision was made to select additional people for
19 a retention bonus?
20   A.  Shortly before that.
21   Q.  Do you recall when that was?
22   A.  No; I do not.
23   Q.  Could it have been in the June, 2003
24 time frame?

**24**

1    A.  Would have been June through August, in
2 that time frame somewhere.
3    Q.  When you say that recommendations were
4 made to the Operating Committee with regard to
5 additional bonuses, who made those
6 recommendations?
7    A.  The Operating Committee people -- I'm
8 sorry, I may have said that wrong.  The Operating
9 Committee people made the recommendations for
10 additional personnel.
11   Q.  Do you know who, in the Operating
12 Committee, initially came up with the idea to have
13 additional retention bonuses?
14   A.  No; I don't.  I think it was just the
15 result of a lot of discussion amongst the
16 Operating Committee.
17   Q.  I think you mentioned earlier that the
18 process was similar in selecting persons who had
19 received a retention bonus as it was for the
20 April, 2002 plan?
21   A.  Mmm-hmm.
22   Q.  Is that yes?
23   A.  Yes.
24   Q.  Dan Frey left Old Top-Flite in June of

Case 3:04-cv-30127-KPN   Document 27-8   Filed 09/30/2005   Page 7 of 12

DENNIS PAREN vs. JAMES CRAIGIE ET AL
VAUGHN RIST                    MAY 20, 2005

### Page 25

1  2003, correct?
2    A.  Correct.
3    Q.  Are you aware of who made the decision
4  to select persons for an additional retention
5  bonus who had directed -- I'm sorry; reported to
6  Mr. Frey?
7        MS. BRODEUR-McGAN:  Objection; you
8  can answer.
9        THE WITNESS:  Well, when Mr. Frey
10 left, he did announce it at one of our Operating
11 Committee meetings and immediately, we were very
12 concerned, obviously, as to how we were going to
13 go forward and who would run the Finance
14 Department.
15       Dan's suggestion was that we separate
16 some of his functions out and give some of them to
17 Nigro, Lyon, and Charlie Kimmett.  He recommended
18 that -- at that time we had not finalized the
19 decision on what we were going to do with the
20 money that was left over from the retention bonus
21 plan and that if we were going to add people to
22 it, he would like to add an amount in there for
23 them.
24       Jim was also very much supportive of

### Page 26

1  that.
2    Q.  (BY MS. NEWMAN)  What was Mr. Nigro's
3  job title?
4    A.  Nigro was the Director of Taxation.
5    Q.  What was Mr. Lyon's job title?
6    A.  He was the director of -- I'll have it
7  in a minute.  It should be on the list there.
8    Q.  Is it possible that Mr. Nigro was the
9  Director of External Reporting?
10   A.  Yes; that's what it was.
11       MS. BRODEUR-McGAN:  Objection.
12   Q.  (BY MS. NEWMAN)  Mr. Kimmett?
13   A.  He would have been the -- probably the
14 controller.
15   Q.  After Mr. Frey left, did Mr. Nigro,
16 Mr. Lyon, and Mr. Kimmett in fact assume
17 Mr. Frey's prior duties?
18       MS. BRODEUR-McGAN:  Objection; you
19 may answer.
20       THE WITNESS:  Along with Mr. Varga;
21 yes.
22   Q.  (BY MS. NEWMAN)  What did Mr. Varga do?
23   A.  He was the Director of Financial
24 Planning and Analysis.

### Page 27

1    Q.  Did Mr. Craigie ever tell you that
2  Mr. Paren was not selected for an additional
3  retention bonus because he complained about
4  alleged unlawful or improper conduct?
5    A.  No.
6        MS. BRODEUR-McGAN:  Objection.
7    Q.  (BY MS. NEWMAN)  Did Mr. Frey ever tell
8  you that Mr. Paren was not selected for an
9  additional retention bonus because he complained
10 about alleged unlawful or improper conduct?
11   A.  No.
12   Q.  Do you have any reason to believe that
13 either Mr. Craigie or Mr. Frey chose not to select
14 Mr. Paren for a retention bonus in 2003 because
15 Mr. Paren complained about alleged unlawful or
16 improper conduct?
17   A.  No.
18   Q.  Turning your attention back to the
19 April, 2002 retention bonus plan, had Mr. Paren
20 been selected for a retention bonus under that
21 plan, how much would he have received?
22       MS. BRODEUR-McGAN:  Objection; you
23 can answer.
24       THE WITNESS:  To the best of my

