# EXHIBIT I

# SHC, Inc. Retention Bonus Program

## I. Purpose.

The purpose of this SHC, Inc. Retention Bonus Program is to reward select management employees for their services to the Company and it Affiliates and to foster their continued employment with the Company and or its Affiliates.

## II. Certain Definitions.

A. "Affiliate" means (i) any entity that directly or indirectly is controlled by, or is under common control with the Company and (ii) any entity in which the Company has a significant equity interest, in either case as determined by the Board.

B. "Board" means the Board of Directors of the Company.

C. "Bonus Period" means the one-year period ending on the last day of each of the first three calendar years ending after the Effective Date; provided that for calendar year 2002 it shall mean the period from the Effective Date through December 31, 2002.

D. "Bonus Pool" means the total amount to be paid with respect to (i) Retention Bonuses payable in respect of a Bonus Period or (ii) Sale Bonuses payable in respect of a Sale, as applicable, in each case as set forth on Appendix I hereto.

E. "Bonus Program" means this SHC, Inc. Retention Bonus Program.

F. "Cause" means the Company or an Affiliate having "cause" to terminate a Participant's employment or service, as defined in any existing employment, consulting or any other agreement between the Participant and the Company or an Affiliate, or, in the absence of such an employment, consulting or other agreement, upon (i) the determination by the Board that the Participant has ceased to perform his duties to the Company or an Affiliate (other than as a result of his incapacity due to physical or mental illness or injury), which failure amounts to an intentional and extended neglect of his duties to such party and which has not been cured within ten days after the Participant has received a demand for substantial performance of his duties, (ii) the Board's determination that the Participant has engaged in conduct materially injurious to the Company or an Affiliate, (iii) the Participant having been convicted of, or plead guilty or no contest to, a felony or a misdemeanor involving dishonesty, moral turpitude or breach of trust (iv) the failure of the Participant to follow instructions of the Board or his direct superiors, which failure has not been cured within ten days after the Participant has received a demand for substantial performance of such instructions, other than any such instructions that would subject the Participant or the Company or any Affiliate to any criminal, professional or similar liability.

G. "Company" means SHC, Inc., a Delaware corporation and its successors.





H. "Disability" means, unless in the case of a particular Participant, an applicable employment agreement states otherwise, a condition entitling a person to receive benefits under the long-term disability plan of the Company or an Affiliate, as may be applicable to the Participant in question, or, in the absence of such a plan, the complete and permanent inability by reason of illness or accident to perform the duties of the occupation at which a Participant was employed or served when such disability commenced or, as determined by the Board based upon medical evidence acceptable to it.

I. "Effective Date" means April 23, 2002.

J. "Good Reason" means a Participant having "Good Reason" to terminate a Participant's employment or service, as defined in any existing employment, consulting or any other agreement between the Participant and the Company, the Operating Company or an Affiliate, or, in the absence of such an employment, consulting or other agreement, upon (1) a material diminution in the Participant's title, position or duties; (2) a reduction in the Participant's base salary or annual bonus opportunity; or (3) a relocation of the Participant's principal office outside of the area which compromises more than a thirty (30) mile radius from the Corporation's current headquarters in Chicopee, Massachusetts.

K. "Participant" means an employee of the Company or an Affiliate whose name is set forth on Appendix I hereto.

L. "Permitted Holder" means each, or any combination, of Oaktree and any of its Affiliates.

M. "Retention Bonus" means a bonus payable pursuant to Section IV hereof.

N. "Sale" means:

(i) the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")(a "Person")), other than Permitted Holders, of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act), directly or indirectly, of more than 50% of either (A) the then outstanding shares of common stock of the Company (the "Outstanding Company Common Stock") or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities");

(ii) the dissolution or liquidation of the Company; provided that this clause (ii) shall not include the filing of a voluntary or involuntary petition under Chapter 7 or Chapter 11 of the United States Bankruptcy Code, or any substantially equivalent federal, state or foreign law;

(iii) the sale of all or substantially all of the business or assets of the Company; or

