# EXHIBIT J

IN THE MATTER OF:

DENNIS PAREN vs. JAMES CRAIGIE, INDIVIDUALLY AND DANIEL FREY, INDIVIDUALLY

DEPOSITION OF:

PETER A. ARTURI
DATE: MAY 20, 2005

**PERLIK and COYLE REPORTING**
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

**COMPRESSED TRANSCRIPT & WORD INDEX**

---

**Page 1**

```
                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS

                      C.A. No. 04-30127-MAP
                          Pages 1-122


DENNIS PAREN

vs.

JAMES CRAIGIE, INDIVIDUALLY AND
DANIEL FREY, INDIVIDUALLY


-------------------------------------------------
           DEPOSITION OF: PETER A. ARTURI
-------------------------------------------------

      Taken before Joanne Coyle, Certified
   Shorthand Reporter, Notary Public, pursuant
   to the Federal Rules of Civil Procedure, at
   the offices of Bulkley, Richardson and
   Gelinas, LLP, 1500 Main Street, Springfield,
   Massachusetts on MAY 20, 2005, commencing at
   10:35 a.m.



              Joanne Coyle
              Certified Shorthand Reporter
              License No. 106693


          PERLIK and COYLE REPORTING
          Certified Professional Reporters

                  1331 Main Street
                 Springfield, MA 01103
     Tel. (413) 731-7931    Fax (413) 731-7451
```

---

**Page 2**

APPEARANCES:

FOR THE PLAINTIFF:

   LISA BRODEUR-MCGAN, ESQUIRE
   1380 Main Street
   Springfield, Massachusetts 01103
BY: LISA BRODEUR-McGAN

FOR THE DEFENDANTS:

   MORGAN, LEWIS & BOCKIUS LLP
   1701 Market Street
   Philadelphia, Massachusetts 19103
BY: TAMSIN J. NEWMAN, ESQUIRE

REPRESENTING THE DEPONENTS:

   SKOLER, ABBOTT & PRESSER
   One Monarch Place
   Springfield, Massachusetts 01144
BY: JAY M. PRESSER, ESQUIRE

In Attendance: Vaughn Rist

---

**Page 3**

                        I N D E X

WITNESS              DIRECT  CROSS  REDIRECT  RECROSS
PETER A. ARTURI        5      41     113        117
                                     119        120


                        E X H I B I T S

NO.   DESCRIPTION                                    PAGE
 1    SHC, Inc. Retention Bonus Program               14
 2    Bankruptcy Filing                               28
 3    Kimmett, Lyon, Nigro & Varga Pay
      Statements                                      32
 4    Documents Re Craigie Expense Account            72
 5    9/18/03 Paren to Graves Letter                  90
 6    Paren to Arturi Memo Re Stock Loss             100
 7    Letter of Recommendation                       118

---

**Page 4**

                     S T I P U L A T I O N S

     It is agreed by and between the parties
that all objections, except objections as to the
form of the question, are reserved to be raised at
the time of trial for the first time.

     It is further agreed by and between the
parties that all motions to strike unresponsive
answers are also reserved to be raised at the time
of trial for the first time.

     It is further agreed that the deponent will
read and sign the deposition and that the sealing
of said deposition will be waived.

     It is further agreed by and between the
parties that notification to all parties of the
receipt of the original deposition transcript is
also hereby waived.

                        * * * * *

Case 3:04-cv-30127-KPN   Document 27-10   Filed 09/30/2005   Page 4 of 16

DENNIS PAREN vs. JAMES CRAIGIE ET AL
PETER A. ARTURI                      MAY 20, 2005

**13**

1  debt and subordinated debt. Approximately sixty
2  to seventy percent of our senior debt and an
3  equivalent percentage of our subordinated debt was
4  owned by one company, Oak Tree Capital.
5       Oak Tree agreed with KKR that the
6  company would be recapitalized so that Oak Tree
7  would end up with a majority of the equity
8  ownership in the company and in connection with
9  that recapitalization, two hundred million dollars
10 of subordinated debt was swapped for a hundred
11 million dollars of new subordinated debt resulting
12 in a significant benefit to the company's balance
13 sheet.
14    Q.  Describe for me the process that was
15 involved in deciding which employees would be
16 included as part of the retention bonus plan?
17         MR. PRESSER: In April, 2002?
18         MS. NEWMAN: I'm sorry. In April of
19 2002.
20         THE WITNESS: The Operating
21 Committee was told that there would be four
22 million dollars available to fund a retention
23 bonus plan, the purpose of which would be to
24 retain certain key employees of the company

**14**

1  subsequent to the recapitalization because it was
2  likely that subsequent to the recapitalization,
3  the company would be broken up and pieces of it
4  sold off.
5       We needed to ensure that those persons
6  who were vital to the operation of the business
7  would remain through this process because
8  otherwise, it was likely that they would leave for
9  more stable employment.
10        MS. NEWMAN: Can we go off the
11 record for one second?
12        (Discussion off the record.)
13        (Arturi Deposition Exhibit
            No. 1 offered and marked.)
14
15    Q.  (BY MS. NEWMAN) Mr. Arturi, I'm handing
16 you a document that's been pre-marked Arturi 1.
17 It bears the Bates labels Top-Flite 0308 through
18 Top-Flite 0316.
19     Do you recognize this document?
20 (Indicating.)
21    A.  (Witness examining document.) Yes.
22        MS. BRODEUR-McGAN: You're looking
23 at which numbers? 0308?
24        MS. NEWMAN: Through 316.

