# EXHIBIT M

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SHC, INC., *et al.*, | ) | Case No.  03–12002 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Objection Deadline:** July 16, 2003 at 4:00 p.m. |
| | ) | **Hearing Date:** July 23, 2003 at 9:30 a.m. (Stand-by) |
| | ) | |
| | ) | **(Start time for hearing subject to the Court's availability)** |

## MOTION OF DEBTORS FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363(b) AND 365(a) OF THE BANKRUPTCY CODE FOR APPROVAL OF A KEY EMPLOYEE RETENTION PLAN

SHC, Inc. ("SHC"), Top-Flite, Inc. ("TF Inc."), The Top-Flite Golf Company ("Top-Flite") and Lisco Sports, Inc. ("Lisco"), the above-captioned debtors and debtors in possession in these chapter 11 cases (each a "Debtor," and collectively, the "Debtors"), hereby move (the "Motion") for an order pursuant to sections 105(a), 363(b) and 365(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), authorizing the implementation of a key employee retention plan (the "KERP"). In support of this Motion, the Debtors rely on the Affidavit of Peter A. Arturi, Esq., in Support of Chapter 11 Petitions and First Day Motions (the "Arturi Affidavit"), which is incorporated herein by reference, and respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2) and venue is proper in

this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

## BACKGROUND

*A. Introduction*

2.    On June 30, 2003 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.    The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.    Top-Flite (f/k/a Spalding Sports Worldwide, Inc.), a Delaware corporation, is one of the preeminent producers of golf balls worldwide. It is engaged in the business of manufacturing, marketing, distributing, and selling golf balls and golf-related goods. Its products include the Ben Hogan Apex Tour, the Top-Flite XL, the Top-Flite XL2000, the Top-Flite XL3000, the Top-Flite Tour and the Strata line of golf balls. Top-Flite also produces golf clubs, including the Ben Hogan Apex Edge Pro, a leader in forged iron clubs, and the Top-Flite Tour and Top-Flite Recreational clubs, its two value brands.

5.    Headquartered in Chicopee, Massachusetts, which is also the site of its primary manufacturing facilities and state of the art research and development center, Top-Flite is the largest golf ball manufacturer in the world, employing approximately 1,057 people and manufacturing approximately 19 million dozen golf balls per year. Top-Flite also owns a smaller manufacturing facility in Gloversville, New York and leases warehouse and office space in Texas, Florida and Arkansas.

62265 1001

6.    In addition to its domestic golf ball operations, Top-Flite owns 100% of the common stock of (a) Lisco, a Delaware corporation and holder of Top-Flite's foreign trademarks, and (b) Top-Flite's foreign subsidiaries: Top-Flite Australia Pty Ltd., Top-Flite Canada Inc., Top-Flite New Zealand, Ltd., Top-Flite Nordic AB and Top-Flite UK Limited. The foreign subsidiaries are engaged primarily in distributing Top-Flite's products overseas. Top-Flite's foreign subsidiaries have not filed bankruptcy and are not part of these chapter 11 cases.

7.    TF Inc. (f/k/a Spalding, Inc.) is an intermediate holding company which owns as its sole asset 100% of Top-Flite's common stock. TF Inc., in turn, is a wholly-owned subsidiary of SHC. SHC's sole asset is the common stock of TF Inc. SHC has approximately 4.6 million shares issued and outstanding, all of which are held by six entities. In addition, SHC and Top-Flite have issued and outstanding various stock options and warrants, relating to, among other things, employee stock award plans. Neither TF Inc. nor SHC engages in business operations of its own, other than administrative matters incident to the ownership of its respective assets. Each is a Delaware corporation.

B.    *Debtors' Capital Structure*

8.    The Debtors' secured debt includes a bank facility and a state industrial development loan. Specifically, SHC and TF Inc. are co-borrowers under a $650 million bank facility (the "Bank Facility"), of which approximately $430 million is outstanding. The Bank Facility is guaranteed by Top-Flite and Lisco, and is secured by all assets of SHC, TF Inc., Top-Flite, and Lisco. Top-Flite is also a borrower under a $6.5 million economic development loan in favor of the Massachusetts Development Finance Agency (together with the Bank Facility, the "Secured Debt"). The development loan is secured by a first lien on the national warehouse at the Chicopee facility, and has approximately $5.2 million outstanding. Thus, even after a sale of

the Debtors' assets for cash consideration of approximately $125 million, the Debtors will have approximately $308.2 million in Secured Debt that remains unpaid.

