# EXHIBIT N

Scott L. Graves
Oaktree Capital Management, LLC
333 South Grand Ave, 28th Floor
Los Angeles, CA 90071

September 18, 2003

**Private and Confidential**
Ref. The Top-Flite Golf Company

Dear Scott,

Last Friday I sent you a copy of an email concerning Jim Craigie's recent expense reports that had been sent to Vaughn Rist and Peter Arturi. In that email, I indicated my belief that I had been excluded from the retention bonus plan for criticizing certain management decisions. Peter Arturi effectively confirmed by suspicion on Tuesday, 9/16/03.

Peter stated that my superior, Dan Frey, the CFO, had decided to exclude me because "I was a pain in his butt." When Vaughn Rist and Peter Arturi went to Dan in February 2002 and again in May 2003 to see if Dan was going to include me in the retention bonus plan Dan indicated it was not a topic open to discussion. I have been through a number of ownership changes and I have always merited inclusion in retention bonus schemes, such as in 1992, 1994, 1996, and 1998. The handling of this approximately $2.2 million retention bonus plan is again a reflection on how the company's normal and historical policies and practices deteriorated over the last 4 years.

What could the Director of Insurance & Risk Management do to the CFO to be such a pain in his butt? First, I work very independently and I had discussions with Dan on average only 20 minutes a week. During my weekly review session, I covered issues regarding insurance, employee benefits, business travel, and expense report audits. I came prepared with typed notes to both document my activities and to review issues quickly. My performance salary reviews were on the "exceeds expectations" range and my 24-year personnel file does not include any negative comments. However, what apparently angered Dan was my tenacity for criticizing management decisions, which I deemed, improper, imprudent, inequitable, or just unwise.

The following is a sampling of the issues I brought up to the CFO and CEO, which resulted in my exclusion from the retention bonus plans:

1. In December 2001, while working on procuring credit insurance I indicated that the credit insurance broker was alarmed at the extent of credit that had been provided to K-Mart, upwards of $4 million. There were already rumblings of a potential bankruptcy filing and we were already experiencing problems in getting paid by K-Mart. Nevertheless, because the OCM had committed to Oaktree that they would meet a $40 million EBITDA target they shipped to K-Mart around $4 million of product at the end of December. K-Mart filed for bankruptcy in about February and the 2001 EBITDA number ended up closer to $30 million than $40 million.

2. In November 2001, the CEO forgave the promissory notes a number of the officers had signed in 1999 to purchase their company stock. I paid for my $60,000 in stock through a 401-K loan that I didn't finish paying off until February 2002. I didn't believe then and I do not believe now that this action was fair and equitable to the other current employee/stockholders. In addition, this appears to be a taxable transaction according to our own tax director. The loan forgiveness also is a related party transaction that was not reported in the 2001 10-K according to GAAP.

3. In February 2002 a $30,000 a month consulting agreement was entered into with the Chairman essentially to make him whole for his stock loss. This amount the company could ill-afford and it clearly appears to be a conflict of interest. Also it was not fair and equitable to the other current employee/stockholders that are not being paid for their loss. This is especially true in my



Frey-13
DEPOSITION
EXHIBIT
sc 8/30/05

circumstance as every other employee that had invested in the stock program at my level or more received some form of bonus compensation to help offset their loss.

4. In April 2002 the CEO's stock loan was forgiven under the same circumstances as item 2.

5. In April 2002 there was a $1 million dollar party in Hawaii after the Restructuring for a customer appreciation program (it had been postponed due to 9/11). The cost per individual exceeded $5,000 and IRS forms 1099's were suppose to be issued but the CFO and CEO did not enforce this company policy.

There were other but the preceding list provides you a flavor of the issues I fought against.

The purpose of a retention bonus plan is to retain and reward those employees whose responsibilities and performance are crucial to a sale or re-organization. Whatever the rationale for my exclusion it was arbitrary and capricious. An officer can make decisions within his scope of authority but purposely causing financial hardship on a senior manager for voicing an opposing opinion on inappropriate financial dealings is retaliation that should not be permitted. If you and/or the board of directors can correct the misapplication of this plan with regards to my inclusion at a level comparable to my peers and my stock loss, I would be grateful. I have also attached my memo regarding my stock loss for your records.

Sincerely,

Dennis A. Paren

Attachment

CC.   Andy Howley, Kevin Golmont

0010

# EXHIBIT O

**Blaney, Diane**

From: Rist, Vaughn
Sent: Saturday, September 20, 2003 2:39 PM
To: Blaney, Diane
Subject: FW: Why?

Diane : Please put this in both Dennis' and Jim's file and make me a copy.

-----Original Message-----
From: Arturi, Peter
Sent: Friday, September 19, 2003 8:41 AM
To: Rist, Vaughn
Subject: FW: Why?

FYI.

-----Original Message-----
From: Craigie, Jim
Sent: Thursday, September 18, 2003 9:56 PM
To: Arturi, Peter
Subject: FW: Why?

peter, i thought that you should see the attached e-mail that I issued to Dennis. I could not resist telling him some facts that will hopefully bring an end to his bitterness before he hurts other employees.

-----Original Message-----
From: Craigie, Jim
Sent: Thursday, September 18, 2003 9:54 PM
To: Paren, Dennis
Subject: Why?

Dennis, i have always enjoyed working with you and felt that you were a very competent employee. That is why I was totally astounded by your attempt to accuse me of expense account fraud.

Dennis, here are some facts that you should know:

1) My expense accounts are done by my admin, Rosanne Stirlacci. As you know, Rosanne is highly competent but she also supports over 10 people every day so it is possible that she makes mistakes in quickly filling out expense reports while trying to manage her excessive workload.

