# EXHIBIT 1

**Dennis A. Paren**
**April 29, 2005**

---

**1**

Volume 1, Pages 1-231, Exhibits 1-16
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Civil Action No. 04-30127-MAP

DENNIS A. PAREN
  Plaintiff
  v.
JAMES CRAIGIE, Individually
DANIEL FREY, Individually
  Defendants


DEPOSITION of DENNIS A. PAREN
Friday, April 29, 2005, 10:20 a.m. to 6:46 p.m.
Offices of Bulkley, Richardson & Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, Massachusetts


---------- JONATHAN H. YOUNG, RDR, CRR ----------
COURT REPORTER

---

**2**

PRESENT:
Lisa Brodeur-McGan, Esq.
Cooley Shrair, PC
  1380 Main Street, Suite 201
  Springfield, Massachusetts 01103
  413.735.1775
  lbrodeurmcgan@cooleyshrair.com
  for the Plaintiff

Tamsin J. Newman, Esq.
Morgan, Lewis & Bockius LLP
  1701 Market Street
  Philadelphia, Pennsylvania 19103
  215.963.5201  Fax 215.963.5299
  tnewman@morganlewis.com
  for the Defendants

---

**3**

April 29, 2005
[Witness sworn]
DENNIS ALAN PAREN, Sworn
EXAMINATION
BY MS. NEWMAN:
  Q. Good morning, Mr. Paren. My name is
Tamsin Newman. We just met a couple of minutes
ago. I am an attorney with Morgan Lewis & Bockius
of Philadelphia, and we are counsel for James
Craigie and Dan Frey in this matter that you
brought against them.
  A. Yes.
  Q. Can you please state your full name for the
record?
  A. Dennis Alan Paren.
  Q. Have you ever been known by any other name?
  A. No.
  Q. What is your current address?
  A. 576 Golf Club Road, Apartment 6, Danville
Virginia 25540.
  Q. Do you have any other residences?
  A. I have a home in Longmeadow, Massachusetts;
299 Ellington Road, Longmeadow, Mass 01106.
  Q. And what is your wife's name?

---

**4**

1   A. Marie.
2   Q. And does she live in Longmeadow?
3   A. Longmeadow.
4   Q. Let me backtrack for a second. Have you
5 ever had your deposition taken before?
6   A. Yes, I have.
7   Q. I'll just review quickly for you what
8 will happen today. You were just sworn under oath
9 to provide testimony under penalty of perjury; do
10 you understand that?
11   A. Yes.
12   Q. And it's important that you wait for me to
13 fully ask the question before you answer; you
14 understand that?
15   A. Yes, I do.
16   Q. And if you don't understand a question,
17 I want you to tell me that. Otherwise, I'm going to
18 assume that you understand it; okay?
19   A. Correct; fine.
20   Q. And the same if you don't hear what I said;
21 I want you to tell me to repeat so that you can hear
22 it, otherwise I'll assume that you've heard the
23 question. Do you understand that?
24   A. Yes, I do.

---

**Dennis A. Paren**
**April 29, 2005**

---

### 5

1    Q. Are you taking any drugs or medication of
2 any kind that would preclude you from answering
3 truthfully and accurately today?
4    A. No.
5    Q. Have you had any alcohol to drink in the
6 last eight hours?
7    A. No.
8    Q. And are you feeling sick at all today?
9    A. No.
10    Q. Is there any reason you can think of that
11 you would not be able to testify fully and
12 truthfully as you sit here today?
13    A. No.
14    Q. When were you deposed before?
15    A. I don't recall the exact dates; but I've
16 been deposed at other times in, normally, product-
17 liability claims against the company.
18    Q. Which company?
19    A. Spalding and Evenflo Companies,
20 Incorporated.
21    Q. How many times have you been deposed
22 before?
23    A. Maybe three.
24    Q. And those were in the 1990's, do you

### 6

1 remember?
2    A. Well, there were one or two after that.
3    Q. Have you ever been deposed in any lawsuit
4 to which you've been a party?
5    A. No.
6    Q. Have you ever filed any lawsuits before?
7    A. No.
8        MS. NEWMAN: I've taken the liberty
9 of premarking some exhibits, which I'm just going to
10 put in front of Mr. Paren.
11        Actually, I guess I should have brought
12 this up at the beginning. Are we doing the usual
13 stipulations?
14        MS. BRODEUR-MC GAN: Usual stipulations.
15        MS. NEWMAN: Okay.
16        [Paren Exhibits 1 through 4 marked for
17 identification]
18    Q. Mr. Paren, please take a look at the
19 document that's previously been marked as Exhibit
20 Paren 1. Do you recognize this document?
21    A. Yes.
22    Q. What is it?
23    A. It is the complaint against Jim Craigie and
24 Daniel Frey.

### 7

1    Q. And prior to the complaint being filed, did
2 you review it?
3    A. Yes, I did.
4    Q. And did you authorize your attorney to file
5 it on your behalf?
6    A. Yes, I did.
7    Q. On what date was it filed?
8    A. I don't remember the exact date. June or
9 July last year.
10        There's a date listed here of July 2,
11 2004.
12    Q. Does that sound about right to you?
13    A. It does.
14    Q. Do you have any reason to dispute July 2,
15 2004 as the filing date of the complaint?
16    A. No, I don't.
17    Q. And prior to filing the complaint, were the
18 allegations in the complaint true and accurate, to
19 the best of your knowledge and belief?
20    A. Yes, they were.
21    Q. If you could turn your attention to the
22 document that has previously been marked as Exhibit
23 Paren 2, do you recognize this document?
24    A. Yes, I do.

### 8

1    Q. What is it?
2    A. It's the complaint of age discrimination.
3    Q. Filed against which entities?
4    A. Filed against the Top-Flite Golf Company, a
5 wholly-owned subsidiary of Callaway Golf.
6    Q. If you could turn to Page 3, or the last
7 page of Exhibit Paren 2, is that your signature
8 halfway down the page?
9    A. Yes, it is.
10    Q. Prior to signing on Page 3, did you review
11 this complaint?
12    A. Yes, I did.
13    Q. Was it true to the best of your knowledge,
14 information and belief at the time that you signed
15 it?
16        MS. BRODEUR-MC GAN: Objection. You can
17 answer.
18    A. To the best of my knowledge, yes.
19    Q. And on what date did you sign this
20 complaint?
21    A. It is dated July 1, 2004. Therefore, I
22 must have signed it somewhere on or before that
23 date.
24    Q. Well, did you sign it in the presence of a

---

**Accurate Court Reporting**
**413.747.1806**

**Dennis A. Paren**
**April 29, 2005**

---

9

1  notary public?
2     A.  I don't recall where I was at the time that
3  I signed it.  Is it notarized?  It's notarized.
4  Must have signed it in front of Lisa.
5     Q.  Do you remember signing it in front of Lisa
6  Brodeur-McGan?
7     A.  I don't remember where I was when I signed
8  that.
9     Q.  Did you authorize Ms. Brodeur-McGan to file
10 this complaint with the Massachusetts Commission
11 Against Discrimination?
12    A.  Yes, I did.
13    Q.  On what complaint was this complaint filed,
14 if you know?
15    A.  I don't know.  The date on this piece of
16 paper states July 1, 2004.
17    Q.  And if you could turn to the second page,
18 which is the first page of the complaint, you see
19 where it says Filing Date?
20    A.  Yes.
21    Q.  And it says 7/2/04?
22    A.  Yes, I see that.
23    Q.  Do you have any reason to dispute that
24 the complaint was filed with the Massachusetts

---

10

1  Commission Against Discrimination on July 2, 2004?
2     A.  No, I don't.
3     Q.  So it's possible that your complaint
4  against Mr. Craigie and Mr. Frey and your complaint
5  against Top-Flite, a wholly-owned subsidiary of
6  Callaway, were filed on the same day?
7     A.  Someone should know that answer; I don't.
8  It's possible.
9     Q.  It's possible?
10    A.  I believe so.
11    Q.  If you could turn your attention to the
12 exhibit that's been marked as Exhibit Paren 3, do
13 you recognize this document?
14    A.  Yes, I do.
15    Q.  What is it?
16    A.  This is my answers to the defendants James
17 Craigie and Daniel Frey's first set of
18 interrogatories.
19    Q.  Did you assist in the preparation of these
20 responses?
21    A.  Yes, I did.
22    Q.  If you could turn to Page 9 of Exhibit
23 Paren 3, is that your signature at the top of the
24 page?

---

11

1     A.  Yes, it is.
2     Q.  Prior to affixing your signature on Page 9,
3  did you review your answers to the interrogatories
4  to make sure that they were accurate and complete?
5     A.  Yes.
6     Q.  And you reviewed them under the penalties
7  of perjury?
8     A.  Yes.
9     Q.  Affixed to the back of Exhibit Paren 3 are
10 two charts.  Do you see those?
11    A.  Yes, I do.
12    Q.  Did you authorize those to be attached to
13 the back of Exhibit Paren 3?
14        Let me ask it a different way.  Are
15 these intended to be part of your response to the
16 interrogatories?
17        MS. BRODEUR-MC GAN:  Objection.  You can
18 answer.
19    A.  Yes.
20    Q.  If you could turn your attention to Exhibit
21 Paren 4, do you recognize this document?
22    A.  Yes.
23    Q.  What is it?
24    A.  My supplemental answers to defendants James

---

12

1  Craigie and Daniel Frey's first set of
2  interrogatories.
3     Q.  Did you assist in the preparation of your
4  answers to defendants' interrogatories?
5     A.  Yes.
6     Q.  And is that your signature on Page 2 of
7  Exhibit Paren 4?
8     A.  Yes, it is.
9     Q.  Prior to signing Exhibit Paren 4, did you
10 review it to insure that it was accurate and
11 complete?
12    A.  Yes.
13    Q.  And you signed it under penalties of
14 perjury; is that correct?
15    A.  That's correct.
16    Q.  And the last page of Exhibit Paren 4 is a
17 chart entitled Damage Calculation Chart for Dennis
18 Paren; do you see that?
19    A.  Yes, I do.
20    Q.  Did you prepare this chart?
21    A.  No, I did not.
22    Q.  Did you assist in the preparation of the
23 chart?
24    A.  I was asked some questions, which I

---

**Dennis A. Paren**
**April 29, 2005**

---

13

1  responded to.
2      Q. Did you review this chart prior to affixing
3  your signature to Page 2 of Exhibit Paren 4?
4      A. Yes.
5      Q. If you could turn your attention to
6  the exhibit that's been marked as Paren 2, the
7  complaint filed with the Massachusetts Commission
8  Against Discrimination, I just want to get the time
9  line straight, as well as some nomenclature
10  straight.
11          You were formerly an employee of Top-
12  Flite company; correct?
13      A. Correct.
14      Q. And at some point in time Top-Flite went
15  bankrupt and sold its assets to another company; is
16  that correct?
17      A. That's correct.
18      Q. And as you allege in Paragraph 3, Top-Flite
19  filed the bankruptcy on June 30, 2003; is that
20  right?
21      A. Yes.
22      Q. And Callaway Golf Company acquired the
23  assets of Top-Flite as part of that bankruptcy; is
24  that right?

---

14

1      A. That's correct.
2      Q. And the bankruptcy closed on September 15,
3  2003; is that right?
4      A. Could you repeat that question?
5      Q. The bankruptcy and the Callaway acquisition
6  closed on or about September 15, 2003?
7          MS. BRODEUR-MC GAN: Objection to form.
8  You can answer.
9      Q. Is that right?
10      A. No, that's not right.
11      Q. Tell me your understanding of what
12  happened.
13          MS. BRODEUR-MC GAN: Objection to form.
14  You can answer.
15      A. On September 15, 2003, Callaway Golf
16  Company purchased the assets of the bankrupt Top-
17  Flite Company, and then changed its name of TFGC
18  Acquisition Company to Top-Flite Golf Company,
19  a wholly-owned subsidiary of Callaway Golf.
20      Q. So, prior to September 15, 2003, you were
21  an employee of Top-Flite Golf Company; correct?
22      A. Correct.
23      Q. And then, after September 15, 2003, you
24  were an employee of a new company, also called

---

15

1  Top-Flite Golf Company; is that correct?
2      A. That's correct.
3      Q. And that new Top-Flite was a wholly-owned
4  subsidiary of Callaway; is that right?
5      A. That's correct.
6      Q. Just for purposes of clarity in this
7  deposition today, I'm going to refer to Old Top-
8  Flite or New Top-Flite, or alternatively Callaway.
9  Do you understand that?
10      A. Yes.
11          MS. BRODEUR-MC GAN: Objection.
12          MS. NEWMAN: What's the nature of your
13  objection?
14          MS. BRODEUR-MC GAN: Could we go off the
15  record for a second?
16          MS. NEWMAN: Sure.
17          [Off the record]
18      Q. Mr. Paren, for purposes of clarity in this
19  deposition, when I refer to your employer prior to
20  September 15, 2003, I'm going to refer to Old Top-
21  Flite. Do you understand that?
22      A. Yes.
23      Q. And when I refer to your employer on or
24  after September 15, 2003, I will be referring to

---

16

1  New Top-Flite; do you understand that?
2      A. Yes.
3      Q. Where are you working now?
4      A. DIMON, Incorporated.
5      Q. What's your position there?
6      A. Director, international risk and benefits
7  management.
8      Q. When did you assume that position?
9      A. Late October 2004.
10      Q. Is that a full-time position?
11      A. Yes.
12      Q. What's your annual salary?
13      A. At this moment?
14      Q. Yes.
15      A. Or at the time I was hired?
16      Q. When don't you give it to me at the time
17  you were hired, and then tell me when it changed.
18      A. When I was hired, it was $110,000.
19      Q. Was there a point when that changed?
20      A. It changed effective April 1 to $113,200,
21  I believe.
22      Q. And when you say April 1, do you mean April
23  1, 2005?
24      A. Yes, I do.

---

**Dennis A. Paren**
**April 29, 2005**

17

1    Q. What benefits are you receiving as an
2  employee of DIMON, Incorporated?
3    A. I receive a pension plan, a 401(k)
4  plan, medical benefits which I pay through my
5  spouse; dental plan, group life insurance, group
6  long-term disability, accidental death and
7  dismemberment.
8    Q. Prior to DIMON, where were you employed?
9    A. David L. Babson.
10    Q. What were your dates of employment with
11  Babson?
12    A. I believe it was three weeks during the
13  month of July 2004.
14    Q. Were you employed by Babson at any other
15  time?
16    A. No, I wasn't.
17    Q. What was your position with Babson?
18    A. I don't remember what the title was.
19    Q. What were your job duties?
20    A. The job was to review loan covenants with
21  regard to insurance.
22    Q. And what was your pay at Babson?
23    A. $70,000.
24    Q. Annually?

18

1    A. Annually.
2    Q. But you only worked there for three weeks?
3    A. Correct.
4    Q. Why is that?
5    A. Because I found another position.
6    Q. With DIMON?
7    A. With DIMON.
8    Q. Why did you decide to go to DIMON from
9  Babson?
10    A. Because it paid more money, and the job was
11  more challenging.
12    Q. How did you get the job with DIMON? Did
13  you send them a resume through the mail, or was
14  there some other way?
15    A. I actually made contact with the recruiter
16  in April 2004 in San Diego, California.
17    Q. What was the recruiter's name?
18    A. I don't remember. It's International
19  Insurance Recruiters in Fort Lauderdale, Florida.
20    Q. Where are your offices at DIMON?
21    A. 512 Bridge Street, Danville, Virginia
22  24541.
23    Q. And where were your offices at Babson?
24    A. In this building.

19

1    Q. Here in Springfield, Massachusetts?
2    A. Yes.
3    Q. You said you worked for Babson for about
4  three weeks in July 2004, but you didn't start for
5  DIMON until October of 2004?
6    A. Correct.
7    Q. Did you earn any income in August or
8  September 2004?
9    A. I was on unemployment.
10    Q. How much did you collect in unemployment in
11  August and September 2004?
12    A. I don't recall. I know the total for 2004.
13    Q. How much was that?
14    A. About $9,000.
15    Q. We have some of the unemployment comp
16  documents, but I don't think we necessarily have
17  all of them; so if you wouldn't mind checking to see
18  if you have any other documentation of that.
19    A. It's listed on my tax return, the total
20  amount.
21    Q. I'll take a look at that as well.
22    A. Yes.
23    Q. Prior to Babson, where did you work?
24    A. I was sort of a consultant for TFGC Estate,

20

1  Inc.
2    Q. A consultant doing what?
3    A. Insurance- and pension-related work for the
4  bankrupt estate.
5    Q. Who hired you as a consultant?
6    A. Susan Watson.
7    Q. Who is she?
8    A. She is with Walker, Truesdell and
9  Associates.
10    Q. And what do they do?
11    A. They serve as administrators for bankrupt
12  companies.
13    Q. When you were working as a consultant for
14  TFGC estate, Inc, who did you report to?
15    A. Susan Watson.
16    Q. Was there anyone at New Top-Flite to whom
17  you reported?
18    A. No.
19    Q. Was there anyone at Callaway to whom you
20  reported?
21    A. No. It's a completely different company.
22    Q. And what is Susan Watson's title?
23    A. I don't recall.
24    Q. What was your rate of pay as consultant for

**Dennis A. Paren**
**April 29, 2005**

---

21

1 TFGC Estate, Inc?
2    A. $150 an hour.
3    Q. And when did you first start rendering
4 services as a consultant for TFGC Estate, Inc?
5    A. In December 2003.
6    Q. Was that directly after your termination of
7 employment from New Top-Flite?
8    A. Shortly thereafter.
9    Q. Do you remember the exact date?
10    A. No, I don't remember the exact date.
11        [Paren Exhibit 5 marked for
12 identification]
13    Q. Mr. Paren, I've just handed you some
14 documents that I've marked as Exhibit Paren 5.
15    A. Yes. Go ahead.
16    Q. I'll just represent to you that these
17 are documents that your attorney produced to us in
18 response to our document request seeking documents
19 relating to sources of income that you had received
20 after the termination of your employment from New
21 Top-Flite.
22        Do these look accurate to you?
23        MS. BRODEUR-MC GAN: Objection. You can
24 answer.

---

22

1    A. Well, I know that these are forms that I
2 received.
3        MS. BRODEUR-MC GAN: Can I just ask you
4 to rephrase the question? Do all the forms look
5 accurate as to what, specifically?
6        MS. NEWMAN: Okay; I will adopt that.
7        MS. BRODEUR-MC GAN: Thank you.
8    A. The forms from the Division of
9 Unemployment Assistance for Massachusetts only
10 show the very first payment of 558; and then it
11 shows payment of 474, when they began to withhold
12 taxes.
13        Those are not all of the receipts I
14 received from the DUA.
15    Q. And that's what I was referring to before.
16        It's your testimony that you received
17 approximately $9,000 as unemployment in the year
18 2004?
19    A. I believe that that was the amount on my
20 2004 tax return.
21    Q. If you could turn to the third page of
22 Exhibit Paren 5, which is Bates-numbered 0716, do
23 you recognize this document?
24    A. Yes.

---

23

1    Q. What is it?
2    A. This is one of my severance statements for
3 income received as of 9/30/2004 from the New Top-
4 Flite Golf Company.
5    Q. So there should be more than just one
6 paycheck, correct; or pay statement?
7        MS. BRODEUR-MC GAN: Objection. You can
8 answer.
9    A. There was a pay statement. There were 24
10 pay statements; each was for the exact amount.
11    Q. And that was in the year 2004?
12    A. That's correct.
13    Q. So if I look where it says on the upper
14 left-hand side Severance, and it says five
15 thousand...
16    A. Sixty-eight.
17    Q. ...sixty-eight fifty, that was paid on a
18 semimonthly basis; is that right?
19    A. Yes.
20    Q. So if I multiply that by 24, that was the
21 amount of the severance that you received from the
22 New Top-Flite?
23    A. Correct.
24    Q. And if I do that it comes to approximately

---

24

1 128; is that about right?
2    A. Correct.
3    Q. If you could turn to the next page, does
4 this reflect all of the income you received from
5 Babson Capital Management?
6    A. Yes.
7        As I look at this statement, I see that
8 the three weeks that I worked were during September,
9 and not July as I indicated earlier.
10    Q. So you're correcting your testimony that
11 you gave before?
12    A. Yes.
13    Q. Are there any other pay statements from
14 Babson that were issued?
15    A. I don't recall. There might have been one
16 prior to this, but this is the year-to-date and last
17 statement.
18    Q. So Babson paid you in 2004 approximately
19 $2,962.16?
20    A. Yes.
21    Q. The rest of the documents appear to be pay
22 stubs. Are they pay stubs from Walker, Truesdell?
23    A. Yes.
24    Q. I'll represent to you that I added these up

---

Dennis A. Paren
April 29, 2005

25

1 and it came to $59,480. Does that sound about
2 right?
3     A. I think it was just a little bit more than
4 that. Again, the correct amount is listed on my
5 2004 statement.
6     Q. Let's take a look at your 2004 tax return,
7 which you have provided me today. I only have one
8 copy. We'll mark this as Exhibit Paren 6.
9         [Paren Exhibit 6 marked for
10 identification]
11     Q. Mr. Paren, looking at your 2004 federal tax
12 return, on Line 7 you've listed your wages; do you
13 see that there?
14     A. Yes, I do.
15     Q. Can you tell me the sources of income or
16 wages that comprise the total wage amount listed on
17 Line 7 of $141,455?
18     A. Well, I don't have with me an accurate
19 breakdown; but the majority of that, $120,000-some,
20 is a severance from the New Top-Flite Golf Company.
21 There's $2900 or so from David L. Babson Company.
22 There is a portion from DIMON. And then there is
23 also my wife's income from Baystate Hospital.
24     Q. What about your income from Walker,

26

1 Truesdell?
2     A. That is listed on Line 12; or a part of it,
3 actually.
4     Q. It's listed as business income because you
5 were rendering services as a consultant?
6     A. You actually have to turn to Schedule C,
7 Line 1.
8     Q. If you could provide me a copy of any
9 supporting documentation for your tax return for
10 2004, including your W-2s.
11     A. Yes.
12         MS. BRODEUR-MC GAN: Supporting
13 documentation I'll object to, but we could talk
14 specifically about what you want.
15         MS. NEWMAN: W-2s, specifically.
16     Q. So as reported to the Department of the
17 Treasury, Internal Revenue Service, your gross
18 income for 2004 was $211,870; is that right?
19     A. That's correct.
20     Q. And how much of that was your wife's
21 income, approximately?
22     A. Well, my wife began work in November; so it
23 was only about $5,000.
24         MS. NEWMAN: Off the record.

27

1         [Off the record]
2     Q. What were your exact dates of employment
3 for Old Top-Flite?
4     A. I can give you approximate dates.
5     Q. That's fine.
6     A. April 1979 to September 15, 2003.
7     Q. And then from September 15, 2003 through
8 December 5, 2003, you were an employee of New Top-
9 Flite?
10     A. Correct.
11     Q. What position did you hold with Old Top-
12 Flite just prior to September 15, 2003?
13     A. Director of risk management.
14     Q. How long did you hold that position?
15     A. Since 1989.
16         Well, the title had changed. Well, the
17 responsibilities had changed a little bit, also,
18 during those years.
19         [Paren Exhibits 7 and 8 marked for
20 identification]
21     Q. Mr. Paren, I'm handing you a document that
22 I've just marked as Exhibit Paren 7. Do you
23 recognize this document?
24     A. Yes. This is one of my earlier job

28

1 descriptions.
2     Q. I'll represent to you that I found this in
3 the personnel file that New Top-Flite provided to
4 us. Are you aware of a later job description?
5     A. Yes. There was a later job description.
6     Q. If you could take a moment to review this
7 job description and tell me if you believe that it
8 accurately describes your job duties as director of
9 risk management in 2003 for Old Top-Flite.
10     A. There are a number of responsibilities that
11 I had in 2003 that are not reflected in this job
12 description.
13     Q. What are those?
14         MS. BRODEUR-MC GAN: Objection.
15     Q. What are the additional job duties that you
16 believe you held in 2003 that are not reflected on
17 Exhibit Paren 7?
18     A. I was in charge of business travel.
19     Q. Anything else?
20     A. I was in charge of, well, to a degree the
21 auditing of expense reports. I was on the pension
22 committee, the 401(k) committee.
23         Those were the primary additions that
24 I can think of at this moment.

**Dennis A. Paren**
**April 29, 2005**

---

29

1    Q. And when did you move up to Massachusetts?
2    A. In October 1998.
3    Q. And who did you report to at that time?
4    A. Wade Lewis.
5    Q. What was his position?
6    A. Acting chief financial officer.
7    Q. Did there come a point in time when you
8 reported to someone else?
9    A. Yes. Wade Lewis hired Daniel Frey.
10    Q. When was that?
11    A. I don't recall the exact date.
12    Q. Do you have any reason to dispute that Dan
13 Frey started with Old Top-Flite in approximately
14 September of 1999?
15    A. No.
16    Q. That sounds about right?
17    A. Yes.
18    Q. So beginning September of 1999, you
19 reported to Dan Frey?
20    A. Correct.
21    Q. And what was his position?
22    A. Chief financial officer.
23    Q. And who did he report to, if you know?
24    A. Jim Craigie.

---

30

1    Q. And what was his position?
2    A. Chief executive officer.
3    Q. In the time frame from September of 1999
4 into 2003, who else reported to Dan Frey, if you
5 know?
6    A. Mike Lyon.
7    Q. What was his position?
8    A. Director of taxes. Charlie Kimmett.
9    Q. What was his position?
10    A. General accountant.
11    Q. Who else?
12    A. Lynn LaFond.
13    Q. What was her position?
14    A. I don't know whether she reported directly
15 to Dan. Payroll administrator.
16    Q. Who else?
17    A. Stephen Nigro.
18    Q. What was his position?
19    A. Directory of treasury operations.
20    Q. Who else?
21    A. Vic; last name escapes me right now.
22    Q. Varga?
23    A. Varga.
24    Q. What was his position?

