**EXHIBIT 3**

COPY

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

## DENNIS PAREN

-vs-

## JAMES CRAIGIE and DANIEL FREY

## No. 04-30127-MAP

----------

Tuesday, August 30, 2005
Princeton, New Jersey

----------

## DEPOSITION OF DANIEL FREY

CHARLES P. CARMODY & ASSOCIATES

COURT REPORTING & LEGAL VIDEO SERVICES

SERVING PHILADELPHIA, SOUTHEASTERN PA, NJ & SURROUNDING REGION
PO BOX 525 * AMBLER, PA   19002
(215) 646-2599 (O)*(215) 542-8650 (F)* DEPOSITION 1 @ COMCAST.NET

DANIEL FREY



1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3                      -   -   -

4

5    DENNIS PAREN,                    :
              Plaintiff,              :
6                                     :
         VS.                          :
7                                     :
     JAMES CRAIGIE, Individually,     :
8    and DANIEL FREY, Individually:
              Defendant.             :   NO. 04-30127-MAP
9

10                      -   -   -

11            Tuesday, August 30, 2005
              Princeton, New Jersey
12                      -   -   -

13

14

15

                   Oral deposition of DANIEL
16   FREY, taken pursuant to notice, was held in the Law
     Offices of MORGAN, LEWIS & BOCKIUS, 502 Carnegie
17   Ctr. #3, on the above date, commencing at
     approximately 9:15 a.m., before Susan Endt, Court
18   Reporter and Notary Public.

19

20

21   ------------------------------------------------
          CHARLES P. CARMODY & ASSOCIATES
22           Court Reporting Services
     768 Bethlehem Pike, Suite 107 * P.O. Box 525
23          Ambler, Pennsylvania  19002
        (215) 646-2599 * deposition1@comcast.net
24

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 2

```
 1   A P P E A R A N C E S :
 2
 3      BRODEUR-MCGAN
        BY:  LISA BRODEUR-MCGAN, ESQUIRE
 4      1380 Main Street
        Springfield, Massachusetts 01103
 5      Representing the Plaintiff
 6
 7      MORGAN, LEWIS, & BOCKIUS, LLP
        BY:  TAMSIN NEWMAN, ESQUIRE
 8      1701 Market Street
        Philadelphia, Pennsylvania  19103
 9      Representing the Defendants
10
11   Also Present:
        James Craigie
12
13              - - -
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1   (Continued)
 2   Frey-6    Letter, Management Recipients of RBP   99
 3
 4   Frey-7    Letter, Recipients of RBP              100
 5
 6   Frey-8    SHC, Inc. Retention Bonus Program      111
 7            Packet
 8
 9   Frey-9    Bankruptcy Court Packet                115
10
11   Frey-10   Memo, Dated 7/6/01, To Vaughn Rist,    121
12            From Dennis Paren
13
14   Frey-11   E-mail, Dated 9/20/05, To Diane        125
15            Blaney, From Vaughn Rist
16            E-mail, Dated 9/19/03, To Vaughn Rist,
17            To Peter Arturi, From Peter Arturi
18            E-mail, Dated 9/18/05, To Peter Arturi,
19            From Jim Craigie
20            E-mail, Dated 9/18/03, To Dennis Paren,
21            From Jim Craigie
22
23   Frey-12   Memo, Dated 6/7/02, To Peter Arturi,   134
24            From Dennis Paren
```

Page 3

```
 1                I_N_D_E_X
                  - - - - -
 2
 3   WITNESS:
 4     DANIEL FREY
 5
 6   QUESTIONED:                        PAGE
 7     By Ms. Brodeur-McGan - Examination   6
 8
 9
10            E_X_H_I_B_I_T_S
              - - - - - - - -
11   MARKED                            PAGE
12   Frey-1    Personnel Record, Dennis Paren      33
13
14   Frey-2    Personnel Record, Stephen Nigro     33
15
16   Frey-3    Objections and Responses to         45
17            Production of Documents
18
19   Frey-4    Document, Key Employee Retention     93
20            Schedule
21
22   Frey-5    Document, Additional Key Employee    94
23            Retention % of Base Salary
24
```

