UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENNIS PAREN,                          )
            Plaintiff            )
                           )
                           )
        v.                     )     Civil Action No. 04-30127-KPN
                           )
                           )
JAMES CRAIGIE and DANIEL FREY,         )
            Defendants           )

MEMORANDUM AND ORDER WITH REGARD TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (Document No. 26)
June 15, 2006

NEIMAN, C.M.J.

      Dennis Paren ("Plaintiff") brings this complaint against the former president and

chief executive officer of Spalding Sports Worldwide ("Spalding" or "the company"),

James Craigie ("Craigie"), and Spalding's former chief financial officer, Daniel Frey

("Frey") (together "Defendants").  The complaint stems from events which occurred

between 2001 and 2003 as Spalding was struggling financially.  In essence, Plaintiff,

who had been Spalding's director of risk management and insurance, had a falling out

with Craigie and Frey over certain financial incentives that a number of managers, but

not he, had received.  Then, on December 5, 2003, shortly after Spalding's assets were

purchased by a competitor, the new owner terminated Plaintiff's employment.  Plaintiff's

claims against Craigie and Frey, both of whom had left the company by the time of the

asset purchase, are for defamation, intentional interference with contractual relations,

and intentional interference with advantageous relations.

Defendants, denying liability, have moved for summary judgment and the parties have consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons stated below, the court finds that, even viewing the facts in a light most favorable to Plaintiff, his claims against Defendants are not sustainable as a matter of law.  Accordingly, Defendants' motion for summary judgment will be allowed.

## I. BACKGROUND

Because Defendants' Statement of Material Undisputed Facts (pages 2-19 of Document No. 27 (hereinafter "Defendants' Brief")) provides the only comprehensive (and properly cited) summary judgment background and is essentially undisputed, the following facts are derived directly from that document.  Further "facts" mentioned in Plaintiff's "Statement of Facts" (pages 2-12 of Document No. 29 (hereinafter "Plaintiff's Brief")) are addressed in the court's discussion below.  As required, the court has omitted from this background any "conclusory allegations, improbable inferences, and unsupported speculation," *Aguiar-Carrasquillo v. Agosto-Alicea*, 445 F.3d 19, 26 (1st Cir. 2006) (citation and internal quotation marks omitted), and has also stated the facts in a light most favorable to Plaintiff, the non-moving party, *Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 41 (1st Cir. 2005).

A.  Overview of Parties and Corporate Entities

The parties are all former employees of Spalding, which used to be a wholly-owned subsidiary of SHC, Inc. ("SHC") headquartered in Chicopee, Massachusetts.  At all times relevant to the complaint, Spalding was involved in the production, distribution and sale of golf-related products.  From 2001 through 2003, Spalding employed

2

approximately one thousand individuals at its Chicopee headquarters.  Of these, approximately four hundred (including Plaintiff and Defendants) were salaried, non-union employees.

On June 30, 2003, SHC filed for bankruptcy.  Shortly before the filing, Callaway Golf Company ("Callaway"), based in California, agreed to purchase certain of Spalding's assets and liabilities, which were placed into Callaway's wholly-owned subsidiary, Top-Flite Golf Company.  This resulted in Spalding becoming an entity the parties refer to as "New Top-Flite".  Callaway's acquisition of these assets and liabilities -- described more fully below -- was consummated on September 15, 2003.

Plaintiff was employed by Spalding as the director of risk management and insurance from April of 1979 until the Callaway acquisition in September of 2003.  He initially worked in Florida but relocated to Massachusetts in October of 1998.  It is undisputed that, throughout his tenure, Plaintiff performed his job in a satisfactory manner and received satisfactory evaluations.  It is also undisputed that, in 1997, Plaintiff was given the right to purchase company stock, a right which he exercised by purchasing 18,000 shares at a cost of $5 per share.

In December of 1998, Spalding's majority owner, a firm called "KKR," recruited Craigie to be Spalding's new president and chief executive officer ("CEO").  KKR had purchased Spalding in 1996, but the company had continued to lose money.  KKR expected Craigie to lead a new team to turn the company around.

In 1999, Frey was recruited to become Spalding's chief financial officer ("CFO").  In that role, Frey headed the finance department and directly supervised the follosing

seven individuals: Plaintiff, the director of risk management and insurance; Charlie

Kimmett ("Kimmett"), the director of accounting; Larry Kustra ("Kustra"), the director of

credit and accounts receivable; Richard Levandowski ("Levandowski"), the manager of

cost accounting; Mike Lyon ("Lyon"), the director of taxation; Stephen Nigro ("Nigro"),

the director of treasury operations; and Victor Varga ("Varga"), the director of financial

planning and analysis.

It should be noted that when Craigie and Frey joined Spalding as officers they

were required to purchase stock in the company which they could do either "up-front" or

by executing a promissory note.  Craigie purchased 250,000 shares of common stock

up-front at $2 per share, for a total cash output of $500,000.  He also purchased

500,000 shares of restricted stock, at a cost of $0.01 per share.  Frey, on the other

hand, made an initial investment of $10,000 and executed a promissory note for the

remainder.  Frey, however, did not recall at his deposition the total number of shares

that he purchased; he did recall that he ultimately paid $40,000 out-of-pocket for the

stock.

In any event, as president and CEO, Craigie presided over Spalding's operating

committee (referred to by the parties as "the OCM").  The OCM had eight members, all

of whom were officers of the company, including Frey, Vaughn Rist ("Rist"), the director

of human resources, and Peter Arturi ("Arturi"), the general counsel.  (Plaintiff was not a

member of the OCM and never attended any of its meetings.)  Although Craigie and the

OCM were ultimately accountable to the board of directors -- which was controlled by

Spalding's majority owner, KKR -- the OCM, under Craigie's leadership, made the

critical management decisions that directed the future of the company.