### Page 28

1  recollection, Dennis was somewhere in the area of
2  one hundred and eighteen to a hundred twenty
3  thousand dollars a year in base salary and then at
4  a twenty percent bonus level so it would have been
5  twenty percent of that number, whatever it may be.
6  Using the higher number, it would be twenty-four
7  thousand dollars.
8        I do not recall what his base pay was at
9  that time.
10   Q.  (BY MS. NEWMAN)  The calculation that
11 you just described is consistent with the manner
12 in which you calculated the amounts of retention
13 bonuses for those persons who did, in fact,
14 receive bonuses under the April, 2002 plan?
15       MS. BRODEUR-McGAN:  Objection; you
16 can answer.
17       THE WITNESS:  Yes; with the
18 exception that we still had to make it fit the
19 four-million-dollar number and therefore, it was
20 not a dollar -- it was not a precise calculation
21 because we had to adjust.
22   Q.  (BY MS. NEWMAN)  So the twenty-four
23 thousand dollars that you just mentioned, in
24 making it fit, it's possible that if Mr. Paren had

Case 3:04-cv-30127-KPN    Document 27-8    Filed 09/30/2005    Page 8 of 12

DENNIS PAREN vs. JAMES CRAIGIE ET AL
VAUGHN RIST          MAY 20, 2005

**29**

1  been selected for a bonus, it could have been less
2  than that?
3     A.  Yes.
4     Q.  Following the Callaway acquisition on
5  September 15, 2003, Mr. Craigie was no longer
6  employed by Old Top-Flite, correct?
7     A.  Correct.
8     Q.  And he was never employed by New
9  Top-Flite, correct?
10    A.  Correct.
11    Q.  But Mr. Paren continued to be employed
12 by New Top-Flite, is that right?
13    A.  That's correct.
14    Q.  Did there come a time when Mr. Paren's
15 employment with New Top-Flite was terminated?
16    A.  Yes.
17    Q.  How do you know that?
18    A.  Myself, along with the new CFO,
19 communicated that to Dennis.
20    Q.  Who is the new CFO?
21    A.  (No response.)
22    Q.  Could it be Andrew Kelleher?
23    A.  Andrew Kelleher.
24    Q.  Did you make the decision to terminate

**30**

1  Mr. Paren's employment?
2     A.  No; I did not.
3     Q.  Do you know who did?
4     A.  Not specifically; no.
5     Q.  How did you learn that the decision had
6  been made to terminate Mr. Paren's employment from
7  New Top-Flite?
8     A.  Mr. Kelleher told me.
9     Q.  When was that?
10    A.  At the date of his termination, whatever
11 date that is. I don't have his termination date
12 handy.
13    Q.  Do you recall what Mr. Kelleher told
14 you?
15    A.  Basically that over the past few months
16 many of his functions had been -- were being moved
17 to Callaway and it appeared that additional
18 functions were also going to be moved to Callaway.
19       In his discussion of that transition
20 with Callaway, the decision was made to terminate
21 him.
22    Q.  Mr. Kelleher didn't tell you who made
23 that decision?
24    A.  No.

**31**

1     Q.  Do you have any reason to believe that
2  Jim Craigie had any involvement in or influence
3  upon the decision to terminate Mr. Paren's
4  employment from New Top-Flite?
5     A.  No.
6     Q.  Do you have any reason to believe that
7  Dan Frey had any involvement or influence upon the
8  decision to terminate Mr. Paren's employment from
9  New Top-Flite?
10    A.  No.
11       MS. NEWMAN: I don't have any more
12 questions at this time.
13       MS. BRODEUR-McGAN: I have some
14 questions.
15       \*\*\*\*\*
16 CROSS-EXAMINATION BY MS. BRODEUR-McGAN
17    Q.  Starting up with where Ms. Newman left
18 off, do you have any idea of who made the decision
19 to lay off or terminate Mr. Paren?
20    A.  My speculation would be that it would be
21 between Andrew Kelleher and the CFO of Callaway.
22    Q.  Do you have any specific information as
23 to what they would have considered or what they
24 did consider with respect to Mr. Paren and his