(iv) the consummation of a merger, consolidation, statutory share exchange or similar form of corporate transaction involving the Company that requires the approval of the Company's stockholders, whether for such transaction or the issuance of securities in the transaction (a "Company Business Combination"), unless immediately following such Company Business Combination: (A) more than 50% of the total voting power of (x) the corporation resulting from such Company Business Combination (the "Surviving Corporation"), or (y) if applicable, the ultimate parent corporation that directly or indirectly has beneficial ownership of sufficient voting securities eligible to elect a majority of the directors of the Surviving Corporation (the "Parent Corporation"), is represented by the Outstanding Company Voting Securities that were outstanding immediately prior to such Company Business Combination (or, if applicable, is represented by shares into which the Outstanding Company Voting Securities were converted pursuant to such Company Business Combination) and (B) no Person (other than a Permitted Holder), is or becomes the beneficial owner, directly or indirectly, of more than 50% of the total voting power of the outstanding voting securities eligible to elect directors of the Parent Corporation (or, if there is no Parent Corporation, the Surviving Corporation).

O. "Sale Bonus" means a bonus payable pursuant to Section V hereof.

## III. <u>Duration</u>.

The Bonus Program shall be effective upon the Effective Date and shall terminate at such time as all payments required to be made hereunder have been satisfied.

## IV. <u>Retention Bonuses</u>.

A. Subject to satisfaction of the terms and conditions set forth in this Bonus Program, each Participant shall be paid a Retention Bonus in respect of each Bonus Period.

B. A Retention Bonus in respect of each Bonus Period shall be payable to a Participant who is an employee of the Company or an Affiliate on the last day of such Bonus Period.

Notwithstanding the foregoing, no later than ten business days following the earlier to occur of (i) a Sale or (ii) the date a Participant ceases to be an employee of the Company or an Affiliate as a result of death, Disability or termination by the Company or an Affiliate without Cause or by the Participant for Good Reason, a Participant shall be paid all unpaid Retention Bonuses to which the Participant would have been entitled pursuant to Appendix I had the applicable event described in clause (i)

or (ii) not occurred and the Participant had been otherwise employed by the Company through December 31, 2004. However, for the avoidance of doubt, a Participant who resigns his or her employment with the Company and its Affiliates without Good Reason or is terminated by the Company or an Affiliate for Cause prior to the payment of a Retention Bonus will not be entitled to receive any unpaid Retention Bonuses.

V. **Sale Bonuses.**

A. Participants who are employed by the Company or an Affiliate as of the date of consummation of a Sale shall receive a Sale Bonus under this Bonus Program in an amount determined pursuant to Appendix I hereto.

B. Each Participant's Sale Bonus shall be payable upon consummation of a Sale to a Participant who (i) is an employee of the Company or an Affiliate as of the date of the signing of a definitive agreement to consummate the Sale (or, if there is no such agreement, upon the consummation of the Sale) or (ii) ceases to be an employee of the Company or an Affiliate as a result of death, Disability, or termination by the Company or an Affiliate without Cause or a termination of employment by the Participant for Good Reason within three months prior to the date of the signing of the definitive agreement to consummate the Sale (or, if there is no such agreement, upon the consummation of the Sale); provided, however, that a Participant who resigns his or her employment with the Company and its Affiliates without Good Reason or is terminated by the Company or an Affiliate for Cause prior to the payment of a Sale Bonus will not be entitled to receive any Sale Bonus.

VI. **Administration/Interpretation/Amendment.**

A. The Bonus Program has been adopted by the Board and shall be administered and interpreted by the Board and determinations and interpretations by the Board relating to the Bonus Program shall be conclusive; provided that the Board may delegate any of its powers or authorities hereunder to a committee which is comprised solely of two or more members of the Board. The Board's determinations and interpretations under the Bonus Program need not be uniform and may be made by it selectively among persons who receive, or are eligible to receive, Retention Bonuses or Sale Bonuses under the Bonus Program (whether or not such persons are similarly situated).