**15**

1         MS. BRODEUR-McGAN: Thanks.
2     Q.  (BY MS. NEWMAN) What is the document
3  that we've marked as Arturi 1?
4     A.  SHC, Inc. Retention Bonus Program.
5     Q.  Is this the document that was created
6  which adopted the retention bonus plan that we
7  have been discussing?
8     A.  Yes; with one exception -- that the sale
9  bonus that was part of this plan is missing from
10 this particular copy.
11    Q.  This is a document that you have
12 provided to me, is that right?
13    A.  Correct.
14    Q.  So if there are additional pages, that's
15 something that you can provide to me at a later
16 point?
17    A.  Yes.
18    Q.  Directing your attention to page six of
19 the document with Bates number Top-Flite 313, do
20 you know whose signature that is?
21    A.  That's mine.
22    Q.  When did you sign this?
23    A.  April 23rd, 2002.
24    Q.  SHC, Inc. is a parent company to Old

**16**

1  Top-Flite?
2     A.  SHC, Inc. was formerly known as Spalding
3  Holdings Corporation and immediately prior to the
4  recapitalization, Spalding Holdings Corporation
5  was the direct parent of Spalding Sports Worldwide
6  or Old Top-Flite.
7     Q.  The participants in this retention bonus
8  program were identified under Appendix I, is that
9  correct?
10    A.  Yes.
11    Q.  I'm referring to the chart that appears
12 on Top-Flite 315 and 316.
13        Tell me how these names came to appear
14 on this chart?
15    A.  At the top of the chart, under OCM --
16 which stands for Operating Committee Members --
17 were the chief executive and all of his direct
18 reports, which were the senior management of the
19 company at that time.
20        The others listed as key employees were
21 selected using the following process: Jim
22 Craigie, the company's then chief executive, asked
23 each of the Operating Committee members to think
24 about which of their direct reports would be vital

Case 3:04-cv-30127-KPN   Document 27-10   Filed 09/30/2005   Page 5 of 16

DENNIS PAREN vs. JAMES CRAIGIE ET AL
PETER A. ARTURI                    MAY 20, 2005

17

to the company's business and therefore needed to be assured of certain bonuses as the next eighteen to twenty-four months unfolded.

Each Operating Committee member, myself included, then made a list of those employees and submitted them to the whole Operating Committee which then parceled out the retention bonus pool that would have been available to all of those employees among them.

I believe that the amount of the total retention bonus was between one or two percent of those employees' gross compensation or roughly equivalent to what they might have received as an annual bonus under the company's then management incentive bonus program.

Q. So Dan Frey made the decision regarding which of his direct reports would receive a retention bonus under this April, 2002 plan, is that correct?

A. That's correct.

Q. Were there any meetings of the OPM in which there were discussions regarding whether particular people should be included or excluded?

MR. PRESSER: You mean OCM -- you

18

said OPM.

MS. NEWMAN: I apologize. I'll rephrase.

THE WITNESS: I understand the question.

Q. (BY MS. NEWMAN) I'll ask it again anyway.

Were there any Operating Committee meetings in which inclusion or exclusion of particular employees was discussed with respect to this April, 2002 retention bonus program?

A. Not necessarily specific employees. Some Operating Committee members tended to be more generous with their employees than others and I believe there were meetings where somebody would include all of their direct reports and others would include only a few of their direct reports and, in fact, Mr. Craigie included none of his direct reports other than the Operating Committee.

We would have discussed slimming down the program so it was available to only those employees who were so important to the business that we needed to keep them around for the next twenty-four months.

19

Q. Did Mr. Craigie explain in any of these meetings the reason why he didn't include any of his direct reports for a retention bonus?

A. Yes.

MS. BRODEUR-McGAN: Objection; you can answer.

THE WITNESS: Jim said that as far as he was concerned, none of his direct reports, all of whom were in the marketing area, fit into that description.

Q. (BY MS. NEWMAN) Were there any discussions in the Operating Committee meetings regarding the inclusion or exclusion of the direct reports of Dan Frey?

A. I don't recall any.

Q. Referring back to Exhibit Arturi 1, the retention bonus program document, explain to me the anticipated timing of the retention bonuses?

A. The retention bonuses were paid in four equal installments, the first at the closing or shortly after the closing of the April 23rd, 2002 recapitalization; the second quarter would be paid at the end of 2002; the third at the end of 2003; and the fourth at the end of 2004.

20

However, if all of the assets of the company were sold or the company was sold prior to one or more of those dates, then the remaining unpaid portion of the retention bonus would become immediately due and payable.