9.    Along with the Secured Debt, the Debtors have two series of outstanding subordinated bond debt. Specifically, SHC is the issuer of approximately $10.6 million of 10 3/8% senior subordinated notes due 2006 currently outstanding under the Indenture dated as of September 30, 1996 between Spalding Holdings Corporation (f/k/a E&S Holdings Corporation) and HSBC Bank USA (f/k/a Marine Midland Bank) (the "SHC Notes"). TF Inc. is the issuer of approximately $95 million of 9 1/2% senior subordinated notes due 2008 under the Indenture dated as of April 23, 2002 between Spalding, Inc. and U.S. Bank National Association as Indenture Trustee (the "TF Notes").

10.    The TF Notes were issued in connection with a recapitalization of the Debtors' debt and equity structure in April 2002 (the "April 2002 Restructuring"). At that time, holders of approximately 95% of the SHC Notes exchanged their existing notes for a substantial portion of the shares of common stock of SHC and the TF Notes issued in a principal amount equal to 50% of the SHC Notes. Following the exchange transaction, $10.6 million of the SHC Notes remained outstanding. The remaining SHC Notes are held by approximately 100 public holders. The Debtors' Bank Facility was also amended as part of the April 2002 Restructuring. The April 2002 Restructuring did not alter the Debtors' status as private companies and they continue to be exempt from routine filings with the Securities Exchange Commission.

11.    Finally, the Debtors' foreign operating subsidiaries have various lines of credit outstanding which are secured by standby letters of credit issued under the Bank Facility. The Debtors also have ordinary course trade debt.

WP3:903217 4

62265 1001

### C.    Company History

12.    The Spalding sporting goods business, of which Top-Flite is the remaining core business, was at one time the preeminent sporting goods manufacturer. Founded in Chicago on February 3, 1876 by A.G. Spalding, Spalding got its start as a baseball and general sporting goods emporium. In 1905, Spalding moved to Chicopee, Massachusetts, and set up the first manufacturing plant in the United States for golf balls and clubs. Among its many achievements, Spalding is credited with creating the first ever basketball, as well as creating the first tennis ball, football, and golf ball made in the United States. Spalding also manufactured the first ever matched set of woods and irons, liquid centered golf balls, two-piece golf balls and synthetic-covered golf balls. Over time, Spalding added diverse product lines and business divisions, including a toy manufacturer. After a series of ownership changes, Spalding became a separate company with two distinct business lines: sporting goods and golf balls, golf clubs and other golf products. Spalding also actively licensed its name for soft goods such as apparel, footwear and other related items.

13.    Golf products traditionally have been Spalding's largest and most profitable business segment. For the year ending 2002, the Top-Flite family of golf balls was the number one golf ball in unit volume and the number two golf ball in dollar value nationwide. Top-Flite is also the second most often used brand of golf ball nationally and the most often used golf ball for 85+ scorers, public golf course users, and golfers 50 years of age and older. In addition to its Top-Flite brand, Top-Flite also manufactures Ben Hogan and Strata golf balls, and the Ben Hogan and Top-Flite lines of golf clubs. Net golf ball and club sales approximated $186 million and $40 million respectively for Top-Flite in 2002. Top-Flite has long-standing customer relationships, a well-tested and solid brand portfolio, and an innovative and expansive

5

portfolio of intellectual property. Its products are endorsed by prominent professional golfers including Jim Furyk, Bernhard Langer, Lee Trevino, Hal Sutton and Justin Leonard.

D    *Events Leading to Chapter 11.*

14.    Compounding the general economic downturn commencing in early 2000 were certain industry specific factors which caused the golf industry in particular to suffer a swift and dramatic decline. While demand remained flat, various new entrants emerged in the golf ball market, such as Nike, Callaway and Taylor-Made–adidas. This, in turn, resulted in significant excess capacity in ball manufacturing. The new entrants also quickly gained market share, increased competitive intensity, and eroded industry profitability. The end result was that golf ball prices dropped substantially while the fixed costs of production remained stable, causing the Debtors' gross margins on golf balls to decrease by approximately 20% since 2000.

15.    The golf ball and equipment market therefore became structurally unattractive for Spalding and its market position was materially weakened. Because Spalding's overall economic success was heavily dependent on the success of its golf ball business, and also as a consequence of the weak economy generally, Spalding began experiencing severe financial difficulties near the end of 2001. Through negotiations with its banks and bondholders, Spalding averted bankruptcy at that time with the April 2002 Restructuring. Though these transactions improved Spalding's liquidity, its operating results continued to suffer. Consequently, despite its debt restructuring, Spalding's overall profitability and cash flow continued to deteriorate and it became unable to service its bank and bond debt.