2) As part of an effort to reduce overhead this year as a result of the sporting goods sale to Russell, Dan Frey (who was never a Kraft employee) recommended the elimination of your position and placed your name on the initial severance list. I removed your name from the list since you were a 20+ year employee and it was possible that a bankruptcy action would have eliminated your severance pay as part of prepetition claims. I also made sure that your severance was protected as part of the Key Employee Retention Plan.

3) While I saved you from being severed and protected your severance pay, I did follow Dan's recommendation to not include you in the Retention Bonus Plan.

4) The only case of double billings of expense reports by an OPCOM member that i am aware of was done by Stephanie Lawrence. When I was informed of this violation, I immediately made Stephanie repay the double billed amounts and I subsequently severed her as an employee.

Now you know some facts which you were obviously unaware of before or did not see when you made your unsupported allegations. I welcome the audit of my expense reports as I know that it will prove that there was no intentional pattern of fraud.

While i am no longer an employee of the company, i would ask you to please try to bury your bitterness about not being part of the retention bonus plan. The company now has a bright future as a result of the elimination of the debt load and becoming part of the world's largest golf equipment company. It needs your help to deliver this bright future by focusing your energy on issues that can motivate fellow employees rather than continuing to spew your venom on the integrity of fellow employees.

1

0037

# EXHIBIT P

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Dennis Paren, | : |
|                Plaintiff, | :   Civil Action No. 04-30127-MAP |
| v. | : |
| James Craigie, Individually and Daniel Frey, Individually, | : |
|                Defendants. | : |

### **AFFIDAVIT OF BRAD HOLIDAY**

I, Brad Holiday, depose and state as follows:

1. I am employed by The Callaway Golf Company ("Callaway") as the Chief Financial Officer, a position I have held since August 2000. Among my duties is the responsibility for overseeing the financial, tax and risk management functions of Callaway and its subsidiaries and affiliates.

2. Effective September 15, 2003, a wholly-owned subsidiary of Callaway, then known as TFGC Acquisition Corp. ("TFGC"), acquired the golf businesses of The Top-Flite Golf Company ("Old Top-Flite"), a wholly-owned subsidiary of SHC, Inc. TFGC subsequently changed its name to The Top-Flite Golf Company ("New Top-Flite").

3. Prior to the acquisition, I had discussions with certain members of Old Top-Flite's senior management team concerning potential synergies that might result from the acquisition, including functions that might become redundant as a result. However, those discussions were in very general terms, and did not result in any one function or employee being targeted for elimination.

4. Following the acquisition, I began the process of assessing the synergies of New Top-Flite and Callaway from an overall organizational perspective, with the goal of eliminating any redundancies within my supervision. As part of this process, I met with Victor Varga, who was then the Director of Financial Planning and Analysis at Old Top-Flite and who continued to hold this position at New Top-Flite, to identify potential redundancies within the two organizations.

5. Based upon information provided to me by Mr. Varga, I decided that, in addition to consolidation of other functions, the risk management function of New Top-Flite could be consolidated with the existing risk management function at Callaway. As a result, I made the decision to eliminate a number of redundancies within my supervision including, but not limited to, the position of Director of Risk Management at New Top-Flite, which position was held by Dennis Paren.

6. James Craigie, who was the President and Chief Executive Officer of Old Top-Flite and who had left as of September 15, 2003, had no influence upon my decision to eliminate Mr. Paren's position following the Callaway acquisition.

7. Daniel Frey, who was the Chief Financial Officer of Old Top-Flite and who left in June of 2003, had no influence upon my decision to eliminate Mr. Paren's position following the Callaway acquisition.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing information is true and correct, based upon my knowledge, information and belief.

DATED: June 3, 2005

BRADLEY J. HOLIDAY

2

# EXHIBIT Q

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Dennis Paren, | :  |
| Plaintiff, | :  Civil Action No. 04-30127-MAP |
| v. | :  |
| James Craigie, Individually and Daniel Frey, Individually, | :  |
| Defendants. | :  |

## AFFIDAVIT OF VICTOR VARGA

I, Victor Varga, depose and state as follows:

1. In September of 2001, I was hired as Director of Financial Planning and Analysis at Top-Flite Golf Company f/k/a Spalding Sports Worldwide ("Old Top-Flite"), a wholly-owned subsidiary of SHC, Inc.

2. Effective September 15, 2003, a wholly-owned subsidiary of The Callaway Golf Company ("Callaway"), then known as TFGC Acquisition Corporation ("TFGC"), acquired the golf businesses of Old Top-Flite. TFGC subsequently changed its name to the Top-Flite Golf Company ("New Top-Flite"). Following the Callaway acquisition, I continued to be employed as Director of Financial Planning and Analysis at New Top-Flite.

3. In or about October of 2003, I met with Brad Holiday, the Chief Financial Officer of Callaway, in Springfield, Massachusetts. At Mr. Holiday's request, I provided an overview of the organizational structure of the finance function of New Top-Flite, and

informed him that certain functions appeared to be redundant with functions at the corporate level at Callaway. These functions included tax, risk management, treasury, and credit and collection.

4. The information I provided to Mr. Holiday was based upon my own independent assessment of the apparent redundancies within the organization. Daniel Frey and James Craigie did not have any input in, or influence upon, the information I provided to Mr. Holiday.

5. It is my understanding that the position of Director of Risk Management of New Top-Flite, held by Dennis Paren, was eliminated in December of 2003. Aside from the above, I had no involvement in the decision to eliminate that position.

6. My position was eliminated in February of 2004. I am no longer employed by New Top-Flite.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing information is true and correct, based upon my knowledge, information and belief.

_____
VICTOR VARGA

DATED: June 2, 2005

2