---

31

1    A. Director of financial planning.
2    Q. Did anyone else report to Dan Frey?
3    A. Yes. The director of collections.
4    Q. What was his name, or her name?
5    A. It escapes me right now.
6    Q. Could it have been an employee by the last
7 name of Kustra?
8    A. Kustra, K-u-s-t-r-a.
9    Q. What was that employee's first name?
10    A. Larry.
11    Q. Did anyone else report to Dan Frey?
12    A. No.
13    Q. You mentioned Rich Levandowski. What was
14 his position?
15    A. Standard cost accountant.
16    Q. So to summarize, in addition to
17 yourself, Mike Lyon, Charlie Kimmett, Stephen
18 Nigro, Vic Varga, Larry Kustra and Rich Levandowski
19 reported directly to Dan Frey; is that right?
20        MS. BRODEUR-MC GAN: Objection. You can
21 answer.
22    A. To the best of my knowledge.
23    Q. And in addition, Lynn LaFond may have
24 reported to Dan Frey indirectly; is that right?

---

32

1    A. Correct.
2    Q. Did there come a point in time when Dan
3 Frey was no longer employed by Old Top-Flite?
4    A. Yes.
5    Q. When was that, if you know?
6    A. I believe it was in June 2003.
7    Q. Is it possible it could have been about...
8    A. Could have been the end of May.
9    Q. June 20, 2003? Does that sound about
10 right?
11    A. Yes.
12    Q. Did there come a point in time when Jim
13 Craigie was no longer employed by the New Top-Flite?
14    A. Yes.
15    Q. When was that?
16    A. September 15, 2003.
17    Q. So Dan Frey was never employed by New Top-
18 Flite; correct?
19    A. Correct.
20    Q. Actually, I need to rephrase something I
21 said before.
22        Jim Craigie was never employed by New
23 Top-Flite either, was he?
24    A. Correct.

---

**Dennis A. Paren**
**April 29, 2005**

33

1   Q. After Dan Frey left, who did you report to?
2   A. The name escapes me.
3   Q. Would it refresh your recollection to look
4  at the list of employees on...
5   A. No. He wouldn't have been on that list.
6   Q. If the name comes to you later, if you
7  wouldn't mind telling me, that would be great.
8   A. Okay.
9   Q. After Dan Frey left...
10   A. Andrew Kelleher.
11   Q. Kelleher?
12   A. I believe so.
13   Q. What was his position?
14   A. Chief financial officer.
15   Q. Of what company?
16   A. The New Top-Flite.
17   Q. On what date did you begin to report to
18  Andrew Kelleher?
19   A. I don't remember the date that he started.
20   Q. But it was sometime after September 15,
21  2003?
22   A. Correct.
23   Q. Who did you report to in the time period
24  from when Dan Frey left in June of 2003 until

34

1  September of 2003?
2   A. I don't recall the name. He was in
3  California.
4   Q. So the person you reported to was at
5  Callaway?
6   A. Correct.
7   Q. Did they have an insurance department at
8  Callaway?
9   A. The insurance functions were divided.
10   Q. In what way?
11   A. In that they did not have one person or
12  department.
13     They had workmen's compensation in one
14  area, and the person that I reported to did the
15  majority of the acquisition of the insurance.
16   Q. And that's the person whose name you can't
17  remember right now?
18   A. Correct.
19   Q. Who took over Dan Frey's job duties as CFO
20  from June of 2003 through September of 2003?
21   A. Andrew Howley, H-o-w-l-e-y.
22   Q. What was his job title?
23   A. Acting chief financial officer.
24   Q. Was he hired from the outside?

35

1   A. He was with, I can't remember the exact
2  name of the company. Kolfo, Zoop; help me out.
3     He was with a consulting company that
4  they hired. Kevin Goldmont and Andrew Howley.
5  Kevin Goldmont is the acting CEO.
6   Q. Was this after New Top-Flite came into
7  being?
8   A. He continued after New Top-Flite, but he
9  didn't work for New Top-Flite. He was working for
10  the estate at that point.
11   Q. But wasn't Jim Craigie the chief executive
12  officer of Old Top-Flite?
13   A. Yes, he was; but he was sharing those
14  responsibilities once the bankruptcy happened.
15   Q. With Kevin Goldmont?
16   A. Yes.
17   Q. That was just for the time period of June
18  2003 to September 2003?
19   A. Yes.
20   Q. Were there any employees that assumed some
21  of Dan Frey's job responsibilities after he left, to
22  your knowledge?
23   A. Not know.
24     MS. BRODEUR-MC GAN:  What was the

36

1  answer? Not know?
2     THE WITNESS:  Not that I know of.
3   Q. Do you remember giving your resume to
4  Vaughn Rist in about April 2003?
5   A. I remember giving my resume to Vaughn Rist.
6  I do not recall the date.
7   Q. Were you aware that Vaughn Rist passed your
8  resume on for possible consideration by Russell?
9   A. Yes. I do recall that.
10   Q. Did you authorize Mr. Rist to pass your
11  resume on to Russell?
12   A. Yes, I did.
13   Q. Why did you do that?
14   A. He thought it would be a good idea to do.
15     He suggested it because the president of
16  Russell also used to live in western Massachusetts,
17  Longmeadow, Massachusetts; and because Russell was
18  obtaining the assets of Spalding that had the
19  largest exposure to product-liability claims.
20   Q. And was that something desirable for you?
21     MS. BRODEUR-MC GAN:  Objection. You can
22  answer.
23   Q. Why did that matter to you?
24   A. Why did what matter to me?

**Dennis A. Paren**
**April 29, 2005**

---

37

1    Q. What you just described about the Russell
2  business.
3       MS. BRODEUR-MC GAN: Objection. You can
4  answer.
5    A. Well, it's when companies have an exposure
6  that they normally need somebody more specialized in
7  insurance.
8    Q. Is it possible that this could have been in
9  or around April of 2003?
10    A. Yes.
11    Q. Were you looking to leave Old Top-Flite in
12  April of 2003?
13    A. No, I wasn't looking to leave. Matters
14  were very uncertain at the time.
15    Q. What response, if any, was there to your
16  resume on behalf of Russell?
17    A. I never heard back. I never heard
18  anything.
19    Q. Did you pass your resume on to any other
20  companies in April 2003?
21    A. I may have. I don't recall. I was not in
22  an active job search in April 2003.
23    Q. It just basically looked like a good
24  opportunity, so you wanted to just consider that

---

38

1  opportunity?
2       MS. BRODEUR-MC GAN: Objection. You may
3  answer.
4    Q. Just explain to me why you were interested
5  in applying there.
6       MS. BRODEUR-MC GAN: Objection.
7    A. I did not apply.
8       If somebody says there could be
9  an opportunity, most people would say I don't
10  have any problem with you having them look at my
11  resume.
12    Q. Did you tell anyone other than Vaughn Rist
13  that your resume was being passed on to Russell?
14       MS. BRODEUR-MC GAN: Objection. You can
15  answer.
16    A. I believe Peter Arturi and Vaughn both
17  spoke to their counterparts at Russell.
18    Q. Are you aware of anyone else who may have
19  known that your resume had been passed on to
20  Russell?
21    A. No.
22    [Recess taken]
23  BY MS. NEWMAN:
24    Q. Mr. Paren, when did you learn that New Top-

---

39

1  Flite was terminating your employment?
2    A. On the date that it happened.
3    Q. December 5, 2003?
4    A. Yes.
5    Q. How did you learn that your employment was
6  being terminated? Did somebody tell you?
7    A. I was called into Vaughn's office.
8    Q. What was Vaughn Rist's job title?
9    A. Senior vice-president of human resources.
10    Q. Was anyone else in Mr. Rist's office when
11  he called you in?
12    A. Oh. Andrew.
13    Q. Andrew Kelleher?
14    A. Andrew Kelleher.
15    Q. Anyone else?
16    A. No.
17    Q. And what happened next when you went into
18  Mr. Rist's office?
19    A. He informed me that the job function was
20  being terminated.
21    Q. This is Mr. Rist; he said that? Who was it
22  that said that?
23    A. I don't recall whether it was Vaughn or
24  Andrew.

---

40

1    Q. What else did they tell you?
2    A. They told me I had the rest of the
3  afternoon to clean my office up.
4    Q. Anything else?
5    A. They asked me if there was anything that I
6  could think of that I wanted from the company.
7  I said, Laptop computer.
8    Q. How did you respond?
9    A. I said, I'd like to keep the laptop.
10       And they provided me the severance
11  agreement.
12    Q. Was that in the form of a letter?
13    A. The letter I had already had, yes. They
14  handed me a termination package.
15    Q. What was contained in the termination
16  package?
17    A. A COBRA notification, and I think it was
18  about a three-page termination letter.
19    Q. Anything else?
20    A. There might have been something else, but I
21  don't recall what that was. Maybe something to do
22  with the 401(k).
23    Q. Did Mr. Rist or Mr. Kelleher explain to you
24  what they meant by your job function being

---

**Dennis A. Paren**
**April 29, 2005**

---

41

1  terminated?
2     A. I think they basically said that the
3  responsibilities were shifting to California.
4     Q. To Callaway?
5     A. Correct.
6     Q. What else did they tell you? Did they tell
7  you anything else?
8     A. I don't recall.
9     Q. Did they tell you which person or persons
10 in Callaway were assuming your job responsibilities
11    A. No.
12    Q. Did you have an understanding as to who
13 that person or persons might be?
14    A. I didn't ask. I had an idea of what the
15 structure was at the time.
16    Q. Did you express any opinion regarding the
17 fact that your job function was being terminated?
18       MS. BRODEUR-MC GAN: Objection. You can
19 answer.
20    A. No, I didn't express any opinion other than
21 at that time.
22    Q. Did you express anything to them in this
23 meeting in December of 2003?
24    A. No. I was in shock.

---

42

1     Q. You had no reason to know that your
2  employment was being terminated prior to December of
3  2003?
4     A. Well, everyone's employment was uncertain.
5     Q. Why were you in shock?
6     A. Because I was still performing a required
7  function for the company, and I felt that I was
8  contributing and getting along with all
9  individuals.
10       I mean, it wasn't a complete shock; but
11 nevertheless, 25 years, when someone says your job
12 is ending.
13    Q. And by this time, in December of 2003,
14 Mr. Craigie was not employed by New Top-Flite;
15 correct?
16    A. That's correct.
17    Q. And by this time, in December of 2003, Dan
18 Frey was not employed by New Top-Flite; correct?
19    A. Correct.
20    Q. I'm handing you a document, Mr. Paren, that
21 I've just marked as Exhibit Paren 8. Is this the
22 termination letter to which you just referred?
23    A. It appears to be.
24    Q. Did Mr. Rist or Mr. Kelleher discuss the

---

43

1  contents of this December 5, 2003 letter with you?
2     A. Briefly.
3     Q. What did they say?
4     A. I believe they said that my pay
5  would continue until the end of December 2004, and
6  that I would have medical coverage at the employee-
7  contribution rate during that period of severance.
8     Q. And your annual salary at this time was
9  what?
10    A. I think it was $122,000.
11    Q. Do you see Paragraph 6 on Page 2?
12    A. Yes, I see it.
13    Q. Did Mr. Rist or Mr. Kelleher discuss with
14 you Paragraph 6?
15    A. No, they did not discuss this.
16    Q. Did you have an opportunity to review the
17 December 5, 2003 letter at some point after your
18 meeting with Mr. Rist and Mr. Kelleher?
19    A. Yes, I did.
20    Q. Did you review Paragraph 6?
21    A. I'm familiar with what Paragraph 6 attempts
22 to do, and so I did not read it.
23    Q. What do you mean, you're familiar with what
24 it attempts to do?

---

44

1     A. The purpose of Paragraph 6 is to release
2  one's rights against a company, and I didn't feel I
3  was going to do that. I didn't bother to review in
4  detail this document.
5     Q. Was it your understanding that signing the
6  release was a condition to receiving your severance
7  benefits?
8     A. I did not believe so, and therefore I never
9  signed that release.
10    Q. Why didn't you believe so?
11    A. Because in the change-of-control letter
12 that I had from the company, which provided for one
13 year of severance, there is no language with regard
14 to signing a release. Therefore, I did not believe
15 any additional consideration was being provided me,
16 and I wasn't going to sign it.
17    Q. Did you raise to anyone at New Top-Flite
18 your belief that you didn't have to sign the
19 release?
20    A. It was inherent in my actions.
21    Q. But basically, you accepted the severance
22 but didn't sign the release?
23       MS. BRODEUR-MC GAN: Objection. You can
24 answer.

---

**Dennis A. Paren**
**April 29, 2005**

---

45

1    A. Correct.
2    Q. What do you believe is the reason why your
3  employment was terminated by New Top-Flite on
4  December 5, 2003?
5    A. The company wanted to reduce costs to the
6  extent possible, and they wanted to eliminate any
7  employees who they felt had any type of working
8  relationships with previous management.
9    Q. What is the factual basis for your belief
10  in the fact that the company wanted to reduce costs
11  and to eliminate any employees who they felt had
12  working relationships with previous management?
13    A. I had heard that they believed that Jim
14  Craigie, Dan Frey, Lou Tursi, Ed Several and Mike
15  Esch had lied during the due-diligence period, and
16  they did not want them or anyone related to them.
17  They began to find out how bad the company really
18  was.
19    Q. When you say they, who are you referring
20  to?
21    A. Well, I heard that from Peter Arturi.
22    Q. When was that?
23    A. Sometime in early 2004.
24    Q. In early 2004, when you spoke to

---

46

1  Mr. Arturi, was this in person?
2    A. Yes.
3    Q. Where?
4    A. At the New Top-Flite headquarters.
5    Q. At his offices?
6    A. Either in his office or my office. I also
7  had an office there.
8    Q. And Mr. Arturi was general counsel of New
9  Top-Flite at the time?
10    A. Correct.
11    Q. When you say you had an office there,
12  didn't your employment terminate in December of
13  2003?
14    A. Yes, it did.
15    Q. Why did you have an office at the New
16  Top-Flite in 2004?
17    A. Because the TFGC Estate, Inc had contracted
18  for an office with the New Top-Flite.
19    Q. In your conversation with Mr. Arturi in
20  early 2004, that you were referring to earlier, what
21  exactly did he tell you?
22    A. Something to the effect that the new
23  president -- I forget his first name; last name was
24  Pennicka -- Pennicka and top management at Callaway

---

47

1  had decided that it was best to rid the company of
2  anyone associated in any way with Jim Craigie or
3  his direct reports.
4    Q. What else did Mr. Arturi tell you?
5    A. Well, I want to change that. That was the
6  implication of what Mr. Arturi told me.
7        He stated that Pennicka had instructed
8  him to terminate the employment of Roseanne
9  Stirlacci.
10    Q. Who is she?
11    A. She was Jim Craigie's secretary;
12  administrative assistant.
13        And when Roseanne asked why am I being
14  terminated, the response was that the company has
15  made a decision to terminate anyone associated with
16  Jim Craigie.
17    Q. And who did Ms. Stirlacci hear that from?
18    A. Peter Arturi.
19    Q. Just so I understand, Ms. Stirlacci was
20  terminated and she asked why...
21    A. She asked Peter Arturi.
22    Q. She asked Mr. Arturi why.
23        And Mr. Arturi said, Because I have
24  been told to terminate the employment of employees

---

48

1  who are associated with prior management, and
2  specifically Jim Craigie? Did I characterize
3  that right?
4        MS. BRODEUR-MC GAN: Objection. You can
5  answer.
6    Q. Just feel free to correct me.
7    A. That's close.
8    Q. Is there anything else you want to add to
9  that?
10    A. Well, I don't recall every detail. This is
11  over a year ago, now, that that took place.
12        People talked about this type of stuff
13  all day long; and, even though I was no longer an
14  employee, I still saw all of the announcements of
15  the New Top-Flite.
16        And we saw that there were consecutively
17  layoffs, and the people being laid off were those
18  people that had had executive-type relationships
19  under Jim Craigie's leadership.
20    Q. I just want to completely understand. What
21  did Mr. Arturi tell you?
22    A. Mr. Arturi told me that he was given the
23  task to terminate Roseanne Stirlacci, even though
24  Roseanne did not report to him.

---

Dennis A. Paren
April 29, 2005

49

1    Q. And who gave him that task; did he tell
2 you?
3    A. The president of the New Top-Flite.
4    Q. Pennicka?
5    A. Pennicka. Rob, Pennicka, I believe is his
6 first name.
7    Q. So Mr. Arturi related to you Ms.
8 Stirlacci's response when was notified that
9 she was being terminated?
10    A. Correct.
11    Q. Are there any other facts on which you base
12 your belief that the company wanted to eliminate the
13 positions of employees who had had relationships
14 with prior management?
15    A. Well, prior to the acquisition I was
16 interviewed by the chief financial officer of
17 Callaway.
18    Q. Who was that?
19    A. I don't recall his name.
20    Q. When you say prior to the acquisition...
21    A. Prior to September 15, 2003.
22    Q. Was it immediately prior, or several months
23 prior?
24    A. A few weeks prior.

50

1        I informed him of many of the issues
2 related in this complaint. He told me that those
3 types of issues would not be tolerated by Callaway.
4    Q. Did he tell you anything else?
5    A. To let people know that there's a new
6 sheriff in town. Those were his words.
7    Q. What did you understand that to mean?
8    A. Well, I understood that to mean that
9 internal policies going forward had to be
10 adhered to. That was primarily it.
11    Q. How did you respond when he told you that
12 there would be a new sheriff in town?
13    A. I was elated.
14    Q. Are there any other facts on which you base
15 your belief that the company wanted to eliminate any
16 employees who they felt had a working relationship
17 with previous management?
18    A. General discussions with people throughout
19 the course of working are at the New Top-Flite.
20    Q. Please identify who these people were.
21    A. Well, first of all, this is something that
22 everyone talked about.
23    Q. This being what?
24    A. This being the fact that we had a group of

51

1 senior executives, that did not deserve to be where
2 they were, operating the company, and that they had
3 all been brought in by Jim Craigie, and that their
4 time was limited because they wouldn't be able to
5 fool the new management; they no longer had any
6 protection from their superior.
7        So these types of conversations would
8 have happened with everyone that I talked with, and
9 everyone else talked with, at the company.
10    Q. In what time period?
11    A. This type of conversation started in 2000,
12 and went right through until employment termination
13 and past.
14    Q. The end of your employment termination?
15    A. Yes; past that to the time that I left that
16 office, which was not until May of 2004.
17    Q. Aside from what you already told me, do
18 you believe there were any other reasons why your
19 employment was terminated by New Top-Flite?
20    A. I think we've covered it.
21    Q. Mr. Paren, if you could direct your
22 attention to Exhibit Paren 2, which is the MCAD
23 complaint that you filed; do you see that?
24    A. Yes.

52

1    Q. Can you show me where in your MCAD
2 complaint you allege that your employment was
3 terminated because the company wanted to eliminate
4 any employees they felt had had a working
5 relationship with previous management?
6        MS. BRODEUR-MC GAN: Objection. You can
7 answer.
8    A. I don't believe that that is listed as a
9 reason within this document, or complaint.
10    Q. Why didn't you include that?
11        MS. BRODEUR-MC GAN: Objection.
12        I instruct you not to answer anything
13 that is attorney-client-privileged, but otherwise
14 answer the question.
15    A. This is a complaint for age discrimination,
16 and therefore at least at the time he must not have
17 thought it was relevant at the time for this
18 particular complaint.
19    Q. In this complaint you're alleging,
20 and correct me if I'm wrong, that your job was
21 eliminated in order to replace you with a younger
22 employee; correct?
23    A. That's correct.
24    Q. Do you believe that that's the reason why

**Dennis A. Paren**
**April 29, 2005**

---

53

1  your employment was terminated?
2     A. The purpose of filing this complaint was
3  the fact that my job was in fact parceled out to
4  younger employees.
5     Q. So you believe that your age was the reason
6  why your employment was terminated by New Top-Flite?
7        MS. BRODEUR-MC GAN: Objection. You can
8  answer.
9     A. That could have been one of the reasons
10 which they had.
11    Q. When did you decide that you wanted to
12 assert a claim against New Top-Flite, the wholly-
13 owned subsidiary of Callaway?
14    A. When? During 2004.
15    Q. At what point during 2004?
16    A. Sometime from the point when I was
17 terminated to the point that the claim was filed.
18    Q. Did you contemplate filing a claim against
19 New Top-Flite while you were still employed at
20 Top-Flite?
21        MS. BRODEUR-MC GAN: Objection. You may
22 answer.
23    A. For age discrimination?
24    Q. Yes.

---

54

1     A. No.
2     Q. At what point in time did you first
3  contemplate filing a claim against Mr. Craigie and
4  Mr. Frey?
5     A. Seriously, in 2004. That's when I
6  seriously contemplated it.
7     Q. Did it occur to you at an earlier point?
8     A. It probably occurred to me at the point in
9  time when I found out that I was excluded from the
10 retention-bonus program.
11    Q. When was that?
12    A. Well, come to think of it, I think
13 the first time I ever thought of some type of
14 claim, probably -- I don't know whether it would
15 have been a claim by me or a claim from the taxing
16 authorities -- is when I found out about the
17 forgiveness of the promissory notes, and the
18 fact that they did not declare that as
19 income.
20    Q. And when was that?
21    A. That was in late 2001.
22    Q. And when did you first contemplate filing a
23 claim on behalf of yourself against Mr. Frey and
24 Mr. Craigie?

---

55

1     A. I thought I already answered that.
2     Q. It was after you found out that you were
3  excluded from the retention-bonus plan?
4     A. Yes. I believe that probably is when I
5  began to keep a diary of things that were happening.
6     Q. And that was when?
7     A. That was in early 2002.
8     Q. You started keeping a diary in early 2002?
9     A. Someplace around 2002, yes.
10    Q. What did you put in your diary?
11    A. Well, you have a copy of that.
12    Q. So that's been produced to us?
13    A. Yes.
14    Q. The thing that looks kind of like a
15 calendar?
16    A. Yes.
17        Well, it doesn't look like a calendar.
18 I may say calendar of events or something of that
19 nature. It's just, as something happened, I would
20 note it.
21    Q. I will go back and check my files and see
22 if have the document you're referring to, but I'm
23 not sure I do.
24        MS. BRODEUR-MC GAN: We sent it to the

---

56

1  POB.
2        MS. NEWMAN: I will let you know if I
3  have it.
4        MS. BRODEUR-MC GAN: There's no
5  question.
6        THE WITNESS: Okay.
7     Q. Did you want to add something to your
8  earlier answer?
9     A. Just that it was not a comprehensive diary,
10 but it was something to help jog my memory.
11    Q. And why did you feel that your memory would
12 need jogging at a later date?
13    A. Because I tend to forget things, like most
14 people, as time goes on.
15    Q. But you thought that you might need to
16 remember this should you file a claim against
17 Mr. Craigie or Mr. Frey?
18        MS. BRODEUR-MC GAN: Objection. You can
19 answer.
20    A. Or should I just want to remember the
21 events as they took place.
22    Q. Mr. Paren, I'm handing you a document that
23 I've just marked as Exhibit Paren 9. Do you
24 recognize this document?

---

**Accurate Court Reporting**
**413.747.1806**

Dennis A. Paren
April 29, 2005

57

1    A. Yes, I do.
2        [Paren Exhibit 9 marked for
3    identification]
4    Q. What is it?
5    A. It is a copy of my application for
6    employment at Babson Capital Management.
7        MS. BRODEUR-MC GAN: Before you answer,
8    please look at all the papers attached to it.
9        The question is what is this document?
10       MS. NEWMAN: He answered that, actually.
11   Q. Have you had a moment to review that?
12   A. Yes, I have.
13   Q. If you could turn to the third page of
14   Exhibit Paren 9, is that your signature at the
15   bottom of the page?
16       MS. BRODEUR-MC GAN: You're on the third
17   page, or you're talking about the fourth page?
18       MS. NEWMAN: Okay; fourth page.
19       MS. BRODEUR-MC GAN: Is there a Bates
20   stamp?
21       MS. NEWMAN: I can't read it.
22       MS. BRODEUR-MC GAN: I can't either.
23   A. Yes.
24   Q. And did you sign this on August 26, 2004?

58

1    A. It appears that I did.
2    Q. And the preceding pages, are they all your
3    handwriting?
4    A. Yes, they are.
5    Q. On the third page you listed your
6    employment history; do you see that?
7    A. Yes, I see that.
8    Q. Your second entry says Spalding Sports
9    Worldwide; do you see that?
10   A. Yes, I do.
11   Q. You listed your reason for leaving
12   as, Company filed for bankruptcy on of/30/03 and
13   assets sold on 9/16/03. Corporate functions were
14   transferred to California. Did you write that?
15   A. Yes, I did.
16   Q. Why didn't you include in your reasons for
17   leaving that you believed that New Top-Flite was
18   terminating your employment because you had
19   associations with earlier management?
20   A. Because I don't think that that would have
21   been conducive to supporting my application for
22   employment.
23   Q. But, I mean, that's your reason for
24   leaving.

59

1    A. Yes, it is.
2    Q. Why didn't you list what you believed was
3    your reason for leaving?
4        MS. BRODEUR-MC GAN: Objection; asked
5    and answered. You can answer it again.
6    A. I could have listed many reasons,
7    and I listed a reason which I thought was more
8    applicable to what this employer was interested in
9    knowing.
10   Q. One of your allegations in your complaint
11   against Mr. Craigie and Mr. Frey is that you were
12   not selected to receive a retention bonus in 2002;
13   is that right?
14   A. Yes.
15   Q. There were previous years where you
16   received a retention bonus; correct?
17   A. Right.
18   Q. What years were those?
19   A. 1981. There might have been 1982. 1984.
20   1996. 1999. That covers the majority.
21   Q. Aside from 2002, were there any years
22   retention bonuses were given to employees in which
23   you did not receive a retention bonus?
24   A. Not to my knowledge.