Page 5

```
 1   (Continued)
 2   Frey-13   Letter, Dated 9/18/03, To Scott Graves, 136
 3            From Dennis Paren
 4
 5   Frey-14   Personnel Record, Michael Lyon          146
 6
 7   Frey-15   1999 MAP, Dennis Paren                  146
 8
 9   Frey-16   2000 MAP, Dennis Paren                  146
10
11   Frey-17   2001, MAP, Dennis Paren                 146
12
13   Frey-18   Letter, Dated 5/10/99, To Dennis        146
14            Paren, From Vaughn Rist
15
16   Frey-19   E-mail, Dated 7/15/02, To Peter         146
17            Arturi, From Dan Frey
18
19   Frey-20   Job Description, Director of Risk        146
20            Management
21
22   Frey-21   Objections and Responses to             190
23            Interrogatories
24              - - -
```

CHARLES P. CARMODY & ASSOCIATES
215.646.2599

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 70

1    Q.    Thank you.
2    A.    We discussed implementing a retention
3    bonus plan to retain those people who would be
4    most affected by those potential changes, be most
5    involved in helping us successfully navigate
6    through those potential changes and who,
7    potentially, were a risk to leave the company and
8    not be available to help us navigate through those
9    potential changes.
10    Q.    Was the initial concept for the
11    retention bonus plan of 2001 the brain child of
12    any one individual?
13    A.    I don't recall the genesis of it, no.
14    Q.    Can you tell me, were there, ultimately,
15    parameters created for creating the retention
16    bonus plan of 2001?
17    A.    I'm sorry. I don't understand the
18    question.
19    Q.    That was a bad question. There will be
20    some more today.
21        The operating -- you discussed how the
22    operating committee discussed how there should be
23    an RBP of 2001; is that fair?
24        MS. NEWMAN: Objection to

Page 71

1        form.
2        THE WITNESS: I discussed
3        my understanding, again, as -- and the
4        precursor to my answer, my understanding
5        of how I viewed my direct reports which
6        is all I had influence over.
7    BY MS. BRODEUR-MCGAN:
8    Q.    Other than your understanding of how you
9    were going to view your direct reports, were there
10    any discussions that you were present in about how
11    other people were going to view their direct
12    reports and how they would select people for
13    inclusion?
14        MS. NEWMAN: Objection to
15        form.
16        THE WITNESS: Not that I
17        recall, no.
18    BY MS. BRODEUR-MCGAN:
19    Q.    Were there any written criteria that the
20    operating committee members had to go by when
21    selecting people for the RBP?
22    A.    Not that I recall, no.
23    Q.    Did you ever have any conversations, for
24    instance, with Mr. Craigie, as to how he was going

Page 72

1    to select people for the retention bonus plan of
2    2001?
3    A.    No, I did not.
4    Q.    Did he ever mention it to you how or to
5    any other person in your presence as to how he was
6    going to select people?
7        MS. NEWMAN: Objection to
8        form.
9        THE WITNESS: No.
10        Only to me tell me that I
11        would be selected.
12    BY MS. BRODEUR-MCGAN:
13    Q.    How about Peter Arturi, did he, in your
14    presence, discuss how he was going to select
15    people to be obtaining the RBP in 2001?
16        MS. NEWMAN: Objection to
17        form.
18        THE WITNESS: Not that I
19        can recall.
20        I'm not sure whether Peter
21        had any people in the retention bonus
22        plan.
23    BY MS. BRODEUR-MCGAN:
24    Q.    How about Vaughn Rist?