B.  The Retention Bonus Program

In 1999 and 2000, Spalding faced significant competitive challenges when Nike, Taylor-Made, Adidas, and Callaway entered the golf ball market.  These challenges were compounded by the economic downturn following the events of September 11, 2001, increased competition from Titleist, and the fact that golf, as a sport, was in a nationwide decline.  As a result, no employee received a merit increase in 2001 or 2002, although Plaintiff requested a salary increase on July 6, 2001.

In the Fall of 2001, Craigie recommended to the board of directors that Spalding be sold or, if a seller could not be located, that it undergo significant changes aimed at cutting costs so that it could survive as a stand-alone entity.  In order to increase the company's desirability to potential buyers, the OCM discussed a variety of cost-cutting measures, including a possible one-third reduction of employees.

In addition, Craigie recommended that Spalding adopt and implement a "Retention Bonus Program" as a means of ensuring the continuity of management during the uncertain and potentially rocky years to come.  The OCM thereafter determined that the Retention Bonus Program would be specifically aimed at retaining those employees with skill sets in high demand who (1) were critical to the ongoing value of the company and (2) would be most at risk to leave.  To that end, the OCM earmarked a $4 million pool to be used for the program and Craigie directed each OCM member to submit recommendations of potential participants from their respective departments.

Frey recommended that four of seven members of the finance department participate in the Retention Bonus Program.  First, Frey recommended Kimmett, the director of accounting, because he had primary responsibility for monthly accounting, frequent interaction with the external auditors and familiarity with accounting details; according to Frey, Kimmett was also likely to play a key role in any due diligence or merger and acquisition activity.  Second, Frey recommended Lyon, the director of taxation, because he was handling several complex tax issues, including international transfer pricing, an ongoing IRS audit and valuation assessments of the company's net operating loss carry-forwards, which were likely to be a factor in any debt restructuring or merger and acquisition activity.  Third, Frey recommended Nigro, the director of treasury operations, because he had primary responsibility for managing the company's cash position, coordinated the timing of disbursements and monitored cash collections; Nigro was also responsible for monitoring compliance with debt covenants, involved in amendments to the company's debt agreements and, in Frey's view, a key contact for external auditors and banks.  Finally, Frey recommended Varga, the director of financial planning and analysis, because of his role in the company's budget forecasting, long-term planning, and evaluation of new business opportunities; Varga also had primary responsibility for analyzing business results and preparing materials for the OCM, board meetings and third-party consultants, experience which was likely to require Varga's involvement in debt restructuring and the merger and acquisition process.

Frey states that he did not recommend Plaintiff to receive a retention bonus

because he believed that Plaintiff was not critical to ongoing company functions, that Plaintiff was not a risk to leave and that, if Plaintiff did leave, his work could be absorbed elsewhere in the organization.  For essentially the same reasons, Frey asserts, he did not select two other members of the department, Kustra and Levandowski.

After a composite list of potential participants in the Retention Bonus Program was prepared, Craigie sought input from the OCM as to whether the potential participants were worthy of selection.  None of the OCM members objected to Frey's selections from the finance department and, ultimately, forty salaried, non-union employees (including Frey's four selections) were chosen to participate.  Although Plaintiff was not selected for a retention bonus, he received restricted stock shares, representing a "sale bonus" which would be paid in the event of a sale of the company for more than $400 million.

The amount of a participant's retention bonus was determined by Rist, the director of human resources, based upon a percentage of base salary, the participant's prior bonus level, and the overall $4 million pool.  Using these criteria, the participants selected by Frey were allotted the following retention bonuses to be paid in four equal installments: $17,000 for Kimmett (whose salary was $87,000); $23,528 for Lyon (whose salary was $120,000); $34,800 for Nigro (whose salary was $90,000); and $35,000 for Varga (whose salary was $144,000).  It is undisputed that, had Plaintiff been selected to participate in the Retention Bonus Program, his bonus would have been approximately $24,000.

On April 23, 2002, the board of directors formally adopted the Retention Bonus Program, including the schedule of participants. (At approximately the same time, Spalding entered into a restructuring agreement with Oaktree Capital Management.) Pursuant to the program, the first bonus payment was made on April 23, 2002, with three additional payments scheduled for December 31, 2002, December 31, 2003, and December 31, 2004, with the caveat that payments would be accelerated in the event of a sale of the company.

C. <u>Plaintiff's Response to the Retention Bonus Program</u>

Although the Retention Bonus Program was intended to be kept confidential, Plaintiff learned about its existence shortly following the first payment on April 23, 2002. Soon thereafter, Plaintiff claimed to a number of individuals -- including Rist and Arturi, the general counsel -- that it was "unfair" that he had been excluded.

Thereafter, in May or June of 2002, Plaintiff called Jerry Sullivan ("Sullivan"), the risk manager at KKR, to complain that he had not been selected for a bonus. Sullivan responded by contacting Marc Lipschultz ("Lipschultz"), a Spalding board member, who contacted Frey for an explanation. Frey reiterated to Lipschultz the reasons why he did not select Plaintiff to participate in the Retention Bonus Program.

In a June 7, 2002 memorandum to Arturi entitled "Stock Loss," Plaintiff complained yet again. He argued that his "$60,000 investment" in Spalding stock had "evaporated" and that he should be compensated for the loss by receiving a retention bonus. Plaintiff also argued that certain employees "had the impact of their loss substantially mitigated" through "the forgiveness of a company loan," but he was not so

fortunate.[1]

Plaintiff provided a copy of his June 7, 2002 memorandum to Craigie. Craigie, in turn, forwarded the memorandum to Rist and Arturi with the following handwritten note:

> Vaughn/Peter—
>
> Dennis stopped by this morning and gave me this letter. He was very polite and asked me to read it at my convenience and respond. He is looking for inclusion in the retention bonus plan (how does he know?). We cannot do this unless we have $'s left under that plan or one of the participants leaves Spalding. We could give him more stock options.
>
> Vaughn – please review and recommend a response.