**32**

1  retention of employment?
2     A.  The only thing that they would have been
3  considering, I think, was the functional duties
4  that he had performed and where those functional
5  duties ended up or were going to end up.
6     Q.  Do you have any personal knowledge as to
7  what, in fact, they did consider before they made
8  the decision to lay off or terminate Mr. Paren?
9     A.  No; I don't.
10    Q.  Do you know if he was laid off or
11 terminated?
12       MS. NEWMAN: Objection to form.
13       THE WITNESS: In fact, he would have
14 been laid off, eligible for unemployment, which he
15 applied for.
16    Q.  (BY MS. BRODEUR-McGAN) With respect to
17 Dan Frey's prior direct reports whose names are
18 escaping me right now, the two that did not get
19 selected for the retention bonus?
20    A.  Yes.
21    Q.  Mr. Kustra, I think, and
22 Mr. Levandowski?
23    A.  That's correct.
24    Q.  Do you know if they were laid off or

Case 3:04-cv-30127-KPN   Document 27-8   Filed 09/30/2005   Page 9 of 12

DENNIS PAREN vs. JAMES CRAIGIE ET AL
VAUGHN RIST                MAY 20, 2005

### Page 61

1 million dollars, is that accurate?
2   A.   That's correct.
3   Q.   There was going to be one million per
4 quarter paid out to the members, is that correct?
5   A.   That's correct.
6       MS. NEWMAN:  This is referring to
7 the April, 2002 plan.
8   Q.   (BY MS. BRODEUR-McGAN)  Referring to the
9 April, 2002 plan.
10      You described for the key employees as
11 opposed to the OCM a semi-formula for figuring out
12 their receipt of monies under the April, 2002
13 plan, is that correct?
14      MR. PRESSER:  Objection.
15      MS. NEWMAN:  Objection to form.
16  Q.   (BY MS. BRODEUR-McGAN)  You can answer.
17  A.   Yes.
18  Q.   Can you tell me how the bonus was
19 figured out for the OCM?
20  A.   Yes; I can.  To the best of my
21 recollection, it was again based on their bonus
22 percentage in their grade level and I think that
23 was doubled.
24  Q.   Was there any working the numbers

### Page 62

1 backwards as you had done for the key employees?
2       MS. NEWMAN:  Objection to form.  He
3 never testified about the key employees.
4   Q.   (BY MS. BRODEUR-McGAN)  You can answer.
5   A.   Ask the question again, please?
6   Q.   Sure.  For the non-members of the OCM
7 that received the bonuses, what would you call
8 them?
9       MS. NEWMAN:  Objection to form.
10  Q.   (BY MS. BRODEUR-McGAN)  And I'm
11 referring to Exhibit 1?
12  A.   I'd refer to them as managers of
13 functional areas that we needed to run the
14 business going forward.
15  Q.   Does that document in front of you list
16 them as key employees -- Exhibit 1?
17  A.   Yes; it does.
18  Q.   Of Peter Arturi's deposition?
19  A.   It does list them as key employees.
20  Q.   For amounts of key employees, you
21 described a process by which there would be a
22 suggested bonus, the first step, correct?
23  A.   (Witness nodding.)
24  Q.   Is that a yes?

### Page 63

1       MS. NEWMAN:  Objection to form.
2       THE WITNESS:  Finish the question.
3   Q.   (BY MS. BRODEUR-McGAN)  You described a
4 process whereby the name was placed on a list.
5 There was, one, a suggested bonus; two, you would
6 go back and adjust down depending on what a rough
7 formula would come out at to see if there was
8 enough money in the pool and then go back and work
9 the numbers so that the key employees together
10 with the OCM could get a bonus of four million
11 dollars?
12      MS. NEWMAN:  Objection to form.
13      MR. PRESSER:  Objection.
14      THE WITNESS:  There was one -- just
15 to clarify it.
16  Q.   (BY MS. BRODEUR-McGAN)  That would be
17 helpful.
18  A.   The guideline for those, quote, key
19 employees, was basically taking their annual bonus
20 and applying that -- taking the total of all
21 annual bonuses and applying that to the
22 four-million-dollar number.
23      We would then go back and adjust down in
24 most cases, because we were over the