B. The Board may at any time and from time to time amend this Bonus Program, except that no such amendment shall adversely affect any Participant's ability to earn a Retention Bonus or Sale Bonus in accordance with Appendix I hereto without a Participant's express written consent.

VII. **Miscellaneous.**

A. No person shall have any rights hereunder until and unless such person becomes a "Participant" as defined herein and nothing herein shall be construed as conveying any rights to any employee of continued employment with the Company. Rights to the payment of any Retention Bonus or Sale Bonus payable hereunder may not be assigned, transferred, pledged or otherwise alienated by any Participant, other than by will or the laws of descent and distribution.

B. Participation in this Bonus Program is in addition to, and not in lieu of, participation in any other bonus or incentive compensation programs currently made available to employees and shall not be deemed in any way to limit or restrict the Company or the Board from making any bonus or other payment to any person under any other plan or agreement, whether now existing or hereinafter in effect.

C. No payments made hereunder shall be taken into account in computing any Participant's salary or compensation for the purposes of determining any benefits or compensation under (i) any pension, retirement, life insurance or other benefit plan of the Company or its Affiliates or (ii) any agreement between the Company or its Affiliates and the Participant.

D. The Company may withhold from all payments due to a Participant (or his beneficiary or estate) hereunder all taxes which, by applicable federal, state, local or other law, the Company is required to withhold therefrom.

E. In the event of any merger, consolidation, share exchange or similar event, the provisions of this Bonus Program shall be binding upon the surviving or resulting corporation or the person or entity to which such assets are transferred.

F. This Bonus Program shall inure to the benefit of and be enforceable by each Participant's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees. If a Participant shall die while any amounts are payable to the Participant hereunder, all such amounts, unless otherwise provided herein shall be paid in accordance with the terms of this Bonus Program to such person or persons appointed in writing by the Participant to receive such amounts or, if no person is so appointed, to the Participant's estate.

G. The interpretation, construction and performance of this Bonus Program shall be governed by and construed and enforced in accordance with the laws of the State of New York without regard to the principle of conflicts of laws. The invalidity or unenforceability of any provision of this Bonus Program shall not affect the validity or enforceability of any other provision of this Bonus Program, which other provisions shall remain in full force and effect.

H. Each member of the Board shall be fully justified in relying, acting or failing to act, and shall not be liable for having so relied, acted or failed to act in good faith, upon any report made by the independent public accountant of the Company and Affiliates and upon any other information furnished in connection with the Bonus Program by any person or persons other than himself.

J. For all purposes herein, a person who transfers from employment or service with the Company to employment or service with an Affiliate or vice versa shall not be deemed to have terminated employment or service with the Company or an Affiliate.

* * *

As adopted by the Board of Directors of SHC, Inc. as of April 23, 2002.

SHC, INC.

By:____________________
Name:
Title:

## APPENDIX I

2002 Retention Bonus Pool: $1 million

2003 Retention Bonus Pool: $1 million

2004 Retention Bonus Pool: $1million

| | Participant | Retention Bonus (as a % of Bonus Pool) |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

Sale Bonus Pool: $1million in the event of a Sale as result of which the Company is valued at $600 million or more, reduced on a linear to basis to $0 in respect of a Sale as result of which the Company is valued at $400 million.

| | Participant | Sale Bonus (as a % of Bonus Pool) |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

In the event a Participant's employment with the Company and its Affiliates is terminated due a Participant's resignation without Good Reason or by the Company or an Affiliate for Cause, the amount of any Retention Bonus or Sale Bonus not paid to such Participant as a result of such termination shall be paid pro rata to the remaining Participant's who are eligible to be paid a Retention Bonus or Sale Bonus at the time payment thereof is made.

PENGAD 800-631-6989 Frey. 12 DEPOSITION EXHIBIT SC 8/30/05

Vaughn/Peter –

Dennis stopped by this morning and gave me this letter. He was very polite and just asked me to read it at my convenience + respond.

He is looking for inclusion in the retention bonus plan (how does he know?). We cannot do this unless we have $'s left under that plan or one of the participants leaves Spalding. We could give him more stock options.