Q. So the first quarter of the retention bonus was paid at closing, which was April of 2002, is that right?

A. It was paid shortly after April 23rd, 2002.

MR. PRESSER: Just for the record, closing of recapitalization.

THE WITNESS: The closing of the recapitalization.

Q. (BY MS. NEWMAN) Just to clarify, the first retention bonus payment was made in April of 2002, is that right?

A. Yes.

Q. Do you recall when the second payment was made?

A. December 31, 2002.

Q. When was the third installment paid?

A. The third and fourth installments were paid together at the time that Callaway Golf

Case 3:04-cv-30127-KPN   Document 27-10   Filed 09/30/2005   Page 6 of 16

DENNIS PAREN vs. JAMES CRAIGIE ET AL
PETER A. ARTURI          MAY 20, 2005

### Page 21

1  Company purchased the assets of former Top-Flite.
2  Q. Do you have any understanding as to why
3  Mr. Kimmett, Mr. Lyon, Mr. Nigro, and Mr. Varga
4  received retention bonuses under the April, 2002
5  retention bonus plan?
6  A. Only that Dan Frey considered those
7  employees to be so important for the operation of
8  his finance function that he needed to make sure
9  that they stayed around.
10 Q. Did Mr. Frey tell you that?
11 A. No; that's my assumption.
12 Q. But your understanding is that Mr. Frey
13 was the person who made the decision to include
14 those people in the plan?
15 A. Correct.
16 Q. Did Mr. Frey ever tell you that he was
17 excluding Mr. Paren from a retention bonus because
18 he complained about alleged unlawful or improper
19 conduct?
20        MS. BRODEUR-McGAN: Objection; you
21 can answer.
22        THE WITNESS: No.
23 Q. (BY MS. NEWMAN) Do you have any reason
24 to believe that Dan Frey excluded Mr. Paren from a

### Page 22

1  retention bonus in April of 2002 because he
2  complained about alleged unlawful or improper
3  conduct?
4        MS. BRODEUR-McGAN: Objection; you
5  can answer, and I think we should put on the
6  record and lay out this concern to the extent that
7  that question calls for Peter Arturi to disclose
8  any attorney-client confidential information, then
9  I'd suggest that the door is being opened and that
10 Plaintiff's counsel gets to walk into it. You can
11 answer.
12        THE WITNESS: Can you repeat the
13 question, please?
14 Q. (BY MS. NEWMAN) Do you have any reason
15 to believe that Dan Frey excluded Mr. Paren from a
16 retention bonus in April of 2002 because he
17 complained about alleged unlawful or improper
18 conduct?
19 A. No.
20 Q. Did there come a time when additional
21 people were selected for a retention bonus?
22 A. There was a subsequent pool that was
23 made available to the company in late spring of
24 2003.

### Page 23

1  Q. Where did this pool come from?
2  A. We were getting close to declaring
3  bankruptcy and there were a number of employees
4  who had left the company in connection with the
5  sale of the Spalding business to Russell. When
6  those employees left voluntarily, they forfeited
7  the last half of their retention bonus so that
8  created some additional money that was available
9  to the company.
10       In addition, right around that time, Dan
11 Frey left the company, meaning that the company
12 wouldn't have to pay either the back half of his
13 retention bonus or his severance.
14       I believe at the time, Jim Craigie spoke
15 to Oak Tree, which was our majority owner, and
16 asked if the company could make a new pool using
17 those funds to offer retention bonuses to an
18 additional group of key employees who were vital
19 to the company's business over the next ninety to
20 a hundred twenty days to get through the
21 bankruptcy and the sale of the golf business to a
22 successful bidder at the bankruptcy offer.
23       MS. BRODEUR-McGAN: You said ninety
24 to a hundred twenty days?

### Page 24

1        THE WITNESS: Yes.
2  Q. (BY MS. NEWMAN) Dan Frey left Top-Flite
3  in June of 2003?
4  A. June, 2003.
5  Q. Do you recall the amount of money that
6  was available in this time frame before additional
7  retention bonuses --
8  A. (Interposing) Not without looking at the
9  Key Employee Retention Plan that was adopted by
10 the Bankruptcy Court which has that money in it.
11 Q. Were there discussions in Operating
12 Committee meetings regarding who would be selected
13 for an additional retention bonus in 2003?
14 A. There may have been but I don't recall
15 any with specificity.
16 Q. Do you know who made the decision to
17 include people for the additional retention
18 bonuses in 2003?
19 A. Again, I believe it was by functional
20 head so that Operating Committee members would
21 have gone to either Jim Craigie and/or Vaughn Rist
22 with recommendations as to which of their
23 additional employees might be included in this
24 additional plan.