16.    Faced with this liquidity crisis, and with no relief in sight for itself or within the industry, the Debtors explored various strategic options, including sale, merger and recapitalization alternatives. The Debtors ultimately determined that it was impracticable to operate as a stand-alone company. Consequently, with the help of its investment bankers, UBS

Warburg LLC ("UBS") and Credit Suisse First Boston ("CSFB"), Spalding began aggressively marketing itself for a potential sale or merger transaction. Although unable to find a buyer or merger partner for its entire business, on April 8, 2003, Spalding successfully sold its Etonic golf shoe and glove business to Etonic Worldwide LLC for an aggregate value of $7 million (subject to certain purchase price adjustments). Subsequently, on May 16, 2003, Spalding sold its sporting goods business, along with the Spalding trademark and name, to Russell Corp. for an aggregate value of $65 million (subject to certain purchase price adjustments).

17.    All that remains now is the golf business. Along with its other assets, Spalding has actively marketed its golf business since mid-2002. During that time, it was approached by, and sought out, strategic buyers in the golf ball market. On June 30, 2003, after extensive arms-length negotiations, the board of directors of Top-Flite authorized it to enter into the Agreement with Callaway, a manufacturer and producer of high-end golf clubs. Under the Agreement, as consideration for substantially all of Top-Flite's assets, Callaway will pay Top-Flite an aggregate cash consideration of $125 million (subject to certain purchase price adjustments) as well as assume certain liabilities.

18.    The Debtors believe that it is infeasible to continue operating as viable stand-alone companies, and are convinced that consolidation is necessary in today's golf ball industry. Accordingly, the Debtors have determined that chapter 11 protection is necessary to stabilize their businesses and preserve their value while they attempt to sell their assets to Callaway or another successful bidder. The Debtors believe that a sale of their business to a strategic buyer like Callaway will maximize the value of their estates for the benefit of their creditors and other interested parties.

WP3:903217.4

62265.1001

## **RELIEF REQUESTED**

19.    The Debtors seek authority under sections 105(a), 363(b) and 365(a) of the Bankruptcy Code to implement their KERP which establishes bonuses to encourage the retention of specific employees whose responsibilities are directly and significantly impacted by the chapter 11 cases (the "Key Employees"). The KERP also provides severance arrangements for certain Key Employees, as described more fully below. In developing the KERP, the Debtors reviewed their existing compensation and employee benefit plans, their existing retention and severance policies in effect, and similar policies adopted by companies while operating under chapter 11. In addition, the Debtors considered the complexity of the proposed sale (or similar transaction) in these chapter 11 cases (the "Sale"), as well as their employees' efforts to date to preserve the value of the Debtors' operations and their continued necessity to maximize estate value up to and through the completion of the Sale.

20.    The KERP would provide bonuses to encourage Key Employees to (a) remain employed by the Debtors up to and through the closing of the Sale, (b) work productively to ensure that the Debtors complete the Sale in a timely and efficient manner, and (c) preserve the value of the Debtors' intellectual property, operations, and in particular, its institutional knowledge of the golf-ball manufacturing business.

*A    The Stay Bonus*

21.    The proposed KERP is based largely on the Debtors' existing retention plan (the "Retention Plan") and employment contracts (the "Employment Contracts" and together with the Retention Program, the "Retention Policy") established at the time of the April 2002 Restructuring. With this Motion, the Debtors seek authority to honor the stay bonus and severance provisions of their Retention Policy, as well as to include certain additional Key

Employees not currently subject to the Retention Policy under the stay bonus provisions of the proposed KERP.

22.     The Retention Plan provides for the payment of a stay bonus (the "Stay Bonus") to certain critical employees if they, among other things, remain employed by the Debtors up to a certain time period, including up to and through a transaction such as the Sale. The Debtors submit that all the employees still employed by the Debtors who are subject to the Retention Plan are Key Employees for purposes of the KERP, and accordingly, would be entitled to payment of a Stay Bonus under the KERP if they remain employed with the Debtors up to and through the closing of the Sale. The amounts of the Stay Bonuses under the Retention Plan and the eligible employees are set forth on Exhibit A annexed hereto.[1]