60

1    Q. Were any retention bonuses given out to
2    employees in 2002 by Old Top-Flite, to your
3    knowledge?
4    A. What I don't recall is the work that I did
5    in 1998, where that bonus was paid to me in 1999 or
6    2000.
7        Whichever year it was, I provided that
8    information; and during that same year there were
9    other people that also received bonuses.
10   Q. In the year 2002?
11   A. In the year in which I received my bonus.
12   Whether that was 1999 or the year 2000, I don't
13   recall.
14   Q. So you would defer to representatives of
15   the company as to whether a retention bonus was
16   given out in a typical year?
17       MS. BRODEUR-MC GAN: Objection. You can
18   answer.
19   A. Or the reconstruction of 1998, yes.
20   Q. Were retention bonuses given out in 2000?
21       You were just talking about 1998 and
22   1999, right? What about 2000? Were any retention
23   bonuses give out?
24   A. The bonus that I'm talking about for 1999

**Dennis A. Paren**
**April 29, 2005**

---

61

1 was not paid in 1999. It was paid in either 1998 or
2 the year 2000.
3    Q. Were any retention bonuses given out in
4 2001?
5    A. I don't know. Not that I know of.
6    Q. Were any merit increases given out in 1999?
7    A. I'm sure merit increases were given out in
8 1999.
9    Q. Did you receive a merit increase in 1999?
10    A. I'm sure I did.
11    Q. Were merit increases given to employees in
12 2000?
13    A. I think so.
14    Q. Did you receive one?
15    A. I think so.
16    Q. But you're not sure?
17    A. I don't have the records in front of me.
18 You're talking about something five years ago.
19    Q. So you would defer to company records as to
20 whether or not merit increases were given in any
21 particular year, and as to whether or not you
22 received one?
23        MS. BRODEUR-MC GAN: Objection. You can
24 answer.

---

62

1    A. Yes.
2    Q. What about 2001? Do you recall whether
3 there were any merit increases given out?
4    A. I don't know. I would defer.
5    Q. And what about with respect to performance
6 bonuses? Do you remember whether there were any
7 performance bonuses given out in 1998, 1999,
8 2000 or 2001?
9    A. I believe there were in one of those years,
10 but I don't know which one.
11    Q. Why are you certain?
12    A. Because I remember that we received one
13 bonus. I bought my daughter a car with the money,
14 so that's how I remember.
15    Q. Do you remember what kind of a car it was?
16    A. It wasn't a new car. It was a used car.
17    Q. So you would again defer to company records
18 as to the exact year in which you received a
19 performance bonus?
20    A. Yes.
21    Q. Do you recall if any performance bonuses
22 were given in 2002?
23    A. I don't know. I'm sure that there were.
24        The rumors were that there were bonuses

---

63

1 always being given, even if they weren't being given
2 to everyone that was considered bonus-eligible.
3    Q. Who did you hear these rumors from?
4    A. The payroll department.
5    Q. Who?
6    A. Cindy Marr.
7    Q. How do you spell her last name?
8    A. M-a-r-r.
9        Mary Rosenthal. Lynn LaFond. And
10 there's another person in payroll that I also...
11    Q. If the name comes to you, let me know.
12    A. Yes.
13    Q. What did Cindy Marr tell you?
14    A. That bonuses were being paid, but not to
15 all people.
16    Q. When was that?
17    A. I don't know exactly when that was.
18 I talked to Cindy on a frequent basis.
19    Q. Was this before or after you learned that
20 you were not selected for a retention bonus in 2002?
21    A. I can't recall.
22    Q. What did Mary Rosenthal tell you?
23    A. That she was sick of seeing people getting
24 bonuses.

---

64

1    Q. When was that?
2    A. Probably in 2001 and 2002.
3    Q. What did Lynn LaFond tell you?
4    A. Simply, again, short little comments
5 indicating that certain people were getting bonuses
6 when others were not;
7        and, first of all, everyone was under
8 the same all-encompassing management incentive bonus
9 plan, MIBP as it was referred to.
10    Q. When you say everyone, you mean literally
11 every employee?
12    A. Jim Craigie placed all salaried employees
13 in that plan; and, once he placed all employees in
14 that plan, never did all the employees ever receive
15 a bonus. And he did that in a manner by which to
16 obtain a lower merit rate increase for all the
17 employees.
18    Q. What makes you think that?
19    A. Because I had many discussions about that
20 with Vaughn Rist, and in fact Jim Craigie announced
21 it to all the employees.
22    Q. What did Vaughn Rist tell you?
23    A. That the management incentive bonus program
24 was going to be extended to all salaried employees,

---

**Dennis A. Paren**
**April 29, 2005**

65

1  rather than to a smaller management group; and by
2  doing that management was going to provide
3  employees a smaller merit rate increase.
4      Q. Did Mr. Rist tell you how he reached that
5  understanding?
6      A. It was all spelled out in company
7  documents. It was provided to the employees
8  through a communication meeting.
9      Q. Do you have a copy of any of those
10 documents?
11     A. I don't know, but everybody is familiar
12 with that.
13     Q. And what did Jim Craigie announce to the
14 employees?
15     A. Simply that the company was going
16 to provide a smaller merit rate increase to all
17 employees, but was going to include the employees in
18 the management incentive bonus program;
19          so thereby, if the company met
20 its performance goals, which he was in charge of
21 achieving with his direct reports, then everybody
22 would enjoy in effect a higher rate of compensation
23 than what they would have received just with a pure
24 merit increase.

66

1          Not only was this communicated one time;
2  there were subsequent meetings where Jim Craigie
3  would explain how the company's performance was
4  doing versus its goal.
5      Q. Did Cindy Marr, Mary Rosenthal or Lynn
6  LaFond identify any of the persons they believed
7  were receiving bonuses?
8      A. They did, but I don't recall their names.
9          They did, sort of reluctantly. This
10 payroll information should be confidential.
11     Q. If you remember, who were the people that
12 they identified as receiving bonuses?
13     A. I can't recall their names. They were
14 sales people.
15     Q. How would you characterize the financial
16 conditions of Old Top-Flite or Spalding in the
17 2000-2001 time frame?
18     A. It was deteriorating, due to poor
19 performance.
20     Q. Well, isn't it also true that at the time
21 there were new entrants into the market, including
22 Nike, Adidas, and Callaway?
23     A. Throughout the industry, there will always
24 be cycles of new entrants coming in and others

67

1  leaving.
2      Q. Were you familiar with that in the
3  2000-2001 time frame?
4      A. Yes.
5      Q. Now, Old Top-Flite had different managing
6  committees?
7      A. Can you be more specific?
8      Q. Sure. Are you familiar with the operating
9  committee of Old Top-Flite?
10     A. Yes.
11     Q. Were you on that committee?
12     A. No.
13     Q. What committees did you sit on?
14     A. The pension committee. The 401(k).
15     Q. Were the pension committee or the 401(k)
16 committee involved in making decisions with regard
17 to the award of retention bonuses?
18     A. No.
19     Q. Do you know what committee, if any, was
20 involved in making those decisions?
21     A. There was a compensation committee, I
22 believe.
23     Q. Were you on that committee?
24     A. No.

68

1      Q. Do you believe the compensation committee
2  was involved in making decisions with regard to
3  retention bonuses?
4          It's okay if you don't know; you just
5  need to tell me what you know.
6      A. I believe that it was primarily Jim
7  Craigie, Dan Frey, and the direct reports of Jim
8  Craigie.
9      Q. And what's your factual basis for believing
10 that Jim Craigie, Dan Frey, and Mr. Craigie's direct
11 reports made decisions with regard to retention
12 bonuses for employees?
13     A. Those individuals served as the members of
14 the operating committee; OCM.
15     Q. And it's your understanding that the OCM
16 and its members made decisions with regard to the
17 retention bonuses?
18         MS. BRODEUR-MC GAN: Objection. You can
19 answer.
20     Q. Is that right?
21     A. It's conjecture on my part. That's what I
22 would assume. They directed the operations of
23 everything in the company.
24     Q. But you had no involvement in making

**Dennis A. Paren**
**April 29, 2005**

69

1 decisions with regard to retention bonuses?
2    A. No, I did not.
3    Q. And you didn't attend any OCM meetings, did
4 you?
5    A. No, I did not.
6    Q. You attend any meetings at which retention
7 bonuses were discussed, did you not?
8        MS. BRODEUR-MC GAN:  Objection.  You can
9 answer.
10    A. Correct.
11    Q. Did you have the opportunity to review any
12 documents that related to the retention-bonus
13 program that was adopted in 2002?
14    A. When?
15    Q. At any time.
16    A. At any time?  I saw certain documents
17 during the course of a year or two with regard to
18 the retention-bonus programs.
19    Q. What documents did you see?
20    A. There is a document in the April 2002
21 restructuring agreement with Oaktree Capital
22 Management.
23    Q. What document is that?  Can you describe
24 the document for me?

70

1    A. It's a document that lays out a guaranteed
2 retention-bonus program.
3    Q. When did you have the opportunity to review
4 that document?
5    A. Peter Arturi and Mike Lyon had copies of
6 that agreement, and they each provided me at
7 different times access to look at it.
8    Q. When did Peter Arturi provide you access to
9 the retention-bonus-program document that you refer
10 to?
11    A. Well, first of all, the retention-
12 bonus-program document was included in a very
13 large binder, so he did not specifically provide
14 me the document just to look at retention bonuses.
15    Q. Why did he provide you the document, if you
16 know?
17    A. I was probably looking at, it could have
18 been warranties and representations that were being
19 made by the company, insurance requirements that
20 were being asked, directors' and officers'
21 exposures; things of that nature.
22    Q. And what did Mr. Lyon show you; the same
23 document?
24    A. He had the exact same copy.

71

1    Q. Have you had the opportunity to review any
2 other documents relating to the retention-bonus
3 program?
4    A. There were additional documents that were
5 filed with the bankruptcy court.
6    Q. Anything else?
7    A. No.
8        With regard to just pure documents, it
9 all depends what your definition is of a document
10 with the retention-bonus program on it.
11    Q. I guess I want to hear about documents
12 that related to eligibility for retention bonuses,
13 or determining the amounts of retention bonuses.
14 Did you see any documents like that?
15    A. No.  Those are the ones I saw.
16    Q. When did you become aware that Old Top-
17 Flite had adopted a retention-bonus program in
18 2002?
19    A. I believe it was subsequent to the first
20 payment being made, which would have been after mid-
21 April 2002.
22    Q. And how did you learn that the first
23 payment of the retention bonuses had been made?
24    A. Either Mike Lyon or Peter Arturi provided

72

1 me access to the 2002 restructuring agreement, and
2 it was enclosed in that.
3    Q. But the first you learned about the
4 retention-bonus payments being made was when you
5 reviewed the Oaktree Capital restructuring agreement
6 in April of 2002?
7    A. Correct.
8    Q. Did that document reflect that payments
9 were being made in April 2002?
10    A. Yes.
11    Q. What did you do after you learned about the
12 payments being made?
13    A. I believe I talked with Mike Lyon, and I
14 might have talked with some other individuals, and
15 indicated how it was unfair that I was not included
16 in that program; and then I began to prepare a
17 memorandum to that effect.
18    Q. Did Mr. Lyon receive a retention bonus?
19    A. Yes, he did; small one.
20    Q. Do you know how much his bonus was?
21    A. No, not offhand.
22    Q. Do you know which the other direct reports
23 to Dan Frey received a retention bonus as part of
24 the 2002 retention-bonus plan?

Dennis A. Paren
April 29, 2005

73

1    A. Vic Varga and Stephen Nigro.
2    Q. Anyone else?
3    A. Mike Lyon; and I believe at some point Lynn
4  LaFond might have received something small.
5    Q. Did Charlie Kimmett receive a retention
6  bonus?
7    A. Charlie Kimmett was listed too.
8    Q. How about Larry Kustra?
9    A. I don't believe so.
10    Q. Or Mr. Levandowski?
11    A. I don't believe so.
12    Q. Did you ever talk to Messrs Lyon, Nigro,
13  Varga, and Kimmett about the amount of their
14  retention bonuses?
15    A. Not specifically.
16    Q. If you could direct your attention to a
17  document that we marked as Exhibit Paren 4. These
18  are your supplemental answers to interrogatories.
19    A. Yes.
20    Q. Do you see at the bottom of the first page
21  where you've listed Mr. Varga and Mr. Nigro?
22       Does this represent your understanding
23  of the bonus payments that were made to Mr. Varga
24  and Mr. Nigro according to the 2002 retention-bonus

74

1  program?
2    A. This represents the amounts, I believe, for
3  2003; which were then simply multiplied by four,
4  because there were four guaranteed retention
5  bonuses.
6    Q. So, walk me through why you believe that
7  Mr. Varga received total retention-bonus payments of
8  $150,000.
9    A. I believe that, because we did not have all
10  information available, that this simply represents
11  the maximum that they could have had had they been
12  paid the same amount each time equivalent to the
13  amount that they received in 2003.
14    Q. Did Mr. Varga tell you that his total
15  retention-bonus payment was $150,000?
16    A. No, he did not.
17    Q. Did anyone tell you that?
18    A. No.
19    Q. Did Mr. Nigro tell you that his total
20  retention-bonus payment was $149,600?
21    A. No. I had no conversations with them with
22  regard to the amount of money they received.
23    Q. So the payment were made in 2002 and 2003;
24  is that right? That's your understanding?

75

1       MS. BRODEUR-MC GAN: Objection. You can
2  answer.
3    A. I believe this is just simply a payment for
4  2003; the $17,000 plus the $20,000.
5    Q. And the $37,500 for Mr. Varga is what?
6    A. Again, I believe that $37,500 was the
7  payment that he received from December 31, 2002,
8  through September 15, 2003.
9    Q. And the $17,500 plus the $20,000 is the
10  amount that he received after September 2003?
11    A. Ask me again.
12    Q. Would the total amounts of retention
13  bonuses paid to Mr. Varga and Mr. Nigro be reflected
14  on their pay statements issued by Old Top-Flite and
15  New Top-Flite?
16    A. For each calendar year there would have
17  been an amount listed, assuming the W-2s were done
18  correctly.
19    Q. So you would defer to the pay statements
20  issued by Old Top-Flite and New Top-Flite to Mr.
21  Varga and Mr. Nigro with respect to the total
22  retention bonuses that they received?
23       MS. BRODEUR-MC GAN: Objection.
24    A. Yes, I would.

76

1    Q. Were you aware that in 2002 the company
2  also adopted a program to award sale bonuses to
3  certain employees?
4    A. As I stated earlier, I was aware that
5  bonuses were being paid.
6    Q. Do you know what a sale bonus is?
7    A. You can explain it to me.
8    Q. The answer is no?
9    A. I don't know what the description of that
10  plan is.
11    Q. Were you aware in 2002 that a
12  determination was made that if the company was
13  sold for at least $400 million certain employees
14  would receive a sale bonus as a percentage of a
15  $1 million sale-bonus pool?
16    A. Yes, I was aware of that.
17    Q. How were you aware of that?
18    A. Well, number one, it was a laughable type
19  of plan to begin with; because everyone knew there
20  was no way that that amount would ever be reached.
21       But I knew through Peter Arturi.
22    Q. When did you find that out from Peter
23  Arturi?
24    A. Probably the summer of 2002.

**Dennis A. Paren**
**April 29, 2005**

77

1    Q. Do you know who was involved in making the
2 decision to award sale bonuses to certain employees?
3    A. Specifically, no, I do not.
4    Q. Do you have a belief as to who was involved
5 in making determinations with regard to sale
6 bonuses?
7    A. I would believe that Dan Frey and Jim
8 Craigie drove the program, and maybe there was
9 some type of contribution from Vaughn Rist.
10   Q. What did Mr. Arturi tell you in the summer
11 of 2002 with regard to sale bonuses?
12   A. That it was being somehow based upon the
13 amount of stock which a current employee owned in
14 the company.
15   Q. Did he tell you anything else?
16   A. He might have told me something else, but
17 that's all I can recall at this moment.
18   Q. Are you aware that you were one of the
19 employees that was selected for a sale bonus?
20   A. Yes, I was.
21   Q. When did you become aware of that?
22   A. When Peter Arturi informed me.
23   Q. So he informed you in the summer of 2002?
24   A. Yes. I believe Dan Frey might have

78

1 informed me of that also.
2    Q. Do you remember if it was Mr. Arturi or
3 Mr. Frey who told you first?
4    A. I believe it was Mr. Arturi.
5    Q. And what did you say in response to him, if
6 anything, after he informed you that you had been
7 selected for a sale bonus?
8    A. We both laughed.
9    Q. Did he say anything?
10   A. He might have said something to the effect
11 of, Don't count on it ever happening.
12   Q. And when did you discuss the sale bonus
13 with Mr. Frey?
14   A. Sometime towards the summer of 2002, I
15 believe, Dan called me in to give me, I believe,
16 some restricted stock shares, and told me at that
17 point in time in an effort to appease me.
18   Q. What did he tell you about the restricted
19 stock shares?
20   A. That I had more than anybody else in the
21 finance group.
22   Q. Did he tell you why you were being issued
23 restricted shock shares?
24   A. Because I had purchased more company stock

79

1 than anybody else in the finance group, and paid
2 for it.
3    Q. What did you say in response, if anything?
4    A. I don't recall what my response was. It
5 was not positive.
6    Q. Why wasn't it positive?
7    A. Because it was based upon an unattainable
8 level.
9    Q. The sale bonus?
10   A. The sale bonus, yes.
11   Q. What about the restricted stock shares?
12   A. The restricted stock shares were worthless.
13   Q. When did you purchase shares, originally,
14 in the company?
15   A. 1997.
16   Q. Any other years?
17   A. No.
18   Q. And how much stock did you purchase in
19 1997?
20   A. I purchased, I think it was 18,000 shares.
21   Q. How much did you pay for the 18,000 shares?
22   A. $5 apiece. And then there were some
23 adjustments afterwards.
24   Q. Was it mandatory to purchase stock in 1997?

80

1    A. It was expected.
2    Q. Was there something in writing that it was
3 expected?
4    A. The purpose of the program was to have
5 management, that was in charge of performance of the
6 company, share in the exposure as to its success or
7 failure.
8    Q. But did anyone convey to you that you were
9 expected to purchase shares?
10   A. It was an honor. It was presented to
11 people as an honor to be able to purchase shares,
12 and in fact everyone purchased shares but one
13 individual.
14   Q. And you were not required to purchase those
15 shares in 1997; correct?
16   A. No one told me I was required, right.
17      MS. NEWMAN: We can take a break for
18 lunch right now.
19      [Luncheon recess]
20 BY MS. NEWMAN:
21   Q. Mr. Paren, now I want to talk about your
22 defamation claim that you've asserted against
23 James Craigie.
24      If you could turn to your complaint,

**Dennis A. Paren**
**April 29, 2005**

81

1  which is Exhibit Paren 1, Page 13; and also if you
2  could refer to your answers to interrogatories,
3  which is Paren 3.
4          Do you see your answer to the first
5  interrogatory?
6      A. Is that number one?
7      Q. Yes.
8      A. Yes, I see it.
9      Q. You identify two verbal or written
10  statements made by Mr. Craigie as allegedly
11  defamatory in your Response Number 1; do
12  you see that there?
13      A. Yes.
14      Q. The first is a September 18, 2003 e-mail,
15  and a second is a statement that Mr. Craigie made
16  in front of his secretary; is that right?
17      A. Yes.
18      Q. Are there any other statements that you
19  allege were defamatory by Mr. Craigie?
20      A. That I know about at this time?
21      Q. Yes.
22      A. No, but I believe that there could be
23  others.
24      Q. Mr. Paren, I'm handing you a document that

82

1  I've just marked as Exhibit Paren 10.
2          [Paren Exhibit 10 marked for
3  identification]
4          This document bears Bates stamp 0045,
5  and appears to be an e-mail that was forwarded to
6  various people.
7          Is the original message at the bottom
8  that starts halfway down the page, from Jim Craigie
9  to you, dated September 18, 2003, the e-mail that
10  you're alleging is defamatory?
11      A. Yes.
12      Q. Tell me what statements in this e-mail you
13  believe were untrue and defamatory.
14      A. Well, I definitely believe that it's
15  defamatory to say that I'm spewing venom on the
16  integrity of fellow employees.
17      Q. Anything else?
18      A. I also think it's defamatory to state, Bury
19  your bitterness.
20      Q. Why do you believe that that's defamatory?
21      A. Because I don't believe that you should
22  characterize what I did or felt as bitterness.
23          It was inequitable and unjust and
24  unlawful, some of the things that I complained

83

1  about.
2      Q. Are there any other statements in this
3  September 18, 2003 e-mail which you believe are
4  untrue or defamatory?
5      A. I believe that it's untrue to put the blame
6  of the falsification of his expense reports on his
7  administrative assistant.
8      Q. Anything else?
9      A. I have no way of knowing whether it's true
10  that he removed my name from a list, so I can't
11  verify that.
12      Q. Which list?
13      A. The list he's talking about, an initial
14  severance list; Item 2.
15      Q. Anything else that you allege to be untrue
16  or defamatory?
17      A. I think it was an untrue characterization,
18  the first sentence in Item 4, The only case of
19  double billing of expense reports by an OPCOM
20  member.
21          Well, that's true. There were only
22  himself and Stephanie Lawrence; but there were
23  many indications of double billings of expense
24  reports.

84

1          So the way he's characterizing it is
2  in a framework that it was very minimal, this
3  particular falsification of expense reports.
4      Q. Is there anything else that you believe is
5  untrue or defamatory?
6      A. Well, you're asking me whether untrue or
7  defamatory.
8          I think it was untrue that the company
9  now has a bright future.
10      Q. Why do you say that?
11      A. Because I believe that he's sufficiently
12  destroyed the company's performance to a point that
13  three days after he left all of a sudden the company
14  was going to have a bright future, and in fact it
15  turned out not to be the case.
16      Q. Are there any other statements in this
17  September 18, 2003 e-mail that you allege to be
18  untrue or defamatory?
19      A. Again, the first sentence in Item 2, I do
20  not know whether that's a true statement. Dan Frey
21  recommended the elimination of your position: I do
22  not know whether that was true or not.
23      Q. Any other statements that you believe are
24  untrue or defamatory?

**Dennis A. Paren**
**April 29, 2005**

---

85

1    A.  The last part of Item 4.
2    Q.  Which part?
3    A.  When I was informed of this violation, I
4  immediately made Stephanie repay the double-billed
5  amounts, and I subsequently severed her as an
6  employee.
7        Her termination of employment was quite
8  a bit past the time at which I reported the double
9  billing; and the characterization is that he was
10  punishing her for falsifying her expense reports,
11  when that was really not the case.
12        Other than that, there are no other
13  statements.
14    Q.  This e-mail was sent from Jim Craigie to
15  you on September 18, 2003; is that right?
16    A.  Yes.
17    Q.  Did you forward this e-mail to anyone?
18    A.  I may have.  I don't recall.
19    Q.  Do you remember the names of any of the
20  people to whom you may have forwarded Mr. Craigie's
21  September 18, 2003 e-mail?
22        MS. BRODEUR-MC GAN:  Objection.
23    A.  I do not recall at this moment.
24    Q.  To your knowledge, was this e-mail shared

---

86

1  with anyone within the company; the company being
2  New Top-Flite?
3    A.  Within the New Top-Flite, or the Old
4  Top-Flite?
5    Q.  Well, this was sent on September 18, 2003,
6  so there was no Old Top-Flite any more; right?
7    A.  Well, there was still Kevin Goldmont, and
8  there was still Andy Howley, that worked for the Old
9  Top-Flite.
10    Q.  But the entity itself didn't exist after
11  September 15, 2003; right?
12    A.  The bankrupt entity continued to exist.  It
13  had just simply changed its name from the Top-Flite
14  Golf Company to TFGC Estate, Inc.
15    Q.  But we discussed earlier the definitions of
16  New Top-Flite and Old Top-Flite, so I need to
17  understand...
18        MS. BRODEUR-MC GAN:  Objection.
19    A.  There were no longer any employees in the
20  Old Top-Flite.
21        However, there was still the
22  acting CFO, there was still the acting CEO;
23  and those people, Andy Howley, I did talk to
24  about this e-mail.  I don't know that I showed

---

87

1  it to him, but I did talk to him about it.
2    Q.  And who was Andy Howley?  What was his
3  position?
4    A.  Oh.  Kroll Zolfo Cooper; that's the name of
5  the company.
6        Andy Howley was the acting chief
7  financial officer; was.
8    Q.  So, how did Andy Howley become aware of
9  Mr. Craigie's September 18, 2003 e-mail?
10    A.  I informed him.
11    Q.  What did you tell him?
12    A.  I told him I received this e-mail.
13    Q.  Did you show him a copy of the e-mail?
14    A.  I don't recall.
15    Q.  Did you describe the contents of the e-mail
16  to him?
17    A.  I believe I did.
18    Q.  And what if anything did he say in
19  response?
20    A.  It sounds like Jim Craigie had too much
21  wine to drink before he sent that e-mail to you at
22  10:00 at night.
23    Q.  Are there any other persons who became
24  aware of Mr. Craigie's September 18, 2003 e-mail?

---

88

1    A.  I might have shown it to Peter Arturi.
2    Q.  When was that?
3    A.  I don't know whether I did or I did not,
4  but normally I shared information with Vaughn Rist
5  and Peter Arturi.
6    Q.  So is it possible that you shared
7  Mr. Craigie's September 18, 2003 e-mail with
8  Vaughn Rist?
9    A.  Possible.
10    Q.  Are there any other persons you believe
11  were aware of Mr. Craigie's September 18, 2003
12  e-mail?
13    A.  I can't recall.
14    Q.  Do you have any reason to believe that
15  Mr. Arturi, Mr. Rist, or Diane Blaney, to whom this
16  e-mail was forwarded, shared the e-mail with anyone
17  else?
18    A.  Peter Arturi could have provided it to his
19  legal assistants, paralegals, who knew me quite
20  well.
21    Q.  Do you have any knowledge that he did that?
22    A.  No, I don't.
23        MS. BRODEUR-MC GAN:  Don't guess.
24    A.  I don't know that he did that, or I don't

---

Dennis A. Paren
April 29, 2005

89

1  know that he didn't do that.
2      Q. So the question is, do you have any reason
3  to believe that anyone other than the people to whom
4  this e-mail was forwarded saw this e-mail; the
5  September 18, 2003 e-mail?
6      A. Do I have any reason to believe?
7          My only reason to believe that
8  somebody else saw it is because this is gossip
9  fodder in a corporate office; and people like to
10  see things like this, especially about an ex-CEO
11  who was very disliked.
12      Q. Did anyone tell you that they saw the
13  e-mail?
14      A. No. No, they did not.
15      Q. So you're just assuming that people saw it
16  because it was gossip fodder?
17      A. Yes.
18      Q. In your complaint, you allege that your
19  ability to secure continued employment with the
20  purchased company Callaway was affected by the
21  false statements.
22          Do you see that in Paragraph 48 of your
23  complaint?
24      A. Yes.