Page 73

1    A.    I don't recall any operating committee
2    member having any discussion with me as to how
3    they were going to select people for inclusion in
4    the RBP.
5    Q.    My next question is: So do you have any
6    sense, from any source, as to how others selected
7    people for the RBP in 2001?
8    A.    No, I do not.
9    Q.    Do you know whether or not people in the
10    operating committee used similar analyses, as you
11    described for me earlier, for your basis for
12    selection for the RBP for 2001?
13        MS. NEWMAN: Objection to
14        form.
15        THE WITNESS: I have no
16        knowledge of that, no.
17    BY MS. BRODEUR-MCGAN:
18    Q.    Now, prior to 2000, in September of '99,
19    when you first came to Spalding --
20    A.    Yes.
21    Q.    -- was there any designation of
22    employees as being key employees, for any reason?
23    A.    Not that I'm aware of.
24    Q.    Were you familiar with any history of

19 (Pages 70 to 73)

DANIEL FREY

Page 74

1  Spalding that had designated employees as key
2  employees prior to the year of 2000, for any
3  reason?
4     A.    Not that I recall, no.
5     Q.    To your knowledge, prior to the year of
6  2000, was there any listing of key employees, for
7  any reason, other than the retention bonus of
8  2001?
9            MS. NEWMAN:  Objection to
10       form.
11            THE WITNESS:  I don't
12       understand the question.
13            I think you just asked me
14       if prior to 2000, there was a listing,
15       other than a listing that was created in
16       2002.
17  BY MS. BRODEUR-MCGAN:
18    Q.    Yeah.  Bad question.
19          Did "key employee" mean anything to you
20  in the year of 1999 or the year of 2000, while you
21  were employed in the context of Spalding?
22    A.    I don't recall using the term "key
23  employee" or having an understanding, either
24  verbal or written, of what a key employee was.

Page 75

1     Q.    Again, I'm talking about history of
2  Spalding or its predecessors.
3          Prior to 2000, were you ever aware that
4  Spalding had retention bonuses in the past?
5     A.    No.
6     Q.    Again, prior to the creation of the
7  retention bonus plan in 2001, can you tell me if
8  Spalding had a bonus plan for the years of 1999
9  and 2000?
10            MS. NEWMAN:  Objection to
11       form.
12            THE WITNESS:  There was a
13       bonus plan for all of my tenure at
14       Spalding, yes.
15  BY MS. BRODEUR-MCGAN:
16    Q.    Now, is there a name or a label for
17  non-factory level employees, that we could use?
18            MS. NEWMAN:  Objection to
19       form.
20            THE WITNESS:  I believe the
21       factory employees were primarily union
22       employees.
23            So if you refer to people
24       as "non-union employees," I would take

Page 76

1       that to mean people who were not
2       employed in the factory.
3            I'm not sure that that's
4       100-percent accurate but I would take
5       that meaning.
6  BY MS. BRODEUR-MCGAN:
7     Q.    For non-union employees, were you
8  familiar with whether or not they had a bonus
9  incentive plan for the years of 1999 and 2000?
10            MS. NEWMAN:  Objection to
11       form.
12            THE WITNESS:  There was a
13       bonus plan, I believe, for 1999 and
14       2000.
15            I don't recall whether it
16       covered all of non-union employees or
17       only certain levels of non-union
18       employees.
19  BY MS. BRODEUR-MCGAN:
20    Q.    Was that bonus plan for the years of
21  1999 and 2000, also know as the MIBP?
22    A.    Management incentive bonus plan, yes.
23    Q.    Do you recall whether or not Mr. Paren
24  was a recipient of or participated in the

Page 77

1  management incentive plan for the years of 1999
2  and 2000?
3            MS. NEWMAN:  Objection to
4       form.
5            THE WITNESS:  I don't
6       recall.
7            I don't believe anybody
8       received a bonus for the year 2000 and
9       for 1999.  Again, I was there for the
10       tail quarter of the year.  I don't
11       recall.
12  BY MS. BRODEUR-MCGAN:
13    Q.    Do you know whether or not the
14  management incentive bonus plan was still in
15  affect in the years of 2001 through June of 2003?
16    A.    I believe it was.
17    Q.    Do you know whether or not criteria for
18  selection in the MIBP changed during your tenure
19  in 1999 to 2003?
20    A.    I recall, at one point, I believe the
21  eligibility for the MIBP was expanded to include
22  all non-union employees, regardless of level.
23    Q.    Do you recall when that was?
24    A.    I do not.