Rist thereafter advised Craigie that Plaintiff could not be included in the Retention Bonus Program because all of the bonus pool money had been allocated to employees who met the criteria to receive a retention bonus.

Plaintiff also complained about his exclusion from the program in a discussion with Frey on July 15, 2002. Frey memorialized the substance of that discussion later that same day in an e-mail to Arturi, Rist and Craigie, a copy of which was placed in Plaintiff's personnel file. In part, Frey wrote the following:

---

[1] Apparently, Plaintiff was referring to Craigie's decision, in another step designed to retain employees, to cancel the promissory notes and corresponding stock of those employees who had not purchased their stock in cash up-front. Since the stock had become worthless, Craigie felt that it would make little sense, and would result in the loss of employees who were critical to the ongoing function of Spalding, if the company continued to require payments on promissory notes for worthless stock. However, for those employees who had paid for their stock up-front, including Craigie and Plaintiff, Craigie felt that nothing could be done, *i.e.*, even if there were sufficient funds to refund employees for their stock investments (which apparently there was not), any excess monies would have to be paid to creditors.

> I spent about a half hour with [Plaintiff], and I was very frank.
> We walked through a few points in his letter to Peter [Arturi]
> which I felt were factually inaccurate or distorted, and
> agreed to disagree on a few things.  Our discussion was
> civil, but knowing Dennis we still probably haven't heard the
> last from him on this topic.

At his deposition, Plaintiff disagreed that any of the points in his communications with Arturi were "factually inaccurate or distorted" and opined that the last sentence of Frey's e-mail message characterized him "as someone who, once he has heard the truth, doesn't accept it; and that's not what happened."  Plaintiff, however, did not challenge the placement of the e-mail in his personnel file.

Around the same time, Frey told Arturi, according to Arturi's deposition testimony, that he did not select Plaintiff to participate in the Retention Bonus Program because "[Plaintiff's] job is easy and . . . [he] is not going anyplace."  Arturi understood Frey's comments to mean that "[Plaintiff's] job was not one of the jobs that [Frey] needed people around to be able to do over the next twelve to twenty-four months and [Frey] didn't consider [Plaintiff] to be one of the people who would leave the company regardless of whether he got a retention bonus."

D.  The Supplemental Bonuses

As indicated, Spalding's parent company, SHC, filed for bankruptcy on June 30, 2003.  Several entities then competed in a court-ordered auction to acquire Spalding's golf business assets.  Callaway was the winning bidder and, as part of its bid, agreed to assume liability for the Retention Bonus Program.

Prior to the bankruptcy sale, however, a few employees in the Retention Bonus

Program left the company, including Frey who accepted a position with St. Paul Traveler's on or about June 20, 2003. At the urging of debt holders, the OCM distributed as supplemental bonuses the funds that had been freed from the departure of these Retention Bonus Program participants to additional Spalding employees whose functions the OCM deemed essential to ensure a smooth transition through the acquisition (for example, certain employees in Spalding's research and development department). In this regard, Craigie asked Frey who else in the finance department was needed to assume his CFO duties to see the company through the bankruptcy filing and the acquisition by Callaway. Frey identified Kimmett, Nigro and Varga, and further stated that he believed that payments of $20,000 each should be sufficient incentive for these three employees to stay and perform his CFO duties. The supplemental bonus payments to those three employees were reflected on the revised schedule of retention bonus recipients included in Spalding's June 30, 2003 bankruptcy filing.

The bankruptcy filing also identified those employees who had been guaranteed a severance payment in the event of a change of control, including Plaintiff (whose severance had been increased from thirty-nine weeks to fifty-two weeks). Many other employees were not entitled to any severance payment. As it turned out, Plaintiff did not assume any of Frey's duties after his departure.

When Plaintiff learned that additional funds had been freed up by the departure of some of the participants in the Retention Bonus Program, he "hope[d]" that Craigie would select him for a supplemental bonus. Upon learning from Rist that he had not

been chosen, Plaintiff concluded that it was a "given" that he was being passed over because he had reported alleged unlawful or improper conduct.  (This allegation is explored more fully below.)

E.  The Callaway Purchase

On September 15, 2003, the remaining two installments of the Retention Bonus Program, along with the supplemental bonus payments, were paid.  The Callaway acquisition took effect that same day and "New Top-Flite" was created.  Craigie, however, had opted not to continue as Spalding's CEO and his last day was September 12, 2003.  He was never employed by New Top-Flite and, since July of 2004, has served as the president and CEO of Church & Dwight, Inc.  For its part, New Top-Flite initially retained Plaintiff in his same position as director of risk management and insurance.

On September 16, 2003, the day after the Callaway acquisition, Plaintiff again spoke to Arturi about his displeasure at being excluded from the bonus programs. During that conversation, Arturi mentioned that Frey had once called Plaintiff a "pain in the butt" or a "pain in the ass."  Although Frey had not explained what he meant by this remark, Arturi inferred that Frey was referring to Plaintiff's ongoing complaints about not receiving a retention bonus juxtaposed against Spalding's massive debt restructuring.

F.  Plaintiff's Response and Craigie's September 18th e-mail

After his conversation with Arturi, Plaintiff embarked upon his own audit of Craigie's expense reports and discovered that two items had been double-billed.  He

reported this to Arturi and Rist -- and, then, in a September 18th letter to Scott Graves of Oaktree Capital Management -- claiming that he had been "excluded from the retention bonus plan for criticizing certain management decisions."  Plaintiff argued that he had been the victim of retaliation.  (Again, Plaintiff's claim of retaliation is explored more fully below.)