### Page 64

1 four-million-dollar number so there had to be some
2 sort of pro-ration of this thing down -- and
3 that's what happened with the exception of one or
4 two people that had employment agreements.
5   Q.   Was there any adjustments down or up for
6 the OCM in this process?
7   A.   There were adjustments.  I can't
8 recall -- there were adjustments.  I can't recall
9 whether they went up or down.
10  Q.   Can you tell me, would inclusion of
11 additional names to this list have necessarily
12 reduced the amounts to some of the members on the
13 list?
14  A.   Yes.
15  Q.   At some point, did Dennis Paren, after
16 April of 2002, come to ask you for some help to be
17 a member of the retention bonus group?
18  A.   Yes.
19  Q.   Can you tell me the first conversation
20 that you had wherein he asked you to help him?
21  A.   There were multiple discussions on the
22 topic.
23      Some were sit down-in-my-office type of
24 discussions.  Others might have been in the

Case 3:04-cv-30127-KPN   Document 27-8   Filed 09/30/2005   Page 10 of 12

**DENNIS PAREN vs. JAMES CRAIGIE ET AL**
**VAUGHN RIST**            **MAY 20, 2005**

Page 65

1  hallway, the first of which may have happened
2  toward the fall of 2002.
3     Q.  During that first discussion, did you
4  tell Mr. Paren that you would try to help him
5  receive a bonus?
6     A.  What I tried to do was not encourage him
7  because I knew that the total amount had been
8  used.
9        If I had included him, if we had
10 included him -- well, it was too late to include
11 him -- but if we had, it would have done damage
12 elsewhere.  We would have had to have gone back
13 and moved money around.
14    Q.  For existing people on the plan?
15    A.  Yes.
16    Q.  At some point, people that were a member
17 of the plan left and were not entitled to the
18 remainder of their share, is that accurate?
19    A.  That's right.
20    Q.  When that happened, did Mr. Paren ask
21 you to revisit the issue and include him in the
22 plan?
23    A.  He assumed that because people were
24 leaving the plan, that those dollars were

Page 66

1  available.
2        That was not necessarily a correct
3  assumption.
4     Q.  Did you ever tell him that it was not
5  possible for him to be listed in the plan because
6  it was a done deal?
7     A.  At the early stages, yes, because it was
8  a done deal.  Nobody had left.
9     Q.  How about later on when people had left?
10    A.  Later on, the problem was that we didn't
11 know -- first of all, we didn't know how much
12 money there would be because people were leaving
13 constantly.  We would lose a person maybe once a
14 month or whatever, of this list.
15       We couldn't sit there and say exactly
16 how much money was in the pool until we got a lot
17 closer to the actual sale time or sale date.  Then
18 there was a discussion as to what to do with the
19 money amongst the Operating Committee and we
20 talked about distributing it amongst the existing
21 people and doing some sort of pro-rata.  That was
22 not agreed to.
23       We thought that, as I said I think
24 earlier, there were some functional areas that we

Page 67

1  missed in this list, specifically our research and
2  development.  If you go down this list, you'll see
3  that there is nobody -- quickly looking at this
4  list, I don't believe we had anybody in here from
5  research and development.  Research and
6  development is the key to golf ball manufacturing
7  here in Chicopee, Massachusetts.  Without it, it
8  would not be here.
9        A decision was made -- as I think I said
10 earlier -- that a decision was made to consider
11 some of the people out of research and
12 development, information systems, marketing, and
13 manufacturing.
14    Q.  What you're referring to was ultimately
15 the June, 2003 employee stay bonus that we talked
16 about earlier during Peter Arturi's deposition?
17    A.  What date, again?
18    Q.  Approximately June of 2003 -- and I'm
19 just going to refer you to --
20    A.  (Interposing) That's what I'm talking
21 about.
22    Q.  Peter Arturi's -- it's been marked Peter
23 Arturi Exhibit 2 and we looked at a list of
24 employees who got a bonus on or about June of 2003