Vaughn – please review + recommend a response.

Tim Fargo

cc: P/O Rel

## MEMO

***Attorney Client Communication***
***Privileged and Confidential***

June 7, 2002

To: Peter Arturi
From: Dennis Paren Dennis

Ref. Stock Loss

This is to request compensation for the loss imposed on me by the cancellation of my shares of Spalding Holdings stock effective with the Restructuring on April 23, 2002.

Most, if not all other, employees that also suffered significant stock losses appear to be effectively compensated for their stock and stock option losses through a retention bonus plan. Surprisingly, my personal losses have exceeded the losses suffered by many of the participants in the retention bonus plan. In the past, I have always been included in such bonus plans. My responsibilities and job performance have not changed, and at a minimum equals that of some current participants in the new retention bonus plan.

Through the 1996 Employee Stock Purchase Program, I was offered and purchased approximately 12,000 shares at $5.00. This purchase was paid for by a 5-year loan against my 401-K balance and payment was completed in February 2002. About 9,000 of these shares each had 3.5 stock options attached, with an exercise price of $5.00, with these options vesting over a 5-year period. This Stock Purchase Program was only offered to employees that were considered to have a direct and material impact on the Company's financial performance. Employees were selected to participate in this program based upon the responsibilities inherent in their position and their job performance. Employees that met these criteria were considered Key Employees. In the summer of 1999, the 1996 Employee Stock Purchase Program was revised to provide an incentive and to retain Key Employees. Under this revised program, I was provided an additional 30,000 stock options, with an exercise price of $2.00, which were to vest over a new 5-year period.

Now, because of the Restructuring, my $60,000 investment has evaporated, without value or prospective monetary consideration for the loss. Similarly situated employees had the impact of their loss substantially mitigated through the new retention bonus plan and in some instances, also the forgiveness of a company loan.

As a Key Employee, I accepted a relocation of my family from Tampa to Springfield when the Tampa office was closed. Due to my tenure with the company and my sizeable financial interest in the success of this company, the relocation made sense even in light of the disruption caused by relocating teenagers in high school. This was an extremely difficult adjustment for my family.

Since transferring, I assumed the additional responsibilities of travel contract administrator, corporate credit card manager and Pension Committee member, in addition to my normal responsibilities as Director Insurance and Risk Management. At every opportunity, I have sought to save this company money and improve its financial performance. My successes are well documented. In October 1999, I itemized for Dan Frey the sizeable savings I had achieved – one-time cost savings of $600,000 and annual savings of nearly $300,000. In July 2001, I again outlined new savings - one-time cost savings of $353,000 and annual savings of

nearly $263,000. By structuring the directors and officers insurance program on a shared basis effective with the new Restructuring on April 23, 2002, an additional $300,000 is saved in 2002 and I am only pointing out the largest savings achieved as of this date. I have also obtained significant savings in group life and disability insurance coverages, and in airline travel through the establishment and subsequent keeping of preferred discount agreements with airlines. The savings we realize from the proper management of casualty insurance, workers compensation and health insurance programs positively impact the bottom line on an on-going basis.

Outlined below are instances where my efforts brought cash into the company during the last three years:

| | |
|---|---|
| A) Premium Refund from Cancellation of Evenflo's multi-year PL policy – March 1999 | $ 400,000 |
| B) Obtained a Massachusetts Workforce Grant – November 1999 | $ 170,000 |
| C) Insurer Settlement on LGB Traffic Claim – July 2000 | $ 170,000 |
| D) Reimbursement of Legal Fees Related to 1995 Acushnet Lawsuit – April 2001 | $ 68,000 |
| E) Zurich Loss Deposit Recovery – October 2001 | $ 69,318 |
| F) ESIS Loss Deposit Recovery – April 2002 | $ 90,000 |
| TOTAL | **$ 967,318** |