Case 3:04-cv-30127-KPN   Document 27-10   Filed 09/30/2005   Page 7 of 16

DENNIS PAREN vs. JAMES CRAIGIE ET AL
PETER A. ARTURI            MAY 20, 2005

25

1  Q. With respect to Dan Frey's direct
2  reports, who made the decision whether to include
3  or exclude those people from a retention bonus in
4  2003, if you know?
5  A. I assume it was Dan.
6  Q. What do you base that assumption on?
7  A. Because all of us were -- to the degree
8  that we wanted to include certain employees in the
9  plan, we were the ones who would have made that
10 decision and then brought it to James Craigie,
11 Vaughn Rist, and the Operating Committee.
12 Q. But Dan Frey left in June of 2003, so
13 are you saying he made that decision before he
14 left?
15        MS. BRODEUR-McGAN: Objection; you
16 can answer.
17        THE WITNESS: With respect to three
18 of the employees that were in that additional
19 program. I believe they were Steven Nigro,
20 Charlie Kimmett, and Victor Varga.
21        At that time, I recall being in Jim
22 Craigie's office when Dan had announced that he
23 was leaving the company. Jim asked which of Dan's
24 employees were needed to take on additional duties

26

1  because of Dan's leaving and Dan identified those
2  three as being the ones who would essentially take
3  on the chief financial officer role.
4         Jim asked Dan to recommend how much they
5  should get paid out of that pool and Dan
6  recommended the amounts that are on that
7  schedule -- twenty thousand dollars apiece, I
8  believe.
9  Q. (BY MS. NEWMAN) To your knowledge, did
10 Mr. Kimmett, Mr. Nigro, and Mr. Varga in fact
11 assume Mr. Frey's job duties after his departure?
12        MS. BRODEUR-McGAN: Objection; you
13 can answer.
14        THE WITNESS: To my knowledge, yes;
15 but that was a different function.
16 Q. (BY MS. NEWMAN) Did Jim Craigie ever
17 tell you that he was excluding Dennis Paren from a
18 retention bonus in 2003 because he complained
19 about alleged unlawful or improper conduct?
20        MS. BRODEUR-McGAN: Objection; and
21 again the same objection regarding prior
22 attorney-client privilege.
23        THE WITNESS: No.
24 Q. (BY MS. NEWMAN) Do you have any reason

27

1  to believe that Jim Craigie excluded Mr. Paren
2  from a retention bonus in 2003 because he
3  complained about alleged unlawful or improper
4  conduct?
5         MS. BRODEUR-McGAN: Objection; you
6  can answer, same objection.
7         THE WITNESS: No; and Jim would not
8  have had anything to do with that decision because
9  Dennis didn't report to Jim.
10 Q. (BY MS. NEWMAN) Who would have had
11 input with respect to the decision to exclude
12 Mr. Paren in 2003 from the retention bonus
13 program, if you know?
14        MR. PRESSER: Objection.
15        MS. BRODEUR-McGAN: Objection; you
16 can answer.
17        MR. PRESSER: Just to form -- the
18 decision to exclude him.
19        MS. NEWMAN: I agree. I'll
20 rephrase.
21 Q. (BY MS. NEWMAN) Do you have any reason
22 to believe that Mr. Craigie did not select
23 Mr. Paren for a retention bonus in 2003 because he
24 complained about alleged unlawful or improper

28

1  conduct?
2         MS. BRODEUR-McGAN: Objection; you
3  can answer.
4         THE WITNESS: No.
5  Q. (BY MS. NEWMAN) Do you have any reason
6  to believe that Mr. Frey did not select Mr. Paren
7  for a retention bonus in 2003 because he
8  complained about alleged unlawful or improper
9  conduct?
10        MS. BRODEUR-McGAN: Objection; you
11 can answer.
12        THE WITNESS: No.
13        (Arturi Deposition Exhibit
14        No. 2 offered and marked.)
15 Q. (BY MS. NEWMAN) Mr. Arturi, I'd like to
16 show you a document that was previously marked
17 Arturi Exhibit 2, the bankruptcy filing bearing
18 Bates numbers Top-Flite 01318 through 0365.
19        Do you recognize this document as the
20 bankruptcy filing that you provided to me?
21 (Indicating.)
22 A. Yes.
23 Q. Is it a true and correct copy of that
24 document?

Case 3:04-cv-30127-KPN   Document 27-10   Filed 09/30/2005   Page 8 of 16

DENNIS PAREN vs. JAMES CRAIGIE ET AL
PETER A. ARTURI                MAY 20, 2005

**37**

1  Q. (BY MS. NEWMAN) Did Mr. Frey respond?
2  A. Yes; he did.
3  Q. What did he say?
4  A. He said that Dennis' job is easy and
5  that Dennis is not going anyplace.
6  Q. Those were the reasons why he did not
7  select Mr. Paren for retention bonus?
8      MS. BRODEUR-McGAN: Objection.
9  Q. (BY MS. NEWMAN) That he told you?
10     MS. BRODEUR-McGAN: Objection. You
11 can answer.
12     THE WITNESS: I believe what Dan
13 meant was Dennis' job was not one of the jobs that
14 he needed people around to be able to do over the
15 next twelve to twenty-four months and he didn't
16 consider Dennis to be one of the people who would
17 leave the company regardless of whether he got a
18 retention bonus.
19 Q. (BY MS. NEWMAN) Did Mr. Frey tell you
20 that one of the reasons that he did not select
21 Mr. Paren for a retention bonus was because he was
22 a pain in the butt?
23 A. No.
24 Q. Did there come a time when Mr. Craigie