23.     The Debtors have also identified 35 additional employees who should be eligible for Stay Bonuses under the KERP in the event such employees remain employed with the Debtors up to and through the closing of the Sale, even though such employees are not currently subject to the Retention Policy. Each of these additional employees is critical to the Debtors' efforts to preserve and maximize the value of their estates and should be deemed a Key Employee for purposes of the KERP. These additional employees were not originally eligible for participation in the Retention Policy because, at the time the Debtors' implemented the policy, the Debtors underestimated the extent of the transition services these employees would be required to render throughout the Debtors' restructuring efforts, and its impact on employee

---

[1]     Due to sensitive commercial information contained in Exhibits A, B, C and D annexed to the Motion, the Debtors are seeking by a separate motion authorization under Bankruptcy Code section 107 to file the Exhibits to the Motion under seal.

morale and productivity. Moreover, the unexpected length of the sale process has exacerbated fears among these Key Employees and is resulting in a high rate of employee attrition.[2]

24.    Furthermore, since the resignation of the Debtors' CFO, three individuals have effectively assumed the duties and responsibilities formerly held by the CFO. Although these individuals are already entitled to Stay Bonuses under the Retention Plan, the Debtors feel that an additional incentive is appropriate to avoid losing these key individuals during a time when the Debtors' need for executives knowledgeable of – and with responsibilities for – their financial affairs is critical. The Debtors have therefore allocated these individuals new bonuses in addition to those to which they are entitled under the Retention Plan.

25.    The additional employees who should be deemed Key Employees under the KERP, as well as those individuals eligible for an additional bonus, along with the amounts of the proposed Stay Bonuses, are set forth on Exhibit B annexed hereto.

26.    The services provided by the Key Employees identified on Exhibits A and B are essential for the Debtors to continue operating in chapter 11 and to preserve the value of their estates. They include, for example, (a) the maintenance and preservation of the Debtors' information technology programs necessary to carry-on daily operations, (b) the maintenance and preservation of the Debtors' payroll, accounts payable, and cash management systems, (c) the Debtors' effective and successful launch of several new products instrumental to the Debtors' business plan and of value to Callaway or another purchaser and (d) the industry-specific analysis of the Debtors' financial data necessary to maximize the effectiveness of the Debtors' sales strategies. In addition, many of these Key Employees have unique and proprietary

---

[2]    As just one example, the Debtors' CFO resigned as of June 20, 2003.

WP3:903217 4

62265 1001

knowledge of the Debtors' manufacturing processes and intellectual property that are essential to their manufacturing operations.

27.    Under the proposed KERP, the Debtors intend to pay eligible employees the Stay Bonus during the first payroll period immediately following the closing of a Sale.  In the unlikely event a Sale is consummated after December 31, 2003 but before December 31, 2004, the Debtors intend to pay (a) 50% of the Stay Bonuses to eligible Key Employees during the first payroll period immediately following December 31, 2003 and (b) 50% of the Stay Bonuses to eligible Key Employees during the first payroll period immediately following a closing of such Sale.  In the event no Sale is consummated prior to December 31, 2004, the Debtors intend to pay (a) 50% of the Stay Bonuses to eligible Key Employees during the first payroll period immediately following December 31, 2003 and (b) 50% of the Stay Bonuses to eligible Key Employees during the first payroll period immediately following December 31, 2004.

28.    The Debtors estimate that the maximum aggregate amount of the Stay Bonuses payable under the KERP is $2,081,588.00.  All such payments are premised upon the Key Employees remaining in the Debtors' employ at the time such payments become due.  The Debtors understand that their prepetition bank group has reviewed the Stay Bonus provisions of the proposed KERP, as set forth herein, and has no objection.

B.    *The Severance Payments*

29.    The Employment Contracts, among other things, provide for severance payments (the "Severance Payment").  In most cases, the Severance Payments equal the base annual salary and benefits of the employees subject to the Employment Contracts in the event they are terminated without Good Cause, as such term is defined in the contracts (a "Termination Event").  In some instances, however, the amount of the Severance Payment is more than the

annual base salary and benefits of the eligible employee. Specifically, the Debtors' CEO, James Craigie, is entitled to two years' base salary and benefits and Keith Keindel, Executive Vice President International & Licensing, is entitled to 18 months' base salary and benefits. Other individuals are entitled to Severance Payments in amounts less than their annual base salary and benefits. The Debtors believe these amounts are reasonable, given that it is typical for senior executives in companies of this size to receive two to three times their annual salaries in the event of a change-of-control or termination without cause. Here, the majority of the Severance Payments equal one year's salary or less; indeed, only the Debtors' CEO and Executive Vice President International & Licensing, are entitled to more.[3] The employees eligible for Severance Payments and the amounts thereof are set forth on Exhibit C annexed hereto.