90

1      Q. How did Mr. Craigie's September 18, 2003
2  e-mail affect your ability to secure continued
3  employment with Callaway?
4          MS. BRODEUR-MC GAN: Objection to form.
5  You can answer.
6      A. Paragraph 48 was not referring to that
7  e-mail specifically, although it could include
8  that e-mail.
9      Q. Sitting here today, do you believe that
10  Mr. Craigie's September 18, 2003 e-mail affected
11  your ability to secure continued employment with
12  Callaway or New Top-Flite?
13      A. May have influenced that, yes.
14      Q. How?
15      A. Well, it was placed in my personnel file;
16  and as part of new management coming in, reviewing
17  personnel files of individuals, that would have been
18  one of the most recent additions to the file.
19      Q. Do you believe it was inappropriate for
20  this e-mail to have been put in your personnel
21  file?
22      A. I don't believe that it was something that
23  positively reflected upon me by putting it in my
24  personnel file.

91

1      Q. But the question is, are you saying that it
2  was inappropriate for Vaughn Rist to have directed
3  Diane Blaney to put Mr. Craigie's September 18,
4  2003 e-mail in your file?
5      A. I believe that Vaughn might have done
6  better to put this in a separate file.
7          However, I am not a human-
8  resource executive; so I do not know exactly
9  what the policies and procedures are as to what
10  should be placed in a personnel file and what
11  shouldn't.
12      Q. Are there any other facts that support your
13  belief that Mr. Craigie's September 18, 2003 e-mail
14  affected your ability to secure continued employment
15  with Callaway or the New Top-Flite?
16      A. No.
17      Q. The next statement that you identify as
18  defamatory that was made by Mr. Craigie relates to a
19  statement he made in front of his secretary; is that
20  right?
21      A. Yes.
22      Q. Tell me what he said.
23      A. Reading from the answer, it says, A oh, he
24  has one of those Dennis Paren faces on.

92

1      Q. When was this?
2      A. Shortly after Stephanie Lawrence was found
3  cheating on her expense reports.
4      Q. And when was that?
5      A. I would have to review records to give you
6  that date.
7      Q. And Jim Craigie's secretary was Roseanne
8  Stirlacci?
9      A. Correct.
10      Q. Were there any other witnesses to this
11  statement that he made?
12      A. No.
13      Q. What was the context in which he made that
14  statement?
15      A. The context was that I was bringing him bad
16  news, and I had sort of a frown on my face at the
17  time, because nothing was getting done with these
18  types of incidents.
19          And so I was appealing to the most
20  authoritative person there in the office to do
21  something significant to stop these abuses.
22      Q. So he made the statement before you
23  informed him about Stephanie Lawrence's double
24  submissions of travel expenses?

**Dennis A. Paren**
**April 29, 2005**

93

1  A. Yes.
2       I don't know, he might have known
3  previous to that, though; before I went to talk to
4  him.
5  Q. Was he expecting you?
6  A. No.
7  Q. And did you have an understanding as to
8  what he meant when he said He has one of those
9  Dennis Paren faces on?
10  A. Yes.
11  Q. What did you believe he meant?
12  A. Well, he meant that within the small
13  corporate-executive wing that we had, the majority
14  of the individuals all had happy, smiley faces on,
15  because they were all part of his cronyism bunch
16  and were being rewarded, and I was excluded from
17  that;
18      and I was trying to instill ethics
19  within the company, and because I was having no
20  success very often the stress would make me frown.
21  Q. Did he ever tell you that that's what he
22  meant when he referred to your Dennis Paren face?
23  A. It was, I thought, very well understood.
24  Q. But you're just assuming that you have the

94

1  same understanding that he had; right?
2  A. Yes; a strong belief that that's correct.
3  Q. How did Mr. Craigie's statement in front of
4  Roseanne Stirlacci affect your ability to secure
5  continued employment with Callaway or the New
6  Top-Flite?
7       MS. BRODEUR-MC GAN: Objection. You can
8  answer.
9  A. Well, again, Roseanne worked for the
10  president, and she was going to continue with the
11  new president; and Roseanne also knew that I felt a
12  lot of stress in trying to clean up the company
13  without having the support of the executive
14  management.
15      To give you one example, one time
16  when I was writing something to the CFO before Dan
17  Frey, Wade Lewis, she saw it and reported that to, I
18  think, Vaughn Rist; who came and spoke to me and
19  said, no, it would be better not to have that.
20      Another thing that Roseanne did, because
21  she knew of this stress, is she would buy me things
22  that said Don't sweat the small stuff; try not to
23  carry this all on your shoulders.
24  Q. So, how did Mr. Craigie's statement affect

95

1  your ability to secure continued employment with New
2  Top-Flite?
3  A. Well, I think it tarnished my reputation,
4  and it closed off opportunities for me with the new
5  company; because people talk, and people share
6  opinions, and sometimes presidents like to
7  take the advice of their assistants.
8  Q. Who is the president that Roseanne
9  Stirlacci worked for?
10  A. Rob Pennicka. I believe it's Rob, is his
11  first name.
12  Q. Do you believe that Ms. Stirlacci repeated
13  Mr. Craigie's statement -- Oh, he has one of those
14  Dennis Paren faces on -- to other people?
15  A. I can't say.
16  Q. You don't know?
17  A. I don't know.
18  Q. Are there any other reasons why you
19  believe that Mr. Craigie's statement in front of
20  Roseanne Stirlacci affected your ability to secure
21  continued employment with Callaway or the New Top-
22  Flite?
23  A. Only that because of Mr. Craigie's
24  position with the company, and because he was at

96

1  one time trusted by and interacted with the people
2  at Callaway, his having a diminished view of myself
3  didn't help me with seeking employment with the new
4  company.
5  Q. Is it your contention that Mr. Craigie
6  advised Top-Flite or Callaway not to continue with
7  you?
8  A. No. It's my contention that he had
9  interactions with them which I am not privy to;
10  and during those interactions something may have
11  been said, and it's through this course of
12  discovery that we hope to find out.
13  Q. But you don't know that he said anything at
14  all to anyone at New Top-Flite or Callaway about
15  you, do you?
16  A. No, I don't know for a fact; no.
17  Q. In your answers to interrogatories, which
18  are Exhibit Paren 3, you identified Peter Arturi,
19  Vaughn Rist, Dan Frey, Andy Howley, Ferris Grooms
20  and your family as having knowledge or information
21  regarding the two statements that you allege
22  Mr. Craigie made that were defamatory.
23      MS. BRODEUR-MC GAN: Can I ask what
24  number you're referring to?

**Dennis A. Paren**
**April 29, 2005**

---

97

```
 1        MS. NEWMAN:  Number 2; right there.
 2     A.  Yes.
 3     Q.  Other than what you've already testified
 4  to, is there any other knowledge or information that
 5  Peter Arturi would have about either of these two
 6  allegedly defamatory statements?
 7     A.  I don't know what else Peter would have,
 8  but I know that Peter had a relationship, and he
 9  served on the operating committee; so he surely
10  overheard things that I would not have heard.
11     Q.  What about Vaughn Rist?
12     A.  Vaughn Rist was in the same position.
13     Q.  But do you have any specific knowledge that
14  Vaughn Rist knew about Jim Craigie's statement in
15  front of Roseanne Stirlacci?
16     A.  When statements out of the ordinary
17  were made, more often than not I shared those
18  with Vaughn Rist; and he did likewise, a lot of
19  the time.
20     Q.  So to the extent that Mr. Rist knew about
21  that statement, it was because you shared it with
22  him?
23        MS. BRODEUR-MC GAN:  Objection.
24     A.  I don't know whether somebody else shared
```

---

98

```
 1  it with him.
 2     Q.  What knowledge or information does Dan
 3  Frey have about Mr. Craigie's September 18, 2003
 4  e-mail and/or his statement in front of Roseanne
 5  Stirlacci?
 6     A.  I don't know what Dan actually knows about
 7  that, other than I'm sure that he has seen this
 8  e-mail.
 9     Q.  You're sure of that because it's been
10  produced in this litigation, or you're sure that he
11  saw it prior to this litigation?
12     A.  I know that he saw it because of
13  this litigation. I don't know whether he saw it
14  beforehand; but because of the communication ties
15  between people, there is a very high possibility he
16  could have seen it, yes.
17     Q.  But you're really speculating about that?
18     A.  Right. I don't know, yes.
19        MS. BRODEUR-MC GAN:  Objection.
20     Q.  Other than what you've already testified
21  to, what knowledge or information does Andy Howley
22  have about either Mr. Craigie's September 18, 2003
23  e-mail or his statement in front of Roseanne
24  Stirlacci?
```

---

99

```
 1     A.  As I informed you, he knows about the
 2  e-mail because I told him. I did not tell him about
 3  the comment that he made in front of Roseanne
 4  Stirlacci.
 5     Q.  Who is Ferris Grooms?
 6     A.  Ferris Grooms is the president of Grooms
 7  Financial Group in Tampa, Florida, and served as a
 8  broker-slash-consultant on employee-benefits issues.
 9     Q.  And what knowledge or information does he
10  have about Mr. Craigie's September 18, 2003 e-mail
11  and/or Mr. Craigie's statement in front of Roseanne
12  Stirlacci?
13     A.  I shared information with Ferris on a
14  regular basis.
15        So, as something happened, I normally
16  shared it with him shortly thereafter.
17     Q.  And what knowledge or information does your
18  family have regarding the September 18, 2003 e-mail
19  or Mr. Craigie's statement in front of his
20  secretary?
21     A.  They knew when things happened as soon as
22  they happened. We lived through this for years.
23     Q.  I'd like to turn your attention now
24  to your claim of defamation against Daniel Frey,
```

---

100

```
 1  which starts on Page 14 of your complaint, and to
 2  which you refer beginning on Page 2 of your
 3  interrogatory responses.
 4        The first statement that you allege to
 5  be defamatory is a July 15, 2002 e-mail that Dan
 6  Frey sent to Peter Arturi; is that right?
 7     A.  Yes.
 8     Q.  I'm handing you a document that I've marked
 9  as Exhibit Paren 11.
10        [Paren Exhibit 11 marked for
11  identification]
12     Q.  This document bears the Bates label 0047,
13  and appears to be an e-mail from Dan Frey to Peter
14  Arturi, copying Vaughn Rist and Jim Craigie, on July
15  15, 2002.
16        Is this the e-mail that you allege was
17  defamatory?
18     A.  Can I take a minute to read it?
19     Q.  Of course.
20        [Pause]
21     A.  All right; what was the question again?
22        MS. NEWMAN:  Can you read the question
23  back?
24        MS. BRODEUR-MC GAN:  The question was,
```

---

**Dennis A. Paren**
**April 29, 2005**

---

101

1  Is this what you were referring to in the
2  interrogatory?
3       THE WITNESS: Yes.
4    Q. What statements in Dan Frey's July 15, 2002
5  e-mail do you believe are untrue or defamatory?
6    A. In the second paragraph, where he states
7  We walked through a few points in his letter to
8  Peter which I felt were factually inaccurate or
9  distorted.
10       Well, I don't believe that I wrote
11 anything that was factually inaccurate or
12 distorted.
13   Q. Anything else?
14   A. And then also the following sentence, Our
15 discussion was civil, but knowing Dennis we still
16 probably haven't heard the last from him on this
17 topic.
18   Q. Why do you character that as untrue or
19 defamatory?
20   A. Because it characterizes me as someone who,
21 one he has heard the truth, doesn't accept it; and
22 that's not what happened.
23   Q. Is there anything else in Mr. Frey's July
24 15, 2002 e-mail that you believe is untrue or

---

102

1  defamatory?
2    A. No
3    Q. This e-mail was not sent to you, was it?
4    A. No, it was not.
5    Q. How did you become aware of Mr. Frey's July
6  15, 2002 e-mail?
7    A. It was in my personnel file.
8    Q. Did there come a time when you inspected
9  your personnel file?
10   A. I believe there was.
11   Q. When was that?
12   A. Well, definitely after my termination, and
13 possibly prior to that.
14   Q. How did you get access to your personnel
15 file?
16   A. The process was the same for everyone. You
17 went to the human-resource department and requested
18 to see your personnel file.
19       They did not permit you to remove the
20 file from their presence, and you could inspect it;
21 and if you wanted to make a copy of something you
22 could.
23   Q. And did you make a copy of this e-mail?
24   A. Yes.

---

103

1    Q. Do you believe that Mr. Frey's July 15,
2  2002 mail was shared with anyone other than Peter
3  Arturi, Vaughn Rist and Jim Craigie?
4    A. Well, it was shared with those individuals,
5  plus anyone who reviewed my personnel file. That
6  was at a minimum.
7    Q. Are there others that you believe acquired
8  access to Mr. Frey's July 15, 2002 e-mail?
9    A. No.
10   Q. Do you believe that it was inappropriate
11 for Mr. Frey's July 15, 2002 e-mail to be placed in
12 your personnel file, if in fact it was?
13   A. If in fact it was? I don't understand.
14   Q. If the July 15, 2002 e-mail was in your
15 personnel file, do you believe it was
16 inappropriate for it to be there?
17   A. Well, first, it was in my personnel file;
18 all right?
19   Q. Okay.
20   A. And then, again, the decision as to whether
21 it should have been in my personnel file was not
22 mine to make. And so, I won't judge that.
23   Q. In Paragraph 57 of your complaint,
24 you allege that your ability to secure continued

---

104

1  employment with the purchased company Callaway was
2  affected by the false statements of Dan Frey; do you
3  see that there?
4        MS. BRODEUR-MC GAN: Objection. You can
5  answer.
6    A. Yes, I see it.
7    Q. How did Mr. Frey's July 15, 2002 e-mail
8  affect your ability to secure continued employment
9  with Callaway or the New Top-Flite?
10   A. By not supporting everything else in my
11 personnel file, which was all positive. This was
12 in effect a negative type of memo.
13   Q. And is it the same as you testified earlier
14 with respect to the fact that it was in your
15 personnel file?
16       Explain to me the causal link between
17 the e-mail being in your personnel file and it
18 affecting your ability to secure continued
19 employment with the new company.
20       MS. BRODEUR-MC GAN: Objection. You can
21 answer.
22   A. Two ways.
23       One, with regards to this memo, it was
24 the fact that this memo was in my personnel file and

---

**Dennis A. Paren**
**April 29, 2005**

105

1  was available for anyone from the new company to
2  see; all right?
3          It is customary, for people to
4  take a look at the personnel file, even if it's
5  just briefly, to get an idea of who they're going to
6  interview or discuss or even consider, without that
7  person maybe even having knowledge of it.
8          The second item that this refers to is
9  the fact that Dan Frey, just like Jim Craigie, had
10  interactions with the people at Callaway and with
11  other companies that might have been interested in
12  purchasing the assets of the bankrupt estate.
13          And I'm not privy to what conversations
14  they actually had. However, knowing that they had
15  been retaliating against me to begin with, I knew
16  that nothing positive was going to be said.
17      Q. But sitting here today, you don't know
18  whether Dan Frey said anything about you to the
19  people at New Top-Flite or Callaway, do you?
20          MS. BRODEUR-MC GAN: Objection. You can
21  answer.
22      A. No, I don't know.
23      Q. Looking back at your interrogatory
24  response, this is your Response Number 3, you

106

1  state, Furthermore, on September 16, 2003 Peter
2  Arturi informed me that Dan Frey had decided to
3  exclude me (from the retention bonus plan) because
4  I was a pain in his butt. Did I read that
5  correctly?
6      A. Which number were you reading, again?
7          MS. BRODEUR-MC GAN: Right here.
8      A. Yes, you read that correctly.
9      Q. Tell me in your own words what Peter Arturi
10  told you on September 16, 2003.
11      A. Well, that's exactly what Peter Arturi told
12  me.
13      Q. What was the context in which he...
14      A. The context was that I knew, again, at this
15  point in time that everybody was receiving large
16  bonuses at the time of the closing of the sale
17  of the company, which was September 15;
18          and so there were many, many people
19  that were very, let's say, joyous about the event,
20  because they were happy to receive a large amount of
21  money. I was excluded from that.
22          Peter through the history had known
23  I had been asking for information; and he had
24  supported me in that effort, even though Dan

107

1  prevailed and excluded me.
2          So Peter, continuing with the
3  new company, sort of wanted to tell me that We're
4  starting with the new company, there's nothing that
5  the new company can do about what Dan Frey did; so
6  this is why you were excluded according to Dan, and
7  you just have to live with it and go on. That was
8  the context.
9      Q. What did Mr. Arturi tell you about Dan
10  Frey's reasons for excluding you from the
11  retention-bonus plan?
12      A. Well, the reasons, we knew. The reasons
13  were unstated. We knew what the reasons were.
14      Q. Did Peter Arturi tell you his understanding
15  of Dan Frey's reasons for excluding you from the
16  retention-bonus plan?
17      A. Peter and I talked on a daily basis for
18  years. He knew all of the various flaws within the
19  company that I had uncovered and tried to correct.
20          So those were the issues that were being
21  a pain in the ass to Dan Frey; because it was Dan
22  Frey's failings on these issues, financial in
23  nature, that were his responsibility.
24          And nobody likes to be told they're not

108

1  performing up to what I felt their duties and
2  responsibilities were.
3      Q. The question I'm posing to you is, did
4  Peter Arturi tell you his understanding of Dan
5  Frey's reasons for excluding you from the
6  retention-bonus plan?
7      A. Peter said something; but again it was all
8  well known between Peter, myself, Mike Lyon, Stephen
9  Nigro, Charlie Kimmett, Lynn LaFond, that I was the
10  person tooting the horn saying something is wrong,
11  and they didn't want to hear it.
12          So, we didn't have to talk about, Oh,
13  they didn't like it because you went and reported
14  Stephanie Lawrence, or you did something else.
15      Q. So the answer is that Mr. Arturi did not
16  tell you Mr. Frey's reasons for excluding you from
17  the retention-bonus plan?
18          MS. BRODEUR-MC GAN: Objection.
19      A. Mr. Arturi did not specifically outline
20  item by item those reasons.
21      Q. Did any of the people you just mentioned
22  ever tell you their understanding of the reasons
23  why you were excluded from the retention-bonus
24  plan?

**Dennis A. Paren**
**April 29, 2005**

---

109

1    A. Only upon what the assumptions were; that
2  because I came at them and told them of things that
3  they were doing which were inequitable, unlawful, or
4  not in compliance with general accounting principles
5  or with US tax laws.
6    Q. But did anyone, including Mr. Arturi, ever
7  tell you they believed that you were being excluded
8  from the retention-bonus plan because you reported
9  these acts that you believed to be inappropriate or
10  unlawful?
11    MS. BRODEUR-MC GAN: Objection. You can
12  answer.
13    A. No, because nobody talked in that manner.
14  It was well known.
15    Q. Going back to your conversation with Peter
16  Arturi on September 16, 2003, which part of what he
17  told you are you alleging is defamatory? Is it his
18  conversation with you relating what Dan Frey said,
19  or is it Dan Frey's statement that you're
20  alleging is defamatory?
21    A. It's Dan Frey's statement, and it's Dan
22  Frey's whole perspective on me as an employee; and
23  whatever he did with that.
24    Q. So, do you know when Mr. Frey allegedly

---

110

1  told Peter Arturi that he had excluded you from the
2  retention-bonus plan because you were a pain in his
3  butt?
4    A. What I know is that at two different times
5  both Peter Arturi and Vaughn Rist went to Dan Frey
6  and asked him to include me in the retention bonus,
7  and I would imagine it was at one of those times.
8    Q. Do you know whether there were any
9  witnesses to Dan Frey's statement to Peter
10  Arturi that you were a pain in his butt?
11    A. I don't know.
12    Q. And are you alleging that Dan Frey made a
13  similar statement to Vaughn Rist?
14    A. I don't know who was present.
15    Q. Do you have any reason to believe that
16  Mr. Arturi shared with anyone else Mr. Frey's
17  statement that you were a pain in his butt?
18    A. I would imagine he did, but I don't know.
19    Q. How did Mr. Frey's statement that he
20  decided to exclude you from the retention-bonus
21  plan because you were a pain in his butt affect your
22  ability to secure continued employment with the New
23  Top-Flite or Callaway?
24    A. Because the individuals that were

---

111

1  considered to be included were considered to be
2  those people that you needed in order to run the
3  operation; the rest were expendable.
4    Q. So, are there persons that you can identify
5  that held that view with respect to the list of
6  people who got the retention bonuses?
7    MS. BRODEUR-MC GAN: Objection.
8    A. The people that designed the retention-
9  bonus program and decided who was going to be
10  included had that viewpoint.
11    Q. Who specifically?
12    A. You asked me that question before. I don't
13  know who was on that.
14    Q. Is it your contention that the persons
15  responsible for making up the list of who would get
16  a retention bonus communicated to New Top-Flite or
17  Callaway that these are the people that they
18  should keep on as employees?
19    A. The list of who was on the retention bonus
20  was a very important list; I know that. There was a
21  lot of money tied to that list.
22    Q. But is it your contention that that list
23  was presented by the people responsible for creating
24  the retention-bonus list to New Top-Flite or

---

112

1  Callaway?
2    A. Could have been.
3    Q. Do you have any reason to believe that?
4    A. Normal business principles would lead me to
5  believe that.
6    Q. But you don't have any specific facts that
7  you can point to to support your belief?
8    MS. BRODEUR-MC GAN: Objection.
9    A. The specific facts that I would have are
10  simply that the list would be scrutinized by the new
11  company, and I know that it was looked at by the new
12  company; but it totalled to a lot of money.
13    So, as someone is scrutinizing the
14  list, they're going to begin to ask who are these
15  individuals on this list, and why are they on this
16  list.
17    Q. Do you have any knowledge that Jim
18  Craigie or Dan Frey or any other of the people
19  who were involved in putting that list together
20  communicated to New Top-Flite or Callaway that
21  these are the people that you should keep?
22    A. In effect, yes.
23    Q. What is the factual basis for that?
24    A. Because they gave them a list of these are

---

**Dennis A. Paren**
**April 29, 2005**

113

1  the people that you need to operate this company
2  with; these are the people that you need to
3  retain.
4        The whole purpose of the retention
5  bonus was to retain those people that you needed
6  to operate the company with, and continue to have
7  some type of value for the company. It's inherent
8  in the list.
9     Q. But you weren't present at any of the
10 discussions where that list was communicated to
11 New Top-Flite or Callaway, were you?
12    A. No; but that list was filed with the
13 bankruptcy court, and that list was provided to
14 each one of the companies that was reviewing and
15 seeing whether they were going to continue.
16        And part of the sale process was for the
17 company to continue that retention bonus after the
18 sale of the company.
19    Q. Your next statement that you point
20 to as being defamatory is, On many occasions,
21 Dan Frey would address me in a derogatory manner
22 as Mr. Sunshine while speaking to other employees.
23 I believe there are additional statements made
24 which I will supplement.

114

1        When did Mr. Frey refer to you in a
2  derogatory manner as Mr. Sunshine?
3     A. During the time that I worked underneath
4  him.
5     Q. For the entire period; from September...
6     A. You asked me when. I don't remember the
7  exact time. I didn't note the time.
8     Q. How many times did he refer to you as
9  Mr. Sunshine?
10    A. At least twice, that I heard.
11    Q. On the first occasion that he referred to
12 you as Mr. Sunshine, where were you?
13    A. I believe I was in a hallway.
14    Q. Which hallway?
15    A. The hallway outside of his office.
16    Q. What was the context in which he referred
17 to you as Mr. Sunshine?
18    A. He wasn't saying it to me. I overheard it;
19 he was saying it to someone else.
20    Q. Who was he saying it to?
21    A. I don't remember. And I don't recall.
22        And the context was similar to when
23 I when I went to see Jim Craigie. Again, it was
24 me normally having reported on something that was

115

1  inappropriate, and having a scowl on my face. So,
2  that's why he called me Mr. Sunshine.
3     Q. Did he tell you that's why he called you
4  Mr. Sunshine?
5     A. No.
6     Q. So that's just your understanding of why he
7  referred to you that way?
8     A. Well, he had no hair, and I called him
9  Baldy. I wouldn't have to tell him that I'm calling
10 you that because you don't have any hair. It was
11 that type of implication.
12    Q. Were there any other people that overheard
13 Mr. Frey this first time that he referred to you as
14 Mr. Sunshine?
15    A. Yes. Somebody overheard that, right.
16    Q. Who was that?
17    A. I just don't recall.
18    Q. Do you have any reason to believe that his
19 reference to you as Mr. Sunshine in this first
20 instance was shared with anyone else?
21    A. Do I have any concrete reason? No.
22        The only reasons I have are my reasons
23 and beliefs because of him in normal conversation
24 with his cohorts.