20 (Pages 74 to 77)

5a005064-e997-439e-b888-c505537e3c24

DANIEL FREY

Page 122

1    A.    I'm not aware of whether his job
2    description changed either formally or informally,
3    no.
4        Q.    Can you tell me, is it your
5    understanding -- let me strike that.
6            Is it your experience that Spalding kept
7    good track of job descriptions for people that
8    were working as direct reports to you?
9            Were they accurate and updated?
10                MS. NEWMAN:  Objection to
11            form.
12                THE WITNESS:  I don't
13            recall having spent any time with HR
14            updating or modifying job descriptions
15            over time for my direct reports.
16    BY MS. BRODEUR-MCGAN:
17        Q.    Okay.  That would be true, as well, for
18    Mr. Paren?
19        A.    All of my direct reports, including Mr.
20    Paren.
21        Q.    Now, Mr. Paren claims that he was
22    responsible for saving Spalding significant sums
23    of money on account of accounting in the travel
24    auditing, in the travel arena.

Page 123

1            Were you familiar with that?
2        A.    Having read his memo and recalling some
3    previous discussions, Dennis was always of the
4    view that he had generated cost savings for the
5    company, yes.
6        Q.    Other than your review of Exhibit Number
7    10, which you just referred to, did you have
8    individual experience or personal experience with
9    Mr. Paren, having saved the company money on
10    auditing of travel expenses?
11        A.    Yes.
12            I'm aware of two instances in which
13    Dennis or people reporting to Dennis uncovered
14    errors in travel and expense reporting for which
15    the company was ultimately reimbursed.
16        Q.    Do you recall if they were material or
17    immaterial accounts?
18        A.    Immaterial amounts.
19        Q.    Do you recall whether or not Mr. Paren
20    had cost saving accomplishments in the area of
21    insurance?
22        A.    No.
23        Q.    Was there a time when Spalding changed
24    its W-2 reportings by using a new reporting

Page 124

1    accounting system?
2        A.    At least once during my tenure, our
3    payroll provider changed.  And that, by default,
4    changed the W-2 reporting process.
5        Q.    And do you know who it changed to,
6    during your tenure?
7        A.    Peoplesoft was involved.
8            I don't recall whether it changed to
9    Peoplesoft or from Peoplesoft.
10        Q.    Was Chris Rousseau involved with any
11    kind of accounting software or any kind of
12    accounting software changes during your tenure?
13        A.    Chris Rousseau was in charge of all of
14    IT, which would have included, at least,
15    peripheral involvement in any systems
16    implementation, including general ledger or
17    accounting system changes.
18        Q.    I forgot to ask you, with respect to
19    Exhibit 8, were there any employees listed on that
20    document that were not a direct report to an OCM
21    member?
22        A.    I can't say for sure because I'm not
23    positive of everyone on here's position but I do
24    not recognize, from this list, anyone who I'm

Page 125

1    aware was not a direct report of an OCM member --
2        Q.    Okay.
3        A.    -- but I cannot say with certainty.
4                MS. BRODEUR-MCGAN:  Can we
5            have this marked?
6                - - -
7            (Whereupon, Exhibit Frey-11 was marked
8            for identification.)
9                - - -
10                MS. BRODEUR-MCGAN:  For the
11            record, it has a Bates stamp 37.  It's
12            an e-mail.  The first date on the top is
13            September 20, '03.
14    BY MS. BRODEUR-MCGAN:
15        Q    My question is:  Exhibit Number 11, have
16    you seen that before Mr. Paren sued you?
17        A.    No.
18        Q.    Have you ever seen it?
19        A.    Yes.
20        Q.    When is the first time you saw it?
21        A.    Sometime within the last nine months.
22            I don't recall specifically in which set
23    of documents it was included.
24        Q.    In this document, Mr. Craigie states