When Craigie learned of Plaintiff's accusations on September 18, 2003 -- which was six days after Craigie left Spalding -- he sent an e-mail to Plaintiff stating, in part, the following: "I have always enjoyed working with you and felt that you were a very competent employee. That is why I was totally astounded by your attempt to accuse me of expense account fraud."  Craigie went on to explain that his administrative assistant may have made a mistake in filling out the expense report and that he welcomed the audit of his expense reports.  Craigie closed the e-mail as follows:

> While I am no longer an employee of the company, I would
> ask that you please try to bury your bitterness about not
> being part of the retention bonus plan.  The company now
> has a bright future as a result of the elimination of the debt
> load and becoming part of the world's largest golf
> equipment company.  It needs your help to deliver this bright
> future by focusing your energy on issues that can motivate
> fellow employees rather than continuing to spew your venom
> on the integrity of fellow employees.

Craigie forwarded a copy of this e-mail to Arturi, who in turn forwarded it to Rist, who placed a copy in both Plaintiff's and Craigie's personnel files.  Again, Plaintiff did not challenge Rist's placement of the e-mail in his file.  Nor did Plaintiff recall at his deposition whether he himself forwarded the e-mail to anyone, although he did discuss it with Arturi and communicate its contents to at least one other party.

13

In response to Plaintiff's accusations, the board of directors completed an independent audit of Craigie's expense reports during his entire tenure at Spalding and determined that the only instances of double-billing were the two identified by Plaintiff. The audit concluded that the double-billing had been the result of inadvertent mistakes by Craigie's administrative assistant.[2]  Plaintiff acknowledges that the independent audit cost Spalding's bankrupt estate "an exorbitant amount of money."

H.  Plaintiff's Termination and Subsequent Employment

Following the Callaway acquisition, Brad Holiday, Callaway's CFO, began to assess the "synergies" of the two companies from an organizational perspective with the goal of eliminating any "redundancies" within his supervision.  As part of this process, Holiday met with Varga, who continued to be the director of financial planning and analysis at New Top-Flite.  At Holiday's request, Varga provided an overview of the organizational structure of New Top-Flite's finance department and informed him that certain functions -- including tax, risk management, treasury, and credit and collection -- appeared to duplicate with functions at the corporate level at Callaway.

Holiday thereafter agreed that the risk management function at New Top-Flite could be consolidated with similar functions at Callaway and decided to eliminate Plaintiff's position.  On December 5, 2003, therefore, Plaintiff was informed that, effective immediately, his job was eliminated and his responsibilities were to be shifted

---

[2]  In one instance, a car payment check that had been cut and deposited prior to the bankruptcy filing was accidentally resubmitted and paid again and, in the second instance, Craigie's assistant double-billed an airline ticket after Craigie had changed flights during a business trip.

to Callaway in California.  For a full year thereafter, *i.e.*, through December of 2004, Plaintiff -- although refusing to sign a release -- received a severance package equal to his annual salary of $122,000 plus medical coverage.

During the next five months, through May of 2004, Plaintiff was retained as a consultant for TFGC Estate, Inc., performing insurance and  pension-related work for Spalding's bankrupt estate.  In this position, Plaintiff continued to have an office at New Top-Flite and was paid $150 per hour.  Then, after receiving unemployment compensation for a short period of time in July, Plaintiff worked briefly for Babson Capital as an insurance specialist.  In September of 2004, Plaintiff accepted a position with DIMON, Inc. as director of international risk and benefits management, earning an annual salary of $110,000 plus benefits, the position he holds today.

I. Procedural History

On July 2, 2004, Plaintiff commenced the instant action asserting three claims each against Craigie and Frey relating to his non-selection for participation in the bonus programs and the termination of his employment from New Top-Flite: defamation, intentional interference with contractual relations, and intentional interference with advantageous business relations.  Plaintiff seeks retention bonus payments amounting to $150,000, back pay, front pay and benefits to age sixty-five, damages for emotional distress, and attorney's fees.  That same day, July 2, 2004, Plaintiff filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") against Callaway, alleging that it unlawfully terminated him because of his age.

15

Plaintiff eventually withdrew his MCAD complaint and, in May of 2005, executed a release in favor of New Top-Flite and Callaway in exchange for meeting with Arturi and Rist (who were still employed by New Top-Flite) in an effort to obtain "information and documents that might be relevant to his case against Mr. Craigie and Mr. Frey." Notwithstanding the meeting, both Arturi and Rist provided sworn deposition testimony that exonerated Craigie and Frey.  In due course, Defendants filed the instant motion for summary judgment and the court heard oral argument.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Although some facts may be disputed by the parties, the summary judgment standard requires that there be no genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A material fact creates a genuine issue for trial "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Substantive law governs materiality and only disputes over facts that might affect the outcome of the trial are material.  *Id.*  To avoid summary judgment, a plaintiff must make a sufficient showing of the elements essential to the case on which it bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.  DISCUSSION

As indicated, the complaint's six counts raise three claims against each

16

defendant, *i.e.*, that Defendants are liable for: (1) defamation (Counts I and II); (2) intentional interference with contractual relations (Counts III and IV); and (3) intentional interference with advantageous business relations (Counts V and VI).  The court first addresses the interference claims together and then turns to defamation.

A.  INTENTIONAL INTERFERENCE WITH CONTRACTUAL/ADVANTAGEOUS BUSINESS RELATIONS

As the parties recognize, the elements of an intentional interference with contractual or advantageous business relations claim are as follows: (1) the existence of a contract or business relationship with contemplated economic benefit; (2) defendant's knowledge of the contract or business relationship; (3) defendant's intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages.  *See Bourque v. Cape Southport Assocs., LLC*, 800 N.E.2d 1077, 1082-83 (Mass. App. Ct.), *rev. denied,* 806 N.E.2d 102 (Mass. 2004).  *See also Mill-Bern Assocs., Inc. v. Dallas Semiconductor Corp.*, 2002 WL 1340853, at *5 (Mass. Super. Ct. June 13, 2002) (indicating that the elements of the torts are essentially the same).