Page 68

1  arising from a new bonus plan?
2        MS. NEWMAN:  Objection.
3        THE WITNESS:  They did not receive
4  the bonus.  They were just listed to receive it.
5  They received it at the time of sale.
6     Q.  (BY MS. BRODEUR-McGAN)  During that
7  time, on or about June of 2003 when people were
8  being listed for a new bonus for the new bonus
9  plan, was Dennis Paren's name raised to Mr. Frey?
10    A.  No; it wasn't.
11    Q.  Did you say to Mr. Frey that Dennis
12 should have been included in the first list?
13    A.  Let me back up.  I did discuss it with
14 Mr. Frey at the time the second list was
15 developed.
16    Q.  What did Mr. Frey say when you discussed
17 it with him?
18    A.  He felt that the criteria that was
19 established for the first list still applied and
20 that his particular function was going to go away
21 one way or the other.
22       It seemed like it was all going to be
23 absorbed at the Callaway level and that Dennis was
24 not going to leave the company.

Case 3:04-cv-30127-KPN   Document 27-8   Filed 09/30/2005   Page 11 of 12

DENNIS PAREN vs. JAMES CRAIGIE ET AL
VAUGHN RIST               MAY 20, 2005

69

1  Q. Were you aware that Mr. Paren, with your
2  assistance, was looking for options to leave the
3  company on or about June of 2002 and June of 2003?
4  A. Yes.
5  Q. Did you mention that to Mr. Frey?
6  A. No.
7  Q. Do you know if Mr. Frey was aware that
8  he was looking to leave the company?
9  A. I don't believe so.
10  Q. I'm going to show you something that was
11  previously marked as Peter Arturi Exhibit 6 and
12  ask you if you've seen that document before?
13  (Indicating.)
14  A. Yes; I have.
15  Q. Can you tell me what you did when you
16  first saw the document?
17       MR. PRESSER: Objection.
18       THE WITNESS: I called Peter and
19  said what the hell is going on.
20       This was the first time I -- the first
21  time I saw this document was with Jim's written
22  notes on it. I did not see this document prior.
23  Q. (BY MS. BRODEUR-McGAN) What did Peter
24  say to you?

70

1  A. That he was aware of it and that was
2  about it -- and that he had discussed it with, I
3  guess, Jim.
4  Q. Did you raise the issues with Mr. Frey
5  that were raised by that letter of June 7th?
6  A. You know, I don't have a specific
7  recollection of discussing this specific letter
8  with Dan.
9  Q. Have you ever heard Dan call Peter --
10  excuse me, Dan call Donald Paren a pain in the
11  ass?
12  A. No; not specifically that.
13  Q. Are you aware that Mr. Frey felt that
14  Donald Paren could be a pain in the ass?
15       MS. NEWMAN: Object to form.
16       THE WITNESS: I had a feeling that
17  Mr. Frey felt that Dennis could be contentious but
18  a pain in the ass might be a little strong.
19  Q. (BY MS. BRODEUR-McGAN) What was the
20  basis of your information that Mr. Frey felt that
21  Mr. Paren could be contentious?
22  A. It was the same basis that the previous
23  CFO had -- previous two CFOs had -- and it had to
24  do with Dennis did his job very well. He was a

71

1  very good employee from that standpoint. It was
2  the manner in which he did his job.
3  Q. Can you specifically recall Mr. Paren
4  complaining about failure to report inventory
5  pursuant to GAP standards?
6  A. No; again, that's not my kind of area of
7  responsibility.
8  Q. Do you know -- why don't I back up a
9  second.
10       Can you tell me how familiar you were on
11  a day-to-day basis between how often and on what
12  level Mr. Paren and Mr. Frey communicated?
13       MS. NEWMAN: Objection to form.
14       THE WITNESS: I wouldn't have that
15  much knowledge.
16  Q. (BY MS. BRODEUR-McGAN) I just need a
17  clarification. Mr. Nigro, what did you think his
18  title was?
19  A. He was the -- Nigro was the treasurer.
20  Q. I thought you said external reporting?
21  A. That was Lyon -- Mike Lyon.
22  Q. What is external reporting?
23  A. Well, that was -- because we were going
24  through a public kind of situation, it was all of