The more significant cost savings I've obtained for the company during the last three years are as follows:

| | |
|---|---|
| A) Reduced Life & Disability Premiums – March 2001 | $ 37,000 |
| January 2002 | $ 114,000 |
| B) Hartford Retroactive Adjustment Revisions for the Years 1994-2000 – January 2001 | $ 84,000 |
| 1984 Adjustment - May 2001 | $ 72,000 |
| B) Correction of Employee Benefit Administration Errors – During 1999 | $ 198,000 |
| C) Establishment of Airline Preferred Discount Agreements – On Going | $ 400,000 |
| D) Establishment of AMEX Corporate Card Program - 1999 | $ 45,000 |
| E) Collection from Employees of Duplicate Expense Report Submissions – During 2001 | $ 31,000 |
| F) Directors & Officers Coverage – April 2002 | $ 300,000 |
| TOTAL | **$1,197,000** |

I also serve as the point man on indemnification issues with Evenflo. In carrying out this responsibility, I sought to recoup funds Spalding had paid for the closing of the Tampa office that, per agreement, should have been shared between Evenflo and Spalding. Although this effort was not ultimately supported by KKR, it again demonstrates my drive to pursue complicated contractual issues in favor of Spalding. My attention to detail is also displayed in the reviewing of product recall expenses. I have stopped hundreds of thousands of dollars of duplicate expenses (not included above) from being paid and have challenged hundreds of thousands of dollars of invoices for lack of documentation and or applicability under the agreement. Due to Evenflo's refusal to work on resolving disputes between us, the entire indemnification issue ultimately may be litigated.

Partly as an aside, on several occasions where there was a need, I have voluntarily assumed a leadership role in an area that was not my responsibility. An example involves the initial agreement with Jim Furyk. Nick Raffaele at that time was not receiving adequate direction from Eddie Binder and had offered a five-year contract that was exceedingly rich in bonus monies. With the contract in the agent's hands, I directed Nick to pull the contract and revise the bonus payouts downward. Consequently, if Furyk wins a major tournament before 2005, the bonus revisions to his contract will save at a minimum $200,000.

With regard to past retention and Key Employee bonuses, I have been included in bonus programs since 1981. Most recently I received a $45,000 Key Employee Transaction bonus in 1996 related to the sale of S&E to KKR. In 1999, I received a $30,000 Key Employee Retention bonus related to the closing of the Tampa headquarters. In 2000 and 2001 my overall performance on my MAP reviews was rated as "Exceeds Expectations". In fact, all of my performance reviews have been excellent and therefore performance has never been an issue.

Insurance-related costs are sizeable and complex expenditures that this year at Spalding will approach $8.0 million and air travel expenditures will approximate $1.2 million. My functional responsibilities of insuring the assets of the company and its cash flow have always in the past merited inclusion in special bonus payouts.

My desire is only to be treated fairly and equitably as the professional and loyal employee I have been, and will continue to be.