**38**

1  was no longer employed by Old Top-Flite?
2  A. Yes.
3  Q. When was that?
4  A. Immediately following the acquisition by
5  Callaway Golf on September 15th, 2003.
6  Q. Was Mr. Craigie, to your knowledge, ever
7  employed by New Top-Flite?
8  A. No.
9  Q. But Mr. Paren continued to be employed
10 by New Top-Flite?
11 A. Yes.
12 Q. Did there come a time when Mr. Paren's
13 employment with New Top-Flite was terminated?
14 A. Yes.
15 Q. How do you know that?
16 A. I was employed by New Top-Flite at the
17 time as well.
18 Q. How did you become aware of the fact
19 that his employment had been terminated or would
20 be terminated?
21     MR. PRESSER: Unless, again, you
22 were giving advice, feel free to answer unless it
23 was in the course of your giving legal advice or
24 opinion.

**39**

1      THE WITNESS: I saw Dennis cleaning
2  out his office.
3  Q. (BY MS. NEWMAN) You weren't involved in
4  the decision to terminate Mr. Paren's employment
5  from New Top-Flite?
6  A. No.
7  Q. Do you know who made the decision to
8  terminate Mr. Paren's employment from New
9  Top-Flite?
10 A. No.
11 Q. Do you have any reason to believe that
12 Jim Craigie had any involvement in or influence
13 upon the decision to terminate Mr. Paren's
14 employment from New Top-Flite?
15 A. No.
16 Q. Do you have any reason to believe that
17 Dan Frey had any involvement in or influence upon
18 the decision to terminate Mr. Paren's employment
19 from New Top-Flite?
20     MS. BRODEUR-McGAN: Objection. I
21 would just state the objection again that it could
22 call for attorney-client privileged information
23 and if the witness answers it, then the door is
24 open and you may answer.

**40**

1      THE WITNESS: No.
2  Q. (BY MS. NEWMAN) Did you have a meeting
3  with Lisa Brodeur-McGan earlier this week?
4  A. Yes.
5  Q. When was that?
6  A. Wednesday.
7  Q. How did you come to have a meeting with
8  Ms. Brodeur-McGan?
9  A. Mr. Paren had brought a complaint
10 against New Top-Flite and Callaway Golf before the
11 Massachusetts Commission Against Discrimination.
12     Mr. Paren's counsel advised New
13 Top-Flite's counsel that Mr. Paren would be
14 willing to release all claims that he might have
15 against New Top-Flite and Callaway Golf if I and
16 Vaughn Rist voluntarily provided information and
17 documents that might be relevant to his case
18 against Mr. Craigie and Mr. Frey.
19 Q. Is Mr. Paren's complaint with the
20 Massachusetts Commission still pending?
21 A. No; it's been withdrawn.
22 Q. When was it withdrawn?
23 A. It was withdrawn several months ago but
24 there was the possibility that he could refile the

Case 3:04-cv-30127-KPN   Document 27-10   Filed 09/30/2005   Page 9 of 16

DENNIS PAREN vs. JAMES CRAIGIE ET AL
PETER A. ARTURI          MAY 20, 2005

Page 61

1 thousand seven hundred dollars, is that correct?
2   A.  Yes.
3   Q.  All right.
4   A.  And then in September of '03, after the
5 Callaway acquisition closed.
6   Q.  And before you answer, can you tell me
7 which Bate stamp document you're referring to?
8   A.  Yes; 0302 you see a total of
9 thirty-seven thousand four hundred dollars which
10 is the remaining two payments under the
11 April 23, '02 plan, eight thousand seven hundred
12 dollars apiece or a total of seven thousand four
13 hundred dollars plus the twenty thousand dollars
14 he was entitled to under the Exhibit B of the Key
15 Employee Retention Plan.
16       MS. NEWMAN:  Referring to
17 Exhibit Arturi 2.
18       THE WITNESS:  Correct.
19   Q.  (BY MS. BRODEUR-McGAN)  Thank you.  Is
20 it fair to say that at least with respect to
21 Mr. Nigro, that there are some documents missing
22 that reflect -- that would have reflected two
23 additional eighty-seven-hundred-dollar payments?
24   A.  No.