     30.    Only the Debtors' senior management and key executives have Employment Contracts and are therefore eligible for a Severance Payment. Moreover, Severance Payments are not payable in the event a buyer or new owner of the business, among other things, offers employment to the employee in a job with comparable job responsibilities, location, and in a product division for which the employee is employed immediately prior to the Sale, and at compensation levels at least commensurate with the employees' existing salary and benefits, as set forth in the applicable Employment Contracts.[4] The Debtors submit that all of its senior management and key executives are Key Employees for purposes of the KERP, and accordingly, would be entitled to payment of the Severance Payment under the KERP if they

---

[3]    Under his Employment Contract, James Craigie is also entitled to payment by the Debtors under a term life insurance policy.

[4]    The Debtors' assumption of the Employment Contracts is conditioned on the applicable executive's agreement that section 5.3(b) of their Employment Contract will be modified to provide that such executive may not deliver a notice of termination thereunder if they have accepted an offer of comparable employment with a new owner.

remain employed with the Debtors up to and through the closing of the Sale. The Debtors proposed paying the Severance Payment during the first payroll period immediately following a Termination Event.

      31.    The Debtors propose implementing the Severance Payment provision of the KERP by assuming the Employment Contracts under section 365 of the Bankruptcy Code. Only by assuming these contracts will the Debtors be able to fully honor their agreements they reached with their key executives pursuant to which these individuals agreed to stay with the Top-Flite. By doing so the Debtors will also assume liability for certain medical and disability-type benefits. A form of Employment Contract is annexed hereto as Exhibit D.

      32.    The Debtors estimate that the maximum aggregate amount of the Severance Payments payable under the KERP is $4,912,241.00. The Debtors understand that their prepetition bank group has reviewed the terms of the proposed KERP, as set forth herein, and has no objection.

## C.    *The KERP is Reasonable and Appropriate under the Circumstances*

      33.    Modeling the KERP on the Retention Plan and Employment Contracts is justified under the facts of these cases. The Debtors entered into these agreements as part of the April 2002 Restructuring. At that time, the Debtors faced declining economic performance while operating in an industry with significant excess capacity and flat demand. The Debtors determined that the only way to retain their Key Employees and stabilize their workforce during and following the restructuring, particularly in the event of a sale or merger transaction, was to establish the Retention Policy. Partly on account of their ability to retain their Key Employees, the Debtors were able to continue operating and maximize the value of their assets while successfully divesting themselves of their sporting goods and golf glove and shoe divisions.

WP3:903217 4

62265 1001

34.    The Debtors submit that the need for the Stay Bonus and Severance Payment provisions of their Retention Policy continues unabated during these chapter 11 cases. First, the initial impetus for establishing these programs has not changed since the Debtors' chapter 11 filings. The Key Employees are essential to maximize the value of the Debtors' estates and continue their manufacturing operations. Second, the Debtors' chapter 11 filings exacerbate the need to motivate their employees and stabilize their work force. Anxiety and apprehension about job security have become major factors affecting employee performance. Naturally, an environment in which employees fear for the security of their jobs leads inevitably to a loss of productivity and the destabilization of the employer's business through, among other things, the departure of employees.

35.    In fact, the Debtors have already suffered a loss of key personnel, including among others, their Chief Financial Officer, their National Warehouse Manager, their Senior Packing Specialist, their Director of Retail Strategy, their West Coast Sales Coordinator, at lease one senior Scientist, and numerous Sales Managers. Under such circumstances, it is often difficult for a debtor's employees to focus fully on their day-to-day tasks, let alone long-term projects and objections. In addition, a manufacturing operation such as the Debtors, which depends on state-of-the art, highly confidential manufacturing processes, is heavily dependent on the institutional knowledge of its Key Employees.

36.    The Debtors therefore submit that it is essential for them to implement the KERP and honor the Stay Bonus and Severance Provisions of their Retention Policy as set forth above.

## BASIS FOR RELIEF

37.    Section 363 of the Bankruptcy Code permits a debtor in possession to use its property other than in the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b).  Bankruptcy courts regularly approve debtors' requests to use property outside of the ordinary course of business so long as a good business justification exists for the request.  See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996).  In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

38.    The use of retention, incentive, and other similar plans by debtors in an effort to provide financial incentives to their employees to remain with the debtor and help it move through the chapter 11 process has long been approved as a valid exercise of the debtor's sound business judgment.  See, e.g., In re America West Airlines, Inc., 171 B.R. 674, 678 (Bankr. D. Ariz. 1994).  In addition, this Court has frequently approved the implementation of such programs to ensure the successful sale of a debtor's assets.  See, e.g., In re eGlobe, Inc., No. 01-1478 (Bankr. D. Del. 2001) (JJF); In re Stellex Technologies, Inc., No. 00-3587 (Bankr. D. Del. 2000) (MFW).