116

1     Q. What do you mean by that?
2     A. When he was out playing golf and they were
3  talking about people in the office, when they were
4  talking people behind their backs. Normal course
5  of office comments.
6     Q. So you're assuming that Mr. Frey told other
7  people that he referred to you as Mr. Sunshine?
8        MS. BRODEUR-MC GAN: Objection.
9     A. Yes, I would assume that.
10    Q. But you don't have any reason to know
11 either way, besides that?
12    A. Not at this moment, no.
13    Q. Now, tell me about the second time that
14 Mr. Frey referred to you as Mr. Sunshine. Where
15 was that?
16    A. I believe that was in the conference room,
17 and I was just coming in late.
18    Q. When was that?
19    A. I don't have a date. We had normal weekly
20 meetings.
21    Q. So a meeting was going on in the conference
22 room?
23    A. It was just beginning, I believe.
24    Q. And who was in the conference room as you

**Dennis A. Paren**
**April 29, 2005**

---

**117**

1  walked in?
2      A. It would have been the majority of the
3  people that were on his finance staff. We've
4  already gone over that.
5      Q. So basically his direct reports?
6      A. Correct.
7      Q. And tell me about the context in which he
8  referred to you as Mr. Sunshine.
9      A. The meetings always began on a semi-
10  light, very sarcastic type of few minutes; and
11  there were sometimes jokes made, not really jokes,
12  but just comments. There wasn't any context other
13  than that.
14      Q. How did you know that it was derogatory
15  when he was referring to you as Mr. Sunshine?
16      A. I had no reason to take it any other way.
17      Q. That was the way you interpreted it;
18  correct?
19      A. That's correct.
20      Q. Did you discuss with anyone who was in that
21  conference room the fact that he would refer to you
22  as Mr. Sunshine?
23      A. No. It was embarrassing.
24      Q. Do you have any reason to believe that

---

**118**

1  any of Mr. Frey's direct reports who were in that
2  conference room shared with anybody else the fact
3  that he referred to you as Mr. Sunshine?
4      A. I think that there was some sharing of a
5  lot of things, but what exactly they were I don't
6  know.
7      Q. So you don't have any specific knowledge
8  that anyone conveyed that comment outside of the
9  conference room?
10      A. Correct.
11      Q. How did Mr. Frey's reference to you as Mr.
12  Sunshine affect your ability to secure continued
13  employment with the New Top-Flite or Callaway?
14      A. Well, again, it was the main comment
15  which affected my confidence to perform and affected
16  my self-esteem with dealing with my peers there, and
17  damaged my reputation within that whole group of
18  finance people. That's how I felt, and that's
19  what was important.
20      Q. Did anyone ever tell you that your
21  reputation had been tarnished because Mr. Frey
22  referred to you as Mr. Sunshine?
23      A. It was well known within the finance
24  department that I was always at the bottom of Dan's

---

**119**

1  list of employees, with regard to just how he viewed
2  me.
3      Q. When you say it was well known, did anyone
4  ever tell you that?
5      A. There are comments within the claim that
6  spell that out.
7      Q. I need you to be more specific.
8      A. Well, when I was in Charlie Kimmett's
9  office and we were talking about the forgiveness of
10  the promissory notes, he said, Oh, yes, I heard you
11  went to Dan, and he sent you out of the office with
12  your dick in your hand.
13      Q. What did you interpret that to mean?
14      A. That I was in the office looking for
15  inclusion within the retention-bonus program, and
16  instead I was sent out humiliated and with nothing.
17      Q. And did Kimmett tell you that that was what
18  he meant when he said that to you?
19          MS. BRODEUR-MC GAN: Objection. You can
20  answer.
21          MS. NEWMAN: I'll rephrase.
22      Q. Did Mr. Kimmett tell you it was his belief
23  that you had been humiliated?
24      A. I don't think people talk that way. People

---

**120**

1  make statements, and the statement is normally
2  understood as to what it means.
3          There was another instance where I was
4  with Mike Lyon and Lynn LaFond in Mike's office, and
5  we were talking about various inappropriate things
6  that management did; and someone made the comment --
7  well, no, I made the comment -- Well, yes, I've
8  told management about these things many times.
9          And the comment came back from Lynn
10  LaFond, Well, we all know what that did for you.
11      Q. I want to come back to this; but I actually
12  have to take a break for a second.
13          [Recess taken]
14  BY MS. NEWMAN:
15      Q. Mr. Paren, another statement that you
16  allege that Dan Frey made which was defamatory is
17  the statement to Marc Lipschultz. Can you tell me
18  what that statement was?
19      A. I can tell you in what context this took
20  place.
21      Q. Okay.
22      A. Marc Lipschultz used to be a director of
23  Spalding.
24          I contacted Jerry Sullivan from Kohlberg

---

**Accurate Court Reporting**
**413.747.1806**

**Dennis A. Paren**
**April 29, 2005**

---

121

1  Kravis Roberts. Jerry Sullivan is the risk manager
2  for KKR.
3      He called Marc Lipschultz to inform
4  him that I had been excluded from this retention-
5  bonus program;
6      and to tell him that with most
7  people it's pretty well known that you don't
8  exclude somebody that's in the core group of a
9  bonus program which is established for those
10 individuals, especially those individuals
11 that have key responsibilities.
12      Mr. Lipschultz called on my behalf to
13 try to influence Dan Frey.
14     Q. Mr. Lipschultz called Dan Frey?
15     A. Dan Frey.
16     Q. And when was this?
17     A. This was after I found out that I was
18 excluded from the bonus program, so it was in the
19 May-June time frame. I believe it was in May 2002.
20     Q. Do you have an understanding as to what Dan
21 Frey said to Marc Lipschultz about the fact that you
22 weren't included for a retention bonus?
23     A. Dan Frey called me into his office, told me
24 that Marc had called him, and told me that he was

---

122

1  not going to be influenced by Marc Lipschultz.
2      Q. Did he tell you anything else?
3      A. That he felt I wasn't doing myself a favor
4  in contacting people on the board of directors.
5      Q. Did he tell you what he meant by that?
6      A. No, he did not tell me what he meant.
7      Q. What did you understand him to mean?
8      A. That the board of directors had no
9  influence over Dan Frey and Jim Craigie in the
10 actions that they took in operating the company.
11     Q. Did Marc Lipschultz tell you about his
12 conversation with Dan Frey?
13     A. No, he did not.
14     Q. Did Dan Frey tell you about his
15 conversation with Marc Lipschultz?
16     A. Just that he had the conversation, that he
17 was contacted very quickly, and that I shouldn't be
18 contacting people outside of the corporate
19 headquarters.
20     Q. And what part of what you just told me are
21 you alleging is defamation?
22     A. Well, the part that's defamation is the
23 fact that he had to say something to Marc Lipschultz
24 to justify his position that I should not be

---

123

1  included in the retention-bonus program.
2      Kohlberg Kravis Roberts is a
3  multifaceted investment firm, that has many,
4  many businesses which could utilize individuals
5  such as me; and Marc is one of the younger people in
6  Kohlberg Kravis, who is going to have a long history
7  with that company, and whatever he said is poisoning
8  that company towards me.
9      Q. But you don't know what Dan Frey said to
10 Marc Lipschultz, do you?
11     A. I only know what the ultimate effect was.
12     Q. What was that?
13     A. The ultimate effect was that, one, I was
14 not included in the retention-bonus program even
15 after indirectly appealing to the board of
16 directors.
17     Q. Any other effects of what he said to
18 Mr. Lipschultz?
19     A. Not that I know of yet. We'll have to find
20 it out through discovery.
21     Q. Are you alleging that Dan Frey's statements
22 to Marc Lipschultz impeded your ability to secure
23 continued employment with New Top-Flite or
24 Callaway?

---

124

1      A. With New Top-Flite, and with possible KKR
2  companies.
3      Q. How?
4      A. Well, I'm not privy to who these
5  people talk to; but when companies are buying
6  other companies they have access to the board of
7  directors, they have access to management, and what
8  exactly was said to them I don't know.
9      Q. You're just assuming that Mr. Frey said
10 something negative about you to Mr. Lipschultz;
11 right?
12     MS. BRODEUR-MC GAN: Objection.
13     A. Well, I think it's a logical assumption
14 based upon the results.
15     Q. But there could have been other reasons why
16 you weren't included in the retention-bonus plan;
17 correct?
18     A. Not that I know of.
19     Q. You have no way of knowing what Mr. Frey
20 said to Mr. Lipschultz; correct?
21     A. He didn't tell me what he said; only that
22 he wasn't going to be influenced.
23     So therefore, I know one party is
24 trying to positively influence Dan Frey; and I know

---

**Dennis A. Paren**
**April 29, 2005**

125

1  Dan Frey is saying, no, it doesn't matter what you
2  say, I'm going to continue to do it my way.
3      Q. Did you say anything in response to
4  Mr. Frey after he told you that you weren't doing
5  yourself a favor in contacting people with the board
6  of directors?
7      A. I don't recall what my response was.
8      Q. Did you ever apply for a job with KKR?
9      A. The company was a KKR company.
10     Q. But later on, after your employment was
11 terminated by New Top-Flite, did you ever apply for
12 a job at KKR?
13     A. I sent them my resume.
14     Q. When was that?
15     A. A number of times.
16     Q. Did you receive a response?
17     A. I never received anything in writing, if
18 that's what you're asking.
19     Q. Did you ever receive any type of a
20 response, in writing or otherwise?
21     A. I received a response that they had
22 received it, and they were hopeful that maybe a
23 position might open up somewhere; but I was never
24 contacted.

126

1      Q. Did anyone at KKR ever tell you that Mr.
2  Frey's statements to Mr. Lipschultz would negatively
3  affect their consideration of you for any open
4  positions?
5      A. No, but I don't converse with the people at
6  KKR.
7      Q. In your Interrogatory Response Number
8  4, you identify as having knowledge of Mr. Frey's
9  defamatory statements Dan Frey, Jim Craigie, Peter
10 Arturi, Scott Graves, Vaughn Rist and your family.
11         MS. BRODEUR-MC GAN:  Objection.
12     Q. Do you see that there?
13         MS. BRODEUR-MC GAN:  Objection.
14         THE WITNESS:  Can I answer?
15         MS. BRODEUR-MC GAN:  Yes.
16     A. Yes, I see that.
17     Q. What knowledge does Jim Craigie have of
18 Mr. Frey's alleged defamatory statements?
19     A. Jim Craigie and Dan Frey spoke all the
20 time, so they shared information as close
21 business associates.
22         These types of issues that I raised were
23 not something that was common, and therefore they
24 had to have conversations between each other and

127

1  with other people.
2      Q. But you're just assuming that Mr. Frey
3  shared his statements that you've identified with
4  Mr. Craigie; isn't that right?
5          MS. BRODEUR-MC GAN:  Objection.  You may
6  answer.
7      A. Well, I know that Jim Craigie wrote me an
8  e-mail in 2002 indicating that Dan Frey was trying
9  to sever me; so I know that as they discussed what
10 was the justification for that something would be
11 discussed, the positives and the negatives about
12 the performance.
13         Although there were no negatives in my
14 performance.
15     Q. Do you believe that Scott Graves has any
16 firsthand knowledge of the statements that were made
17 by Mr. Frey that you've identified as being
18 defamatory?
19         MS. BRODEUR-MC GAN:  Objection to form.
20 You can answer it.
21     A. Again, Scott Graves dealt primarily with
22 Dan Frey; and that information went back and forth
23 between them as to what is happening within the
24 operation.

128

1          So I would think that all issues of
2  importance were relayed between each other.
3      Q. But you don't have any specific knowledge
4  that these statements were shared with Scott Graves?
5      A. No, I don't.
6      Q. And what about Vaughn Rist?  What knowledge
7  or information does he have regarding each of the
8  statements made by Mr. Frey that you identified
9  as defamatory?
10     A. Well, Vaughn Rist was on the e-mail.
11     Q. The July 15, 2002 e-mail?
12     A. Yes.
13     Q. Anything else?
14     A. Again, I don't know; but I'm assuming
15 that within the operating-committee meeting, before
16 it began, or after, or in the course of general
17 discourse in the company, things were spoken
18 behind my back.
19         And those two had offices which adjoined
20 each other; or were very close to each other, put it
21 that way.
22     Q. Which two?
23     A. Dan Frey and Vaughn Rist.  So they were in
24 close proximity to each other.

**Dennis A. Paren**
**April 29, 2005**

---

129

1    Q. But you're just assuming that Dan Frey
2   shared these statements that you've identified with
3   Vaughn Rist; is that right?
4        MS. BRODEUR-MC GAN: Objection. That's
5   not what he said. You can answer.
6    A. What I'm saying is, my assumption
7   is based upon the fact that they worked close
8   to each other, that I went to both of these people
9   continually about the retention-bonus program, and
10  that there were conversations between them that I'm
11  not privy to;
12       and that in supporting Dan's view, he
13  would most likely say something that had a negative
14  connotation to it, because, one, we already know
15  that Peter Arturi told me that he thought I was a
16  pain in the butt,
17       and, two, I know that I annoyed him by
18  telling him of things that were under his control
19  which he was not exercising his authority over.
20   Q. Aside from the statements you've
21  already identified by Mr. Frey, are there any
22  other statements by Mr. Frey that you allege to
23  be defamatory, sitting here today?
24   A. Not that I know of right now.

---

130

1    Q. I'd like to turn your attention
2   now, Mr. Paren, to your claim that Mr. Craigie
3   intentionally interfered with your contractual
4   relations.
5        In Interrogatory Number 5, you were
6   asked to identify each existing and prospective
7   contract or contractual relationship with which
8   you allege that James Craigie interfered; do you
9   see that, under Paragraph 5?
10   A. Yes, I do.
11   Q. And you identified your prospective
12  contract of continued employment with Callaway,
13  and your contract for benefits (ie retention
14  benefits) which you should have had.
15       Are there any other contracts that you
16  believe Mr. Craigie interfered with?
17   A. Well, he could have interfered with my
18  possible employment with a KKR company. I don't
19  know that yet.
20   Q. Anything else?
21   A. No.
22   Q. Did you have employment contracts with
23  Callaway?
24       MS. BRODEUR-MC GAN: Objection. You can

---

131

1   answer.
2    A. No, I did not have an employment contract.
3    Q. And what is the contract for benefits, ie
4   retention benefits, which you allege you should
5   have had?
6    A. Well, I'm not going to say that that is
7   exactly the way that I worded my response.
8    Q. How would you characterize it?
9    A. Well, I'm talking about the retention bonus
10  in that context right there.
11   Q. In your complaint, you allege that
12  Mr. Craigie retaliated against you for reporting
13  his illegal activity; is that accurate?
14   A. Yes.
15   Q. How did your reporting Mr. Craigie's
16  alleged illegal activity result in you not
17  receiving a retention bonus?
18   A. Well, because there was still hope in
19  my mind prior to the assets being sold, with Dan
20  Frey having left the company in June of 2003, that
21  there was still time to rectify this wrong; and I
22  was going to the board of directors and explaining
23  to them what happened, if they were interested in
24  the double expenditures of Jim Craigie.

---

132

1        I know that they audited his expense
2   reports; I know that they probably talked to him at
3   great length. I don't know what he said to them,
4   but I know the end result was that I was excluded
5   from the next bonus payment.
6    Q. When did you go to the board of directors
7   about his expense reports?
8    A. Well, there's an e-mail to Scott Graves.
9   You'd have to look at that date.
10   Q. I'm handing you a document I've just marked
11  as Exhibit Paren 12.
12       [Paren Exhibit 12 marked for
13  identification]
14   Q. Is this the e-mail to Scott Graves to which
15  you were just referring?
16   A. No.
17       MS. BRODEUR-MC GAN: Can you read it?
18       THE WITNESS: It's very hard to read.
19       MS. NEWMAN: It is hard to read.
20       MS. BRODEUR-MC GAN: What's the Bates
21  stamp number on that?
22       MS. NEWMAN: I can't read it. Something
23  ending with 9.
24       [Off the record]

---

**Dennis A. Paren**
**April 29, 2005**

---

133

1    Q. Mr. Paren, the document that I've just
2  provided to you and marked as Exhibit 12, is this
3  the e-mail to which you were referring?
4    A. No.
5    Q. There's another e-mail that you sent to
6  Scott Graves?
7    A. In the first sentence, it talks about
8  an e-mail that I sent him last Friday; so you'd have
9  to go back on a calendar to figure out when that
10  date was.
11    Q. Have you produced us a copy of that e-mail?
12    A. I assume so.
13        MS. BRODEUR-MC GAN: I'm sure, if we had
14  it, we produced it.
15        MS. NEWMAN: I'm sure, if we had it, I'd
16  have it as an exhibit.
17    Q. Well, the e-mail that you sent to
18  Mr. Graves, what did it say?
19    A. I'd have to reread it to be accurate as
20  to what it said, but it had something to do with the
21  fact that in the last days of Jim Craigie operating
22  as CEO he was doubling up on his expense reports.
23    Q. But the retention-bonus plan was adopted in
24  or about April of 2002; correct?

---

134

1    A. Yes.
2    Q. So, how did your reports of Mr. Craigie's
3  alleged unlawful activity result in your exclusion
4  from the retention-bonus plan that was adopted in
5  April of 2002?
6    A. Because the retention-bonus program was
7  under revision during the time when Dan had made
8  it known that he was leaving the company; that's
9  one.
10        Number two, other people that had been
11  included in the retention-bonus program had left the
12  company; which created fewer people, with more
13  money.
14        Number three, Jim Craigie had written
15  on a memo that I had written saying, We can't add
16  Dennis to the plan unless there are more dollars.
17    Q. Which memo did he write that on?
18    A. The memo that I wrote to Peter Arturi, and
19  then went to Jim's office and gave him that.
20    Q. Mr. Paren, I've just handed you a document
21  that we've marked as Exhibit Paren 13. It bears
22  Bates labels 0001 through 0003; a memo from
23  you to Peter Arturi.
24        [Paren Exhibit 13 marked for

---

135

1  identification]
2    Q. Is this the memo to which you were just
3  referring?
4    A. Yes, it is.
5        MS. BRODEUR-MC GAN: Just object for
6  the record. I'm not sure my client was finished
7  answering the question when we pulled the
8  document out.
9        MS. NEWMAN: I'm sorry.
10    Q. Go ahead and finish your answer.
11    A. Ask the question again.
12        MS. BRODEUR-MC GAN: Off the record a
13  second.
14        [Off the record]
15    Q. Mr. Paren, just so the record is clear,
16  I had asked you how your reports of Mr. Craigie's
17  alleged unlawful conduct had resulted in your
18  exclusion from a retention bonus, and you
19  were giving me a list of reasons.
20    A. Yes.
21    Q. Can you just finish that list, and then
22  we'll come back and ask you about Exhibit 13.
23    A. I'm not sure I have anything else to add to
24  that list at this time.

---

136

1    Q. So the first thing you mentioned, which we
2  already went over, was the fact that you went to the
3  board of directors in September of 2003, around the
4  time of the Callaway acquisition; right?
5    A. Correct.
6    Q. And then the second thing you mentioned was
7  the memorandum that you had prepared which had Jim
8  Craigie's handwriting on it; is that right?
9    A. Yes.
10    Q. Now, walk me through how Exhibit 13 relates
11  to your belief that Mr. Craigie excluded you from a
12  retention bonus because you reported his alleged
13  unlawful conduct.
14    A. Which one is Exhibit 13? Oh, okay. Ask me
15  that question again.
16        MS. BRODEUR-MC GAN: I'm objecting as to
17  form.
18    Q. I just want to understand the basis for
19  your belief that Mr. Craigie excluded you from a
20  retention bonus because you reported his alleged
21  unlawful or improper conduct; and you mentioned
22  this memorandum.
23        I just need to understand why you
24  mentioned the memorandum, and your reasons.

---

Dennis A. Paren
April 29, 2005

---

137

1  A. This memorandum provided me hope, because
2 he wrote, We cannot do this unless we have dollars
3 left under that plan or one of the participants
4 leaves Spalding.
5      Now, it was right around this time that
6 participants were leaving Spalding. There was more
7 money, Dan Frey was leaving. And so there were more
8 dollars on the table.
9      And Jim Craigie had a lot of influence
10 with who was accepted or who was put in this plan,
11 and for how much. Those are the reasons.
12  Q. This memorandum that you wrote to Peter
13 Arturi, you sent it to him in June of 2002; is that
14 right?
15  A. Yes.
16  Q. And do you know when Mr. Craigie hand-wrote
17 this language on the upper right-hand corner of
18 Exhibit 13?
19  A. I believe it was a few weeks afterwards.
20  Q. When did you first acquire a copy of your
21 memorandum with Mr. Craigie's handwriting on it?
22  A. I can't recall.
23  Q. So, what is the factual basis for your
24 belief that Mr. Craigie ultimately decided not to

---

138

1 include you in September 2003 for a retention
2 bonus?
3  A. Because I had this memo. Sometime in
4 September 2003 I had this memo, even in August.
5      I went to Vaughn Rist and said, I know
6 things are being changed; it says here that you'll
7 consider me based upon these events happening, and
8 they're happening.
9      And he went to Jim, and talked to Jim;
10 and actually even told me, I think Jim, now that
11 Dan is gone, will approve it.
12      And then subsequently, he came back and
13 he said, I'm sorry, Dennis, but I can only do what
14 I'm told to do.
15  Q. Did Mr. Rist tell you what Jim Craigie said
16 to him when he went to talk to him about your
17 inclusion in the retention bonus in 2003?
18  A. I believe he had more than one conversation
19 with him, and at one point he was hopeful.
20  Q. Did Mr. Rist tell you what Jim Craigie said
21 on any of those occasions?
22  A. No, he did not tell me specifically what he
23 said.
24  Q. But Mr. Rist conveyed to you his optimism

---

139

1 that Mr. Craigie might include you in the retention
2 bonus?
3  A. That's correct.
4  Q. And did Mr. Rist tell you if Mr. Craigie
5 explained to him why you ultimately were not
6 included for a retention bonus in September
7 of 2003?
8  A. Did he explain to me? No. Nothing more
9 than, I'm only told what to do.
10  Q. Did Mr. Rist convey to you what Mr. Craigie
11 had told him, other than that you wouldn't be
12 included?
13  A. No.
14  Q. Did Mr. Rist tell you that Jim Craigie had
15 told him that you would not be included because you
16 had reported improper or unlawful conduct by him?
17  A. No, he did not say it.
18  Q. Did anyone ever tell you that the
19 reason you were not included in the retention
20 bonus in September of 2003 was because you reported
21 unlawful or improper conduct by Jim Craigie?
22  A. Again, not specifically. It was a given
23 that the reason why I wasn't included was because I
24 did report; not just about Jim Craigie, but about

---

140

1 other individuals.
2      And so the precedent was already set to
3 exclude me. Jim Craigie just continued on that
4 path.
5  Q. When you say precedent, you mean the
6 original plan from April 2002?
7  A. Correct; and then when my name came up
8 subsequent to that also.
9  Q. So are you alleging that Mr. Craigie
10 excluded you from the retention-bonus plan in April
11 of 2002 because you reported unlawful or improper
12 conduct by Mr. Craigie, or by anyone else?
13  A. Well, not by Mr. Craigie, but by other
14 people.
15  Q. What is the factual basis for your belief
16 that your reporting of unlawful or improper conduct
17 was the reason why you were excluded from a
18 retention bonus?
19      MS. BRODEUR-MC GAN: Objection. You can
20 answer.
21  A. Well, I would refer you to the third
22 paragraph of the letter to Scott Graves.
23  Q. Paren 13?
24  A. Paren 12.

---

**Accurate Court Reporting**
**413.747.1806**

**Dennis A. Paren**
**April 29, 2005**

141

1    Q. Paren 12.
2         MS. BRODEUR-MC GAN: Which paragraph did
3    you say?
4         THE WITNESS: Beginning with Paragraph
5    3, but then continuing onward.
6    Q. In your September 18, 2003 letter to
7    Mr. Graves, you describe a sampling of issues that
8    you brought up to the CFO and CEO; correct?
9    A. Yes.
10   Q. And which you say resulted in your
11   exclusion from the retention-bonus plans;
12   correct?
13   A. Correct.
14   Q. And then you list and describe them;
15   correct?
16   A. Correct.
17   Q. Then you say, The purpose of a retention-
18   bonus plan is to retain and reward those employees
19   whose responsibilities and performance are crucial
20   to a sale or reorganization. Did I read that
21   correctly?
22   A. Yes, you did.
23   Q. But you already testified that you weren't
24   privy to any of the discussions relating to who was

142

1    going to be included or not included in the
2    retention-bonus plan; correct?
3         MS. BRODEUR-MC GAN: Objection.
4    A. That's correct.
5    Q. So your statement about the purpose of a
6    retention-bonus plan is just your view of what the
7    purpose of a retention-bonus plan is; correct?
8         MS. BRODEUR-MC GAN: Objection.
9    A. Not correct. I believe what I'm stating is
10   a general business purpose.
11        I have been included in retention
12   programs in the past. I know what the purpose in
13   establishing those programs is.
14   Q. But you don't have any firsthand knowledge
15   as to what the purpose of the retention-bonus plan
16   in April of 2002 was, do you?
17        MS. BRODEUR-MC GAN: Objection. I think
18   he's answered that like five times.
19   Q. You can answer.
20   A. What was the purpose of establishing the
21   program in 2002?
22        It was to retain as much value as
23   possible to a company that was financially
24   deteriorating due to executive management.

143

1    Q. And did anyone ever tell you that that was
2    the purpose of the retention-bonus plan in April of
3    2002?
4    A. Yes. Somebody had stated that to me at
5    some point.
6    Q. Who was that?
7    A. I think it was Dan Frey.
8    Q. And you go on and say, Whatever the
9    rationale for my exclusion, it was arbitrary and
10   capricious.
11        An officer making decisions within his
12   scope of authority which purposely cause financial
13   hardship on a senior manager for voicing an opposing
14   opinion on inappropriate financial dealings is
15   retaliation that should not be permitted.
16        Did I read that accurately? That's what
17   you wrote?
18   A. That's what I wrote.
19   Q. What did you mean when you stated an
20   officer can make decisions within his scope of
21   authority?
22   A. Just what it means.
23   Q. An officer meaning members of the OPM?
24   A. Yes. All of those individuals in the OCM

144

1    were officers of the company.
2    Q. And then, what is the factual basis for
3    your statement that Jim Craigie purposely caused
4    financial hardship on you, a senior manager, for
5    voicing an opposing opinion on inappropriate
6    financial dealings?
7         MS. BRODEUR-MC GAN: Object to form.
8    You can answer.
9    A. Well, because when they were discussing or
10   had already begun to discuss the forgiveness of the
11   promissory notes, Peter Arturi told me that he told
12   management that I had had an outstanding loan from
13   my 401(k) to pay off the loan that I took from my
14   401(k) to buy the stock;
15        and that it was not fair for the company
16   to forgive the loans to the officers, yet have other
17   employees that paid cash or borrowed money
18   externally have total financial loss.
19        So he had an opportunity at that time to
20   try to make me somewhat whole; partially offset
21   those losses.
22   Q. He being Jim Craigie?
23   A. Yes. Jim Craigie, Dan Frey.
24   Q. But what's your factual basis for saying

Dennis A. Paren
April 29, 2005

---

145

1 that he purposely caused you financial hardship?
2         MS. BRODEUR-MC GAN: Objection. You can
3 answer.
4    A. Well, purposely because it was a decision
5 that they made after consideration, so they made the
6 decision purposely to exclude me. So the result was
7 purposeful.
8    Q. If you were not in the meetings discussing
9 the retention-bonus plan, how do you know the basis
10 for the decision to exclude you?
11        MS. BRODEUR-MC GAN: Objection. You can
12 answer.
13   A. I can only stand on what I've stated today.
14   Q. So you don't have any other facts to
15 support your claim that it was on purpose that Mr.
16 Craigie caused you financial hardship in retaliation
17 for your expressing an opinion on inappropriate
18 financial dealings?
19        MS. BRODEUR-MC GAN: Objection. You may
20 answer.
21   A. I believe they acted in a retaliatory
22 manner against me for having reported that some
23 of their friends or business associates within the
24 company were acting inappropriately, catching them,

---

146

1 having them to make some type of amends, and then
2 having them repeat the same actions and bringing
3 that to their attention again.
4         So, they took the opportunity to show me
5 who was in control; and so it was purposeful, what
6 they did.
7    Q. But again, nobody told you that; correct?
8         MS. BRODEUR-MC GAN: Objection; form.
9 You can answer.
10   A. They didn't have to tell me. They did it
11 over a period of days, weeks, months and years, the
12 story played out; and the facts came to light.
13   Q. Are there any other facts that you
14 rely on for your claim that Jim Craigie retaliated
15 against you and excluded you from the retention
16 bonus because you reported unlawful or improper
17 conduct?
18        MS. BRODEUR-MC GAN: Objection. You can
19 answer.
20   A. Jim Craigie's e-mail to me in September
21 said that he supported Dan Frey, and Jim Craigie was
22 good friends with Ed Several, good friends with Lou
23 Tursi, and some of the people that they hired; and
24 it was primarily individuals under their report who

---

147

1 I found doing inappropriate activities.
2    Q. Is there anything else?
3    A. Not that I know of right now.
4    Q. What is the factual basis for your claim
5 that Mr. Craigie interfered with your prospective
6 employment with Callaway or the New Top-Flite in
7 retaliation for your reporting unlawful or
8 improper conduct?
9    A. Again, this is something that we've gone
10 over in the past.
11   Q. You don't have anything else to add to your
12 testimony?
13   A. No, I don't.
14   Q. What is the factual basis for your claim
15 that Mr. Craigie interfered with your prospective
16 employment with KKR in retaliation for your
17 reporting unlawful or improper conduct?
18   A. Again, I don't have anything else to add at
19 this moment.
20   Q. If you could turn to Page 16 of your
21 complaint, which is Exhibit 1, I now want to focus
22 on your claim of intentional interference with
23 contractual relations against Dan Frey.
24         Do you assert that the contracts with

---

148

1 which Mr. Frey interfered were the same ones that
2 Mr. Craigie interfered with?
3    A. Yes.
4    Q. So we're talking about your prospective
5 employment with Callaway, your exclusion from the
6 retention-bonus plan, and your prospective
7 employment with KKR?
8    A. Right, and my prospective employment with
9 anybody who would need or would desire a reference
10 from those individuals.
11   Q. What is the factual basis for your belief
12 that Mr. Frey retaliated against you and excluded
13 you from the retention-bonus plan because you
14 reported improper or illegal activity?
15   A. One, it was just a general belief of mine
16 and other people in the company that that's why I
17 was excluded, as I talked to you about earlier.
18         Two, Peter Arturi's comment to me after
19 the purchase that the reason I was excluded was
20 because I was a pain in Dan's butt.
21   Q. Anything else?
22   A. There could have been other things that
23 I've already said, but we seem to be going over and
24 over this.