32 (Pages 122 to 125)

DANIEL FREY

Page 126

1  that you had previously slated Mr. Paren for
2  termination.
3          Is that a true statement?
4  A.    Not entirely.
5          The context in which that discussion
6  occurred was shortly prior to my departure.  We
7  were in active discussions to sell the golf
8  company.  We were also contingency planning for
9  the possibility that no one would buy the golf
10  company and we would be forced to try and make due
11  on a stand-alone company basis which would have
12  meant, given our financial condition, dramatic
13  restructuring and cost-cutting across the
14  organization.
15          I had developed a list for finance of
16  how I thought we would be able to eliminate
17  positions and save money and operate on a
18  bare-bones environment.
19          I did generate, at least, a draft of a
20  listing of how those savings might be
21  accomplished.  It did include the elimination of
22  Dennis' position.  It also included the
23  elimination of my own position.
24  Q.    When was that draft created,

Page 128

1  A.    I was originally contacted by Larry
2  Siuta, S-I-U-T-A, who I had previously worked with
3  at Deloitte & Touche.
4  Q.    In addition to the elimination of Mr.
5  Paren's position, did you eliminate any other
6  positions in that memo that you referred to?
7          MS. NEWMAN:  Objection to
8      form.
9          THE WITNESS:  One, I don't
10      think there was a memo, as opposed to a
11      draft listing of how cost might be cut.
12          And, two, I'm sure there
13      were other positions eliminated but I
14      don't recall specifically which ones.
15  BY MS. BRODEUR-MCGAN:
16  Q.    The draft listing, is that something
17  that you kept?
18  A.    No.
19  Q.    Do you have any idea where it is?
20  A.    No.
21  Q.    Do you know who you shared it with?
22  A.    The only people I recall sharing it with
23  were Bain Consultants.
24          I believe it was Bain Consultants who we

Page 127

1  approximately?
2  A.    Approximately, in the Spring of 2003.
3  Q.    Before or after May of 2003?
4  A.    I can't say for sure.
5  Q.    Now, you knew as early of May of 2003
6  that you were leaving Spalding?
7  A.    Late May of 2003.
8  Q.    When had you begun conversations with
9  Travelers, St. Paul?
10  A.    Sometime, I believe, in early May of
11  2003.
12  Q.    Had you been aggressively pursuing
13  alternative positions within the job market prior
14  to May of 2003?
15          MS. NEWMAN:  Objection to
16      form.
17          THE WITNESS:  No.
18          I had not pursued any
19      opportunities outside Spalding.
20          I was contacted by people
21      within St. Paul Travelers who I had
22      known previously.
23  BY MS. BRODEUR-MCGAN:
24  Q.    Who was that?

Page 129

1  had in sometime in the Spring of 2003.
2  Q.    Where are they out of?
3  A.    They are an international firm.  I think
4  we had them out of Boston but I'm not sure.
5  Q.    Did you share that draft listing with
6  anybody in the OCM?
7  A.    I believe I would have shared it with
8  Mr. Craigie but I can't say for sure.
9  Q.    How about Mr. Rist or Mr. Arturi?
10  A.    I don't recall.
11  Q.    Other than the draft listing where Mr.
12  Paren was slated for elimination, did you have any
13  other communication with Mr. Craigie as to your
14  elimination of Mr. Paren's position?
15          MS. NEWMAN:  Objection to
16      form.
17          THE WITNESS:  I don't
18      understand the question.
19          MS. BRODEUR-MCGAN:  Let me
20      rephrase it.
21          MS. NEWMAN:  He didn't
22      eliminate the job.
23          MS. BRODEUR-MCGAN:  I'll
24      rephrase it.

33 (Pages 126 to 129)

CHARLES P. CARMODY & ASSOCIATES
215.646.2599

5a005064-e997-439e-b888-c505537e3c24