According to Plaintiff, Craigie and Frey interfered with his contractual and/or advantageous business relations in two ways: first, by excluding him from the Retention Bonus Program and the supplemental bonuses; and second, by interfering with his employment with New Top Flite.  In the end, the court concludes that neither theory can survive summary judgment because, in both instances, Plaintiff simply cannot prove that Defendants intentionally interfered with his contract or business relationship via an improper purpose or by improper means.

17

1. <u>Excluding Plaintiff from the Bonus Programs</u>

As to Plaintiff's first theory of recovery -- that Defendants improperly excluded

him from the bonus programs -- Defendants assert that there is no evidence

whatsoever that they acted with an improper motive.  On the contrary, Defendants

argue, the bonus programs had a legitimate business purpose, *i.e.*, to retain critical

employees who would be at high risk to leave, that Plaintiff did not meet those criteria

and, that, as a result, they could not have interfered with his exclusion from the

bonuses as a matter of law.  In response, Plaintiff alleges that a reasonable factfinder

could infer that both Craigie and Frey intentionally kept him out of the bonus programs,

not because of any legitimate business decisions, but in retaliation for reporting

unlawful or improper corporate conduct.

In light of the seriousness of Plaintiff's charges, the court has considered the

facts Plaintiff alleges in detail.  In the end, the court concludes -- for the reasons

described below -- that there is insufficient evidence for a jury's consideration that

Defendants impermissibly retaliated against Plaintiff.

As a preliminary matter, the court notes that Plaintiff's factual assertions of

retaliation are purportedly embedded within his eighty-four paragraph "Statement of

Facts" (hereinafter "Plaintiff's Facts").  Unfortunately, many of Plaintiff's record citations

do not support the assertions for which they are cited, others contain hearsay, and a

number of paragraphs in Plaintiff's affidavit (upon which Plaintiff's Facts are principally

based) allege things about which Plaintiff has no first-hand knowledge.  As a result,

Defendants have "respectfully, and reluctantly" urged the court not to accept at face

18

value any alleged record citations put forth by Plaintiff.  (Document No. 31 (hereinafter "Defendants' Reply") at 3-4.)

Defendants' request to the contrary, the court has not rejected outright Plaintiff's Facts.  Instead, it has attempted to extricate from Plaintiff's Facts any evidence of retaliation, to wit, any evidence that Plaintiff reported unlawful or improper corporate conduct to either Craigie or Frey before they left the company, the dates he supposedly made such reports and what, if anything, they did in response.  *See, e.g.*, *Netherwood v. Am. Fed'n of State, County & Mun. Employees*, 757 N.E.2d 257, 266-67 (Mass. App. Ct. 2001) (plaintiff must submit adequate evidence "to permit a reasonable conclusion" that defendant's alleged interference "directly and proximately resulted from" plaintiff's actions).  *Cf. Stinson v. SimplexGrinnell LP*, 152 Fed. Appx. 8, 11 (1st Cir. 2005) ("Courts have consistently held the failure to make a showing of causation to be a fatal defect in a retaliation claim.") (citing cases).  As will become evident, the court's search has come up empty.[3]

Plaintiff first asserts that "[h]e began reporting improprieties at the Company in 1999."  (Plaintiff's Facts ¶ 3.)  However, none of the supporting paragraphs from his

_____

[3]  To say the least, engaging in this exercise has been frustrating.  As a colleague from the Northern District of Illinois recently observed, "one is tempted to conclude, as did Judge Friendly, that at times counsel seem to be playing a deliberate game to make it hard for the judge to find the portions on the record upon which they relied."  Jeffrey Cole, U.S.M.J., *Lessons Discovered Along the Way*, Litigation, Spring 2006, at 64 (citing Hon. Henry Friendly, *The Common Law Tradition: Deciding Appeals*, Benchmarks, at 34, 39 (1967)).  *See also id.* at 4 ("In practice, most judges subscribe to the philopshy that they are not like pigs hunting for truffles buried in the briefs, *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991), and it is not their responsibility to research and construct the parties' arguments.  *United States v. Lanzotti*, 199 F.3d 954, 960 (7th Cir. 1999).").

19

affidavit (2, 8, 10 or 13) says that.  The court, therefore, does not credit this assertion.

Next, Plaintiff asserts that "almost immediately after arriving in Massachusetts," he "reported improprieties . . . to both Frey and Craigie."  (Plaintiff's Facts ¶ 4.)  As support, Plaintiff cites paragraphs 8-25 of his affidavit.  Again, however, none of those paragraphs contains any dates as to when any particular impropriety was reported to either defendant.[4]

To be sure, Plaintiff avers in paragraph 17 of his affidavit that "[b]oth Mr. Frey and Mr. Craigie knew I reported [certain improprieties] before the Retention Bonus recipients were selected."  Such a vague assertion, however, cannot be credited, particularly when it is not based on first-hand knowledge.  *See Quinones v. Houser Buick*, 436 F.3d 284, 291 (1st Cir. 2006) (observing that "all affidavits submitted in conjunction with an opposition to a motion for summary judgment" must "'set forth such facts as would be admissible in evidence'" and be based on "first-hand knowledge") (quoting Fed. R. Civ. P. 56(e)); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) ("Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inference, and unsupported speculation.").[5]

---

[4]  Perhaps most disturbing is paragraph 9 of Plaintiff's affidavit in which he avers that "[a]ll my allegations in my Complaint are true."  Obviously, Plaintiff cannot survive summary judgment in that manner.  *See Bransford & Petz, P.C. v. Bank of Am. Comm. Fin. Corp.*, 2005 WL 1668224, at *4 (D. Mass. June 13, 2005) ("The party objecting to summary judgment may not merely rest upon the statements put forth in its own pleadings.") (citing cases).