72

1  the reporting for 401(k)s, quarterly reports,
2  working closely with the bankruptcy courts, that
3  kind of thing, making sure that all of our
4  financial reports, whether they be annual,
5  quarterly or monthly were correct.
6       MS. BRODEUR-McGAN: I think I am
7  done. If you don't have more questions --
8       MS. NEWMAN: (Interposing) I have a
9  couple of questions. Do you want me to jump in?
10       MS. BRODEUR-McGAN: Yes.
11       *****
12  REDIRECT EXAMINATION BY MS. NEWMAN
13  Q. Mr. Rist, referring back to
14  Exhibit Arturi 6, which is the June 7, 2002 memo
15  from Mr. Paren to Mr. Arturi, Bate-stamped 0001.
16       Do you see at the bottom of the
17  handwriting where Mr. Craigie wrote, "Please
18  review and recommend" -- "Vaughn, please review
19  and recommend a response"?
20  A. Yes.
21  Q. Did you, in response to Mr. Craigie's
22  request, recommend a response to Mr. Paren's
23  memorandum?
24  A. Yes; I did.

Case 3:04-cv-30127-KPN   Document 27-8   Filed 09/30/2005   Page 12 of 12

DENNIS PAREN vs. JAMES CRAIGIE ET AL
VAUGHN RIST          MAY 20, 2005

**Page 73**

Q. What did you recommend?

A. I simply told him what I think I testified to just a few minutes ago, that we were at the maximum of the limit -- the four-million-dollar limit. There was no money left in the pool.

The only way that we could maybe consider him in the future would be if people left but at that point in time, we had no one that had left. I think this was June of '02. It was a matter, really, of -- he asked for a review and response and so I gave him one.

I think at that time was the first time I raised with Mr. Craigie the issue of his severance, which would be part and parcel to this whole problem.

Q. What did you say with regard to the severance?

A. I think at that time I said I think maybe we should consider some action on the severance side, the change-of-control agreement, but nothing was done about it at that time.

Q. I think you testified earlier, at the end of the day Mr. Craigie did agree to provide a

**Page 74**

year's severance?

MS. BRODEUR-McGAN: Objection.

THE WITNESS: At the end of the day, just almost a year later, I wrote Dennis a change-in-control agreement and gave it to him and that boosted his severance from the thirty-nine-week maximum to a fifty-two-week maximum.

Q. (BY MS. NEWMAN) When you say change-in-control agreement, do you mean an actual contract signed by both the company and Mr. Paren?

A. No; a letter of understanding.

Q. And that would be contained in Mr. Paren's personnel file?

A. It should be; yes.

Q. Were you responsible for maintaining personnel files of employees at Old Top-Flite?

A. Yes.

Q. And at New Top-Flite?

A. Yes.

Q. What criteria did you use in deciding if a particular document would be placed in a person's personnel file?

A. Every document that has to do with an

**Page 75**

employee should be placed in his personnel file. There were two files. There's a medical file and then there's the personnel file.

Q. Do you recall whether, in 2002, any performance bonuses were paid to employees?

A. In 2002? Not in 2002, I don't believe.

Q. Do you recall whether there were any performance bonuses paid in 2001?

A. There were -- I thought it was 2003 but I might be wrong.

There was a couple of performance bonuses paid based upon the extraordinary work being done by a couple of employees as it relates to the sale of the company, their personal time that was used, the loss of vacation time. That period, the stress and tension during that 2003 period was incredible from the spring right through to the sale of the company.

There were two or three employees that Jim felt had done a job over and above the requirement of their position.

Q. Are you aware of any bonuses or extra pay-outs that were made to employees that were not justified?

**Page 76**

A. No.

MS. NEWMAN: I don't have any further questions.

MS. BRODEUR-McGAN: A couple of questions.

*****

RECROSS-EXAMINATION BY MS. BRODEUR-McGAN

Q. That was a document we marked as Exhibit 4 to Peter Arturi's deposition. I'll just ask you if you've seen that before today? (Indicating.)

A. Yes.

Q. Did you see it on or about September of 2003?

A. Yes.

Q. Can you tell me, did you have a conversation with Mr. Craigie about that document after it was sent?

A. After?

Q. After Mr. Craigie sent it?

A. Yes; I have.

Q. Can you tell me what was said in that conversation?

A. Well, it had to do with -- we talked