\\MARS\PAYROLL\Users\DParen\Stock-Revised.doc

**Key Employee Retention Schedule**

| Name | Initial & Quarterly Bonuses | | | | Total |
|---|---|---|---|---|---|
| **OCM** | **At Closing** | **12/31/2002** | **12/31/2003** | **12/31/2004** | |
| Craigie, J. | $250,000 | $250,000 | $250,000 | $250,000 | $1,000,000 |
| Arturi, P. | $30,000 | $30,000 | $30,000 | $30,000 | $120,000 |
| Esch, M. | $62,500 | $62,500 | $62,500 | $62,500 | $250,000 |
| Frey, D. | $55,000 | $55,000 | $55,000 | $55,000 | $220,000 |
| Keindel, K. | $55,500 | $55,500 | $55,500 | $55,500 | $222,000 |
| Kennedy, T. | $45,000 | $45,000 | $45,000 | $45,000 | $180,000 |
| Rist, V. | $47,500 | $47,500 | $47,500 | $47,500 | $190,000 |
| Rousseau, C. | $42,500 | $42,500 | $42,500 | $42,500 | $170,000 |
| Several, E. | $57,643 | $57,643 | $57,643 | $57,643 | $230,572 |
| Tursi, L. | $62,500 | $62,500 | $62,500 | $62,500 | $250,000 |
| Total | $708,143 | $708,143 | $708,143 | $708,143 | $2,832,572 |
| | | | | | |
| **KEY EMPLOYEES** | | | | | |
| Bellows, G. | $7,500 | $7,500 | $7,500 | $7,500 | $30,000 |
| Bourdeau, B. | $4,600 | $4,600 | $4,600 | $4,600 | $18,400 |
| Bourque, K | $2,843 | $2,843 | $2,843 | $2,843 | $11,372 |
| Braken, D. | $6,031 | $6,031 | $6,031 | $6,031 | $24,124 |
| Bugbee,M. | $3,375 | $3,375 | $3,375 | $3,375 | $13,500 |
| Davis, J. | $4,890 | $4,890 | $4,890 | $4,890 | $19,560 |
| Fuller, J. | $15,665 | $15,665 | $15,665 | $15,665 | $62,660 |
| Gay, M. | $4,450 | $4,450 | $4,450 | $4,450 | $17,800 |
| Godbout, M. | $15,001 | $15,001 | $15,001 | $15,001 | $60,004 |
| Greaney, J. | $3,046 | $3,046 | $3,046 | $3,046 | $12,184 |
| Jaszek, J. | $7,419 | $7,419 | $7,419 | $7,419 | $29,676 |
| Kovasala, K. | $4,500 | $4,500 | $4,500 | $4,500 | $18,000 |
| Kimmett, C. | $4,250 | $4,250 | $4,250 | $4,250 | $17,000 |
| Laliberty, R. | $3,923 | $3,923 | $3,923 | $3,923 | $15,692 |
| Litz, J. | $2,773 | $2,773 | $2,773 | $2,773 | $11,092 |
| Lyon, M | $5,882 | $5,882 | $5,882 | $5,882 | $23,528 |
| Marvel, M. | $9,000 | $9,000 | $9,000 | $9,000 | $36,000 |
| Nealon, J. | $14,715 | $14,715 | $14,715 | $14,715 | $58,860 |
| Nelson, J. | $2,723 | $2,723 | $2,723 | $2,723 | $10,892 |
| Nigro, S. | $8,700 | $8,700 | $8,700 | $8,700 | $34,800 |
| Query, M. | $6,353 | $6,353 | $6,353 | $6,353 | $25,412 |
| Quinn, B. | $1,592 | $1,592 | $1,592 | $1,592 | $6,368 |
| Rafaelle, N | $11,750 | $11,750 | $11,750 | $11,750 | $47,000 |
| Seitter, T. | $17,195 | $17,195 | $17,195 | $17,195 | $68,780 |
| Simonds, V. | $13,125 | $13,125 | $13,125 | $13,125 | $52,500 |
| Smith, G. | $25,000 | $25,000 | $25,000 | $25,000 | $100,000 |
| Spenner, T. | $10,313 | $10,313 | $10,313 | $10,313 | $41,252 |
| Talerico, T. | $5,500 | $5,500 | $5,500 | $5,500 | $22,000 |
| Thorne, M. | $18,500 | $18,500 | $18,500 | $18,500 | $74,000 |
| Tzivanis, M. | $9,096 | $9,096 | $9,096 | $9,096 | $36,384 |
| Varga, V. | $8,750 | $8,750 | $8,750 | $8,750 | $35,000 |

| | | | | | |
|---|---|---|---|---|---|
| Zanetich, D. | $21,875 | $21,875 | $21,875 | $21,875 | $87,500 |
| Bloomstrand, R .11SEK | $5,938 | $5,938 | $5,938 | $5,938 | $23,752 |
| Gooch, A. C$ .69 | $5,625 | $5,625 | $5,625 | $5,625 | $22,500 |
| | | | | | |
| TOTAL | | | | | |
| Grand Total | $1,000,041 | $1,000,041 | $1,000,041 | $1,000,041 | $4,000,164 |
| | | | | | |
| Stay Bonus Total | | $4,000,164 | | | |