Page 62

1   Q.  Let me rephrase that question.  On
2 document number 0302 there's a handwriting that
3 says seventeen thousand four hundred plus twenty
4 thousand, is that accurate?
5   A.  That's my handwriting.
6   Q.  When was that done?
7   A.  A couple of months ago, perhaps.
8   Q.  Was it done for this case?
9   A.  It was -- I provided it to Mr. Craigie
10 and Mr. Frey's counsel when they requested this
11 information concerning Mr. Nigro and some others.
12   Q.  To your knowledge at that time, did you
13 provide them with documents other than those
14 contained in Exhibit 3, Exhibit 1, or Exhibit 2?
15   A.  No.
16       MS. NEWMAN:  I just want to clarify
17 for the record, state for the record, there were
18 actually two instances in which Mr. Arturi
19 provided documents.
20       The first instance was when the
21 personnel file was provided to us, which
22 included --
23       THE WITNESS:  (Interposing) Correct.
24       MS. NEWMAN:  -- some of the pay

Page 63

1 statements; and then the second instance was a
2 week or so ago when I believe your assistant faxed
3 me some of the remaining pay statements as well as
4 Exhibits Arturi 1 and Arturi 2.
5       THE WITNESS:  Correct.
6   Q.  (BY MS. BRODEUR-McGAN)  Thank you.  Did
7 you provide personnel files other than Mr. Paren's
8 personnel files to Attorney Newman?
9   A.  No.
10   Q.  Only Mr. Paren's personnel file was
11 provided?
12   A.  Yes.
13   Q.  Getting back to some of your earlier
14 testimony -- let me back up.
15       How long did you work with Donald Paren?
16   A.  From 1998 through 2003.
17   Q.  Did you have an opportunity to observe
18 his competency within his job?
19   A.  Yes.
20   Q.  Can you tell me whether or not he did a
21 good job?
22   A.  Dennis did a good job.
23   Q.  Can you tell me whether or not he was a
24 smart guy?

Page 64

1   A.  Absolutely.  He's a bright guy.
2   Q.  Can you tell me, did you ever come in
3 possession of any information that suggested that
4 he wasn't doing his job well?
5   A.  No.
6   Q.  Regarding Mr. Paren's personality, did
7 you ever have a conversation specifically with
8 Dennis about him being a pain in the ass?
9       MR. PRESSER:  I don't know how it
10 could be, but if it's anything related to a legal
11 issue, don't answer; but otherwise feel free.
12       THE WITNESS:  Not specifically about
13 that subject; no.
14   Q.  (BY MS. BRODEUR-McGAN)  Can you tell me
15 whether or not you ever formed the impression that
16 he was a pain in the ass?
17   A.  I never had the impression that Dennis
18 was a pain in the ass.
19   Q.  Let me try to help you out here.  Did
20 you have a conversation with Mr. Frey at some
21 point wherein Mr. Frey stated that Dennis was a
22 pain in the ass or a pain in the butt?
23   A.  Yes.
24   Q.  That conversation, was that the same

Case 3:04-cv-30127-KPN   Document 27-10   Filed 09/30/2005   Page 10 of 16

DENNIS PAREN vs. JAMES CRAIGIE ET AL
PETER A. ARTURI          MAY 20, 2005

**65**

1 conversation on the same day when you went to
2 Mr. Frey and asked him why Mr. Paren was not
3 listed in the retention bonus plan?
4     A.  Yes.
5     Q.  Can you tell me, did Mr. Frey explain to
6 you what he meant when he said Dennis was a pain
7 in his ass?
8     A.  No.
9     Q.  Did you have any understanding of what
10 Mr. Frey meant?
11     A.  Yes.
12     Q.  Could you tell me what your
13 understanding was -- what was Mr. Frey referring
14 to?
15     A.  Mr. Frey was referring to the fact that
16 Dennis would do some things at the company that
17 would really tick people off.
18     Q.  Can I give you some examples and ask you
19 whether or not any of these things ticked off
20 people?
21     A.  Okay.
22     Q.  Were you aware that Mr. Frey was in part
23 responsible for auditing expense accounts of
24 employees?

**66**

1     A.  Mr. Frey wasn't responsible but his
2 function was.
3     Q.  Let me rephrase it.  Were you aware that
4 Mr. Paren was responsible for auditing managers'
5 expense accounts?
6     A.  Yes.
7     Q.  Were you aware that Mr. Paren from time
8 to time would find double payments on an
9 employee's expense account?
10     A.  Yes.
11     Q.  Were you aware that Mr. Paren would
12 report those persons to Mr. Frey or others in the
13 company?
14     A.  Yes.
15     Q.  Can you tell me, did that have anything
16 to do with Mr. Paren pissing people off?
17         MS. NEWMAN:  Objection to form.
18         THE WITNESS:  Yes.
19     Q.  (BY MS. BRODEUR-McGAN)  Were you aware
20 that Mr. Paren at one point reported Mr. Craigie
21 as having allegedly submitted double billing of
22 expenses?
23     A.  Yes.
24     Q.  Were you aware of whether or not

**67**

1 Mr. Craigie -- were you aware how Mr. Craigie took
2 that?
3         MS. NEWMAN:  Objection to form.
4         THE WITNESS:  Yes.
5     Q.  (BY MS. BRODEUR-McGAN)  Tell me how
6 Mr. Craigie felt about that, based on your
7 personal knowledge, not assumptions?
8     A.  Mr. Craigie felt that Mr. Paren was
9 being vindictive.
10     Q.  Can you tell me the names -- was there a
11 Stephanie Lawrence also who had submitted
12 allegedly double billings?
13     A.  I don't know whether Stephanie's were
14 double billings.
15         They may have been submissions of
16 expenses that weren't properly reimbursable under
17 our policy.
18     Q.  Did you have any personal contact with
19 Mr. Paren concerning Ms. Lawrence's excessive
20 expense account recoverage?
21         MR. PRESSER:  Objection.
22         THE WITNESS:  Yes.
23     Q.  (BY MS. BRODEUR-McGAN)  Can you tell me
24 about that?