39.    Under section 503(b)(1) of the Bankruptcy Code, a debtor in possession may incur, and the court, after notice and a hearing, shall allow as administrative expenses, among other things, "the actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1).  To supplement the powers under sections 363 and 503, section 105(a) of the

WP3:903217 4

62265 1001

Bankruptcy Code authorizes "[t]he court [to] issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

40.    In connection with the anticipated Sale of substantially all of the assets of the Debtors, as well as the overwhelming amount of work that will be required to wind-down the Debtors' operations and transition to a new owner, the Debtors, in the exercise of their business judgment, have determined that it is necessary to implement the KERP. The Debtors believe that the KERP will provide an incentive to their Key Employees to achieve the Debtors' goal of successfully consummating the Sale.

41.    In these cases, good business justifications exist for the Debtors' request to adopt and implement the KERP. Specifically, the Debtors believe that their ability to retain employees is vital to their continued operations and to their successful transition to the eventual purchaser of the assets and that the KERP is necessary to achieve the Debtors' goals in that regard. The Debtors believe that the KERP will serve to (a) secure the continued services of the Debtors' employees and (b) provide financial incentives for consummating the successful Sale of the Debtors' assets. Conversely, the Debtors believe that failure to implement the KERP would directly and substantially impact the value of their estates and thereby reduce the value available to creditors

42.    In addition, the Debtors believe that the terms and conditions of the KERP are reasonable and fair to their estates and creditors. Moreover, the Debtors understand that their prepetition bank group does not oppose implementation of the KERP in accordance with the terms set forth herein.

43.    Because the Debtors' decision to adopt and implement the KERP is within their reasonable business judgment and is in the best interests of the Debtors' estates and

16

creditors, the Court should approve the adoption and implementation of the KERP under sections 105(a), 363 and 365(a) of the Bankruptcy Code, and should also order that the payments to be made by the Debtors under the KERP be accorded administrative priority under section 503(b) of the Bankruptcy Code.

44.    Numerous courts in this and other districts have authorized the establishment of an employee retention program for key employees pursuant to section 363(b)(1) of the Bankruptcy Code.  See, e.g., In re eGlobe, Inc., No. 01-1478 (Bankr. D. Del. 2001) (JJF); In re Armstrong World Indus., Inc., et al., (Case No. 00-4471) (JJF) (D.Del. 2000); In re Carmike Cinemas, Inc. et al., (Case Nos. 00-3302 through 00-3305) (SLR) (D.Del. 2000); In re Genesis Health Ventures, Inc., (Case No. 00-2692) (PJW) (Bankr. D.Del. 2000); In re Hedstrom Holdings, Inc., et al. (Case No. 00-01655) (PJW) (Bankr. D.Del. 2000);  In re Stellex Technologies, Inc., No. 00-3587 (Bankr. D. Del. 2000) (MFW); In re Enron Corp., (Case No. 01-16034) (Bankr. S.D.N.Y. 2002); In re Adelphia Business Solutions, Inc., (Case No. 02-11389) (Bankr. S.D.N.Y. 2002), In re AI Realty Marketing of New York, Inc., Laser Acquisition Corp., DDG I, Inc., Sunbeam Americas Holdings, Ltd., et al, (Case Nos. 01-40252 through 01-40290) (Bankr. S.D.N.Y. 2001); In re R.H. Macy & Co., (Case No. 92 B 40477) (BRL) (Bankr. S.D.N.Y. 1992).

### NOTICE

45.    No trustee, examiner or creditors' committee has been appointed in the Debtors' chapter 11 cases.  Notice of this Motion has been provided to (i) the United States Trustee, (ii) the creditors identified on the Debtors' lists of their largest unsecured creditors, (iii) counsel to the Debtors' prepetition bank group and (iv) counsel to Callaway Golf Company.  The Debtors submit that no other or further notice need be provided.

## PRIOR REQUEST FOR RELIEF

46.    No previous motion for the relief sought herein has been made to this or

any other court.