---

**Dennis A. Paren**
**April 29, 2005**

149

1    Q. When you refer to the general belief that
2  you were retaliated against by Mr. Frey, who were
3  the people that had this belief, to your knowledge?
4    A. Myself, Lynn LaFond, Cheryl Kubic, I would
5  say Mike Lyon, I would say Steve Nigro but I don't
6  know that he would admit it; probably, there were
7  people outside of the office. I would say Bob
8  Kalbfell, Ferris Grooms, my wife, Andy Howley.
9        Let's see. Susan Watson of Walker,
10 Truesdell.
11    Q. Anyone else?
12    A. Let's see. There are some attorneys that I
13 can't remember their names. I'd have to get them.
14    Q. If you think of them.
15    A. Yes.
16    Q. You mentioned before an incident with Mike
17 Lyon and Lynn LaFond in Mike Lyon's office.
18    A. Yes. Oh, I know. Fred Podolski.
19        I think the attorney is Susan Murray.
20    Q. Did Lynn LaFond ever tell you that she
21 believed you had been retaliated against by Dan Frey
22 and excluded from the retention-bonus plan because
23 you were reporting illegal or improper conduct?
24    A. Not in that manner.

150

1    Q. Why do you say or believe that she holds
2  that belief?
3    A. Because Lynn and I thought, just like the
4  majority of the honest individuals in the company,
5  that things were happening that shouldn't happen
6  within a corporation; and she was told by Dan
7  Frey to do things that she didn't necessarily
8  agree with.
9        And so we would have general
10 conversations back and forth with each other.
11    Q. And the topic of your retention bonus came
12 up with Lynn LaFond?
13    A. Lynn LaFond was in charge of payroll.
14 She made out the checks for the bonus programs.
15 She knew who was receiving the checks, who should
16 have received checks that didn't receive checks,
17 and how much they were.
18        So she was intimately aware of the
19 program, even if maybe at the beginning she was not
20 a participant.
21    Q. What about Cheryl Kubic?
22        Did Ms. Kubic ever tell you she believed
23 that you were being retaliated against by Mr. Frey
24 and excluded from a retention bonus because you

151

1  reported illegal or improper conduct?
2        MS. BRODEUR-MC GAN: Objection to the
3  form. You can answer.
4    A. Cheryl always believed that my job was
5  on the line, because I was the only one taking
6  the initiative to go to management with the
7  inappropriate activities that were being
8  done.
9    Q. Did she ever tell you that?
10    A. She laughed about it, in a joking way: Oh,
11 I guess I won't see you tomorrow; things of that
12 nature.
13    Q. When was that?
14    A. This happened for a period of years.
15 Cheryl worked for me, so she knew a lot of the
16 stuff that was going on with the expense reports
17 and the reimbursements.
18    Q. Did she ever tell you that she had any
19 specific knowledge that you had been retaliated
20 against by Dan Frey, and excluded from a retention
21 bonus?
22        MS. BRODEUR-MC GAN: Objection to form.
23    Q. For reporting illegal or improper conduct?
24    A. No. She never came to me and made that

152

1  statement.
2    Q. What about Mike Lyon?
3        What's the factual basis for your
4  identifying him as someone who believes that you
5  were retaliated against and excluded from the
6  retention-bonus plan for reporting illegal or
7  improper conduct?
8    A. Mike and I had a pretty close relationship
9  at the office, and we knew a lot of the things that
10 were going on. Mike knew that I was excluded. He
11 did not agree with my exclusion, and he made that
12 known to me.
13    Q. Did he ever tell you that the reason that
14 you had been excluded was because you reported
15 illegal or improper conduct?
16    A. He did not state that. It was well known
17 from him, he knew what I was reporting, and then he
18 knew what the consequences of reporting that
19 activity were; so...
20    Q. But he never said that those were the
21 consequences?
22        MS. BRODEUR-MC GAN: Objection.
23    A. We knew what the consequences were, because
24 we were both looking at them.

**Dennis A. Paren**
**April 29, 2005**

---

153

1    Q. What about Steve Nigro? Same question.
2    A. Same thing.
3    Q. So he didn't ever tell you that he believed
4  that you were being excluded from the retention-
5  bonus plan for reporting illegal or improper
6  conduct?
7    A. He implied it.
8        He said, Dennis, you're getting the
9  royal screw job from Dan; I don't know why you
10  don't go beat him up, hit him in the head.
11    Q. When did he say that to you?
12    A. In the summer of 2003.
13    Q. Did Mr. Nigro have any involvement in
14  deciding about a retention bonus?
15    A. No. I don't think so.
16    Q. Did he ever tell you that Jim Craigie or
17  Dan Frey had explained to him why you had been
18  excluded from a retention bonus?
19    A. No.
20    Q. Same question for Bob Kalbfell.
21        What's the basis for your belief that he
22  holds the belief that you were retaliated against
23  and excluded from a retention bonus for reporting
24  illegal or improper conduct?

---

154

1    A. Bob was aware of the issues that I had to
2  report to management, and he knew of the retention-
3  bonus program, and the fact that I was being
4  excluded.
5        Given my position with the company, my
6  level of responsibility, the fact that historically
7  I had been included, and the fact that I had been
8  included in all the other key programs, a normal,
9  rational person would come to the conclusion
10  that this person is being retaliated against
11  because of what they're telling management.
12    Q. Did Mr. Kalbfell tell you that, that that
13  was his conclusion?
14    A. No.
15        You can ask him, though; and he will
16  tell you.
17    Q. Did Mr. Kalbfell ever tell you that he
18  discussed with Jim Craigie or Dan Frey your
19  exclusion from the retention-bonus plan?
20    A. No.
21    Q. And he was with what company?
22    A. He is with Willis.
23    Q. The same question for Ferris Grooms.
24        What is the basis for your identifying

---

155

1  him as someone who believes that you were retaliated
2  against for reporting illegal or improper conduct?
3    A. Again, I'm giving you the names of people
4  who I had told things to over a course of years, and
5  who I'm sure have forgotten many of these things,
6  but in the great picture knew what was going on
7  at Spalding.
8    Q. But Mr. Grooms never told you that this was
9  his belief, that you had been retaliated against?
10    A. All of these people agreed that I was
11  getting screwed. People say, Geez, you are really
12  getting screwed. They don't phrase it in terms of,
13  Dennis, you are being retaliated against for
14  reporting the misappropriate behavior of
15  your executive management.
16    Q. So none of the other people you mentioned,
17  your wife, Mr. Howley, Ms. Watson, Mr. Podolski, or
18  Ms. Murray, has any...
19    A. They all agreed with me.
20    Q. So each one of them told you that they
21  believed you'd been retaliated against?
22        MS. BRODEUR-MC GAN: Objection. That's
23  not what he said.
24    A. That's not what I said.

---

156

1    Q. So, tell me. We'll have to go through each
2  one.
3    A. They all agreed that I was retaliated
4  against. I can't recall that they specifically
5  said, Dennis, you're being retaliated against.
6        They used the words, Dennis, you're
7  getting the royal screw job.
8    Q. But isn't it possible that saying you're
9  getting screwed just refers to the fact that you're
10  not getting money that other people got?
11        MS. BRODEUR-MC GAN: Objection. You can
12  answer.
13    A. I don't believe so.
14    Q. But it's possible that that's what they
15  meant, isn't it?
16        MS. BRODEUR-MC GAN: Objection.
17    A. I don't believe so.
18    Q. But, if they didn't say that they
19  believed you were being retaliated against, then
20  it could have been just that they meant that you
21  just weren't getting money that other people
22  were getting; isn't that possible?
23        MS. BRODEUR-MC GAN: Objection, asked
24  and answered. You can answer it again.

---

**Dennis A. Paren**
**April 29, 2005**

---

157

1    A.  I don't believe so.
2    Q.  Are there any other facts that you want to
3  tell me on which you base your belief that they
4  thought you were being retaliated against?
5    A.  Many of these individuals knew many of the
6  incidents that were happening:
7        the falsification of expense reports;
8        the nonreporting of income of
9  individuals;
10        the payment of vacations for some of
11  their cronies with company monies, not adding that
12  income to their W-2s;
13        the forgiveness of the loans, not
14  reporting that properly under SEC regulations or
15  GAAP;
16        the hiding of inventory assets in order
17  to make the balance sheet look better.
18        So these people were intimately aware,
19  because of my explanations to them, and also because
20  of their knowledge in certain areas, and they were
21  able to draw the conclusion that I was retaliated
22  against, and that these individuals were harming me
23  as far as my opportunities going forward and my
24  inclusion in the bonus program, increases in...

---

158

1        If we were to compare my merit
2  increases compared to many, many of the other
3  individuals within the company, I'm sure that we
4  would find that mine was very, very small, while
5  theirs was very, very large, with the company's
6  financials deteriorating.
7    Q.  Is there anything else?
8    A.  No.  Not at this point.
9    Q.  Aside from everything that you've already
10  testified to, is there any other factual basis for
11  your belief that Dan Frey retaliated against you and
12  excluded you from the retention-bonus plan because
13  you reported illegal or improper conduct?
14    A.  Those are the only things I can think of at
15  this moment.
16    Q.  What is the factual basis for your claim
17  that Mr. Frey retaliated against you and hindered
18  your ability to secure continued employment with the
19  New Top-Flite or Callaway because you reported
20  illegal or improper conduct?
21    A.  I believe that, because Dan Frey
22  held me in such low regard in terms of the
23  retention-bonus program, and because of how he
24  was retaliating against me, and because he had it

---

159

1  in for me -- I was a pain in the butt, remember --
2  that he was a person who I could not rely on for any
3  type of recommendation for employment by, not only
4  Callaway, but any prospective future employer.
5        I would have been scared to death to
6  have had to get a reference from Dan Frey, and he
7  was my direct report for the last five years.
8    Q.  In fact, you listed him...
9    A.  And I had excellent performance appraisals
10  from him, and I'm still scared ever to use his name.
11    Q.  Do you contend that Mr. Frey communicated
12  with people at New Top-Flite or Callaway about you?
13        MS. BRODEUR-MC GAN:  Objection.  You can
14  answer.
15    A.  I believe Mr. Frey communicated to other
16  people at Callaway.
17    Q.  Who?
18    A.  I would say the CFO and the controller, and
19  I don't know who the other people would be.
20    Q.  And the CFO's name, again, was what?
21    A.  I don't recall.
22    Q.  The controller's name?
23    A.  I don't recall.
24    Q.  What's the factual basis for your belief

---

160

1  that Mr. Frey spoke to the CFO and controller of
2  Callaway about you?
3    A.  Because I know that they had discussions
4  about the strength of the financial staff and the
5  necessity of keeping the financial staff.
6    Q.  How do you know that?
7    A.  Dan told us.
8    Q.  Do you have any specific knowledge that
9  Mr. Frey talked about you to the CFO or controller
10  of Callaway?
11    A.  It was assumed that he talked about
12  everybody on his staff.
13    Q.  Do you have any knowledge that he said
14  anything negative about you to the CFO or
15  controller of Callaway?
16    A.  I don't have any knowledge.
17        [Recess taken]
18  BY MS. NEWMAN:
19    Q.  Do you have any other facts supporting your
20  belief that Mr. Frey interfered with your ability to
21  obtain prospective employment with Callaway, New
22  Top-Flite, or any other company?
23    A.  Nothing other than what I've already
24  stated.

---

**Accurate Court Reporting**
**413.747.1806**

Dennis A. Paren
April 29, 2005

161

1    Q.  What about with respect to KKR?  Are
2  there any other facts that support your belief that
3  Mr. Frey retaliated against you and interfered with
4  your ability to secure employment with KKR?
5    A.  I don't know anything more at this point.
6  Hopefully I'll learn more during the discovery
7  stage.
8    Q.  Mr. Paren, I'd like to direct your
9  attention to your claims of intentional interference
10  with advantageous business relations against Jim
11  Craigie.
12        Other than what you've already
13  testified to, are there any other facts that you
14  rely on in support of your claim against Mr. Craigie
15  for intentional interference with advantageous
16  business relations?
17    A.  No.
18    Q.  And what about with respect to your claim
19  of intentional interference with advantageous business
20  relations against Dan Frey?  Do you have any other
21  facts that you rely on that you hadn't already
22  testified to in support of that claim?
23    A.  Not that I can think of at the moment.
24    Q.  Now, I'd like to turn your attention to

162

1  Paragraph 22 of your complaint.  I want to give you
2  the opportunity, sitting here today, to fully
3  explain your allegations in Paragraph 22.
4        So, beginning with Paragraph 22 A, you
5  allege -- I'm just going to read this -- a report on
6  the review of an advertising promotion designed by
7  Ed Several whereby Post Cereals was being portrayed
8  as a huge buyer of Spalding products when in reality
9  the majority of the products were being furnished
10  free of charge.
11        While this discrepancy was being
12  discussed with Daniel Frey, Ed Several appeared
13  in his office and Daniel Frey remarked, Speak of the
14  devil; giving up Dennis Paren's identity as the
15  whistleblower.
16        Subsequently, Ed Several humiliated
17  Dennis Paren by screaming Lead me away in handcuffs;
18  and even called Dennis Paren into one of his staff
19  meetings and announced to his staff members From now
20  on Dennis Paren is going to attend all of our staff
21  meetings, and he will review every promotion prior
22  to implementation.
23        Did I read that correctly?
24    A.  Yes.

163

1    Q.  When you state that the discrepancy was
2  being discussed with Daniel Frey, were you the
3  person who was discussing the discrepancy?
4    A.  Yes.
5    Q.  When did this occur?
6    A.  I don't recall.  I don't recall the date.
7  It was probably in 2001.
8    Q.  The incident in which Ed Several screamed
9  Lead me away in handcuffs, when did that occur?
10    A.  Shortly thereafter, after this incident.
11    Q.  The same day?
12    A.  No.
13    Q.  So, it was how much longer after?
14    A.  Well, it was within a period of a week or
15  two.
16        They called him Crazy Ed, and Dan
17  referred to him as psychotic.
18    Q.  Do you contend that Mr. Frey directed
19  Mr. Several to scream Lead me away in handcuffs?
20    A.  Did he direct him?  No.
21    Q.  Okay.
22    A.  But he knew what Ed's reaction was going to
23  be; because he was called Crazy Ed, so he knew the
24  reaction was going to be very negative in nature.

164

1    Q.  Aside from what you've already alleged,
2  is there anything else you want to tell me about
3  your claim that Post Cereals was not appropriately
4  portrayed as a huge buyer of Spalding products?
5        MS. BRODEUR-MC GAN:  Objection.
6    A.  I'm sorry; what is it that you want to know
7  exactly?
8    Q.  What's the factual basis for your belief
9  that Post Cereals was inappropriately portrayed as a
10  huge buyer of Spalding products?
11    A.  There was a contract for this particular
12  promotion.  I reviewed the contract for purposes of
13  seeing whether a performance bond was secured
14  properly.
15        In reading the contract, I obviously
16  became familiar with what the terms of the contract
17  were, and they seemed to be very disfavorable to
18  Spalding.
19        Dan Frey told me that Ed Several had
20  presented this promotion within the operating
21  committee group; and those individuals don't
22  normally read the contracts, they simply
23  listen to the presentation.
24        And Ed Several presented this promotion

**Dennis A. Paren**
**April 29, 2005**

---

165

1 in a manner as that it was going to produce a lot of
2 future sales for the company; and I was telling Dan
3 I didn't see how that was going to happen based upon
4 the contract.
5     I asked Dan who analyzed the contract to
6 see whether it made financial sense for the company.
7 It turned out that nobody actually had analyzed the
8 contract.
9         And so therefore, I took a look at it.
10 I was reporting back to Dan what I saw, and that's
11 when Ed came in the door; and he didn't like
12 the fact that somebody was scrutinizing or
13 second-guessing one of his promotions.
14   Q. How did Mr. Frey respond to your raising a
15 concern about this?
16   A. Very nonchalantly.
17   Q. What did he say?
18   A. He said, Ed has a very strong relationship
19 with Jim Craigie, and whatever Ed wants to do, Jim
20 Craigie is going to approve; Ed is psychotic, so you
21 need to be careful with him.
22         And then, as soon as that was said, Ed
23 walks in the door, and he lets Ed know what I'm
24 talking about.

---

166

1   Q. In Paragraph 22 B, you allege, James
2 Craigie routinely offered extraordinary company
3 benefits to individuals previously associated with
4 him at his prior employer, Kraft Foods, such as
5 signing bonuses, higher salaries, and quick
6 promotions;
7         and also unique benefits for a select
8 few, for instance providing Dan Zanetich, director
9 of procurement, contractual lifetime health-care
10 benefits at the time of his hiring.
11         Did I read that correctly?
12   A. Yes, you did.
13   Q. Which individuals do you believe were
14 receiving extraordinary company benefits?
15   A. In terms of compensation?
16   Q. Well, in terms of the individuals that you
17 were referring to in Paragraph 22 B of your
18 complaint.
19   A. Mike Esch, Lou Tursi, Ed Several, Dan Frey,
20 Dan Bracken. I'd have to take a look at a whole
21 long list. Dan Zanetich, in this instance.
22         They were referred to as cheeseheads in
23 the company, because most of them were formerly from
24 Kraft.

---

167

1   Q. Why do you believe that the benefits
2 offered to these individuals were extraordinary?
3   A. Here's a case where I pointed out
4 that a person was given lifetime medical. That's
5 completely contrary to the policies that the company
6 has. They're not able to give lifetime medical to
7 somebody, especially if they're no longer an
8 employee.
9         Dan Bracken was given an expense-
10 reimbursed vacation.
11         Other individuals from Kraft were
12 given quick promotions, and one year's severance
13 agreements when they had just worked a few months
14 for the company. They were given more vacation than
15 what they were entitled to under company policies.
16   Q. Did you raise to anyone your concern that
17 certain individuals were receiving extraordinary
18 benefits?
19   A. That was talked about all the time.
20   Q. So the answer is yes?
21   A. The answer is yes.
22   Q. Who did you raise your concern to?
23   A. Oh, we talked with Vaughn Rist, Dan Frey,
24 Peter Arturi. It was all talked about within just

---

168

1 the finance group.
2   Q. What was Vaughn Rist's response when you
3 expressed your concern?
4   A. That Jim Craigie and his direct reports
5 were destroying the internal policies of the
6 company.
7   Q. When did he say this?
8   A. I don't recall the date that he said that.
9   Q. And when you raised your concern about the
10 extraordinary benefits provided to certain
11 individuals...
12   A. I don't remember the exact date, but I
13 remember what we were talking about; and what we
14 were talking about was the jump in the level of
15 income of the executive officers as a group from
16 what it used to be to what it was under Jim
17 Craigie.
18   Q. Does that give you a better sense of when
19 it was that you talked with Vaughn Rist about this?
20   A. No. Maybe two years ago. I'm not sure
21 exactly.
22   Q. When did you raise your concern to Dan
23 Frey?
24   A. Well, we were always telling Dan Frey that

---

**Dennis A. Paren**
**April 29, 2005**

169

1 the company's financial performance was terrible,
2 and that they should cut out some of these
3 benefits and things that were going on.
4    Q. When you say we, who are you talking about?
5    A. Well, I voiced it, I believe Lynn LaFond
6 voiced it too; because people were upset, the normal
7 working people were upset, at what was going on.
8    Q. And again, Dan Frey's response to your
9 concern was what?
10    A. It was a nonissue.
11    Q. That's what he said?
12    A. I don't remember what his response was. It
13 was like talking to the wall.
14    Q. When you raised your concerns about the
15 extraordinary benefits to Peter Arturi, do you
16 remember when that was?
17    A. No.
18        On various occasions when a
19 person was being terminated, normally when they were
20 being terminated and they had a prior connection to
21 Jim Craigie they were receiving like a one-year
22 severance agreement and they had only been working
23 for one year, when the normal severance would have
24 been two or three weeks.

170

1        When those issues arose, Peter Arturi
2 and I discussed extraordinary benefits.
3    Q. And what did Mr. Arturi tell you was his
4 view on this issue?
5    A. That it was Jim's decision.
6    Q. In Paragraph 22 C of your complaint,
7 you allege, Dennis Paren reported John Jaszek,
8 director of southeastern operations, for fraud
9 for double submission of the same business travel
10 expenditure to Daniel Frey and to his supervisor,
11 Keith Kendall, vice-president of international.
12        Did I read that correctly?
13    A. Yes.
14    Q. To whom did you report John Jaszek for
15 fraud?
16    A. Dan Frey and Keith Kendall.
17    Q. And when was that?
18    A. I don't know whether we have submitted that
19 in the information or not. I don't recall the exact
20 time that happened. It was probably 2001, 2002.
21 I'm not sure.
22    Q. Did you report Mr. Jaszek for fraud in
23 person, or in a document?
24    A. Yes. There was a document. We have

171

1 written documents for every one of these
2 individuals.
3    Q. Was it a document that was prepared?
4    A. No. It was a document that was prepared by
5 Cheryl Kubic.
6    Q. And what did the document say?
7    A. The document said something to the
8 effect that during an audit of the cash account
9 a credit in the cash account was noted from John
10 Jaszek, and there should not be any credits in the
11 cash account.
12        And so the why, as to what happened to
13 generate that cash account, was looked into; and we
14 found that he had taken out a cash advance to take a
15 trip overseas, had collected on the expense report,
16 and the program automatically subtracted from his
17 expense reimbursement the amount he owed back to
18 the company for the cash advance.
19        Then, when he resubmitted the same
20 expense report to a different supervisor and again
21 it was paid, again, money for that same cash advance
22 was taken out; and that generated the credit, and
23 that's how we found the fraud.
24    Q. Keith Kendall was Mr. Jaszek's supervisor?

172

1    A. Yes.
2    Q. What was the response of Mr. Frey and
3 Mr. Kendall to your report?
4    A. No response.
5    Q. Do you know whether Mr. Frey or Mr. Kendall
6 took any action in response to receiving your
7 report?
8    A. They did not take any action. I took
9 action.
10    Q. What did you do?
11    A. I collected the money back from Mr. Jaszek,
12 and Mr. Jaszek came into my office and told me that
13 I acted as if I was doing something wrong.
14    Q. Did you tell Mr. Frey or Mr. Kendall that
15 you had taken action to get the money back from
16 Mr. Jaszek?
17    A. Yes.
18    Q. Did Mr. Frey or Mr. Kendall ever tell you
19 that they disagreed with your actions?
20    A. They weren't supportive.
21    Q. How were they not supportive?
22    A. Well, Mr. Kendall by never returning my
23 call with regard to the incident; and Mr. Frey by
24 not terminating the employment of these individuals

**Dennis A. Paren**
**April 29, 2005**

173

1  as they were caught, to set an example.
2      Q.  In Paragraph 22 D in your complaint,
3  you allege, Dennis Paren reported suspicious claims
4  for the loss of car-stock inventory by the salesmen,
5  Matt Valentine and Pat Sellers, for $49,000 and
6  $21,000 respectively.
7          Dennis Paren also reported to Daniel
8  Frey that at various times there appeared to be
9  hundreds of thousands of dollars of car-stock
10  inventory not returned by former employees.
11         Did I read that accurately?
12      A.  Yes; except it's Pat Sellers, not Peter.
13      Q.  To whom did you report the suspicious
14  claims for the loss of car-stock inventory?
15      A.  Well, that was talked to with Vaughn,
16  Peter, Dan, Cheryl Kubic, Mike Waniewski.
17      Q.  Why did you believe that the claims were
18  suspicious?
19      A.  Because the pictures of Matt Valentine's
20  storage unit I believe were three floors up, and to
21  take $49,000 worth of equipment would have required
22  a number of trips up and down the elevator into an
23  area that had some type of security, where they had
24  cameras, but they didn't catch this particular

174

1  thing; the tape had already been destroyed or
2  rewritten by the time we got involved.
3          And the fact that he reported that
4  he went to his locker and it was locked, and so he
5  surmised that he had left the storage unit unlocked,
6  someone came in, stole everything, and then locked
7  the storage unit, that was an unbelievable story.
8      Q.  So you believed that Mr. Valentine had
9  stolen the car stock that he claimed was missing?
10      A.  That's correct. I believed that; and so
11  did Mike Waniewski, who was the director of asset
12  protection.
13      Q.  How did you report this to Mr. Frey?
14      A.  As the events unfolded.
15      Q.  Verbally?
16      A.  I believe it was mostly verbally, and I
17  believe there could have been something within
18  my weekly notes that I presented to him.
19      Q.  How did Mr. Frey respond to your report of
20  these suspicious claims for loss of car-stock
21  inventory?
22      A.  Too small of an issue for him to bother
23  with.
24      Q.  He told you that?