[5]  Plaintiff also refers to pages 65-66 and 68-70 of Arturi's deposition.  But again, no dates are mentioned in the pages that Plaintiff provided to the court.  (Indeed, the

Plaintiff also asserts that he "continuously complained to Company management that he was being excluded for criticizing management decisions" and cites "Scott Graves' letter" as support.  (Plaintiff's Facts ¶ 52.)  As it turns out, however, that letter is the one *from* Plaintiff *to* Graves of Oaktree Capital Management, not one from Graves to anyone else.  Moreover, the letter is  dated September 18, 2003, *i.e.*, *after* both Craigie and Frey left the company and well after the bonus recipients had been designated.  Accordingly, the letter is hardly the type of evidence upon which the court can rely.  Nonetheless, the court has considered the letter not only for its substance but as an example of how Plaintiff has shrouded the facts.

At best, Plaintiff's September 18th letter to Graves implies that, perhaps as early as December of 2001, Plaintiff had been "criticizing certain management decisions" that he "deemed improper, imprudent, inequitable, or just unwise."  None of the letter's particular allegations with respect to the bonus programs, however, are linked to Craigie.  Moreover, the only such allegation which arguably targets Frey -- his "pain in the ass" comment -- is undated, based on multiple levels of hearsay, and directly disputed as retaliatory by Arturi, the only individual who witnessed the event.[6]

For his part, Frey testified consistently with Arturi that his comment was

last two pages, 69 and 70, are omitted from Plaintiff's submission.)

[6]  In the letter to Graves, Plaintiff appears to refer to his September 16, 2003 conversation with Arturi, who purportedly told Plaintiff that, at some unspecified time in the past, Frey stated that he "had decided to exclude me because 'I was a pain in his butt.'" (Defs.' Ex. N.)  As described *supra*, Arturi testified at his deposition that, although Frey had not explained what he meant by this remark, he (Arturi) had inferred that Frey was referring to Plaintiff's ongoing complaints about not receiving a retention bonus juxtaposed against Spalding's massive debt restructuring.

21

specifically linked to Plaintiff's complaints for not being included in the bonus programs

and had nothing to do with Plaintiff allegedly reporting unlawful or improper corporate

conduct:

> Q.  Why did you tell Mr. Arturi that Mr. Paren was a pain in
> the ass?
>
> A.  It was with regard to this topic, his not being included in
> the retention bonus plan.  And his, basically, repeated
> unwillingness to accept the answer that these were my
> criteria for who was included in the retention bonus plan.
> He didn't meet those criteria. . . .

(Def.'s Ex. C at 180-81.)  Finally, and perhaps most importantly, Plaintiff's September

18th letter to Graves does not specify *when* Plaintiff allegedly reported unlawful or

improper conduct to Frey such that his "pain in the ass" comment might somehow be

deemed retaliatory.  In short, the court does not deem this particular assertion sufficient

to raise a genuine issue of material fact as to retaliation by Frey.

Plaintiff next asserts that he continuously "complained that Craigie and Frey

were insulating him in order to keep their activities secret."  (Plaintiff's Facts ¶ 53.)  As

no record support is given for this assertion, the court does not credit it either.  More to

the point, the assertion raises no issue of material fact.

Finally, Plaintiff asserts that "Craigie admits that [Plaintiff] raised concerns over

loss of car stock and Stephanie Lawrence's double expense submissions."  (Plaintiff's

Facts ¶ 78.)  However, as is evident from Craigie's affidavit, upon which paragraph 78

of Plaintiff's Facts is based, Craigie's "admissions" simply do not support Plaintiff's

allegations of retaliation:

3.  I recall that . . . Mr. Paren was concerned about the apparent loss of car stock inventory relating to two field sales people based out of the West Coast.  I recall that Mr. Paren involved our security director in order to investigate that issue, but I do not recall the result of that investigation. From the time that Mr. Paren raised this concern through my separation from Spalding on September 15, 2003, I believed that Mr. Paren properly raised this concern within the scope of his job duties as Director of Risk Management.

4.  I recall that . . . Mr. Paren expressed a concern that Stephanie Lawrence had submitted double expense reports. As a result of Mr. Paren's investigation, I made Ms. Lawrence repay all monies, and a few months later, I severed from the Company.  From the time that Mr. Paren raised this concern through my separation from Spalding on September 15, 2003, I believed that Mr. Paren properly raised this concern within the scope of his job duties as Director of Risk Management.

(Defendants' Brief, Ex. B ¶¶ 3, 4.)

In summary, having reviewed in detail Plaintiff's assertions of "fact" regarding this first aspect of his intentional interference claims, the court is clear that Plaintiff has raised no genuine issue with respect to either defendant.  As Plaintiff is well aware, the Supreme Judicial Court of Massachusetts has held that the "improper motive or means" required for intentional interference claims is "actual malice."  *Shea v. Emmanuel Coll.*, 682 N.E.2d 1348, 1351 (Mass. 1997).  Actual malice, in turn, is defined as "any spiteful, malignant purpose, unrelated to the legitimate corporate interest."  *Id.* (citation and internal quotation marks omitted).  No such purpose can be proven with regard to Plaintiff's exclusion from the bonus programs.  Accordingly, Defendants' motion with respect to this portion of Counts III through VI will be allowed.

2.  <u>Interfering with Plaintiff's Employment</u>

23

Plaintiff's second theory of intentional interference -- which focuses on his termination from New Top-Flite in December of 2003 -- can be dealt with in relatively short order.  In essence, Defendants argue that it was impossible for them to interfere with Plaintiff's employment with New Top Flite since neither of them were working there after Callaway's acquisition on September 15, 2003, and neither of them had any input in the decision to terminate Plaintiff's position.  As a result, Defendants continue, there is no evidence that they could have been motivated by an improper purpose, *i.e.*, "actual malice."  The court agrees.