**68**

1     A.  I remember that Dennis had audited
2 Stephanie's expense reports and had noticed a
3 number of items that appeared either excessive or
4 were not properly reimbursable under the company's
5 policy.
6     Q.  Let me stop you there.  You noticed that
7 Stephanie did have some expenses that were
8 excessive or non -- that were not appropriately
9 submitted for reimbursement?
10     A.  Yes.
11     Q.  You had a discussion with Mr. Paren
12 about this?
13     A.  Yes.
14     Q.  Was Mr. Paren upset about this?
15     A.  Yes.
16         MS. NEWMAN:  When was this, for
17 clarity?
18         MS. BRODEUR-McGAN:  No; please
19 don't.  You can come back on redirect.
20         MS. NEWMAN:  If you want the record
21 to be unclear, so be it.
22         MS. BRODEUR-McGAN:  Thank you very
23 much.
24     Q.  (BY MS. BRODEUR-McGAN)  In addition to

# EXHIBIT K

Frey. 12
DEPOSITION EXHIBIT
[illegible] 8/25/05

**MEMO**
*Attorney Client Communication*
*Privileged and Confidential*

To:     Peter Arturi
From:   Dennis Paren

Ref.    Stock Loss

June 7, 2002

*[Handwritten note:]* Vaughn/Peter – Dennis stopped by this morning and gave me this letter. He was very polite and just asked me to read it at my convenience + respond. He is looking for inclusion in the retention bonus plan (how does he know?). We cannot do this unless we have $'s left under that plan or one of the participants leaves Spalding. We could give him more stock options. Vaughn – please review + recommend a response. /s/ Jim Craig  cc: [illegible]

This is to request compensation for the loss imposed on me by the cancellation of my shares of Spalding Holdings stock effective with the Restructuring on April 23, 2002.

Most, if not all other, employees that also suffered significant stock losses appear to be effectively compensated for their stock and stock option losses through a retention bonus plan. Surprisingly, my personal losses have exceeded the losses suffered by many of the participants in the retention bonus plan. In the past, I have always been included in such bonus plans. My responsibilities and job performance have not changed, and at a minimum equals that of some current participants in the new retention bonus plan.

Through the 1996 Employee Stock Purchase Program, I was offered and purchased approximately 12,000 shares at $5.00. This purchase was paid for by a 5-year loan against my 401-K balance and payment was completed in February 2002. About 9,000 of these shares each had 3.5 stock options attached, with an exercise price of $5.00, with these options vesting over a 5-year period. This Stock Purchase Program was only offered to employees that were considered to have a direct and material impact on the Company's financial performance. Employees were selected to participate in this program based upon the responsibilities inherent in their position and their job performance. Employees that met these criteria were considered Key Employees. In the summer of 1999, the 1996 Employee Stock Purchase Program was revised to provide an incentive and to retain Key Employees. Under this revised program, I was provided an additional 30,000 stock options, with an exercise price of $2.00, which were to vest over a new 5-year period.

Now, because of the Restructuring, my $60,000 investment has evaporated, without value or prospective monetary consideration for the loss. Similarly situated employees had the impact of their loss substantially mitigated through the new retention bonus plan and in some instances, also the forgiveness of a company loan.

As a Key Employee, I accepted a relocation of my family from Tampa to Springfield when the Tampa office was closed. Due to my tenure with the company and my sizeable financial interest in the success of this company, the relocation made sense even in light of the disruption caused by relocating teenagers in high school. This was an extremely difficult adjustment for my family.

Since transferring, I assumed the additional responsibilities of travel contract administrator, corporate credit card manager and Pension Committee member, in addition to my normal responsibilities as Director Insurance and Risk Management. At every opportunity, I have sought to save this company money and improve its financial performance. My successes are well documented. In October 1999, I itemized for Dan Frey the sizeable savings I had achieved – one-time cost savings of $600,000 and annual savings of nearly $300,000. In July 2001, I again outlined new savings - one-time cost savings of $353,000 and annual savings of

0001

nearly $263,000. By structuring the directors and officers insurance program on a shared basis effective with the new Restructuring on April 23, 2002, an additional $300,000 is saved in 2002 and I am only pointing out the largest savings achieved as of this date. I have also obtained significant savings in group life and disability insurance coverages, and in airline travel through the establishment and subsequent keeping of preferred discount agreements with airlines. The savings we realize from the proper management of casualty insurance, workers compensation and health insurance programs positively impact the bottom line on an on-going basis.