WHEREFORE, the Debtors respectfully request that this Court enter an

order, substantially in the form annexed as Exhibit E hereto, granting this motion and such other

and further relief as the Court deems just.

Dated: Wilmington, Delaware
        July 3, 2003

                              YOUNG CONAWAY STARGATT & TAYLOR, LLP


                              Pauline K. Morgan (No. 3650)
                              Michael R. Nestor (No. 3526)
                              Joseph Malfitano (No. 4020)
                              The Brandywine Building
                              1000 West Street, 17th Floor
                              Wilmington, Delaware  19801
                              Telephone:  (302) 571-6600
                              Facsimile:  (302) 571-1253

                              Proposed Counsel for Debtors and Debtors in possession.

18

WP3:903217 4                                            62265 1001

## KERP Exhibit A
## Stay Bonuses – Eligible Employees and Proposed Amounts

| Name | Title | Stay Bonus |
|------|-------|------------|
| Craigie, J. | President & CEO | $500,000.00 |
| Arturi, P. | VP, Sec. & Gen. Counsel | $60,000.00 |
| Esch, M. | Exec. V P Operations | $125,000.00 |
| Keindel, K. | Exec. V P Int't. & Licen. | $111,000.00 |
| Kennedy, T. | V P Research & Devel. | $90,000.00 |
| Rist, V. | V P Human Resources | $95,000.00 |
| Rousseau, C. | V P & CIO | $85,000.00 |
| Several, E. | V P Mkt. Ser, & Cust Ball | $115,286.00 |
| Tursi, L. | Exec. V P Sales & Mktg. | $125,000.00 |
| Bellows, G. | Plant Manager | $15,000.00 |
| Bourdeau, B. | Manager Labor Relations | $9,200.00 |
| Bourque, K. | Project Manager | $5,686.00 |
| Bracken, D. | Dir. Marketing Services | $12,062.00 |
| Bugbee, M. | Senior Patent Counsel | $6,750.00 |
| Davis, J. | Dir. Technical Services | $9,780.00 |
| Fuller, J. | Dir. Sales Planning | $31,330.00 |
| Gay, M. | Dir. Benefits Admin. | $8,900.00 |
| Godbout, M. | Dir. Mfg. Engineering | $30,002.00 |
| Greaney, J. | Systems IT Mgr. | $6,092.00 |
| Jaszek, J. | Gen. Mgr. Dist. Mkts. | $14,838.00 |
| Kovasala, K. | Dir. National Accts | $9,000.00 |
| Kimmett, C. | Dir. Corp. Acctg. & Conl. | $8,500.00 |
| Litz, J. | Sales Plan. & Anal. Mgr. | $5,546.00 |
| Lyon, M. | Dir. Taxation | $11,764.00 |
| Mahaffey, S. | Dir. R&D Golf Club | $11,658.00 |
| Marvel, M. | Plant Mgr. Gloversville | $18,000.00 |
| Nealon, J. | Dir. Golf Research | $29,430.00 |
| Nelson, J. | Mgr. Inter. Technologies | $5,446.00 |
| Nigro, S. | Dir. Exter. Report.& Trea. | $17,400.00 |
| Quinn, B. | Mgr. Data Warehouse | $3,184.00 |
| Raffaele, N | Dir. Prof. Tour Relations | $23,500.00 |
| Seitter, T. | V P Mktg. Est. Golf Brds. | $34,390.00 |
| Simonds, V. | Dir. Engineering | $26,250.00 |
| Smith, G. | Dir. US Retail Sales | $50,000.00 |
| Spenner, T. | Dir. Distribution | $20,626.00 |
| Tzivanis, M. | Dir. R&D Materials | $18,192.00 |
| Varga, V. | Dir. Fin. Plan. & Analysis | $17,500.00 |
| Zanetich, D. | Gen. Mgr. Supply Chain | $43,750.00 |
| Bloomstrand, R. | Gen. Mgr.Sweden | $11,876.00 |
| Gooch, A. | Gen. Mgr. Canada | $11,250.00 |
| **Total:** | | $1,833,188.00 |