175

1      A.  He didn't say anything about it. He didn't
2  take any action.
3      Q.  To your knowledge, he didn't take any
4  action?
5      A.  To my knowledge. And if he did take any
6  action, I should have known about it.
7      Q.  And when was this?
8      A.  The date is not listed here, so I can't
9  remember. Matt Valentine was a relatively new
10  employee at the time.
11      Q.  Your allegations in Paragraphs 22 E through
12  I relate to what you characterize as the forgiveness
13  of promissory notes?
14      A.  Yes.
15      Q.  Tell me your understanding of what happened
16  with respect to the promissory notes.
17      A.  Well, first of all, when the
18  individuals purchased stock from the company,
19  they were apparently in this situation given the
20  option of paying cash for it or taking out a company
21  loan in the form of a promissory note.
22          These promissory notes were taken out in
23  1999 and the year 2000; or early 2000, probably.
24          These notes in November of 2001

176

1  were forgiven or, to use the word that Dan uses,
2  cancelled; and it's my contention that when you
3  cancel these notes, or forgive them, however you do
4  that, that's reportable income on the individual's
5  state and federal tax return.
6          Those numbers were not reported.
7      Q.  The numbers were not reported on the
8  individual recipients' tax returns?
9      A.  That's correct.
10      Q.  How do you know that?
11      A.  I was told that by the tax department; I
12  mean, by the payroll department.
13      Q.  But isn't the decision to include something
14  as income made by the individual who is filing their
15  personal tax return?
16          MS. BRODEUR-MC GAN:  Objection. You can
17  answer.
18      A.  No. This is income that the company is
19  required to record on the individual's W-2.
20      Q.  Oh, okay; okay.
21          What happened to the stock of the
22  persons who had promissory notes?
23      A.  The amount that they had not yet paid for
24  was in effect sold back to the company at what they

**Dennis A. Paren**
**April 29, 2005**

---

177

1 had paid for it.
2    Q. So the stock that had not yet been paid for
3 was essentially cancelled?
4    A. Yes; but the thing is that the stock
5 serves as collateral for the note. The stock became
6 worthless, but the company was still owed money.
7 These individuals did not pay the company back
8 the money that was owed.
9    Q. I'm not a tax lawyer, but wouldn't you take
10 a corresponding loss for the deduction for the
11 worthless stock?
12    MS. BRODEUR-MC GAN: Objection. You can
13 answer.
14    A. Yes. The individual has to take the tax
15 loss to offset capital gains, because it's a capital
16 loss; so it can only be offset by capital gains.
17    Q. Who did you complain to about the
18 accounting for the cancellation of the promissory
19 notes?
20    A. Dan Frey, Carl Sun, and Mike Lyon and I
21 talked about it quite often.
22    And then, Cindy Marr is the one that
23 told me that it was not included on their W-2s.
24    Q. How did Mr. Frey respond when you expressed

---

178

1 your concern about the accounting of the
2 cancellation of the promissory notes?
3    A. He said that it was authorized by Simpson,
4 Thatcher.
5    Q. Carl Sun is the SSW audit manager for
6 Deloitte & Touche?
7    A. Yes.
8    Q. How did he respond?
9    A. When I was talking with Carl, I was talking
10 to Carl with regards to the reporting of that on the
11 financial documents, the financial reporting of the
12 company; and he told me that it was immaterial for
13 reporting purposes.
14    We did not talk about the taxability.
15    Q. How did Mike Lyon respond to your concern
16 about the accounting for the cancellation of
17 promissory notes?
18    A. He believed it was totally wrong.
19    Q. He told you that?
20    A. Yes.
21    Q. What action did he take, if you know, based
22 on his belief that it was wrong?
23    A. He didn't take any action. He just knew
24 about it, and knew that Dan Frey did not come to him

---

179

1 with a question as to how the company should record
2 this event; because he knew that Dan did not want to
3 hear the right answer.
4    And that's what we all believed, and
5 that's what we talked about.
6    Q. What about Cindy Marr? How did she
7 respond?
8    A. The only response was, They're at it again.
9    Q. What was her position?
10    A. She is the head payroll clerk. I'm not
11 sure of her exact title.
12    Q. Did she explain to you what she meant by
13 They're at it again?
14    A. I don't know exactly what she said. It was
15 small quip of some type.
16    Q. Are you a tax lawyer?
17    A. No, I'm not.
18    Q. Do you have any tax degrees of any sort?
19    A. Well, I have an MBA in finance, and I've
20 been in corporate finance for 25 years; so I know
21 quite a bit about taxes, even though I don't have a
22 tax degree. But I do have an announcement from the
23 IRS that speaks directly to this point.
24    Q. So you would defer to...

---

180

1    A. The Internal Revenue Service.
2    Q. In Paragraph 22 I, you have an allegation
3 about a statement that Mr. Kimmett made that we
4 discussed earlier.
5    A. Yes.
6    Q. Is there anything you want to add to your
7 earlier testimony with regard to that incident?
8    A. No.
9    Q. In Paragraph 22 J, you allege that the
10 president of the corporation ordered you to arrange
11 an automobile lease for Ed Several; do you see that
12 there?
13    A. Yes.
14    Q. The president was who at this time?
15    A. Jim Craigie.
16    Q. Why do you believe that arranging an
17 automobile lease for Mr. Several was in violation
18 of the car allowance?
19    A. Mr. Several had a $1,000 monthly car
20 allowance.
21    The car that he selected to purchase
22 would have created a total cost in excess of the
23 thousand dollars with regards to the cost of the
24 lease, the cost of gasoline, the cost of whatever;

---

**Accurate Court Reporting**
**413.747.1806**

**Dennis A. Paren**
**April 29, 2005**

181

1 maintenance, taxes and everything else.
2        He complained to Jim Craigie that the
3 cost of his car was going to exceed his monthly
4 allowance.
5        Simultaneously, I was obtaining
6 almost the identical car for Jim Craigie at the
7 same dealership, but it was a more expensive model.
8 Jim Craigie asked me to have the dealership add more
9 cost to his car to offset the decrease in Ed
10 Several's car.
11    Q. Did you express to anyone your opinion that
12 this was inappropriate?
13    A. Sure. I told Vaughn. I indicated that to
14 Peter at some time. Everybody knows that it's
15 inappropriate.
16    Q. How did Mr. Rist respond?
17    A. Negatively. I don't remember anything more
18 than that.
19    Q. Did he agree with you that it was a
20 violation of the policy?
21    A. Yes. I think everybody agrees that it's a
22 violation of the policy.
23    Q. But did Mr. Rist say that he was going to
24 take action to address the violation of the policy?

182

1    A. No, because it was the president doing the
2 violation.
3    Q. And how did Mr. Arturi respond when you
4 expressed your concern about the car allowance?
5    A. Again, it was the president doing the
6 violation. There's not a lot that subordinates can
7 do.
8    Q. In Paragraph 22 K of your complaint, you
9 refer to complaints of corporate waste relating to
10 OCM members not receiving merit increases; do you
11 see that there?
12    A. Yes, I see it.
13    Q. Tell me what you believe was inappropriate
14 about Mr. Craigie's conduct.
15    A. What was inappropriate was that the raises
16 for everybody were on a fiscal-year basis, and the
17 fiscal year began April 1; and that was the year in
18 which people received their raises. That was the
19 time of the year people received their raises.
20        Mr. Craigie wanted to report to the
21 people that the OCM members were not receiving any
22 raises in fiscal 2001; but he didn't mention that in
23 late December 2000 he authorized giving everybody a
24 $1,000 car allowance, which on a percentage basis

183

1 for some of those people was greater, I think for
2 most of them it was greater, than what their merit
3 rate increase would have been.
4    Q. To whom did you complain about this issue?
5    A. Oh, these are probably Vaughn Rist. Again,
6 it might have been mentioned to Peter Arturi; talked
7 to with Mike Lyon, Stephen Nigro.
8        Again, these are samples of things that
9 went on.
10    Q. Later in Paragraph 22 K you allege that
11 Mr. Rist told you that there is no way the company
12 is going to begin a car-allowance policy for OCM
13 members, because it is simply cost-prohibitive
14 given the company's financial performance; and
15 we never gave OCM members car allowances when
16 the company was financially sound.
17        Do you recall him making that specific
18 statement?
19    A. I sure do.
20    Q. Where were you when he made that statement
21 to you?
22    A. In his office.
23    Q. And this is in November of 2000?
24    A. Yes.

184

1    Q. Do you know if Mr. Rist expressed this
2 opinion to Mr. Craigie?
3    A. He gave me every indication he did.
4    Q. Did he tell you what Mr. Craigie's response
5 was?
6    A. Something to the effect that Jim wants to
7 do it.
8    Q. In Paragraph 22 L of your complaint, you
9 refer to Tim O'Neill; do you see that there?
10    A. Yes, I do.
11    Q. What do you mean when you say that Mr.
12 O'Neill was found creating intricate methods of
13 receiving company reimbursement for thousands of
14 dollars in excess of actual expenses?
15    A. One example is making a lot of calls on a
16 cell phone, over say a thousand dollars, submitting
17 that expense report to the company, getting
18 reimbursed the thousand dollars;
19        and then calling the phone company
20 complaining to them that he was overcharged, and
21 then having it taken off of his credit-card bill.
22 That's somewhat intricate.
23    Q. And you made this discovery, that he was
24 doing this?

**Dennis A. Paren**
**April 29, 2005**

185

1    A. Myself, and Cheryl Kubic.
2    Q. When did you report this to Lou Tursi?
3    A. You would have to take a look at the date
4  of the memo.
5    Q. So you reported it by way of the memo?
6    A. Yes. It was my memo.
7    Q. Did you report Mr. O'Neill to anyone other
8  than Mr. Tursi?
9    A. Dan Frey, Peter Arturi, Vaughn Rist, Cheryl
10  Kubic knew about it; Mike Waniewski.
11    Q. This memorandum that you prepared, who was
12  it directed to?
13    A. It was probably directed to Tim O'Neill
14  with a copy to Dan Frey and Lou Tursi. That was
15  the normal manner in which things were done.
16    Q. And what did your memorandum to Mr. O'Neill
17  say?
18    A. It itemized every instance in which he was
19  caught defrauding the company.
20    Q. And how did Mr. Tursi respond to your
21  memorandum?
22    A. He laughed when I showed it to him. He
23  said something to the effect, I don't know how some
24  people can be so good at sales and so terrible at

186

1  bookkeeping.
2    Q. So he believed that Mr. O'Neill had made an
3  inadvertent mistake?
4    A. Yes.
5    Q. And you disagreed with Mr. Tursi?
6    A. Yes, I did.
7        Well, maybe one mistake I can
8  understand; but not five or ten or 15 or 20.
9    Q. Did you discuss Mr. O'Neill's situation
10  with Dan Frey?
11    A. Yes, on a number of occasions.
12    Q. What was his response?
13    A. His response was, We need to talk to Lou;
14  and then Tim O'Neill's wife called Dan Frey up and
15  cried on the phone, and that sort of scuttled any
16  actions of terminating him. Of course, he was
17  well protected by Lou Tursi.
18    Q. Do you know if any actions were taken to
19  address Mr. O'Neill's situation?
20    A. We had a meeting in the conference room;
21  and they said that they wanted to make things tough
22  on Mr. O'Neill and get the money back, and they were
23  going to deduct, I don't know, some amount like $700
24  a month out of his check.

187

1        And when we went to Mr. O'Neill and
2  told him that the company intended on collecting on
3  the amount that they had been defrauded, if I recall
4  correctly, he overnighted a check to the company for
5  the entire amount.
6    Q. In Paragraph 22 M of your complaint, you
7  also refer to Tim O'Neill, and you state that he was
8  found giving away in excess of $50,000 worth of golf
9  ball and golf-club products to current and former
10  players of the New York Yankees; do you see that
11  there?
12    A. Yes.
13    Q. What was wrong with giving products away to
14  members of the Yankees, in your view?
15    A. Because the Yankees weren't purchasing
16  products from the company.
17        The idea of providing somebody a product
18  was to create additional sales.
19    Q. And Dan Frey responded that Mr. O'Neill
20  gets free tickets to Yankees games, and that is what
21  KKR wants; is that right?
22    A. Yes.
23        A very nonchalant type of response.
24  In this example, I'm only showing $50,000; but there

188

1  were thousands and thousands of more dollars that we
2  saw going out of the company due to Tim O'Neill.
3    Q. Did you report Mr. O'Neill's conduct to
4  anyone other than Mr. Frey?
5    A. Mike Waniewski was reporting on
6  Mr. O'Neill's conduct to Jim Craigie directly
7  for a long period of time, and nothing was being
8  done about that.
9    Q. How do you know that he was reporting to
10  Jim Craigie on Mr. O'Neill?
11    A. He told me, and he kept tabs as to how much
12  various salespeople were giving away.
13    Q. Did Mr. Wanieski tell you that he believed
14  that Mr. O'Neill had acted inappropriately in giving
15  away product to the Yankees?
16    A. His reaction was, yes, he believed that it
17  was inappropriate.
18    Q. He told you that?
19    A. When I informed him, his reaction was such
20  that he appeared to be in total agreement with me.
21    Q. That was your perception?
22    A. That was definitely my perception, as well
23  as the perception of other people.
24        I did not know the names of these people

**Dennis A. Paren**
**April 29, 2005**

---

189

1  that were receiving this product; and actually I was
2  looking at a document and Mike Lyon, who was an avid
3  baseball fan, said, hey, a lot of these people are
4  former Yankees, some of them weren't even current
5  players at all.
6     Q.  And you allege in your complaint that
7  Mr. Wanieski said that Tim O'Neill works for Lou,
8  and as long as Lou protects him he is untouchable.
9     A.  Yes.
10    Q.  He said that to you?
11    A.  Yes.
12    Q.  And Lou refers to Lou Tursi?
13    A.  Correct.
14    Q.  In Paragraph 22 N of your complaint, you
15 refer to a double expense-report submission by
16 Stephanie Lawrence.
17    A.  Yes.
18    Q.  When were Ms. Lawrence's double expense-
19 report submissions discovered?
20    A.  In June 2001.
21    Q.  And were you the person who discovered
22 them?
23    A.  No.  It was Cheryl Kubic.
24    Q.  And you reported the double expense

---

190

1  submissions to Peter Arturi as well as
2  Mr. Craigie, Mr. Rist, and Mr. Frey?
3     A.  That's correct.
4     Q.  How did Mr. Arturi respond after you
5  reported Stephanie Lawrence's conduct?
6     A.  He responded that it wasn't fraud unless we
7  called it fraud.
8     Q.  What did he mean by that, if you know?
9  What was your understanding of what he meant by
10 that?
11    A.  My understanding was that we could call
12 it theft and terminate the person for fraud, or we
13 could say we accept it and it's a form of additional
14 compensation in violation of all the practices of
15 the company.
16    Q.  How did you report it to Mr. Craigie?
17    A.  In a memo format.
18    Q.  Who was your memo directed to?
19    A.  The memos were normally always made
20 in a format where it went to the person's direct
21 supervisor; so in this case it was Jim Craigie, with
22 a copy always to the CFO, and in this case Vaughn
23 Rist and Peter Arturi could have been on the memo,
24 or they could have been blind-copied, because they

---

191

1  were blind-copied on just about everything.
2     Q.  Did you have occasion to speak to
3  Mr. Craigie about your report on Stephanie
4  Lawrence?
5     A.  Yes.  I went into his office to talk to him
6  about it.
7     Q.  And what did he say?
8     A.  He said, Oh, there's Dennis Paren with that
9  Dennis Paren look again.
10    Q.  What else did he say?
11    A.  We're going to have to make Stephanie pay
12 this money back.
13    Q.  Did he say anything else?
14    A.  No.
15    Q.  How did Mr. Rist respond to your report
16 about Stephanie Lawrence?
17    A.  That it was out of his control, there
18 wasn't anything he could do about it; it was Jim's
19 decision.
20    Q.  Jim's decision as to what actions to take?
21    A.  Correct.
22    Q.  And did you discuss with Dan Frey Stephanie
23 Lawrence's conduct?
24    A.  Yes.

---

192

1     Q.  And how did he respond?
2     A.  The same way.  It was Jim's decision.
3     Q.  Do you know what actions, if any, were
4  taken in response to your report about Stephanie
5  Lawrence?
6     A.  We gave the report to Stephanie.  She
7  blamed the actions on her administrative assistant,
8  and repaid the money.
9        And she made a comment that Maybe the
10 only reason that this whole incident came up was
11 because she didn't spend time being nice to
12 people in the bullpen area.
13    Q.  She made that comment to you?
14    A.  No.  She made it to Cheryl Kubic.
15    Q.  Who related it to you?
16    A.  Yes.
17    Q.  And do you have an understanding as to what
18 Ms. Lawrence meant by the people in the bullpen?
19    A.  The people that were outside of what they
20 called the executive hallway.
21    Q.  In Paragraph 22 O of your complaint, you
22 refer to the sale of product to K-Mart; do you see
23 that there?
24    A.  Yes, I do.

---

**Accurate Court Reporting**
**413.747.1806**

Dennis A. Paren
April 29, 2005

---

193

1    Q. Why did you have a concern about the sale
2  of product to K-Mart?
3    A. At the time I was doing a study trying to
4  obtain for the company credit insurance on those
5  purchasers of our product that were at highest
6  credit risk.
7        K-Mart was at the top of that list.
8  We already had an exposure to K-Mart in excess of
9  $4 million at the time the study was being
10 conducted.
11       Talking with experts in the area of
12 credit insurance, they informed me that it appears
13 K-Mart is going to go bankrupt, because there is no
14 insurance available for K-Mart.
15       And management went ahead and pushed
16 another $4 million of sales to K-Mart in an attempt
17 to get to a $40 million EBITDA number.
18   Q. That's EBITDA number?
19   A. Yes.
20   Q. What does that...
21   A. Earnings before interest, taxes,
22 depreciation and amortization.
23   Q. Who in management did you inform in
24 management that you believed that this was a high-

---

194

1  risk sale?
2    A. Well, I was talking with Dan Frey and
3  Larry Kustra about this on an ongoing basis. I was
4  reporting to them about my progress in trying to
5  obtain credit insurance for the company.
6    Q. How did Dan Frey respond to your concern?
7    A. He said that it was a good business
8  decision to go ahead and make that sale.
9    Q. Did he explain the basis for that belief?
10   A. Nothing other than they had made a
11 commitment to Oaktree Capital, and they needed
12 this sale at the end of December in order to get
13 to where they wanted to be.
14   Q. How did Larry Kustra respond to your
15 concern about the K-Mart sale?
16   A. He knew that it was a very risky sale, and
17 had he been in charge he would not have approved it;
18 but he knew that Lou Tursi, Jim Craigie and Dan Frey
19 wanted that approved.
20   Q. But he told you that he disagreed with the
21 decision?
22   A. Yes. He disagreed with giving K-Mart any
23 more credit, where we already had given them more
24 credit than any other company in the sporting-

---

195

1  goods industry.
2    Q. In 22 P of your complaint you refer to the
3  previously postponed customer-appreciation Hawaiian
4  trip; do you see that?
5    A. Yes, I do.
6    Q. And actually, you also refer to this trip
7  in Paragraphs 22 Q and R as well; correct?
8    A. Yes. They refer to the same trip.
9    Q. When was the trip to Hawaii originally
10 scheduled for?
11   A. I believe it was October 2001.
12   Q. Were you involved in preparations for the
13 Hawaiian trip?
14   A. I was involved in reviewing the
15 contract when it was originally set up, and
16 in trying to obtain insurance for the company due
17 to the activities that the participants were going
18 to engage in there.
19   Q. When did you review the contract for the
20 Hawaiian trip?
21   A. Sometime in 2001.
22   Q. And are you aware of when the trip was paid
23 for?
24   A. The trip was paid for in installments, and

---

196

1  most of the trip had been paid for at that
2  particular date.
3        So I do realize that the trip had been
4  paid for by the time they took the trip, or a lot of
5  the costs had been incurred.
6    Q. And who went on the trip? Were they mostly
7  customers of...
8    A. I did not see a list of the people that
9  went.
10   Q. But the general purpose of the Hawaiian
11 trip was to express appreciation to the company's
12 customers?
13   A. Correct.
14   Q. Is it your contention that Form 1099s were
15 not issued to persons who attended the Hawaiian
16 trip?
17   A. Yes.
18   Q. Why do you believe that no 1099s were
19 issued?
20   A. This is an incident which Mike Lyon
21 would complain to me about. He was endeavoring to
22 issue 1099s, and each time that he was requesting
23 the information he was being stonewalled and not
24 given the information.

---

**Accurate Court Reporting**
**413.747.1806**

**Dennis A. Paren**
**April 29, 2005**

197

1    And Dan Frey was not supporting him in
2  that. Dan Frey was in charge of enforcing the
3  company's compliance with US tax laws.
4    Q. So it's your understanding that Mike Lyon
5  raised his concern about the 1099s to Dan Frey?
6    A. Yes, and to John Fuller.
7    Q. And do you know when Mike Lyon raised these
8  concerns to Dan Frey?
9    A. Way before the trip.
10   Q. Did you ever discuss this issue with
11 Mr. Frey?
12   A. Probably just in passing.
13   Q. Did Mike Lyon tell you how Dan Frey
14 responded when he expressed his concern about
15 1099s not being issued for the Hawaiian trip?
16   A. He basically said that Dan was not
17 supporting him in his efforts to comply with
18 the law, that this was a taxable event for the
19 participants, and that John Fuller felt that it
20 would be an impediment to taking customers; because
21 some customers had already stated that they would
22 not go on the trip if they were going to get a
23 1099 from the company.
24   Q. And you said that you discussed this in

198

1  passing with Dan Frey. Can you describe for me what
2  was said when you discussed the 1099 issue with Dan
3  Frey?
4    A. Like I said, it was in passing. It was
5  something that I can't recall specifically.
6      But that's a sales issue; it's not my
7  responsibility.
8    Q. In Paragraph 22 S through V, you refer to
9  Mike Esch filing reports regarding inventory.
10   A. Correct.
11   Q. Tell me what you believe was wrong about
12 what Mike Esch did.
13   A. This had to do with in-transit inventory;
14 that is, product that we're buying, primarily in
15 China, and having it shipped to the United
16 States.
17     It takes 30 days for it to go
18 over the ocean; and then it takes about a week
19 after it's unloaded in California to be transported
20 to Chicopee, Massachusetts, which is very near here.
21     When we don't have it in our factories,
22 it's considered in-transit inventory.
23     It is our inventory, because we have
24 contractually obligated ourselves to buy it, and we

199

1  are paying the insurance and the freight to buy it;
2  and we are taking title of that inventory at the
3  port of origin, whatever port that is,
4  someplace in China.
5      What Mike Esch devised doing was,
6  instead of taking title at the port of origin, to
7  take title at the port of Long Beach, California,
8  but still pay the freight and the insurance on
9  the shipment.
10     The general accounting principle is
11 that, first of all, you cannot insure a product
12 unless you have an insurable interest. Once you
13 insure a product and you're paying the freight for
14 that product, that is considered your asset, and you
15 need to report that on your accounting statements.
16     Mike Esch wanted to devise this
17 method of taking title at the port of destination
18 and thereby, in his mind, have a rationale for
19 deducting the amount of inventory that the
20 company owned or was going to buy, that
21 was in transit on the ocean;
22     and that was anywhere from $10 million
23 to $18 million, depending upon the months. So, with
24 a stroke of a pen, that inventory vanished!

200

1    Q. And tell me how you allege that Mr. Frey
2  instructed you to aid in Mike Esch's conduct.
3    A. In order for the manufacturers of this
4  product that we were buying to agree to these new
5  terms of sale, because these were new terms of sale,
6  they wanted to be assured that, should anything
7  happen to that product, they were going to
8  continue to be paid for it.
9      So, in order to do that, they needed me
10 to complete certificates of insurance, which I had
11 to show and file to these companies, to show them
12 that they would be paid in the event that product
13 was lost.
14   Q. Did you do that?
15   A. At Dan's request, yes. I did do that.
16   Q. Did you tell Mr. Frey that you believed
17 that this was inappropriate?
18   A. Oh, Mr. Frey knew it was inappropriate. He
19 told me it was inappropriate.
20   Q. When was that?
21   A. Before we went into the meeting to talk
22 about it.
23   Q. What did he say to you specifically?
24   A. Well, he said that this was against general

Dennis A. Paren
April 29, 2005

201

1  accounting principles.
2      Q. Did he say anything else?
3      A. That he wasn't going to let them get away
4  with this.
5          And then he helped them do it anyway.
6      Q. And tell me about the meeting on this issue
7  where Mr. Frey referred to the chairman, Ed Artz.
8  What did he say?
9      A. Apparently it was Ed Artz that was
10 concerned about the level of inventory, and was
11 putting pressure on Mike Esch to decrease the
12 inventory;
13         and then, during the meeting, they
14 were saying, well, because Mike Esch is going to say
15 something to the chairman, or the chairman is paying
16 attention to the inventory numbers, he's going to
17 see a decrease.
18         And so when he asks, well, that's great,
19 you guys got a decrease, how did you get it, Dan
20 Frey was going to confuse him with his answer.
21     Q. That's what Dan Frey said?
22     A. Yes.
23     Q. In Paragraph 22 W, you again refer to
24 Stephanie Lawrence, this time with respect to

202

1  gasoline expenses; do you see that?
2      A. Yes.
3      Q. Why did you believe that the gasoline
4  expenses were taxable and reportable as income?
5      A. Stephanie Lawrence lived in Exeter, New
6  Hampshire, and commuted to Chicopee, Massachusetts;
7  and because of the two-hour drive one way, her gas
8  expenses were very high.
9          Once she was caught cheating on her
10 expense reports, she was losing income, in effect;
11 and so she went to Jim Craigie and asked Jim Craigie
12 if she could have a gasoline allowance, and he
13 agreed.
14         Now, if you have a gasoline allowance
15 and you're using it just for normal commute back and
16 forth to your workplace, that's taxable under the
17 law.
18         And the people in the tax department
19 knew it, and the people in the payroll department
20 that put it on W-2s knew it; and Dan did it anyway.
21     Q. How did you express your concern about
22 this?
23     A. I told Lynn LaFond to put it on Stephanie's
24 W-2.