As Defendants point out, Varga, the director of financial planning and analysis, has provided an unrebutted affidavit averring that Defendants had no influence upon his assessment of the redundancies within New Top-Flite, which he communicated to Holiday, Callaway's CFO.  In addition, Holiday has provided his own unrebutted affidavit averring that he alone made the decision to terminate Plaintiff's employment in December of 2003 -- without any influence by Defendants -- based upon his conclusion that the risk management function at New Top-Flite could be consolidated with that at Callaway.

To be sure, Plaintiff muses that Varga must be the "nexus" between Defendants' alleged displeasure with him and Holiday's decision to terminate his job.  (See Plaintiff's Brief at 24, 26.)  But Plaintiff has no support for that "assumption" other than a few speculative sentences from his own affidavit.  (See Pl.'s Ex. A ¶¶ 65 ("Based on information and belief, Brad Holiday met with Victor Varga after I was excluded from both the 2002 and 2003 [bonuses]."), 93 (Varga was present when Frey "referred to me

as 'Mr. Sunshine.'"), 67 ("Victor Varga provided the overview of the organization to Callaway, suggesting there was a redundancy of functions, which included risk management and tax."), 71 ("Mr. Varga must have known that I was complaining about a legal tax issue, for which he was now responsible.").)  That is simply insufficient for present purposes.

As Plaintiff is no doubt aware, the "liberality" of the summary judgment standard "does not relieve [him] of the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe."  *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st 2003).  *See also Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994) ("When . . . defendants invoke Rule 56 and identify a fatal flaw in a plaintiff's case, it becomes the plaintiff's burden to produce specific facts, in suitable evidentiary form, to contradict the flaw's existence and thereby establish the presence of a trialworthy issue."); *Medina-Munoz*, 896 F.2d at 8 ("The test for summary judgment is steeped in reality.").  Plaintiff has not done so here.  Accordingly, Defendants' motion with respect to this remaining portion of Plaintiff's intentional interference claims and, hence, all of Counts III through VI, will be allowed.

B. DEFAMATION

According to Massachusetts law, "'defamation' is 'the intentional or reckless publication, without privilege to do so, of a false statement of fact which causes damages to the plaintiff's reputation.'" *Fuentes v. Hampden County Sheriff's Dep't*, --- F. Supp. 2d ---, 2006 WL 931536, at *7 (D. Mass. Mar. 31, 2006) (quoting *Elicier v. Toys "R" Us, Inc.*, 130 F. Supp. 2d 307, 310 (D. Mass. 2001)).  As such, an assertion

25

that cannot be proven false -- *e.g.*, a derogatory statement of opinion rather than a statement of fact -- cannot constitute defamation. *See Galdauckas v. Interstate Hotels Corp.*, 901 F. Supp. 454, 471 (D. Mass. 1995) (citing cases). Moreover, "[a]n employer has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job." *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 79 (Mass. 1987) (citation and internal quotation marks omitted)).

Plaintiff claims that statements made by both Craigie and Frey constitute non-privileged defamation. For the reasons which follow, the court disagrees and, therefore, will allow Defendants' motion for summary judgment with respect to Counts I and II. First, however, the court addresses, and rejects, Plaintiff's argument that his exclusion from the Retention Bonus Program in 2002 and the supplemental bonuses in 2003 was defamatory in and of itself because it implied he was not a "key employee."

1. Exclusion from Bonus Programs

As described, Plaintiff argues that the mere fact that Defendants excluded him from the bonus programs was the equivalent of an announcement to Callaway that he was not a "key" employee and, hence, was defamatory. Plaintiff, however, cites no authority for such inferential defamation. Indeed, the law is clear that defamation requires, among other elements, the existence of a false "statement" about "the plaintiff." *See, e.g.*, *Phelan v. May Dep't Stores Co.*, 819 N.E.2d 550, 553 (Mass. 2004) (the plaintiff must "establish that the defendants published a false statement about him"); *White v. Blue Cross & Blue Shield of Mass.*, 809 N.E.2d 1034, 1036 (Mass.

2004) ("a plaintiff must establish that the defendant was at fault for the publication of a false statement regarding the plaintiff"); *Elicier*, 130 F. Supp. 2d at 310 (defamation involves the publication "of a false statement of fact which causes damages to the plaintiff's reputation"). *See also Corpus Juris Secundum, Libel and Slander; Injurious Falsehood* § 2253 (2005) ("An essential element for a claim of defamation is the existence of a false and defamatory statement concerning the plaintiff."). Here, Plaintiff has proffered no such evidence.

To their credit, Defendants postulate that Plaintiff might be challenging a sealed exhibit to Spalding's bankruptcy filing which identified eligible bonus program participants. That filing, of course, never mentions Plaintiff by name, let alone casts him in a bad light, except perhaps via the tortured logic Plaintiff invokes, *i.e.*, that the listed participants were "key" employees, that because Plaintiff was not listed Spalding did not consider him "key" to their success, that the decision to omit Plaintiff from that list was intentionally or recklessly made by Defendants, that said omission was defamatory and that, because Plaintiff was not listed, Callaway decided to terminate his job. That logic falls of its own weight. Perhaps even more compelling is the fact that the documents filed with the bankruptcy court are protected by the absolute privilege from defamation afforded to statements made in judicial filings. *See, e.g.*, *Sullivan v. Birmingham*, 416 N.E.2d 528, 530 (Mass. App. Ct. 1981) (citing cases and *Restatement (Second) of Torts* §§ 586, 587 (1977) and discussing the "long recognized policy considerations" of the judicial immunity doctrine).

As described, there are multiple reasons why Plaintiff cannot base his

27

defamation claims on the mere fact that he was excluded from the Retention Bonus Program in 2002 and the supplemental bonuses in 2003. Accordingly, the court turns to the particular claims of defamation Plaintiff levies against both Craigie and Frey.