Outlined below are instances where my efforts brought cash into the company during the last three years:

| | |
|---|---:|
| A) Premium Refund from Cancellation of Evenflo's multi-year PL policy – March 1999 | $ 400,000 |
| B) Obtained a Massachusetts Workforce Grant – November 1999 | $ 170,000 |
| C) Insurer Settlement on LGB Traffic Claim – July 2000 | $ 170,000 |
| D) Reimbursement of Legal Fees Related to 1995 Acushnet Lawsuit – April 2001 | $ 68,000 |
| E) Zurich Loss Deposit Recovery – October 2001 | $ 69,318 |
| F) ESIS Loss Deposit Recovery – April 2002 | $ 90,000 |
| TOTAL | **$ 967,318** |

The more significant cost savings I've obtained for the company during the last three years are as follows:

| | |
|---|---:|
| A) Reduced Life & Disability Premiums – March 2001 | $ 37,000 |
| January 2002 | $ 114,000 |
| B) Hartford Retroactive Adjustment Revisions for the Years 1994-2000 – January 2001 | $ 84,000 |
| 1984 Adjustment - May 2001 | $ 72,000 |
| B) Correction of Employee Benefit Administration Errors – During 1999 | $ 198,000 |
| C) Establishment of Airline Preferred Discount Agreements – On Going | $ 400,000 |
| D) Establishment of AMEX Corporate Card Program - 1999 | $ 45,000 |
| E) Collection from Employees of Duplicate Expense Report Submissions – During 2001 | $ 31,000 |
| F) Directors & Officers Coverage – April 2002 | $ 300,000 |
| TOTAL | **$1,197,000** |

I also serve as the point man on indemnification issues with Evenflo. In carrying out this responsibility, I sought to recoup funds Spalding had paid for the closing of the Tampa office that, per agreement, should have been shared between Evenflo and Spalding. Although this effort was not ultimately supported by KKR, it again demonstrates my drive to pursue complicated contractual issues in favor of Spalding. My attention to detail is also displayed in the reviewing of product recall expenses. I have stopped hundreds of thousands of dollars of duplicate expenses (not included above) from being paid and have challenged hundreds of thousands of dollars of invoices for lack of documentation and or applicability under the agreement. Due to Evenflo's refusal to work on resolving disputes between us, the entire indemnification issue ultimately may be litigated.

0002

Partly as an aside, on several occasions where there was a need, I have voluntarily assumed a leadership role in an area that was not my responsibility. An example involves the initial agreement with Jim Furyk. Nick Raffaele at that time was not receiving adequate direction from Eddie Binder and had offered a five-year contract that was exceedingly rich in bonus monies. With the contract in the agent's hands, I directed Nick to pull the contract and revise the bonus payouts downward. Consequently, if Furyk wins a major tournament before 2005, the bonus revisions to his contract will save at a minimum $200,000.

With regard to past retention and Key Employee bonuses, I have been included in bonus programs since 1981. Most recently I received a $45,000 Key Employee Transaction bonus in 1996 related to the sale of S&E to KKR. In 1999, I received a $30,000 Key Employee Retention bonus related to the closing of the Tampa headquarters. In 2000 and 2001 my overall performance on my MAP reviews was rated as "Exceeds Expectations". In fact, all of my performance reviews have been excellent and therefore performance has never been an issue.

Insurance-related costs are sizeable and complex expenditures that this year at Spalding will approach $8.0 million and air travel expenditures will approximate $1.2 million. My functional responsibilities of insuring the assets of the company and its cash flow have always in the past merited inclusion in special bonus payouts.

My desire is only to be treated fairly and equitably as the professional and loyal employee I have been, and will continue to be.

\\MARS\PAYROLL\Users\DParen\Stock-Revised.doc

# EXHIBIT L

**Arturi, Peter**

From: Frey, Dan
Sent: Monday, July 15, 2002 5:48 PM
To: Arturi, Peter
Cc: Rist, Vaughn; Craigie, Jim
Subject: Dennis Paren

Sensitivity: Confidential

After continually missing each other's availability last week, I did finally this afternoon discuss with Dennis our reconfirmation of the original retention bonus participant list (i.e., Dennis is not in the retention bonus plan). I did also communicate his new severance period of one year should he lose his job as a result of the sale or partial sale of the company.

I spent about a half an hour with him, and I was very frank. We walked through a few points in his letter to Peter which I felt were factually inaccurate or distorted, and agreed to disagree on a few things. Our discussion was civil, but knowing Dennis we still probably haven't heard the last from him on this topic.

A few important points that did come up:

1. He did indicate that at the time he purchased his stock in 1996 he was not, in fact, required to purchase stock.

2. He did purchase more shares than were originally "suggested" or "allocated" to him, as he was optimistic.

3. The decision to relocate to New England was his; he indicated that Wade had offered to attempt to develop a suitabl working arrangement without Dennis having to move up from Tampa.

Basically he's upset that his original share investment didn't work out (even though he has new shares to replace the ones which were cancelled), and also that certain people had some of their unpaid-for shares cancelled along with the corresponding loan balance, whereas he had already paid for all his shares.

If I hear anything further I'll keep you posted.
Dan

C407