ii

## KERP Exhibit B
## Stay Bonuses – Additional Eligible Employees and Proposed Amounts

| Name | Title | Stay Bonus |
|------|-------|-----------|
| Arnold, N. | Gen. Mgr. Australia | $4,300.00 |
| Gluyas, S. | Controller United Kingdom | $5,400.00 |
| Bell, I. | Controller Canada | $5,400.00 |
| Nitender, M. | Sales Manager Sweden | $3,200.00 |
| Thurston, S. | Sr. Programmer Analyst | $4,000.00 |
| Liptak, M. | Project Manager | $4,800.00 |
| Parez, K. | Asst. IT Systems Mgr. | $3,100.00 |
| Granfield, J. | Project Manager | $5,300.00 |
| Trase, L. | Project Manager | $5,000.00 |
| Binnette, M. | Sr. Scientist | $4,800.00 |
| Velleux, T. | Sr. Scientist | $5,000.00 |
| Corjay, M. | R&D Test Centr. Mgr. | $4,500.00 |
| LaFond, L. | Mgr. Payroll/Accts. Payable | $4,600.00 |
| McDomough, J. | Business Analyst | $4,000.00 |
| Nguyen, T. | Financial Analyst | $2,800.00 |
| Lee, B. | Sr. Financial Syst, Analyst | $3,900.00 |
| Hanna, R. | Mgr. Golf Ball Engr. | $5,000.00 |
| Johnston, E. | Sr. Process Dev. Engr. Golf Ball | $4,100.00 |
| Heald, T. | Bus. Unit Mgr. Mfg. Golf Ball | $4,900.00 |
| Gomez, D. | Category Logistics Mgr. | $5,000.00 |
| Fernandez, G. | Golf Ball Planner | $3,400.00 |
| Jarmuzewski, M. | Sr. Super. Tool Room | $5,000.00 |
| Prych, J. | National Warehouse Mgr. | $3,800.00 |
| Gearing, L. | Trademark Specialist | $2,800.00 |
| Banas, N. | Executive Asst. to Gen. Counsel | $2,600.00 |
| Ferris, M. | V P Mktg., Ben Hogan | $10,600.00 |
| Lowe, D. | Cat. Dir Ben Hogan G.C. | $7,300.00 |
| McAuliffe, M. | Dir. Established Golf Brands | $7,300.00 |
| Velentine, M. | Dir. Customer Service | $4,200.00 |
| Shaw, G. | National Account Mgr. | $8,000.00 |
| O'Neill, T. | Zone Manager | $9,100.00 |
| Scenti, G. | Zone Manager | $8,400.00 |
| Gielow, R. | Zone Manager | $8,300.00 |
| Chadwick, J. | Zone Manager | $8,500.00 |
| Kimmet, C. | Dir. Corp. Acctng. & Consol. | $20,000.00 |
| Nigro, S. | Dir Exter. Rptg. & Treasury | $20,000.00 |
| Varga, V. | Dir. Fin. Planning & Analysis | $20,000.00 |
| Lynn Lusczkowski | Dir. Public Relations | $10,000.00 |
| **Total:** | | $248,400.00 |

WP3:903217.4

62265.1001

## KERP Exhibit C
### Severance Payments –Eligible Employees and Proposed Amounts

| Name | Title | Severance Payment |
|---|---|---|
| Craigie, J. [1] | President & CEO | $1,400,000.00 |
| Arturi, P. | V P, Sec. & General Counsel | $240,000.00 |
| Esch, M. | Exec. V P Operations | $307,020.00 |
| Keindel, K. | Exec. V P Int'l & Licen. | $450,000.00 |
| Kennedy, T. | V P Research & Development | $270,000.00 |
| Rist, V. | V P Human Resources | $240,000.00 |
| Rousseau, C. | V P CIO | $240,000.00 |
| Several, E. | V P Mktg. Services & Cust. Ball | $276,240.00 |
| Tursi, L. | Exec. V P Sales & Marketing | $350,000.00 |
| Braken, D. | Dir Marketing Services | $120,627.00 |
| Bugbee, M. | Senior Patent Counsel | $45,000.00 |
| Ferris, M. | V P Marketing Ben Hogan | $82,500.00 |
| Lyon, M. | Dir. Taxation | $117,645.00 |
| Nigro, S. | Dir. External Reptg. & Treasury | $57,420.00 |
| O'Neill, T. | Zone Manager | $107,721.00 |
| Paren, D. | Dir. Risk Management | $118,735.00 |
| Seitter, T. | V P Mktg. Established Golf Brnds. | $68,781.00 |
| Smith, G. | Dir US Retail Sales | $169,620.00 |
| Varga, V. | Dir. Financial Plang. & Analys. | $70,000.00 |
| Gasperack, G. | Dir. Sourcing Alliance | $180,932.00 |
| Total: | | $4,912,241.00 |

---

[1] Under his Employment Contract, James Craigie is also entitled to payment by the Debtors of a $10 million term life insurance policy.