203

1          She later told me that Dan told her
2  not to do it; and then Dan told me that he wasn't
3  concerned about adding whatever the thousands of
4  dollars were to her W-2.
5      Q. Did he say anything more; Mr. Frey?
6          What did he mean by he wasn't concerned;
7  did he tell you?
8      A. He was too important to be concerned with
9  those type of issues.
10     Q. Did you express your concern about this to
11 anyone else?
12     A. The typical. Probably Cheryl Kubic knew it
13 at the time. Lynn LaFond knew about it at the time,
14 Mike Lyon. People that knew about taxes in the
15 company. There weren't that many.
16     Q. Did you prepare a memorandum describing
17 your concerns about this issue also?
18     A. No.
19     Q. In Paragraph 22 X of your complaint, you
20 refer to a report that you made in September 2003
21 about the existence of certain improper applications
22 by Mr. Craigie for expenses by doubling up expenses
23 on two expense-report submissions; do you see that?
24     A. Yes, I do.

204

1      Q. And in fact your allegations in Paragraphs
2  Y and Z also relate to this issue, don't they?
3      A. Yes, they do.
4      Q. How did you reach the conclusion that
5  Mr. Craigie was doubling up on expenses?
6      A. The audit function of expense reports had
7  been taken away from Dan Frey, and he gave that
8  back to Lynn Lafond's operation.
9      Q. When was that?
10     A. Beginning of 2002. I believe that was the
11 date.
12         Dan let go of the person that was doing
13 the audit of the expense reports. We had a person
14 that was doing auditing. So, there was a general
15 cutback, and they let this person go; and so they
16 were going back to the old way of doing things,
17 essentially, which I had proved didn't work.
18         In any event. The people that helped
19 audit the reports, I had a relationship with them,
20 a trusting relationship.
21         June Lemlin came to my office and told
22 me, Look at this expense report from Jim Craigie.
23 And I saw that he had an expense report approved by
24 Dan Frey; and then, immediately after Dan left the

Dennis A. Paren
April 29, 2005

205

1 company, he went to Andy Howley and had the same
2 expenditure approved again.
3        And I said to June, Let's wait and see
4 if Jim does this again.  So, we didn't report that
5 when it first happened.
6    Q.  And when did June Lemlin come to you?
7    A.  Sometime right after Dan Frey left.  That's
8 when it happened.
9    Q.  So around June of 2003?
10   A.  Right.  Towards the end of June 2003, the
11 first part of July.
12   Q.  And June Lemlin was in charge of the audit
13 function?
14   A.  That was one of her functions.
15       So we waited for Jim to pass through
16 another fraudulent expense report, and he did.
17   Q.  Tell me how you reached that conclusion.
18   A.  Well, I don't have the information here to
19 look at; but we reached that conclusion because this
20 is something that we caught a lot of people doing,
21 and in this case it just happened to be the
22 president.
23   Q.  So was it June Lemlin who came to you a
24 second time?  Who came to you a second time?

206

1    A.  Yes, it was June Lemlin that came to me
2 a second time; because we were waiting for him to
3 falsify another expense report.  So we were waiting
4 for something to come across that was falsified.
5    Q.  And the first expense report, in June of
6 2003, who filled that out?
7    A.  I don't have it here to look at, so I can't
8 say.
9    Q.  I mean, did Mr. Craigie typically fill out
10 his own expense reports?
11   A.  I don't recall.  I don't know.
12   Q.  Is it possible that his administrative
13 assistant filled it out?
14   A.  It's possible.
15   Q.  Referring just to the first expense report,
16 what was it an expense for?
17   A.  I think it was insurance on his car.
18   Q.  Do you remember how much the submission was
19 for?
20   A.  No, but we did provide that information.
21   Q.  The second time that Mr. Craigie submitted
22 the expense report for the first item, was that
23 expense report filled out by Mr. Craigie?
24   A.  As far as I know it was, yes.

207

1    Q.  Is it possible that it was filled out by
2 his administrative assistant?
3    A.  It's possible; but we all believed that he
4 did it, and he knew exactly what he was doing.
5    Q.  Why did you have that opinion?
6    A.  Because at the time we investigated it, and
7 he said some things that I think we found out to be
8 untrue.
9    Q.  Like what?
10   A.  I would have to look at the information,
11 really.  I don't know.  I believe the second time
12 it was with the purchase of an airline ticket.
13   Q.  And the second time that June Lemlin came
14 to you, with respect to the airline ticket, was in
15 September of 2003?
16   A.  I believe so.
17   Q.  So this was just before the Callaway
18 acquisition?
19   A.  Yes.  His last chance.
20   Q.  Do you remember how much the airline ticket
21 was for?
22   A.  No, I don't.  It was for first-class
23 travel, I believe, from Los Angeles to Hartford.
24   Q.  And again, with respect to the expense

208

1 reports submitted for the airline ticket, do you
2 know whether Jim Craigie personally filled in those
3 submissions?
4        MS. BRODEUR-MC GAN:  Objection.  You can
5 answer.
6    A.  We believe he did.  We believe that he
7 provided information that was false, either to his
8 administrator, or he submitted it himself.  One way
9 or the other, we believe that he knew what he was
10 doing; and we were waiting for him to do it again,
11 and we caught him.
12   Q.  So, how did you make the board of directors
13 aware of your concerns about Mr. Craigie and the
14 expense submissions?
15   A.  It was through an e-mail.
16   Q.  Who was the e-mail addressed to?
17   A.  Scott Graves.
18   Q.  And this is the e-mail that we discussed
19 earlier today?
20   A.  Yes.
21   Q.  How did Scott Graves respond to your
22 raising the concern about the double expense
23 submission of Mr. Craigie?
24   A.  He was concerned.

**Dennis A. Paren**
**April 29, 2005**

---

209

1   Q. Did the board of directors take any action?
2   A. I understand they did a three-year audit.
3   Q. Do you know what the result of the audit
4   was?
5   A. Yes; that the only double expenditures were
6   the ones that I provided them.
7   Q. Did Scott Graves tell you anything else in
8   response to your reporting Mr. Craigie's double
9   expense-report submissions?
10   A. He wrote me back a letter.
11   Q. And what did he say?
12   A. That, after an audit that had cost the
13   estate an exorbitant amount of money, they found
14   nothing other than what I had reported to them.
15   Q. Do you have a copy of the e-mail from Scott
16   Graves? Because I don't believe that it's been
17   produced to us.
18   A. It wasn't an e-mail. Scott sent an
19   overnight package. It was a letter.
20   Q. I don't think we have a letter.
21      MS. BRODEUR-MC GAN: I'm pretty sure
22   it's in there.
23      MS. NEWMAN: I'll go back and check.
24   We can both go back and check:

---

210

1   Q. In your complaint, you state that
2   Mr. Graves implied that you had somehow done
3   something wrong in reporting the misconduct.
4   A. Yes.
5   Q. Why do you believe that that was implied?
6   A. Because, if you read the letter, it sounds
7   like I caused the company to incur needless costs
8   in the examination of his expense reports.
9   Q. In Paragraph 22 AA, you allege that
10   in November of 2001 to September of 2003 agents of
11   the corporation readied the company for bankruptcy
12   by positioning certain individuals in areas of
13   protection to ensure job security and endorsed
14   a "get what you can take" mentality.
15      Did I read that correctly?
16   A. Yes.
17   Q. Which agents of the corporation are you
18   referring to?
19   A. Well, the agents in this context are
20   referring to the officers of the company.
21   Q. Specifically who?
22   A. Well, all members of the operating
23   committee, all operating-committee members;
24   that's what I'm referring to.

---

211

1   Q. And who are the certain individuals that
2   were being positioned in areas of protection?
3   A. Well, they were positioning themselves; and
4   then they were positioning favored people that
5   reported to them.
6   Q. And who were the favored people that were
7   being positioned by members of the OCM?
8   A. I would have to refer to a list of the
9   people, because I don't recall all of them.
10   Q. If you refer to Exhibit Paren 3, there are
11   charts in the back.
12   A. Okay; that might be helpful.
13      So, first we're talking about Jim
14   Craigie, Peter Arturi, Mike Esch, Keith Kendall, Tom
15   Kennedy, Vaughn Rist, Chris Russo, Ed Several, Lou
16   Tursi. They all received lucrative change-in-
17   control agreements.
18      And then the other people they helped
19   protect, I believe, were people like Dan Bracken,
20   Tim Seitter, Mike Ferris.
21      And then they also protected these other
22   people with bonuses.
23   Q. In Paragraph 22 BB, you allege that
24   less qualified men were being placed in positions

---

212

1   of authority for job security over others who were
2   not connected. Do you see that there?
3   A. Yes, I do.
4   Q. Who were the less qualified men that were
5   being qualified in positions of authority for job
6   security?
7   A. Well, people like Lou Tursi, to begin
8   with. People didn't believe that he was qualified
9   to do anything with regard to boost sales; but he
10   continued to receive promotions, bonuses, CIC
11   agreements.
12      It was assumed, or it was thought of,
13   that he was the one creating the turnover in the
14   sales staff.
15      I did not work with sales, so I only saw
16   these people with names and photographs and things
17   of that nature. I would have to see who was in a
18   position, and then who left.
19      There was a lot of talk from people that
20   we did not have competent people any longer on the
21   sales staff.
22   Q. And you spoke out against these practices?
23   A. Yes. I spoke out to everybody about
24   the fact that the company was losing sales, and

---

**Dennis A. Paren**
**April 29, 2005**

---

213

1  the turnover of the sales staff. The rule of thumb
2  was every time a salesperson left, his replacement
3  could only expect to achieve 80 percent of what
4  the other person did.
5      So, as the turnover increased because of
6  the unhappiness with the company's performance, and
7  because they didn't respect Lou Tursi, this created
8  a snowball effect with sales decreasing.
9      Q. Other than what you've already testified
10  to, are there any other facts that you rely on in
11  support of any of your claims in your complaint?
12      MS. BRODEUR-MC GAN: Objection. You can
13  answer.
14      A. I can only say that I have not listed
15  everything that happened in this complaint. There
16  are other things. I can't recall them all. They
17  were just too numerous.
18      But as we go through discovery, we're
19  hopeful that we'll come up with more issues.
20      Q. I would just ask that, to the extent
21  that you remember anything else as we move forward
22  through discovery, that you supplement your
23  interrogatory responses and your
24  documentary responses.

---

214

1      MS. BRODEUR-MC GAN: Objection.
2      MS. NEWMAN: Do you object to
3  supplementing discovery responses?
4      MS. BRODEUR-MC GAN: I object to the
5  question being posed to the witness.
6      MS. NEWMAN: All right.
7      I will pose it to you; and ask
8  that, to the extent that Mr. Paren remembers
9  anything else, any other facts, on which he relies,
10  that he supplement his interrogatory responses and
11  document requests.
12      Are you agreeable to that?
13      MS. BRODEUR-MC GAN: Not necessarily,
14  no.
15      MS. NEWMAN: You're not agreeable to
16  supplementing?
17      MS. BRODEUR-MC GAN: I don't think we
18  need to do this on the record at 6:20.
19      MS. NEWMAN: I'm actually not totally
20  done.
21      MS. BRODEUR-MC GAN: Okay; let's take a
22  five-minute break.
23      [Recess taken]
24  BY MS. NEWMAN:

---

215

1      Q. If you could refer to Exhibit
2  Paren 4, which are your supplemental interrogatory
3  responses, the chart on the last page entitled
4  Damage Calculation Chart for Dennis A. Paren,
5  do you see that?
6      A. Yes, I do.
7      Q. Does this reflect the damages that you're
8  seeking in this case?
9      A. Yes.
10      Q. Why are you seeking damages for pay cuts?
11      A. My attorney advised me to.
12      Q. Why are you seeking damages for 401(k)
13  contribution?
14      MS. BRODEUR-MC GAN: I'm going to
15  instruct the client not to answer any attorney-
16  client-privileged information, but otherwise to
17  answer.
18      A. Well, there is a difference between my past
19  401(k) employer contribution and my current employer
20  contribution; and it's significant.
21      Q. What is your current employer contribution?
22      A. Two percent.
23      Q. And what was the contribution of New Top-
24  Flite?

---

216

1      A. It appears it was five percent.
2      Q. Do you remember it being five percent?
3      A. I believe that that's what it was.
4  I believe that's the correct number.
5      Q. And why are you seeking damages for a
6  pension?
7      A. Again, following the same rationale, the
8  contribution by the employer on their cash-balance
9  plan is different.
10      Q. And you mentioned earlier that you have a
11  pension plan with DIMON.
12      A. Correct.
13      Q. What kind of pension plan is that?
14      A. A cash-balance plan.
15      Q. And was it a cash-balance plan or a
16  defined-benefit plan that you participated in with
17  New Top-Flite?
18      A. With New Top-Flite, they just have a
19  defined-contribution plan.
20      Q. How did you calculate the difference
21  between your pension plan under New Top-Flite and
22  your pension plan with DIMON, considering the
23  difference between seven percent and five
24  percent?

---

**Dennis A. Paren**
**April 29, 2005**

217

1          MS. BRODEUR-MC GAN:  Objection.
2      A.  Well, it appears that we took five percent
3   of the pay for my current job and seven percent for
4   the past job.
5          However, the seven percent was more for
6   the Old Top-Flite, and not the New Top-Flite; now
7   that I'm looking at this and thinking about it
8   again.
9          MS. NEWMAN:  We'd like copies of
10   Mr. Paren's pension plan, and any documents
11   relating to his 401(k) plan; if you could
12   produce them.
13          MS. BRODEUR-MC GAN:  Could you ask for
14   it in a letter as part of discovery?
15          MS. NEWMAN:  I believe we've
16   already asked for any and all documents relating
17   to the damages that he seeks in this litigation, so
18   I think it's already outstanding; but I will send
19   you a letter.
20          MS. BRODEUR-MC GAN:  That would be good,
21   so that we can see exactly what you want.
22      Q.  Are there any other damages that you're
23   seeking in this litigation, Mr. Paren?
24      A.  Not at the moment.

218

1      Q.  You're not claiming emotional-distress
2   damages; correct?
3      A.  Not at the moment.
4      Q.  Mr. Paren, I've just handed you two
5   documents that I have marked as Exhibits Paren 14
6   and Paren 15.
7          [Paren Exhibits 14 and 15 marked for
8   identification]
9      Q.  Do you recognize the document I've marked
10   as Paren 14?
11      A.  Yes, I do.
12      Q.  What is it?
13      A.  It is an insurance binder for the placement
14   of employment practices liability insurance coverage
15   for SHC, Inc.
16      Q.  And when have you seen this document
17   before?
18      A.  Well, when it was faxed to me.
19      Q.  When was that?
20      A.  The date is August 12, 2003.  I imagine I
21   received it that day or the next.
22      Q.  And what is the period of time of coverage
23   for this insurance that...
24      A.  August 20...

219

1      Q.  I have to finish my question.
2          What is the period of time that the
3   insurance that this document covers is for?
4          MS. BRODEUR-MC GAN:  Objection.  You can
5   answer.
6      A.  August 20, 2003 to August 20, 2004.
7      Q.  Was this new insurance that you had
8   secured?
9      A.  No.  This was renewal insurance.
10      Q.  Why did you renew this insurance in August
11   of 2003?
12      A.  August became the date because that was
13   the date of the restructuring back in 1998, when the
14   insurance was first purchased; and we renewed every
15   insurance policy on the date of renewal.  It was
16   just a normal business practice.
17      Q.  Did you discuss with anyone the fact that
18   you were renewing this employment practices
19   liability insurance in August of 2003?
20      A.  Sure.
21      Q.  Who did you discuss it with?
22      A.  Well, it was discussed with Jim Craigie,
23   probably Vaughn Rist, Peter Arturi.
24          Jim Craigie had to sign it.  He had to

220

1   sign the application.
2      Q.  Did you have to complete the application?
3      A.  I completed portions of it, and then Peter
4   Arturi would complete a portion of it and Vaughn
5   Rist would complete a portion of it, and Jim
6   Craigie reviewed it and signed it.
7      Q.  Was there a portion that you had to sign on
8   the application?
9      A.  I don't recall, but normally they don't
10   require it.
11      Q.  Is there a place on the application where
12   you have to indicate if the company is aware of any
13   pending claims?
14      A.  There could be some language in there where
15   they're asking for loss history.
16      Q.  But do you recall there being a question
17   regarding whether the company is aware of any
18   claims that might be asserted against it?
19      A.  There may have been, and it was answered
20   and then submitted.
21      Q.  And how did you answer it?
22      A.  I would have to look at the application.
23      Q.  Do you remember whether in August of 2003
24   there were any claims that were pending or might

**Dennis A. Paren**
**April 29, 2005**

221

1  have been asserted against the company?
2      A. It was a long time ago. I don't recall.
3      Q. Exhibit Paren 15, do you recognize this
4  document?
5      A. This appears to be the insured's policy.
6      Q. Did there come a point in time when you
7  made your attorney aware that there was potential
8  insurance coverage for your claims against
9  Mr. Craigie and Mr. Frey?
10      MS. BRODEUR-MC GAN: Objection. I'm
11  going to instruct you not to answer that.
12      Q. Are you aware of how Ms. Brodeur-McGan
13  became aware that there was potential insurance
14  coverage in this case?
15      MS. BRODEUR-MC GAN: Objection.
16      Again, to the extent that it calls for
17  communications between my client and me, I'm
18  instructing him not to answer that question.
19      Q. Do you have an answer?
20      A. She just instructed me not to answer.
21      Q. Mr. Paren, I just handed you a document
22  that's been marked as Exhibit Paren 16.
23      [Paren Exhibit 16 marked for
24  identification]

222

1      A. Yes.
2      Q. Have you seen this document before?
3      A. I can't recall whether I saw this before or
4  not.
5      Q. Did you authorize your attorney to send
6  this letter to A. I. Management and Professional
7  Liability Claims Adjusters?
8      A. Yes.
9      Q. At what point in time did you authorize
10  that this letter be sent?
11      A. Well, the letter is dated July 16, 2004.
12      Q. Why do you believe that there is insurance
13  coverage for Mr. Craigie and Mr. Frey's claims with
14  respect to this policy?
15      MS. BRODEUR-MC GAN: I'm going to
16  object, and I'm going to allow the witness to answer
17  this question only to the extent that it does not
18  reveal attorney-client communications.
19      MS. NEWMAN: I'm just asking for his own
20  belief.
21      MS. BRODEUR-MC GAN: I understand what
22  you're asking for; and again I object, and I'm
23  instructing my client not to divulge any
24  attorney-client information.

223

1      A. It is normal practice within the risk-
2  management business to provide an insurer
3  notification of a potential claim.
4      Q. How would you describe your personal
5  relationship with Dan Frey?
6      A. Cold.
7      Q. Is that at this point in time?
8      A. Well, there is no relationship at this
9  point in time.
10      Q. In May or June of 2003, what was your
11  relationship with Mr. Frey?
12      A. I was his subordinate.
13      Q. Did you have a personal relationship with
14  him?
15      A. Only that I was the one that was
16  gutsy enough to report to him, again, inappropriate
17  behavior, illegal activity, that the company was
18  doing; and I chided him for failing in his
19  responsibilities.
20      Q. Did you consider him a friend?
21      A. No.
22      Q. Do you know whether he considered you a
23  friend?
24      A. No, he didn't. No.

224

1      Q. Do you remember inviting him to play golf
2  with you and Bob Kalbfell in MoreFar in late May or
3  early June of 2003?
4      A. Yes.
5      Q. And do you remember that that was a golf
6  date that was after Mr. Frey had resigned?
7      A. May have been, because these dates at
8  MoreFar got postponed.
9      Q. Why did you invite Mr. Frey to play golf
10  with you in June of 2003, if...
11      A. I don't recall that I did in June of 2003.
12      I mean, I remember playing golf with him
13  in maybe June 2002. He left in June 2003.
14      Q. So now you don't remember playing golf with
15  him in June 2003 at MoreFar?
16      A. I played with him more than once at
17  MoreFar. The invitation was at the insistence of
18  Willis, not on my part.
19      It is the normal course of the
20  invitation to invite the risk manager and his
21  superior. That's how the invitation is made.
22      Q. Did you attend Mr. Frey's going-away party
23  in June of 2003?
24      A. Yes.

Dennis A. Paren
April 29, 2005

225

1    Q. Why did you attend?
2    A. Let's see. Something happened.
3        MS. BRODEUR-MC GAN: While he is
4    thinking, it's quarter of seven.
5        MS. NEWMAN: I'm almost done.
6        MS. BRODEUR-MC GAN: Like how long,
7    almost?
8        MS. NEWMAN: Like I have one more
9    question, depending on what he says.
10    A. I don't believe I was originally going to
11    attend; but something came up, and two of the people
12    that had prepared something for Dan were unable to
13    make it on time, and so they asked me at the last
14    minute to do it, to provide Dan some type of like
15    going-away gift.
16    Q. And where was his going-away party?
17    A. I don't recall. A restaurant, or a bar.
18    Q. What was the going-away gift that you
19    provided to Mr. Frey?
20    A. I don't recall that either.
21    Q. Is it possible that it was a white-panel
22    basketball?
23    A. Yes, it could have been, yes. That was
24    typical.

226

1    Q. Do you remember writing on the basketball
2    that was given to Mr. Frey?
3    A. I'm sure I wrote something on it.
4    Q. Do you remember what you wrote?
5    A. No, I don't. Probably, Keep me in mind at
6    your new job.
7    Q. Do you remember writing, Dan, it was great
8    working with you, and hopefully we can do it again;
9    Dennis?
10    A. Right. That's referring to using Dan for
11    future employment.
12    Q. And so you stated that you wanted to
13    work with him again despite the fact that you were
14    already contemplating filing a claim against him; is
15    that right?
16    A. Well, I didn't know in July 2003 that I was
17    going to file a claim.
18    Q. But you already knew that he had excluded
19    you from the retention bonus.
20    A. Oh, I was very disappointed with him;
21    that's for sure. I had been disappointed for years.
22    Q. So, why did you write that on the
23    basketball if it wasn't true?
24        MS. BRODEUR-MC GAN: Objection.

227

1    Q. You can answer.
2    A. I thought the most appropriate thing to
3    write on a going-away gift was something positive,
4    regardless of what the truth was.
5        MS. NEWMAN: I have no further
6    questions.
7        Do you have any questions?
8        MS. BRODEUR-MC GAN: No.
9    [6:46 PM]

228

1            CERTIFICATE OF NOTARY PUBLIC
2
3        I, Jonathan H. Young, Registered
4    Diplomate Reporter and Notary Public, the officer
5    before whom the foregoing deposition was taken, do
6    certify that Dennis Alan Paren, whose testimony
7    appears herein, was duly sworn by me; that the
8    testimony of said witness was taken by me in machine
9    shorthand and thereafter reduced to writing by means
10    of computer-aided transcription; that said
11    deposition is a true record of the testimony given
12    by said witness; that I am neither counsel for,
13    related to, nor employed by any of the parties to
14    the action in which this deposition was taken, and
15    further that I am not a relative or employee of any
16    attorney or counsel employed by the parties thereto,
17    nor financially or otherwise interested in the
18    outcome of the action.
19
20    _____
21    Jonathan H. Young
22    Notary Public in and for the
23    Commonwealth of Massachusetts
24    My commission expires: February 20, 2009

Accurate Court Reporting
413.747.1806

**Dennis A. Paren**
**April 29, 2005**

---

229

```
 1            I N D E X
 2         Dennis Alan Paren
 3   Examination by:
 4    Ms. Newman              3
 5   Paren Exhibit 1          6
 6   Paren Exhibit 2          6
 7   Paren Exhibit 3          6
 8   Paren Exhibit 4          6
 9   Paren Exhibit 5         21
10   Paren Exhibit 6         25
11   Paren Exhibit 7         27
12   Paren Exhibit 8         27
13   Paren Exhibit 9         57
14   Paren Exhibit 10        82
15   Paren Exhibit 11       100
16   Paren Exhibit 12       132
17   Paren Exhibit 13       134
18   Paren Exhibit 14       218
19   Paren Exhibit 15       218
20   Paren Exhibit 16       221
21
22   *Original exhibits retained by Ms. Newman
23
24
```

---

231

Dennis Alan Paren
SIGNATURE PAGE / ERRATA SHEET INFORMATION
For deposition taken on: April 29, 2005
Paren v. Craigie

SIGNATURE INFORMATION FOR COUNSEL

The original signature page/errata sheet has been
sent to Lisa Brodeur-McGan, Esq., to obtain
signature from the deponent. When complete, please
send original to Tamsin J. Newman, Esq. A copy of
any errata should be sent to each party of record
present at the deposition.

WITNESS INSTRUCTIONS

After reading the transcript of your deposition,
please note any change or correction and the reason
on the errata/signature page. DO NOT make any
notations on the transcript itself. If necessary,
continue the format on a separate page.
PLEASE SIGN AND DATE (before a notary if requested)
the errata/signature page and return it along with
the transcript to your counsel.

---

230

Dennis Alan Paren
SIGNATURE PAGE / ERRATA SHEET

PAGE   LINE   CHANGE OR CORRECTION AND REASON
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____
_____|_____|_____

I have read the foregoing transcript of my
deposition on April 29, 2005. Except for any
corrections or changes noted above, I hereby
subscribe to the transcript as an accurate record of
the statements made by me.
Signed under the pains and penalties of perjury.
Deponent:_____/___/2005
         Dennis Alan Paren
Notary Public:_____/___/2005
in and for:_____
My commission expires:_____

---