2. Craigie

Plaintiff claims Craigie defamed him twice.[7] First, Plaintiff cites Craigie's September 18, 2003 e-mail to him (which presumably was forwarded to Callaway via Plaintiff's personnel file), in which Craigie asked Plaintiff to "bury your bitterness about not being part of the retention bonus plan" and to focus his energy "on issues that can motivate fellow employees rather than continuing to spew venom on the integrity of fellow employees." Second, Plaintiff cites an instance when he approached Craigie with information that an employee had cheated on her expense reports, at which time Craigie allegedly stated, in front of his administrative assistant, "Oh, he has one of those Dennis Paren faces on." The assistant then purportedly shared the comment with Callaway, the result of which, Plaintiff claims, was that he was "tarnished" in the eyes of the company's new owner.[8]

Both of Craigie's statements can be disposed of quickly. Even assuming the statements somehow damaged Plaintiff's reputation with Callaway, they were nothing

---

[7] Actually, Plaintiff asserts that his complaint "alleges at least four instances" of defamation, but he only discusses two instances in his memorandum of law. The court does likewise.

[8] This second instance of alleged defamation -- which Plaintiff apparently related at his deposition -- is not a part of the factual background, *supra*, since Plaintiff never mentions it in his statement of facts. However, since the parties both address the matter in their respective legal arguments, the court will do so as well.

more than stray remarks of opinion.  As such, they are not actionable.  *See, e.g.*,

*Galdauckas*, 901 F. Supp. at 471 (determining at summary judgment that negative

statements in plaintiff's personnel file and "abusive taunts," including comment that she

belonged to the "Geritol Generation," constituted expressions of opinion and not

defamation); *Fleming v. Benzaquin*, 454 N.E.2d 95, 103 (Mass. 1983) (holding that

calling a police officer "lunkhead," "meathead," "absolute barbarian" and the like were

statements of "harsh judgment" or "mere vituperation and abuse," not defamation);

*Carozza v. Blue Cross & Blue Shield of Mass.*, Inc., 14 Mass. L. Rep. 88, 2001 WL

1517584, at **13-14 (Mass. Super. Ct. Nov. 16, 2001) (deeming interoffice

memorandum authored by human resources representative expressing her opinion that

the plaintiff was "dangerous" was not defamatory).

     Craigie's statements (at least one of which was placed in Plaintiff's personnel

file) are also protected by the conditional privilege enjoyed by employers in certain

contexts.  As Defendants point out, courts applying Massachusetts law have routinely

rejected claims of defamation based upon internal business communications and

statements made in the workplace, including statements contained in an employee's

personnel file.  *See, e.g.*, *Thomas v. Sears, Roebuck & Co.*, 144 F.3d 31, 34 (1st Cir.

1998) (holding that internal company feedback and deficiency memoranda, along with a

comment that the plaintiff was disloyal and a troublemaker were privileged); *Elicier*, 130

F. Supp. 2d at 311 (manager's defamatory statement about the plaintiff at company

meeting was protected by conditional privilege); *Galdauckas*, 901 F. Supp. at 471

(alleged defamatory statement in the plaintiff's personnel file was protected by the

conditional privilege); *McCone v. New Eng. Tel. & Tel. Co.*, 471 N.E.2d 47, 50-51 (Mass. 1984) (negative employee evaluations were privileged).  True, one of Craigie's statements, the September 18th e-mail, was made several days after he himself had left the company.  But even that statement was clearly made in Craigie's role as the outgoing CEO and, thus, was most certainly in furtherance of the company's on-going business interests.  For all these reasons, therefore, Defendants' motion for summary judgment with respect to Count I will be allowed.

 3. <u>Frey</u>

 As for Frey, Plaintiff alleges that four of his statements are defamatory.  First, in his July 15, 2002 e-mail to Craigie, Arturi and Rist, Frey stated that he had discussed with Plaintiff why he was not chosen for the Retention Bonus Program and then said: "Our discussion was civil, but knowing Dennis we still probably haven't heard the last from him on this topic."  The e-mail was placed in Plaintiff's personnel file and, perhaps, viewed by Callaway management.  Second, as discussed previously, Frey told Arturi that Plaintiff was "a pain in the ass."  Third, Plaintiff speculates that Frey was "poisoning" the company against him through the conversation Frey had about Plaintiff with Lipschultz, the Spalding board member.  Fourth, Frey allegedly scowled and called Plaintiff "Mr. Sunshine" when speaking of him to other employees.[9]

 As with Craigie, it is clear that all four of Frey's statements, even assuming they resulted in damage to Plaintiff's reputation, are non-actionable opinions.  It is also clear

---

 [9]  This fourth statement is also not mentioned in Plaintiff's statement of facts. Again, however, because the parties both address the statement in their respective legal arguments, the court will consider it as well.

that Frey's statements were made in his role as CFO and in furtherance of the company's on-going business interests. As such, they too are privileged communications. The statement to Lipschultz suffers from an additional infirmity, *i.e.*, there is no evidence of what was actually said. *Cf. Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 n.6 (1st Cir. 1992) ("[A] defendant is entitled to knowledge of the precise language challenged as defamatory."). For these multiple reasons, therefore, Defendants' motion for summary judgment with respect to Count II will be allowed.

## IV. CONCLUSION

Plaintiff was understandably hurt when he was passed over for bonuses and subsequently fired by his new employer. He has not, however, raised any genuine issue of material fact against Defendants that might somehow enable his intentional interference and defamation claims to survive. Accordingly, Defendants' motion for summary judgment is ALLOWED and the case may now be closed.

IT IS SO ORDERED.

DATED: June 15, 2006

                                      /s/ Kenneth P. Neiman
                                     KENNETH P. NEIMAN
                                     Chief Magistrate Judge